# EXHIBIT 9

1

2          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
3                 ATLANTA DIVISION

4   JILL ALTMAN, individually )
    and on behalf of a class, )
5                             )
        Plaintiff,            )
6                             )CIVIL ACTION FILE NO.
    vs.                       )1:15-cv-024510-SCJ-CMS
7                             )
    WHITE HOUSE BLACK MARKET, )
8   INC., and DOES 1 - 10,    )
                              )
9        Defendants.          )

10

11

12              DEPOSITION OF JILL ALTMAN

13                  Atlanta, Georgia

14              Tuesday, April 18, 2017

15

16

17

18

19

20

21

22

23

24   Reported by: Robin K. Ferrill, CCR-B-1936, RPR

25   Job No: 121777

```
 1
 2
 3
 4         April 18, 2017
 5         9:00 a.m.
 6
 7
 8
 9         Deposition of Jill Altman, held at the
10  office of King & Spalding, 1180 Peachtree Street,
11  NE, Atlanta, Georgia, before Robin K. Ferrill,  a
12  Registered Professional Reporter and Notary
13  Public of the State of Georgia.
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2         APPEARANCES:
 3
 4         Spencer Fane
 5         Attorneys for Plaintiff
 6             1000 Walnut Street
 7             Kansas City, MO 64106
 8         BY:  BRYANT LAMER, Esquire
 9
10
11         Skaar & Feagle
12         Attorneys for Plaintiff
13             2374 Main Street
14             Tucker, GA 30084
15         BY:  CLIFF DORSEN, Esquire
16
17
18         King & Spalding
19         Attorneys for Defendant
20             1180 Peachtree Street Northeast
21             Atlanta, GA 30309
22         BY:  BARRY GOHEEN, Esquire
23
24  ALSO PRESENT:
25             L. Susan Faw, Chico's Fas, Inc.
```

```
 1
 2         IT IS HEREBY STIPULATED AND AGREED
 3  by and between the attorneys for the respective
 4  parties herein, that filing and sealing be and
 5  the same are hereby waived.
 6         IT IS FURTHER STIPULATED AND AGREED
 7  that all objections, except as to the form of the
 8  question, shall be reserved to the time of the
 9  trial.
10         IT IS FURTHER STIPULATED AND AGREED
11  that the within deposition may be sworn to and
12  signed before any officer authorized to
13  administer and oath, with the same force and
14  effect as if signed and sworn to before the
15  Court.
16
17
18
19
20             - oOo -
21
22
23
24
25
```

```
 1             ALTMAN
 2         (Exhibit 1, Amended Notice of
 3         Deposition, marked for identification.)
 4  J I L L   A L T M A N,
 5         called as a witness, having been duly sworn
 6         by a Notary Public, was examined and
 7         testified as follows:
 8  EXAMINATION
 9  BY MR. GOHEEN:
10     Q.  Good morning, Miss Altman.  My name is
11  Barry Goheen.  We, of course, just met earlier
12  today.
13         And I want to go ahead and mark for
14  record purposes our Amended Notice of Deposition.
15  And we will mark that just as Exhibit 1 and
16  provide that to you.
17         And I will just state for the record
18  that this is the deposition of Jill Altman taken
19  in the case of Altman versus White House Black
20  Market, Civil Action Number 13-CV-02451, pending
21  in the United States District Court for the
22  Northern District of Georgia.
23         What is your full name?
24     A.  Jill Ivy Oster Altman.
25     Q.  Have you ever been deposed before
```

```
 1              ALTMAN
 2   today?
 3       A.  No.
 4       Q.  My guess is you have been kind of
 5   given the ground rules, but I will go ahead and
 6   state them just so we are clear.
 7           And you understand your testimony is
 8   under oath, right?
 9       A.  Uh-huh.
10       Q.  Yes?
11       A.  Yes.
12       Q.  Please.  That was probably another
13   thing you may have been told.  If you could say
14   yes or no or whatever else you need to say, but
15   no nonverbal answers would be appreciated so we
16   have an accurate transcript.
17           Is that okay?
18       A.  Yes.
19       Q.  Thank you.
20           If you don't understand a question,
21   please ask me to rephrase it or to restate it or
22   ask me to clarify anything that you feel is
23   confusing or unclear about my question and I will
24   be happy to do that.  Okay?
25           And we will try not to talk over each
```

```
 1              ALTMAN
 2   other as well.  I will tell you on the front end
 3   that that's something I will probably be guilty
 4   of, so I will try to -- try to hold down on that,
 5   but if you will make the same effort on your end,
 6   I will appreciate it.
 7           Did you meet with your counsel to
 8   prepare for your deposition?
 9       A.  Yes.
10       Q.  How many times?  Other than this
11   morning.
12       A.  Several.
13       Q.  Okay.  Did those take place over the
14   telephone?
15       A.  Yes.
16       Q.  So you did not have -- again excluding
17   whatever meeting you had this morning prior to
18   this deposition, did you have any in-person
19   preparation meetings?
20       A.  No.
21       Q.  Did you discuss your deposition with
22   Mr. Wexler after he withdrew as your counsel in
23   this case?
24       A.  Only the date that it was here in
25   Atlanta.  But otherwise, no.
```

```
 1              ALTMAN
 2       Q.  Are you on any medication or taking
 3   any medicine that would affect your ability to
 4   give truthful answers to my questions today?
 5       A.  No.
 6       Q.  Where were you born?
 7       A.  Birmingham, Alabama.
 8       Q.  Is that where you grew up?
 9       A.  Yes.
10       Q.  And you graduated high school in
11   Birmingham?
12       A.  Yes.
13       Q.  What high school?
14       A.  Mountain Brook.
15       Q.  Good part of town.
16       A.  Yes.
17       Q.  Where did you go to college?
18       A.  University of Texas at Austin.
19       Q.  What took you to Austin from
20   Birmingham?
21       A.  I was looking at colleges all over the
22   country and went to visit.  I loved Austin.  I
23   loved the campus.  I knew a couple people there.
24   And that's what brought me to Austin.
25       Q.  So the critical question:  Are you a
```

```
 1              ALTMAN
 2   Bama or UT?
 3       A.  Both.
 4       Q.  Wow.
 5       A.  When they played each other, I rooted
 6   for Texas.
 7       Q.  Now when was that?
 8       A.  Ten years ago.
 9       Q.  Where was that game played?  Was that
10   in --
11       A.  Out in California.
12       Q.  Oh, it was a bowl game, wasn't it?
13           MR. LAMER:  It was the Rose Bowl.
14       A.  It was the Rose Bowl.
15       Q   (By Mr. Goheen) Is that right?
16       A.  Yes.  Yes.  It was eight years ago.
17   It just showed up in my Facebook feed, so sorry.
18   I want to be truthful.
19       Q.  Saban was coaching then or was that
20   before he?
21       A.  I don't remember.
22       Q.  It was Mac Brown?
23       A.  It was Mack Brown.
24       Q.  All right.  So what year did you
25   graduate?  If you said that, I apologize.
```

1           ALTMAN
2      A.  College or high school?
3      Q.  College.
4      A.  1999.
5      Q.  What was your degree in?
6      A.  Advertising.
7      Q.  Have you obtained any other degrees
8  since college?
9      A.  No.
10     Q.  Where are you currently employed?
11     A.  Abbott.
12     Q.  And Abbott Laboratories?
13     A.  That is their official name.  We were
14  recently acquired by them.  I had been working
15  for St. Jude Medical for 10 years.  So in my
16  brand training, they told me that they go by
17  Abbott.
18     Q.  So --
19     A.  Sorry.
20     Q.  It's okay.  Clearly you have been
21  trained well.
22          So the acquisition occurred within the
23  last few months or --
24     A.  January 4th of this year.
25     Q.  At the time of the acquisition,

1           ALTMAN
2  meaning when you were still employed or
3  considered an employee of St. Jude Medical, what
4  was your job title?
5      A.  Senior Director of Global Marketing
6  Communications and Public Relations.
7      Q.  And by the way, this is not to be
8  confused with St. Jude Children's Hospital,
9  right, of Memphis?
10     A.  Correct.
11     Q.  There's no real relationship between
12  the two?
13     A.  Correct.
14     Q.  How long have you worked at St. Jude
15  Medical, now Abbott?
16     A.  More than 10 years.
17     Q.  So it's been more than 10 years.  Now,
18  with post-January 4th, 2017, have your job
19  responsibilities or title changed?
20     A.  Yes.  About two weeks ago we went
21  through a restructuring, so my responsibilities
22  have changed as well as my title.  I'm now Global
23  Director of Marketing Services.  And I say that
24  slightly with a question mark because it's still
25  not quite final from a title standpoint.

1           ALTMAN
2          My responsibilities now include our
3  global digital team, e-learning team, global
4  congresses and events, global marketing
5  communication, and our global customer and
6  employee training logistics.
7      Q.  Sounds like a lot of responsibilities.
8      A.  Oh, yes.
9      Q.  How were they different than
10  pre-Abbott?
11     A.  The responsibilities themselves are
12  not substantively different.  However, since
13  we're integrating with Abbott, part of my job is
14  to help the integration process.  And so I don't
15  quite know what the responsibilities or the
16  department will look like nine months from now
17  because we're just starting the true integration
18  process.
19     Q.  So prior to two weeks ago when your
20  job title and responsibilities seemed to change
21  or expand, as you described, were your
22  responsibilities up until two weeks ago the same
23  as they had been under your St. Jude Medical
24  title of Senior Director of Global Marketing
25  Communications?

1           ALTMAN
2      A.  I had those responsibilities for eight
3  months prior to that.  I mean, my role has
4  changed at St. Jude Medical over 10 years.  I
5  have probably had 10 different roles.
6      Q.  Could you briefly describe those.  You
7  don't have to go into book, chapter and verse,
8  but could you maybe outline for the 10 years when
9  you were at St. Jude Medical before Abbott just
10  your various job responsibilities and roles.
11     A.  Sure.  So I started in e-marketing.
12  Then I took a role to lead our United States
13  marketing communications.  Then I took a role to
14  lead our global brand management.  Then I took a
15  role to lead our global marketing communications.
16          Then they added on responsibilities to
17  manage the global digital team.  Then they added
18  responsibilities to lead our global convention
19  and congress team.  Then they changed my role to
20  lead our corporate communications, so they added
21  the creative services management, took away the
22  marketing communications.
23          Then they gave me back marketing
24  communications, took away digital and creative
25  and gave me PR and then that led us to April.

ALTMAN

Q. Okay. In May of 2015, which as you
know is the time frame that led to the events of
this lawsuit, right?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. What was your title and job
responsibilities?

A. To the best of my recollection, it was
Senior Director Global Marketing Communications.

Q. Prior to joining St. Jude Medical,
where did you work?

A. I worked at an ad agency in Austin for
seven years. I worked at an ad agency in Atlanta
prior to that for two years.

Q. So let's break those out. What was
the ad agency in Austin?

A. When I joined the company, it was
called BRSG. And then they changed their name to
HC&B. Now they go by HCB Health.

Q. And that was an ad agency, you say?

A. Yes.

Q. What was the HCB Health? I take it,
it focused on advertising in the healthcare

ALTMAN

industry?

A. Ultimately, yes.

Q. But not exclusively or at least at
some point in time?

A. When I joined, they were a general ad
agency. That's BRSG. When the partners changed
and they started to win different accounts, they
found that they were winning more accounts that
focused on healthcare.

At which point they focused their new
business efforts on healthcare and really grew
that business and let other accounts lapse, or
contracts lapse with non-healthcare accounts.

Q. So what did you do at HCG when you
were there?

A. Account management.

Q. And what did that entail, at least at
that company?

A. That was the primary liaison between
the client and -- or the marketing department at
the client and the rest of the agency. I was
responsible for campaign planning, strategy,
overseeing creative development, managing
budgets, managing teams.

ALTMAN

Q. How many accounts did you manage at
any given time at HCG?

A. Probably somewhere between three and
five.

Q. Were there other -- well, to the best
of your recollection how many other account
managers were there at this time frame at HCG?

A. Half a dozen or so.

Q. What was the ad agency in Atlanta?

A. Cole Henderson Drake.

Q. Are they still around?

A. I don't think so.

Q. They had been around a while, hadn't
they, when you joined?

A. When I joined, I think they had been
around about 30 years.

Q. Where was the office?

A. It was down off of Marietta.

Q. Close to downtown?

A. Uh-huh.

Q. And is that a job you took straight
out of college?

A. Yes.

Q. How did that opportunity come about?

ALTMAN

A. I knew I wanted to move to Atlanta. I
got the Book of Lists from the Chamber of
Commerce. I sent letters to the top 25 ad
agencies. I came here to interview. And I
interviewed with, I don't recall, maybe four or
six of them and they were the ones that hired me.

Q. When you say the top 25 ad agencies,
you mean in the country?

A. No, in Atlanta.

Q. There are 25 ad agencies in Atlanta?

A. Yes, absolutely.

Q. Wow, in 1999?

A. Absolutely. You can have two people
and call yourself an ad agency.

Q. I guess you could do the same thing
with a law firm, can't you? Good point.

How large was the company when you
joined them?

A. I don't know from a revenue
standpoint, but there were probably around 25 or
30 people there.

Q. When you joined, what was your entry
position?

A. Account coordinator.

ALTMAN

Q. How did that differ from the account
manager role that you had at HCG later?

A. It was an entry level position at Cole
Henderson Drake with a much more limited scope of
responsibilities and much more oversight from my
manager.

By the time I went to HCG and was a
manager and then ultimately an account supervisor
and account director, I was running the
department and had the responsibility for the
relationship with the client.

Q. And that's HCG you are talking about,
right?

A. Correct.

Q. You never had that responsibility at
Cole?

A. Not as the sole or primary account
contact.

Q. Okay. And you were with Cole
Henderson Drake for two years?

A. Yes.

Q. Where did you live in Atlanta during
that time?

A. I lived off of North Druid Hills and

ALTMAN

Briarcliff.

Q. In an apartment?

A. Yes, in a Post apartment building.

Q. Post what?

A. Post Oak, I think.

Q. You said you wanted to come to
Atlanta. Why?

A. Because it was close to Birmingham
where I grew up. I had friends from high school
that were moving back here that had gone to
college all over the country, so it was an
opportunity to reconnect with them and their
friends that they had met in college that were
also moving back here.

It was a warm city. I didn't want to
live in Chicago or New York and there was
opportunity from a career standpoint.

Q. It was a great time to be in Atlanta,
wasn't it?

A. Uh-huh.

Q. I moved in the fall of '96 myself from
another town. So, yes, that was a -- I
understand what you are saying.

Were there any other -- well, let me

ALTMAN

ask you this. Back to your apartment, did you
room with anybody when you came here?

A. I did.

Q. Who was that?

A. Her name is Jill Lichter Bomchel,
B-o-m-c-h-e-l.

Q. And I take it you knew her prior to
rooming with her?

A. She and I grew up together in
Birmingham.

Q. Were there any other entry level
positions or entry level people that came into
Cole Henderson Drake at the same time you did?

A. I don't recall.

Q. What led you to the HCG opportunity
then?

A. In 2001, you may recall we went
through a recession. And then after September
11th, a lot of advertisers cut their budget. At
that time, Cole Henderson Drake went through a
couple different rounds of layoffs. I was laid
off.

I was looking for opportunities here
in Atlanta and was not finding any. So I

ALTMAN

expanded my search, went and looked in Austin at
that point and did the same thing I did when I
moved to Atlanta. I got the Book of Lists. I
sent letters to agencies with my resume. I went
out there to interview, had several interviews
and they hired me.

Q. Now, you have had no legal training;
is that right?

A. That's correct.

Q. Now, have any of the job duties you
have ever had whether it's with St. Jude
Medical/Abbott or the other companies required
you to protect any third person's personal
information?

A. I'm not sure that I understand that
question.

Q. Have you had any privacy
responsibilities at any of your jobs that you've
had?

A. At St. Jude Medical because we manage
patient information, we all comply with the HIPAA
regulations. So from that standpoint, I, as all
employees, have to be trained and certified on
those regulations.

ALTMAN

1
2 Q. And was that something you were
3 trained on when you first came to St. Jude
4 Medical?
5 A. I don't remember when they implemented
6 the training.
7 Q. But as you -- if I understood you a
8 moment ago, you said that's kind of standard for
9 all employees at St. Jude Medical, now Abbott?
10 A. Yes.
11 Q. Beyond the HIPAA training, were there
12 any other areas in terms of protecting personal
13 information, whether employees or patients or
14 anything else that you were responsible for?
15 MR. LAMER: Objection. Form,
16 compound.
17 Q (By Mr. Goheen) You can answer.
18 MR. LAMER: If you know the answer, go
19 ahead.
20 A. Yes, I manage a team, so I'm
21 responsible for managing their employee
22 information.
23 Q (By Mr. Goheen) And that's it?
24 A. As part of the public relations team,
25 there are times where I manage corporate

ALTMAN

1 information, but that's not personal information.
2
3 Q. Understood. So you are talking about
4 potentially sensitive business information of
5 clients or customers?
6 A. No. Corporate information, sensitive
7 information about the company.
8 Q. Your company?
9 A. My company.
10 Q. I'm sorry, my mistake. Okay. So I
11 see. So about Abbott?
12 A. Correct.
13 Q. Okay. What sort of procedures, if
14 any, do you follow in managing that or protecting
15 that information, the company information?
16 A. Mostly we work with our attorneys to
17 ensure that when we are discussing communication
18 strategy and my responsibility that they are
19 present if it is a sensitive conversation; so,
20 therefore, it could be a privileged conversation.
21 Q. During the time you had been with St.
22 Jude Medical now Abbott, do you have any
23 knowledge as to whether the company has had a
24 compromise or a breach of any of its personal
25 information?

ALTMAN

1
2 A. I have no knowledge.
3 Q. Okay. So you currently reside in
4 Austin, Texas, right?
5 A. Correct.
6 Q. What's your current address?
7 A. ███████████████.
8 Q. Is that a house?
9 A. Yes.
10 Q. How long have you resided there?
11 A. Over two years.
12 Q. Do you reside there alone?
13 A. Nope.
14 Q. Who resides there with you?
15 A. My boyfriend.
16 Q. And who is that?
17 A. Roger Graham.
18 Q. Has he lived with you the entire two
19 years or more that you have been at the ████
20 ████ address?
21 A. Yes.
22 Q. Who owns the house?
23 A. Roger.
24 Q. How long has he owned the house?
25 A. Since we moved in.

ALTMAN

1
2 Q. So you are not a co-owner or anything
3 of the property?
4 A. I'm not.
5 Q. Where did you live before that?
6 A. In a condo. The address is 2412-B
7 Wilson Street.
8 Q. And that's in Austin?
9 A. Correct.
10 Q. Did you live there with anyone?
11 A. No.
12 Q. Was that a condo you bought or rented?
13 A. First I rented it and then I bought it
14 from my landlord.
15 Q. And have you sold it?
16 A. I have not.
17 Q. Is it on the market?
18 A. Nope.
19 Q. Do you rent it out to anyone?
20 A. I do.
21 Q. Have you done that ever since 2015
22 when you moved to the current ████████ place?
23 A. Yes.
24 Q. So since you graduated from college,
25 other than two years in Atlanta, you have lived

ALTMAN

1  in Austin?
2
3      A.  Correct.
4      Q.  You lived nowhere other than the Post
5  Oak address when you were in Atlanta?
6      A.  Correct.
7      Q.  Presumably that was under a lease?
8      A.  Correct.
9      Q.  Otherwise you never lived anywhere
10  else in the state of Georgia?
11      A.  Correct.
12      Q.  Do you have any relatives that live in
13  Georgia?
14      A.  I do.
15      Q.  Who?
16      A.  My sister lives here.  I have an aunt.
17  I have several cousins that live here.  I think
18  that's it.
19      Q.  How many cousins?
20      A.  How far down do you want to go?
21      Q.  Cousins in the sense of the term of,
22  you know, the child of one of your parents'
23  siblings?
24      A.  In that sense, none.
25      Q.  Okay.

ALTMAN

1
2      A.  In the grander sense of people that I
3  am related to that I care about that have been to
4  weddings and bat mitzvahs and Facebook friends,
5  several.
6      Q.  How often do you visit Atlanta?
7      A.  A couple of times a year.
8      Q.  For those occasions you just
9  mentioned, bat mitzvahs, bar mitzvahs, family
10  types of gatherings?
11      A.  And to spend time without an occasion
12  with my family and friends.
13      Q.  Do your parents still live in
14  Birmingham?
15      A.  My mother does.
16      Q.  Is your father deceased?
17      A.  No.  He's alive and well.  He lives in
18  Port St. Lucie, Florida.
19      Q.  Other than your sister, do you have
20  any other siblings?
21      A.  I have a half sister through my father
22  who lives in Florida.  I have two stepbrothers
23  who both live in Birmingham.
24      Q.  So one, for lack of a better term,
25  true full sibling and that's your sister?

ALTMAN

1
2      A.  Correct.
3      Q.  Who lives in Atlanta?
4      A.  Correct.
5      Q.  And she's younger?
6      A.  She is.
7      Q.  Does she visit you in Austin?
8      A.  She does.
9      Q.  How often?
10      A.  Every couple of years.
11      Q.  All right.  Let's talk a little bit
12  about your claim in this case against White House
13  Black Market.  So you understand, I take it, that
14  you have alleged that White House Black Market
15  violated a federal statute abbreviated as FACTA.
16      Correct?
17      A.  Yes.
18      Q.  Do you know what that abbreviation
19  stands for, FACTA?
20      A.  Not exactly.  It's fair trade, but I
21  don't recall everything.  And commercial is in
22  there somewhere.
23      Q.  And you understand that FACTA is an
24  amendment to a larger or subsuming a larger
25  federal statute known as the FCRA?

ALTMAN

1
2      MR. LAMER:  Objection, form.
3  Objection, calls for a legal conclusion.
4      Q  (By Mr. Goheen) Not really, but you
5  can answer.
6      A.  No.
7      MR. LAMER:  Hold on a second.  She
8  knows she can answer unless I instruct her
9  not to answer.  Just so you know.
10      MR. GOHEEN:  Okay.  Thank you.
11      Q  (By Mr. Goheen) Prior to filing this
12  lawsuit, had you ever heard of the statute called
13  FACTA?
14      A.  I'm not sure that I knew what the name
15  was, but I knew what the regulation was.
16      Q.  How did you become aware of the
17  regulation?
18      A.  My brother-in-law, Shimshon Wexler, is
19  an attorney.  I knew that he practiced consumer
20  protection law.  And I knew that this was one of
21  the types of laws that he protected consumers
22  against violations from.
23      Q.  How did you know that?
24      A.  Because we talked about it.
25      Q.  Do you know how long he has practiced

ALTMAN

1
2   law in that particular area?
3       A.  Not exactly.
4       Q.  Do you know how old he is?
5       A.  He is 36.
6       Q.  Now, it's my understanding he's from
7   New York or the New York/New Jersey area.  Is
8   that right?
9       A.  That's correct.
10      Q.  And moved to Atlanta a few years ago?
11      A.  Correct.
12      Q.  Going back to your knowledge of the --
13  well, let me try once more.
14          Other than any conversations or
15  communications you had with Mr. Wexler, did you
16  have any other source of knowledge of the statute
17  known as FACTA?  Prior to this lawsuit.
18      A.  I knew what receipts looked like with
19  all the X's and the last four digits, and so I
20  knew that that was based on a federal regulation.
21      Q.  And you knew that other than through
22  Mr. Wexler?
23      A.  Yes.
24      Q.  What was the source of that knowledge
25  apart from Mr. Wexler?

ALTMAN

1
2       A.  That started happening on receipts
3   well before he and my sister got married.
4       Q.  I understand.  I'm just trying to
5   understand how you became aware of it.
6       A.  Yes.
7       Q.  Can you tell me how?
8       A.  I don't recall if I saw it on the news
9   or read it in the paper, I mean.
10      Q.  So it's public domain then, that sort
11  of thing?
12      A.  Thank you, yes.
13      Q.  All right, that's fair.
14          Prior to this lawsuit, had you ever
15  filed a lawsuit alleging violations of FACTA?
16      A.  No.
17      Q.  Let's mark this as Exhibit 2.
18          (Exhibit 2, Introduction and FACTA
19      Background, marked for identification.)
20      Q.  (By Mr. Goheen) Let me hand you
21  Exhibit 2.  You can look through it.
22      A.  Okay.
23      Q.  And I will ask you, as I get more
24  water, do you recognize that to be a copy of the
25  complaint you filed in this case?

ALTMAN

1
2       A.  Yes.
3           MR. LAMER:  Take your time.
4       A.  Oh, hang on.  Yes, this is it.
5       Q   (By Mr. Goheen) And you understand as
6   the top of the document of the first page
7   reflects, it was filed on or about July 8 of
8   2015?
9       A.  Yes.
10      Q.  Did you review any drafts of the
11  complaint before it was filed on your behalf?
12      A.  Yes.
13      Q.  How many times?
14      A.  I don't recall.  Once or twice.
15      Q.  Likely not more than twice?
16          MR. LAMER:  Objection, calls for
17      speculation.
18      Q   (By Mr. Goheen) Is that fair?
19      A.  Sure.
20      Q.  After the complaint was filed, did you
21  read it?
22      A.  I read it before it was filed.  I got
23  a final copy of it.  I don't recall if I reread
24  it after I received the final copy.
25      Q.  When is the last time that you read

ALTMAN

1
2   the complaint?
3       A.  Last night.
4       Q.  Before that?
5       A.  Several weeks ago when we were
6   reviewing documents.
7       Q.  Why did you authorize the filing of
8   this complaint?
9       A.  Because the law was broken.
10      Q.  Why did you authorize the filing of
11  this complaint with a proposed class action?
12      A.  Because I imagine I'm not the only
13  woman who shops at White House Black Market.
14      Q.  Anything else?  Any other reason?
15      A.  No.
16      Q.  As you're aware, the case involves
17  your use of an American Express credit card
18  ending in 1001, correct?
19      A.  Correct.
20      Q.  Was this your personal AmEx card you
21  used for this transaction?
22      A.  Yes.
23      Q.  In the last five years, how many
24  personal credit cards have you had and used?
25      A.  Two.

ALTMAN

1          ALTMAN
2   Q.  So this AmEx card and one other?
3   A.  Correct.
4   Q.  What's the other?
5   A.  A MasterCard.
6   Q.  Did you use one of those two more than
7  the other?
8   A.  Yes.
9   Q.  Which one?
10   A.  The American Express.
11   Q.  Is it fair to say you would consider
12  the AmEx card your primary personal credit card?
13   A.  I use the American Express on a
14  routine basis when I'm out shopping.  I tend to
15  use the MasterCard for recurring bills and
16  household type things.  So I don't -- I mean, I
17  guess from a volume standpoint, yes.  American
18  Express.
19   Q.  But again based on what I'm hearing,
20  you have -- the credit cards are used for
21  different purposes; is that fair?
22   A.  Unless the merchant doesn't take
23  American Express.
24   Q.  How long have you had the AmEx card
25  ending in 1001?

ALTMAN

1          ALTMAN
2   A.  I don't recall exactly.  Maybe five
3  years.
4   Q.  Had you possessed an American Express
5  credit card for personal use prior to obtaining
6  the one ending in 1001?
7   A.  Yes.
8   Q.  When did you first have an American
9  Express credit card?
10   A.  When I was in college, my mother
11  opened a joint account to help establish credit
12  for me.  And I have had an American Express for a
13  period of time then.  I had an American Express
14  card with my ex-husband.  Then that account had
15  closed.  And then I got this one.
16   Q.  The AmEx card with your ex-husband,
17  was that -- were you both on that card?
18   A.  Unfortunately, yes.
19   Q.  So I take it as part of your divorce
20  proceeding that card was -- well, why don't you
21  tell me?
22   A.  Yes.  Yes, as part of my divorce
23  proceeding that card was cut.
24   Q.  And then did you acquire this card,
25  the one ending in 1001, subsequent to your

ALTMAN

1          ALTMAN
2  divorce?
3   A.  Correct.
4   Q.  Was it soon after the divorce became
5  final?
6   A.  Within a couple of years.
7   Q.  Did you have an AmEx card in that
8  two-year period, but prior to this 1001 card?
9   A.  I've had a corporate American Express
10  card since I joined St. Jude Medical in 2007.
11   Q.  But not a personal AmEx card
12  between -- was it 2010 was your divorce?
13   A.  Correct.
14   Q.  And roughly you're maybe estimating
15  five years ago, 2012, for this card?
16   A.  Correct.
17   Q.  So did you use the corporate credit
18  card for personal use during that two-year
19  period?
20   A.  No, I used my MasterCard.
21   Q.  Okay.  Was that the only credit card
22  you had during that two year time frame?
23   A.  I believe so.
24   Q.  Back to your -- the breakdown of the
25  use of the card.  So for the American Express

ALTMAN

1          ALTMAN
2  card, do you use that for purchases from
3  retailers?
4   A.  Yes.
5   Q.  Almost exclusively?
6   A.  Primarily.
7   Q.  Primarily, but not exclusively?
8   A.  Correct.
9   Q.  What about restaurants or on-line
10  shopping?
11   A.  Yes to both of those.
12   Q.  That would be the one you use
13  primarily, the AmEx?
14   A.  Yes.
15   Q.  Do you own or use any debit cards?
16   A.  I have debit cards.  I typically do
17  not use them.
18   Q.  What brand are the debit cards?
19   A.  I'm not sure.
20   Q.  But you say you don't really use them?
21   A.  Correct.
22   Q.  Do you recall the last time you used a
23  debit card?
24   A.  Not exactly.
25   Q.  Do you recall when you acquired the

ALTMAN

1
2 debit cards?
3    A.  I'm sure whenever I opened my checking
4 accounts.
5    Q.  So it just kind of came along with the
6 opening of the account?
7    A.  Correct.
8    Q.  Do you know how many you have?
9    A.  I have at least two because I have two
10 different checking accounts.  Possibly a third
11 that I just don't use.
12    Q.  Why do you have two different checking
13 accounts?
14    A.  I have a personal checking account.  I
15 have a checking account for my condo so that I
16 keep those funds separate.  And then I have a
17 third checking account for the condo association
18 that I manage, so those funds are also separate.
19    Q.  The AmEx corporate card, did you --
20 were you issued that upon beginning employment at
21 St. Jude Medical?
22    A.  Yes.
23    Q.  Is that, to your knowledge, sort of
24 standard procedure for new employees at least in
25 management-type positions?

ALTMAN

1
2    A.  Yes.
3    Q.  Did you have corporate credit cards at
4 your -- either of your two prior employers?
5    A.  I don't recall.
6    Q.  Have you ever had a corporate credit
7 card other than AmEx?
8    A.  At St. Jude Medical, I've only ever
9 had an American Express.  I don't recall the
10 other two companies.
11    Q.  Does St. Jude Medical now Abbott have
12 rules governing the use of corporate credit
13 cards?
14    A.  Yes.
15    Q.  What are those?
16    A.  To the best of my recollection, it's
17 to use it for corporate expenses.  To process
18 your expense reports within a timely manner.  I
19 think within the quarter that the expenses occur.
20       And then there are certain rules not
21 related to the credit card necessarily, but
22 related to our code of ethics about what you
23 spend your money on or what daily caps are and
24 those types of things.
25    Q.  Did you use it for this trip?

ALTMAN

1
2    A.  No.
3    Q.  Are you staying with your sister on
4 this trip?
5    A.  Nope.
6    Q.  Stay in a hotel?
7    A.  Yes.
8    Q.  Are you seeing your sister on this
9 trip?
10    A.  Nope.
11    Q.  For any corporate credit card that
12 you've had, I guess, over the time you've been
13 with St. Jude Medical, have you ever allowed any
14 other person to make a purchase on your corporate
15 card?
16    A.  Yes.  For corporate expenses, I've had
17 some team members that don't have corporate cards
18 and when we have bought certain forms of
19 advertising, for example, social media, we have
20 used my card to purchase the advertising.  It was
21 somebody on my team who used it.
22    Q.  Have you ever allowed other persons to
23 make purchases on your personal AmEx credit card?
24    A.  No.
25    Q.  Lesson learned?  From your prior --

ALTMAN

1
2    A.  There's never been a reason.
3    Q.  Just a policy you follow.  Just
4 something that you just don't allow.
5    A.  Yes.
6    Q.  When a store allows payment at the
7 point of sale by credit card, do you ever use
8 cash?
9    A.  Yes.
10    Q.  How often?
11    A.  I'm not sure of a percentage on a
12 regular basis.
13    Q.  Is it depending on the amount that's
14 being charged?
15    A.  The amount that's being charged.  The
16 amount I have in my wallet at the time.  If I
17 feel like the merchandise is something I may end
18 up returning or also if it's something that I may
19 need some kind of warranty on.
20    Q.  Why would you be more likely to use
21 cash if it were an item you might return later?
22       MR. LAMER:  Objection,
23 mischaracterizes her testimony.  You may
24 want to clarify.
25    A.  Yes, that's not what I said.

ALTMAN

1    Sometimes I found that it's easier if I'm
2    returning something to have it -- to pay with a
3    credit card and then to have it put back on a
4    credit card versus outlying a lot of cash and
5    then getting the cash back.
6         Q.   All right.  So I got it backwards.  So
7    if it's something you might return, you are more
8    likely to use a credit card?
9         A.   Yes.
10        Q.   All right.  So I did get it backwards.
11             Since the events that gave rise to
12   this lawsuit in May 2015, you paid for items in
13   cash more than credit as opposed to before May of
14   2015?
15        A.   Not necessarily.
16        Q.   When you make purchases using your
17   credit cards, either one of them, either one of
18   your personal credit cards, do you typically ask
19   for a copy of the receipt?
20        A.   Sometimes.
21        Q.   And is that based on any guiding rule
22   of thumb that you employ?
23        A.   If I am likely to return the item, I
24   ask for a receipt.  If I am buying a pack of

ALTMAN

1    chewing gum at the airport, I typically don't ask
2    for a receipt.
3         Q.   In your experience, how often do you
4    return items that you purchased?
5         A.   Occasionally.
6         Q.   Do you ever pay for items at the point
7    of sale by using a check, a personal check?
8         A.   Rarely.
9         Q.   But you have done it?
10        A.   Ever in my lifetime, yes, there was a
11   point that that was how most people paid for
12   things.
13        Q.   But not recently?
14        A.   Correct.
15        Q.   What do you do with the receipts that
16   you are given by retailers or other merchants
17   when you make purchases by credit cards?
18        A.   I either have them in the bag of the
19   merchandise that I buy or I put it in my wallet
20   in my purse.
21        Q.   Do you maintain receipts for a certain
22   period of time?
23        A.   If it is an item that I think I may
24   return, then I will save it.  If it is an item

ALTMAN

1    like groceries that I just am going to put away
2    and use, then I check the receipt when I get home
3    and throw it away.
4         Q.   For those that you do save, whether
5    it's on the possibility of return or for any
6    other reason, do you store them together in a
7    certain place?
8         A.   No.
9         Q.   To your knowledge, have any of your
10   credit card receipts ever been stolen or turned
11   up missing?
12        A.   No.
13        Q.   Have you ever reported any stolen or
14   missing receipts to the police?
15        A.   No.
16        Q.   Let's look at your complaint.  In
17   paragraph 20, it's not paginated, but I think
18   it's on -- looks like it's on page 5 according to
19   the top of the header there.
20             Do you see that?  Paragraph 20?
21        A.   Uh-huh.
22        Q.   So you allege:  On May 16, 2015,
23   plaintiff used her American Express credit card
24   to make a purchase at defendant's location at

ALTMAN

1    Phipps Plaza in Atlanta, Georgia.
2             Correct?
3         A.   Correct.
4         Q.   So prior to this transaction, based on
5    what you said a few moments ago, you had been
6    using this particular American Express for
7    roughly three years?
8         A.   Correct.
9         Q.   Prior to this May 2015 transaction,
10   how often had you shopped at any White House
11   Black Market store anywhere in the United States?
12        A.   Occasionally.
13        Q.   More than five times?
14        A.   I can't recall.
15        Q.   More than 10?
16        A.   I don't think so.
17        Q.   Do you recall the first time you ever
18   shopped at a White House Black Market store?
19        A.   No, but I imagine it was a lovely
20   experience.
21        Q.   Have you ever made on-line purchases
22   from White House Black Market?
23        A.   I don't think so.
24        Q.   But it's possible you have shopped in

ALTMAN

1   the sense of looked possibly to purchase on-line
2   whether or not you actually made a purchase?
3        A.  Possibly.
4        Q.  So with this particular transaction in
5   May of 2015, do you recall how long you were in
6   the store?
7        A.  Not precisely.
8        Q.  But what do you recall, if anything,
9   about the sales associate who rang up the
10   purchase?
11        A.  Nothing specific.
12        Q.  Do you recall anything about the
13   process that produced the credit card receipt?
14        A.  Nothing out of the ordinary.
15        Q.  When you say "the ordinary," what do
16   you mean?
17        A.  I don't recall that the machine broke,
18   that there was -- it ran out of paper or
19   something along those lines.
20        Q.  Do you recall having to wait in line
21   to check out?
22        A.  I don't recall.
23        Q.  Did you use a chip or swipe the card,
24   your credit card?

ALTMAN

1        A.  Swipe.  It was before the chip.
2        Q.  Did you swipe it or did the
3   salesperson swipe it?
4        A.  I don't recall.
5        Q.  So you were living in Austin in May
6   2015, right?
7        A.  Correct.
8        Q.  So what brought you to Atlanta in May
9   of 2015?
10        A.  My nephew's second birthday.
11        Q.  Your sister's child?
12        A.  That is correct.
13        Q.  Any other family members attend that
14   birthday celebration?
15        A.  My mother was here.  My ex-stepmother
16   was here.  And then cousins.
17        Q.  Did you stay with your sister and
18   Mr. Wexler on this trip?
19        A.  I did.
20        Q.  Where were they living by this time,
21   were they in a house?
22        A.  They were in a rental house.
23        Q.  Do you recall what part of town?
24        A.  Toco Hills.

ALTMAN

1        Q.  Prior to this visit on May 8th, how
2   often had you -- well, I take it you had been to
3   Phipps Plaza?
4        A.  Yes, but the visit wasn't on May 8th.
5   The visit was on May 16th.
6        Q.  I'm sorry.  I think July 8 was the
7   complaint.  I mixed them up, I'm sorry.
8            So May 16th was the purchase?
9        A.  Yes.
10        Q.  So you had been to Phipps Plaza at
11   some point before this, correct?
12        A.  Absolutely.
13        Q.  Having lived in Atlanta for two years?
14        A.  Yes.
15        Q.  I take it you had been there multiple
16   times?
17        A.  Multiple times.
18        Q.  Since you had left Atlanta in '01, I
19   guess you said it was?
20        A.  Yes.
21        Q.  Late '01, it sounds like, had you been
22   to Phipps Plaza at all prior to this May visit?
23        A.  Yes.
24        Q.  Can you estimate how many times?

ALTMAN

1        A.  Half a dozen.
2        Q.  Were those all on personal visits to
3   see your sister or other family members?
4        A.  Myself in Atlanta a couple of times
5   for work.  So it's possible that I had gone to
6   Phipps while I was here for work.
7        Q.  Actually I was getting ready to ask
8   that question.  Have you ever been required to
9   come to Atlanta --
10        A.  Yes.
11        Q.  And what were those work visits, what
12   did they entail?
13        A.  When I -- when I was with HCB, I think
14   we did some focus groups here.  Since I have been
15   with St. Jude, there have been conventions that
16   have been here, medical conventions.  We have had
17   a couple sales meetings that we have hosted in
18   Atlanta as well.
19        Q.  Have you been to Phipps Plaza since
20   May 16th --
21        A.  Yes.
22        Q.  -- 2015?  How many times?
23        A.  Maybe once.
24        Q.  Do you recall when that was?

ALTMAN

1               ALTMAN
2    A.  Maybe last April.  I was back in town,
3 so ...
4    Q.  Do you recall the purpose of that
5 visit?
6    A.  The purpose of all of the visits was
7 to visit a store at the time that was called
8 Intimacy.  I think they have since changed their
9 name.
10    Q.  And there is or was an Intimacy store
11 in Phipps Plaza?
12    A.  Yes.
13    Q.  Did you go to any store other than
14 that one last April?
15    A.  I don't recall.
16    Q.  Did you go to White House Black
17 Market?
18    A.  I don't think so.
19    Q.  Back to May 16 of 2015, did anyone
20 accompany you on the trip to the mall?
21    A.  No.
22    Q.  Did you shop or at least visit other
23 stores in Phipps that day?
24    A.  Yes.
25    Q.  Did you make other purchases at other

ALTMAN

1               ALTMAN
2 stores?
3    A.  I believe so, yes.
4    Q.  If I asked this before, I apologize,
5 but I will ask:  Have you ever visited this
6 particular White House Black Market location
7 prior to May 16, 2015?
8    A.  I don't recall.
9    Q.  Do you recall what day of the week it
10 was?
11    A.  I think it was a Saturday.
12    Q.  Why did you go in the first place?
13 Just to, you know, shopping excursion just to get
14 out or do you recall the reason you went, if any?
15    A.  So part of it was to go shopping
16 specifically at Intimacy.  Part of it was I was
17 in a house with a two-year-old, two mothers, my
18 sister and my brother-in-law.
19    Q.  Say no more.
20    A.  Thank you.
21    Q.  I will note your counsel is also
22 grinning at that one.
23    A.  Yes.
24    MR. LAMER:  I have many kids and
25 relatives.

ALTMAN

1               ALTMAN
2    Q  (By Mr. Goheen) I guess out of
3 curiosity, how large was the house the Wexlers
4 were renting in May of 2015 that you were staying
5 at?
6    A.  Three bedrooms, I think.
7    Q.  So not necessarily a place where you
8 could go hide within the house?
9    A.  No.
10    Q.  Is there a reason -- well, what
11 reason, if any, did you visit this particular
12 White House Black Market store on this particular
13 day?
14    A.  The intention of going to the mall was
15 to visit Intimacy.  If you -- I presume you have
16 never shopped at Intimacy.
17    Q.  You presume correctly.
18    A.  Often you have to wait and you sign up
19 and they tell you how long it will be.  There was
20 a wait that day and so I went window shopping.
21 And that's how I landed in White House Black
22 Market.
23    Q.  What was the proximity of the two
24 stores, do you remember?
25    A.  I don't exactly recall.  Intimacy is

ALTMAN

1               ALTMAN
2 on the third floor, so I'm not sure -- I don't
3 remember where White House Black Market is.  But
4 Intimacy is smack dab in the middle of the mall,
5 so ...
6    Q.  Okay.  Have you ever visited any other
7 White House Black Market stores in the state of
8 Georgia, other than the Phipps Plaza location?
9    A.  I don't think so.  Is there one at
10 Lenox?
11    Q.  I should ask my daughter.  She went
12 there shopping yesterday.  Well, at the mall,
13 that is.  So says my credit card.
14    I take it you went to Lenox quite
15 frequently as well as an Atlanta.
16    A.  When I lived here, it was easy to go
17 to both.
18    Q.  That is true.
19    (Exhibit 3, Store receipt, marked for
20 identification.)
21    Q  (By Mr. Goheen) We will mark this as
22 Exhibit 3.
23    Miss Altman, do you recognize this
24 document as being a copy of the receipt you
25 received from White House Black Market on May 16,

ALTMAN

1
2    2015?
3        A.   Yes.
4        Q.   Incidentally, I'll just, for the
5    record, I'll note that it's stamped, Bates
6    stamped, and I'm referring to that language on
7    the bottom right-hand corner as Altman_0001.  Do
8    you believe this to be a true and correct copy of
9    that receipt?
10       A.   Yes.
11       Q.   It would appear that you purchased two
12   items from White House Black Market that day; is
13   that correct?
14       A.   Correct.
15       Q.   The items purchased reflect a discount
16   of five percent for something called H -- I'm
17   sorry, WHBM rewards, correct?
18       A.   Correct.
19       Q.   Is that a loyalty program?
20       A.   I believe so.
21       Q.   Do you recall when you enrolled in the
22   WHBM rewards program?
23       A.   No.
24       Q.   Do you recall enrolling in the WHBM
25   rewards program?

ALTMAN

1
2        A.   Not specifically.
3        Q.   Did you enroll in that program on this
4    particular day?
5        A.   I don't think so.
6        Q.   Meaning, you know, sometimes you will
7    be asked to enroll in a program and you get an
8    immediate discount.  You understand what I'm
9    talking about, I suspect.
10       A.   I do.
11       Q.   But you are not sure if that happened
12   on this visit or not?
13       A.   I don't think so.
14       Q.   Other than the five percent -- well,
15   let me back up.
16            Is part of the program that you get an
17   automatic five percent discount on any purchases
18   at a White House Black Market location?
19       A.   Apparently so.
20       Q.   I don't -- I'm just asking.
21            Are you aware of any other benefits
22   for being a WHBM rewards member?
23       A.   I get direct mail postcards.
24       Q.   Anything else like e-mail flash sales
25   or Internet on-line, anything like that?

ALTMAN

1
2        A.   I typically unsubscribe from junk
3    e-mail.
4        Q.   Okay.  You don't consider that -- you
5    would consider that to be junk e-mail?
6        A.   I do.
7        Q.   Now, near the bottom of the receipt,
8    you see under your name, which is in all capital
9    letters about three quarters of the way down --
10       A.   Yep.
11       Q.   -- it states you are a silver member
12   and are $733.25 from gold status.
13       A.   Yes.
14       Q.   Do you have an understanding of the
15   various status levels within WHBM rewards
16   membership?
17       A.   I do not.
18       Q.   Do you have an understanding of what
19   dollar amount of purchases would be necessary for
20   you to achieve gold status?
21       A.   I do not.
22       Q.   Have you ever achieved gold status for
23   WHBM rewards?
24       A.   Not to my knowledge.
25       Q.   You had made -- well, had you made

ALTMAN

1
2    prior purchases in 2015 at White House Black
3    Market stores?
4        A.   Possibly.
5        Q.   The total net -- well, the total
6    payment of this reflected in the middle of this
7    receipt is $136.25, correct?
8        A.   Correct.
9        Q.   So you're $733.25 away from gold
10   status, correct?
11       A.   Correct.
12       Q.   So if I do that math right, the
13   payment plus the dollars away is $869.50,
14   correct?
15       A.   I'll take your word for it.
16       Q.   Do you have any reason to disagree
17   with my calculation?
18       A.   I do not.
19       Q.   Which would be roughly $130 and change
20   away from a thousand dollars, right?
21       A.   Yes.
22       Q.   So then you believe that would be gold
23   status, a thousand dollars of purchases in a
24   year?
25       A.   According to this logic, yes.

ALTMAN

1               ALTMAN
2    Q.  Are you a -- well, as we sit here
3  today, are you still a member of WHBM rewards?
4    A.  I presume so.
5    Q.  Why do you presume so?
6    A.  I have not actively unenrolled from
7  it.
8    Q.  Are you a member of loyalty programs
9  for other clothing retailers?
10    A.  I don't think so.
11    Q.  Could you estimate how many purchases
12  you had made in any White House Black Market
13  store using any credit or debit card prior to
14  this May 16, 2015 transaction?
15    A.  A handful of times, so I'll quantify
16  that for you, maybe somewhere between two and
17  four.
18    Q.  Okay.  For any of those prior
19  purchases, did you look to determine whether the
20  receipt you received for those purchases
21  displayed more than five digits of your credit
22  card or the expiration date of your credit card?
23    A.  Yes.
24    Q.  And were they compliant, to the best
25  of your recollection?

ALTMAN

1               ALTMAN
2    A.  To the best of my recollection, yes.
3    Q.  So then you're not asserting any claim
4  against White House Black Market for any
5  transactions other than this one of May 16, 2015;
6  is that right?
7    A.  Yes.
8    Q.  So stated a little differently, as far
9  as you are aware, based on your prior purchases,
10  White House Black Market's receipts prior to May
11  16th, prior to -- of your prior purchases
12  preceding May 2015 complied with FACTA?
13      MR. LAMER:  Objection.  Compound.
14  Objection.  Calls for a legal conclusion.
15      Go ahead.
16    A.  I'm sorry.  Will you restate the
17  question.
18    Q.  (By Mr. Goheen) Sure.  Is it fair to
19  say that based on your prior purchases, White
20  House Black Market's receipts that you received
21  prior to May of 2015 were in compliance with the
22  FACTA statute?
23      MR. LAMER:  Objection.  Calls for a
24  legal conclusion.
25      Go ahead.

ALTMAN

1               ALTMAN
2    A.  The receipts that I received prior to
3  this one were in compliance with the regulation.
4    Q.  Let's look at paragraph 21 of the
5  complaint.  It's also on page 5.
6      That paragraph states:  At the
7  completion of her purchase, plaintiff was given a
8  computer-generated cash register receipt that
9  published more than the last five digits of
10  plaintiff's credit card number.  In fact, the
11  customer copy published the first six and the
12  last four digits of plaintiff's credit card, a
13  total of 10 digits of the credit card.
14      Is that correct?
15    A.  Correct.
16    Q.  So let me isolate that and unpack that
17  for just a minute.  So let's go back to
18  paragraph 7 of the complaint on page 2.  It's at
19  the bottom of the page.
20      So your allegation in paragraph 7
21  states that:  The operative provision of FACTA
22  codified at 15 USC Section 1681 C(G), provides
23  that, and I quote, no person that accepts credit
24  cards or debit cards for the transaction of
25  business shall print more than the last five

ALTMAN

1               ALTMAN
2  digits of the card number or the expiration date
3  upon any receipt provided to the cardholder at
4  the point of sale or transaction.
5      Correct?
6    A.  Correct.
7    Q.  Is that your general understanding of
8  the FACTA prohibition?
9    A.  And that it's also illegal to print 10
10  digits.
11    Q.  Okay.  Where did you obtain that
12  understanding?
13    A.  Through my brother-in-law.
14    Q.  Any other source?
15    A.  No.
16    Q.  All right.  So in the provision I just
17  read, would you agree that there are two separate
18  prohibitions, one of which is no more than five
19  digits of the card number should display on the
20  credit card receipt?
21      Correct?
22      MR. LAMER:  Objection, calls for a
23  legal conclusion.
24      Go ahead.
25    A.  Correct.

ALTMAN

1            ALTMAN
2    Q.  (By Mr. Goheen) And then the second
3  prohibition is that the expiration date of the
4  credit card should not be displayed.
5        MR. LAMER: Objection.
6    A.  Correct.
7        MR. LAMER: Objection, calls for a
8  legal conclusion.
9    Q.  (By Mr. Goheen) So in the receipt, as
10  we return back to the receipt that you were
11  given, you would agree that the expiration date
12  of your credit card is not displayed anywhere on
13  the receipt.
14        Correct?
15    A.  Correct.
16    Q.  So it's fair to say you're not
17  asserting a claim against White House Black
18  Market based on the expiration date portions of
19  FACTA, correct?
20        MR. LAMER: Objection, calls for a
21  legal conclusion.
22        Go ahead.
23    A.  Correct.
24    Q.  (By Mr. Goheen) Your claim, I think
25  it's based on displaying too many digits on the

ALTMAN

1            ALTMAN
2  credit card number of the receipt, right?
3    A.  Correct.
4    Q.  Now look at the language in the middle
5  of the page below the amount tendered.  Do you
6  see that?
7    A.  Yes.
8    Q.  So there you have the AmEx brand
9  identification and the card number, right?
10    A.  Yes.
11    Q.  And you did use the AmEx card number
12  ending in digits 1001, correct?
13    A.  Yes.
14    Q.  The last five digits -- I'm sorry,
15  more than the last five digits are not displayed
16  on that receipt, correct?
17    A.  Correct.
18    Q.  But the first six numbers are
19  displayed, correct?
20    A.  Correct.
21    Q.  And that's your assertion of the
22  allegation here, correct --
23        MR. LAMER: Objection.  Calls for a --
24        MR. GOHEEN:  I haven't finished the
25  question yet, Counsel.

1            ALTMAN
2        MR. LAMER: Go ahead.  Go ahead.
3    Q.  (By Mr. Goheen) Your allegation is
4  that those first six digits and the total number
5  of digits constitute the violation here; is that
6  correct?
7        MR. LAMER: Objection, calls for a
8  legal conclusion.  Objection to form.
9  Compound.
10        Go ahead.
11    A.  Yes.
12    Q.  (By Mr. Goheen) Is there any other
13  basis for your claim against White House Black
14  Market?
15        MR. LAMER: Objection.  Calls for a
16  legal conclusion.
17        MR. GOHEEN:  No, it doesn't.  I'm
18  asking for facts.
19        MR. LAMER: This is my objection.
20        MR. GOHEEN:  And it's my deposition.
21        MR. LAMER: Fine.
22    Q.  (By Mr. Goheen) You can answer.
23        MR. LAMER: For the record, Counsel, I
24  can -- you can ask your questions and I can
25  assert my objections.  If you disagree with

1            ALTMAN
2  my objections, that's fine.
3        MR. GOHEEN:  Are you done?
4        MR. LAMER:  I am done.
5    Q.  (By Mr. Goheen) Good.  Now you can
6  answer the question.
7    A.  No.
8    Q.  And certainly you're not contending
9  that White House Black Market displayed all 15
10  digits of your credit card number, correct?
11    A.  Certainly.
12    Q.  You are not?
13    A.  I am not.
14    Q.  Now, according to the time stamp in
15  the middle of this receipt, you completed this
16  transaction and received the receipt
17  approximately at 1:40 p.m. on May 16th.  Correct?
18    A.  Correct.
19    Q.  Prior to this occurrence, had you made
20  it a habit to look at your credit card receipts
21  immediately at the point of sale to determine if
22  they complied with FACTA?
23    A.  I frequently look at them upon point
24  of sale because I have to sign them upon point of
25  sale.  So I look at everything on the receipt to

ALTMAN

1 see if it is what I purchased, the price I
2 purchased, and, yes, I look at the credit card
3 number.
4     Q.  Okay.  So how long had that been your
5 practice prior to May 16, 2015?
6     A.  Several years.
7     Q.  And you had not noticed any receipt
8 that you believe may not have complied with FACTA
9 in the several years prior to May 16, 2015?
10     A.  There was one time I got a gas station
11 receipt that I thought was not in compliance that
12 I called my brother-in-law about.  But it was in
13 compliance.  It printed the last five digits and
14 I thought the law was four.  And that's when he
15 refreshed my memory of what that law was.
16     Q.  So that's the only other time, other
17 than this one, that you have at least suspected a
18 noncompliance with the FACTA statute for a credit
19 card receipt that you personally obtained?
20     A.  Yes.
21     Q.  When did you first -- talking about
22 this receipt now, this specific receipt in May
23 2015, when did you first notice that the receipt
24 may not have complied with FACTA?

ALTMAN

1     A.  Within moments of leaving the store.
2     Q.  So you didn't need anyone to advise
3 you this time.  You didn't have to call up your
4 brother-in-law and ask; is that correct?
5     A.  Correct.
6     Q.  What was your reaction when you
7 discovered that your belief was that it did not
8 comply with FACTA?
9     A.  Disgust and disdain.
10     Q.  How so?
11     A.  That a company that is as large as
12 White House Black Market would violate the law.
13     Q.  How many days or weeks after you
14 discovered the alleged violation did you
15 authorize the filing of the complaint?
16     A.  Within a couple of days.
17     Q.  So this alleged disgust and disdain
18 that you felt, what did you -- how did you act
19 upon it?
20         MR. LAMER:  Objection, argumentative.
21 Go ahead.
22     A.  I went back to my sister's house,
23 discussed it with my brother-in-law.  He
24 confirmed the law.  And I said, Can you do

ALTMAN

1 something about this?  And he said yes.  And so
2 within a few days, he had told me that he could
3 file a complaint on my behalf.
4     Q.  Did you hire your brother-in-law to
5 represent you?
6     A.  Technically, yes.
7     Q.  What do you mean "technically"?
8     A.  I did not pay him to represent me.
9     Q.  Have you ever paid him to represent
10 you?
11     A.  No.
12     Q.  Has he represented you in any other
13 legal disputes that you may have been involved
14 in?
15     A.  No.
16     Q.  So this is the first and only time?
17     A.  Yes.
18     Q.  So there would be nothing like an
19 engagement letter that you executed with your
20 brother-in-law then, right?
21     A.  I'm not sure I understand that.
22     Q.  Well, we were provided what was called
23 a class action authorization when you signed that
24 with Mr. Lamer's firm, Mr. Dorsen's firm and then

ALTMAN

1 the firm in Chicago, right?
2     A.  Yes.
3     Q.  You didn't recall -- I'm sorry.
4         You didn't sign anything like that
5 with Mr. Wexler; is that correct?
6     A.  Correct.
7     Q.  So you understand what I'm talking
8 about, like an engagement letter, you don't
9 recall signing anything like that?
10     A.  Correct.
11     Q.  Why did you authorize the filing of
12 the complaint, I think you said two days after
13 you noticed the violation?  Why would you move so
14 quickly?
15     A.  Because he was able to start working
16 on it.
17     Q.  And the complaint itself was filed
18 close to two months later?
19     A.  Yep.
20     Q.  July 8?
21     A.  That's correct.
22     Q.  Same question:  Why file the lawsuit
23 within two months of the transaction?
24     A.  Because, I mean, that's what happens,

```
 1           ALTMAN
 2  right.  The law is broken, you file a complaint.
 3  I don't know.  To me, I move in like minutes and
 4  seconds at my job, so two months seemed
 5  reasonable.
 6        Q.  I'm going to hand you Exhibit 4, what
 7  we will mark as Exhibit 4.
 8        (Exhibit 4, American Express
 9        statement, marked for identification.)
10        MR. GOHEEN:  Why don't we just take
11  five.  It's been --
12        MR. LAMER:  Let's do five.  Off the
13  record.
14        (WHEREUPON, a recess was taken.)
15        Q   (By Mr. Goheen) I think we were
16  marking Exhibit 4, which I will hand to you, Miss
17  Altman.  It's Bates numbered Altman 2942 to 2946.
18  It's a document that you produced to us.
19        You recognize this as a credit card
20  statement from American Express for your AmEx
21  credit card?
22        A.  Yes.
23        Q.  So just on the fourth page of the
24  document, does that unredacted entry accurately
25  reflect your May 16, 2015 purchase at the Phipps
```

```
 1           ALTMAN
 2  Plaza White House Black Market location?
 3        A.  Yes.
 4        Q.  So looks like you have a Delta
 5  SkyMiles credit card, huh?
 6        A.  I do.
 7        Q.  So you earn SkyMiles and maybe other
 8  benefits when you use the card?
 9        A.  Yes.
10        Q.  Well, I have that too.
11        So you still use this credit card, I
12  think you said earlier?
13        A.  Yes.
14        Q.  The one ending in 1001?
15        A.  Yes.
16        Q.  Okay.  All right.  Let's look --
17  return to the receipt.
18        Now, at the bottom, it's actually
19  slightly cut off here, but no language is cut
20  off.  You see the box that's sort of in
21  asterisks, kind of a rectangle?
22        A.  Yes.
23        Q.  So inside that box is the following
24  language:  We value our customers and would like
25  to know how we did today.  Please share your
```

```
 1           ALTMAN
 2  experience at, and this is going to be all caps,
 3  WWW.WHBMLISTENS.COM or WWW.WHBMLISTENS.COM.
 4        Correct?
 5        A.  Correct.
 6        Q.  When you discovered the potential
 7  FACTA violation, did you access that website to
 8  lodge a complaint or otherwise notify WHBM of the
 9  potential violation?
10        A.  No.
11        Q.  Why not?
12        A.  So two reasons:  One, to me, those
13  types of things are more like dirty fitting
14  rooms.  That's how I would perceive it.
15        And, two, is I went home and spoke to
16  my stepbrother about the receipt, which is a
17  legal receipt.
18        Q.  Well, I understand you spoke with your
19  stepbrother --
20        A.  You mean brother-in-law.
21        Q.  I mean your brother-in-law.
22        A.  Yes.
23        Q.  Do you believe that would have
24  prevented you from accessing this website just
25  because you spoke with Mr. Wexler?
```

```
 1           ALTMAN
 2        MR. LAMER:  Objection, argumentative.
 3        Go ahead.
 4        A.  Yes, so to me this type of "contact
 5  us" is about dirty fitting rooms, not about
 6  breaking the law.
 7        Q   (By Mr. Goheen) You don't know that,
 8  right?
 9        A.  Correct, but that's my perception.
10        Q.  I understand, but you don't know that.
11        MR. LAMER:  Objection, asked and
12  answered.
13        Q   (By Mr. Goheen) You can answer.
14        A.  Correct, that's my perception.
15        Q.  But you never did anything to confirm
16  that perception, correct?
17        A.  Correct.
18        Q.  Then there are two other websites on
19  the receipt, correct?  Right above your name is
20  www.WhiteHouseBlackMarket.com, right?
21        A.  Yes.
22        Q.  And then right above that is
23  www.WHBM.com/rewards, correct?
24        A.  Correct.
25        Q.  Did you access either one of those
```

ALTMAN

1 websites to notify White House Black Market of
2 the potential violation?
3
4     A.  No.
5     Q.  Why not?
6     A.  My intention was not to call 1-800
7 White House Black Market and say, You're breaking
8 the law at your Phipps Plaza store, please stop.
9     Q.  Why not?  Why not?
10     A.  Because I felt like there was another
11 route to go.
12     Q.  So you were uninterested in their
13 correcting the violation?
14         MR. LAMER:  Objection,
15     mischaracterizes her testimony.
16     Argumentative.
17     Go ahead.
18     Q.  (By Mr. Goheen) You can answer.
19     A.  I'm very interested in fixing the
20 violation.
21     Q.  Then why didn't you access one of
22 these websites?
23         MR. LAMER:  Objection, asked and
24     answered.
25     A.  I went a legal route.

ALTMAN

1
2     Q.  (By Mr. Goheen) Meaning what, what do
3 you mean by legal route?
4     A.  Meaning I engaged the help of an
5 attorney to fix it.
6     Q.  Oh, so did the attorney access any of
7 the websites then?
8     A.  I have no idea.
9     Q.  Did you advise him to do that?
10         MR. LAMER:  Objection, calls for a
11     privileged communication.
12     Q.  (By Mr. Goheen) Did you think about
13 asking your attorney to do that?
14     A.  It was -- I did not think about
15 telling him how to do his job.
16     Q.  So you did not -- I think you said
17 earlier you did not call White House Black Market
18 either to complain about what you believed was a
19 legal violation?
20     A.  I did not.  I did not speak to the
21 manager.  I did not send a carrier pigeon.
22     Q.  You know, you don't have to say things
23 like that in the deposition, ma'am.
24         Did you write a letter to White House
25 Black Market to that effect?

ALTMAN

1
2     A.  No.
3     Q.  Of course if you want to say that, I'm
4 fine with it actually.
5         So bottom line, having received what
6 you contend is a receipt that violates the law,
7 you just didn't notify White House Black Market
8 of that belief anytime prior to filing this
9 lawsuit.
10     Right?
11         MR. LAMER:  Objection, asked and
12     answered.
13         MR. GOHEEN:  No, it's not.
14     A.  Correct.
15     Q.  (By Mr. Goheen) Let's mark this as
16 Exhibit 5.
17         (Exhibit 5, Plaintiff's First
18     Supplemental Responses to Defendant White
19     House Black Market, Inc.'s First Set of
20     Interrogatories, marked for
21     identification.)
22     Q.  (By Mr. Goheen) These are plaintiff's
23 first supplemental responses to defendant White
24 House Black Market's first set of
25 interrogatories.

ALTMAN

1
2     Are you familiar with this document?
3 You can take your time and look through it.
4     A.  Yes, I'm familiar with this document.
5     Q.  Turn to page 6 and interrogatory
6 number 4.  Paraphrasing, you were asked to list
7 all communications you had with White House Black
8 Market since July 8 of 2013.  Correct?
9     A.  Yes.
10     Q.  And your response in total was
11 plaintiff answers none, correct?
12     A.  Correct.
13     Q.  Does that remain the case today?
14     A.  Yes.
15     Q.  Okay.  Now, when you realized that the
16 May 16th receipt may not have complied with
17 FACTA, did you continue using your AmEx credit
18 card that you used for the Phipps Plaza
19 transaction?
20     A.  Yes.
21     Q.  After realizing that the receipt may
22 have shown too many numbers, did you call
23 American Express and ask them to cancel the card
24 and issue you a new one?
25     A.  No.

ALTMAN

1  
2    Q.  Did you otherwise notify American  
3  Express that you believed your credit card may  
4  have been compromised?  
5    A.  No.  
6    Q.  Did you have any communication at all  
7  with American Express on the subject of the May  
8  2015 receipt?  
9    A.  No.  
10    Q.  Have you ever had to cancel a credit  
11  card for any reason?  
12    A.  Yes.  
13    Q.  What were those reasons?  
14    A.  Lost cards, stolen cards, closing  
15  accounts.  
16    Q.  When did you have a credit card  
17  stolen?  
18    A.  When I was in Europe, stole or lost,  
19  I'm not exactly sure, but my wallet went missing.  
20    Q.  When did that occur?  
21    A.  After college.  
22    Q.  Like after graduation, a graduation  
23  trip or something?  
24    A.  Yes.  
25    Q.  Where were you in Europe?

ALTMAN

1  
2    A.  I don't remember.  
3    Q.  Where did you go on that trip?  
4    A.  We started in France.  We went to  
5  England.  We went to the Netherlands.  We went to  
6  Switzerland.  We went to Germany.  We went to  
7  Austria.  We went to Italy.  We went to Belgium.  
8    Q.  Sounds like a long trip.  How long  
9  were you in Europe?  
10    A.  Four or five weeks.  
11    Q.  Who did you go with?  
12    A.  Jill Lichter, who I mentioned before.  
13  My friend, Amy Aarons Rosen.  And then my sister  
14  met me there at the end.  
15    Q.  So what credit card -- well, were  
16  there multiple credit cards that then you had to  
17  cancel because your wallet went missing or was  
18  stolen?  
19    A.  I don't recall.  
20    Q.  Do you recall what card or cards you  
21  had to cancel?  
22    A.  I don't recall.  
23    Q.  Were you issued new cards upon calling  
24  for the cancellation?  
25    A.  I imagine.

ALTMAN

1  
2    Q.  But you don't specifically recall?  
3    A.  (Witness shook head negatively.)  
4    Q.  Let's mark this as the next exhibit.  
5    (Exhibit 6, American Express "What You  
6  Can Do" sheet, marked for identification.)  
7    Q  (By Mr. Goheen) This is Exhibit 6.  
8  I'll represent to you that this is  
9  information pulled directly from the  
10  AmericanExpress.com website.  Have you ever  
11  accessed this portion of the American Express  
12  website?  
13    A.  No.  
14    Q.  At the top first page is entitled,  
15  "What you can do."  Do you see that?  
16    A.  Yes.  
17    Q.  Right below that there's a heading  
18  entitled, "Protecting yourself."  Do you see  
19  that?  
20    A.  Yes.  
21    Q.  So right below that, the sentence  
22  states, "At American Express we work hard to  
23  protect you from fraud, but your active  
24  involvement plays a very important role.  Here  
25  are some simple and important steps you can take

ALTMAN

1  to help reduce your risk," correct?  
2  
3    A.  Yes.  
4    Q.  Then you see there's a number of  
5  bullet points there.  And the first one says,  
6  "Monitor your account activity on-line," correct?  
7    A.  Yes.  
8    Q.  Do you have an on-line account with  
9  American Express?  
10    A.  Yes.  
11    Q.  How long have you had an on-line  
12  account?  
13    A.  Since the inception of my credit card  
14  with them.  
15    Q.  Meaning the current one, the 1001?  
16    A.  Correct.  
17    Q.  How often do you monitor your account  
18  activity on-line?  
19    A.  Several times a month.  
20    Q.  How long have you engaged in that  
21  practice?  
22    A.  Since I started with the card.  
23    Q.  So the frequency or pattern of your  
24  checking was not altered by the events of May  
25  2015?

ALTMAN

1
2     A.   The frequency or pattern were not
3     altered.
4     Q.   Now, below that there's a bullet point
5     that states, "Review your credit report
6     regularly," correct?
7     A.   Yes.
8     Q.   And American Express recommends that
9     you regularly review your credit report for any
10    inaccurate information or transactions that you
11    didn't authorize, correct?
12    A.   Correct.
13    Q.   Do you regularly review your credit
14    report?
15    A.   Yes.
16    Q.   How often?
17    A.   Every month.
18    Q.   And do you have a service that
19    provides you --
20    A.   Yes.
21    Q.   What service is that?
22    A.   Experian.
23    Q.   How long have you had that service?
24    A.   About seven years.
25    Q.   Since your divorce?

ALTMAN

1
2     A.   Yes.
3     Q.   Is that why you got it?
4     A.   Yes.
5     Q.   Have you had the same product or
6     service that entire seven years with Experian?
7     A.   I'm not sure.
8     Q.   You understand there are different
9     levels of protection and different products,
10    correct?
11    A.   Yes.
12    Q.   So that's my question, why I'm asking
13    the question.  But you are not sure if you have
14    gotten some enhanced or gotten some different
15    level of protection in seven years?
16    A.   Right.
17    Q.   Did you obtain a different level of
18    protection after May 16, 2015?
19    A.   I'm not sure.  Not specifically.
20    Q.   You mean, you don't specifically
21    recall?  What do you mean by "specifically"?
22    A.   No, sorry.  I did not specifically
23    obtain a new level.  If they upgraded me or
24    changed my service, that's why.
25    Q.   I understand.  Let me see if I can

ALTMAN

1
2     rephrase it.
3          You didn't seek some sort of enhanced
4     or elevated level of protection because of the
5     receipt you received from White House Black
6     Market in May of 2015, correct?
7     A.   Correct.
8     Q.   When you have -- well, let me back up.
9          So what are you provided by Experian
10    on a monthly basis, pursuant to the service that
11    you have with that company?
12    A.   My current credit score, alerts when
13    my credit score changes, helpful tips about
14    changing my credit score, and then specifics
15    about what is affecting my score.
16    Q.   It's generated through FICO?
17    A.   I believe so.
18    Q.   When you have reviewed your credit
19    report, have you ever come across transactions
20    from American Express that you did not authorize?
21    A.   Not that I'm aware.
22    Q.   Or any other card brand?
23    A.   Not that I'm aware.
24    Q.   Looking now at the other items on this
25    bullet point, there's a recommendation of going

ALTMAN

1
2     paperless.  Do you see that about halfway through
3     the page?
4     A.   Yes.
5     Q.   Have you switched to paperless
6     statements?
7     A.   For some of my accounts, yes.
8     Q.   Which accounts?
9     A.   This account in particular, yes.
10    Q.   When did you do that?
11    A.   Several years ago.  I don't recall
12    exactly.
13    Q.   Why did you do that?
14    A.   I don't recall exactly.
15    Q.   Let's go to the second page of the
16    document.
17         You see the heading that says, "If you
18    are a victim"?
19    A.   Yes.
20    Q.   That section states, "If you believe
21    that you are a victim of identity theft, inform
22    American Express as soon as possible by
23    contacting the number on the back of your card."
24         Did you inform American Express or
25    contact the number on the back of the card after

ALTMAN

1 you realized you may have been given a
2 noncompliant receipt?
4     A.  No.
5     Q.  And below that there's a
6 recommendation that you can visit the Federal
7 Trade Commission, FTC, website for step-by-step
8 guidelines, correct?
9     A.  Correct.
10    Q.  Have you ever visited the FTC website?
11    A.  No.
12    Q.  So you didn't visit the FTC website
13 after you learned of the possible legal violation
14 here?
15    A.  Correct.
16    Q.  When you discovered the possible
17 statutory violation, did you obtain any further
18 identity theft protection product or service?
19    A.  No.
20    Q.  Does the Experian product function as
21 identity theft protection?
22    A.  I think so.
23    Q.  Or is it simply a credit monitoring
24 product?
25    A.  I'm not sure.

ALTMAN

2     Q.  So putting that aside, whether it does
3 or it doesn't, that's fine, but putting that
4 aside, you did not look into any actual or
5 increased identity theft protection service after
6 May 16, 2015?
7     A.  Correct.
8     Q.  After discovering the possible
9 statutory violation, did you personally take any
10 steps to reduce or prevent the possibility that
11 the display of the digits on your credit card
12 might lead to possible identity theft or identity
13 fraud?
14        MR. LAMER:  Objection, vague.  Do you
15 know what Mr. Goheen is asking?
16    A.  I'm not sure I understand the
17 question.
18        MR. LAMER:  Do you mind, Barry.
19    Q.  (By Mr. Goheen) Did you take any steps
20 to reduce or prevent the possibility that you
21 might be a victim of identity theft or identity
22 fraud?
23    A.  No.
24    Q.  Did you contact -- we will use
25 Experian as the example since they supply your

ALTMAN

2 product.  Did you contact Experian to ask that a
3 fraud alert be put on your account?
4     A.  No.
5     Q.  Did you contact any other credit
6 reporting agency to ask that a fraud alert be put
7 on your account?
8     A.  No.
9        (Exhibit 7, Plaintiff's Responses to
10 White House Black Market, Inc.'s First Set
11 of Requests for Admission, marked for
12 identification.)
13    Q.  (By Mr. Goheen) Let me hand you
14 Exhibit 7.  These are your responses to White
15 House Black Market's Requests for Admission.
16    A.  Yes.
17    Q.  So you recognize the document?
18    A.  I do.
19    Q.  Look at page seven and Request for
20 Admission Number 10.  It's the last one.
21    A.  Page seven is the signature -- oh,
22 okay, at the top, sorry.
23    Q.  No problem.
24        Request for Admission Number 10
25 states, "Admit that you have not filed a report

ALTMAN

2 with any law enforcement agencies arising from
3 the receipt."  And your response was admit,
4 correct?
5     A.  Correct.
6     Q.  Now, this response, as you see right
7 below that, is dated December 5, 2016, correct?
8     A.  Correct.
9     Q.  Does it remain true today that you
10 have not filed a report with any police or law
11 enforcement agency as a result of your being
12 provided with the receipt from White House Black
13 Market in May of 2015?
14    A.  Yes.
15    Q.  Have you ever filed a police report
16 complaining that someone has stolen or attempted
17 to steal your identity?
18    A.  No.
19    Q.  Have you ever filed a police report
20 complaining that someone committed identity fraud
21 on you by making unauthorized charges on your
22 credit card?
23    A.  No.
24    Q.  So let's turn back now to request
25 number one of this same document, which is on

ALTMAN

1 page three. So for the past two years -- it's
2 been almost two years, right? For the past two
3 years, you have retained possession of the
4 receipt, correct?
5     A. My attorneys have the receipt.
6     Q. Good qualification. Let me rephrase.
7     Other than your providing it to your
8 attorneys, you, otherwise, have retained
9 possession of it since May 2015; is that correct?
10     A. Correct.
11     Q. And request for admission number one
12 here, as you look at that, states, "Admit that
13 you are still in possession of the receipt." And
14 you admit that, is that --
15     A. Yes.
16     Q. And is that still something today you
17 would admit four or five months after this
18 response?
19     A. Yes.
20     Q. The next admission right below that
21 states, "Admit that you have not lost the receipt
22 at any time since you received it from White
23 House Black Market." And you admit that,
24 correct?

ALTMAN

1     A. Correct.
2     Q. And does that also remain true as we
3 sit here today?
4     A. Yes.
5     Q. So other than showing it to your
6 counsel, I'm not asking about that, have you ever
7 shown the May 2015 receipt to a family member?
8 And I'm excluding Mr. Wexler from that.
9     A. Not intentionally.
10     Q. Would you please explain that?
11     A. Yes. I don't recall if my sister may
12 have been standing there when I first showed it
13 to my brother-in-law.
14     Q. With that exception -- oh, I'm sorry,
15 with that possible exception, you have, to your
16 knowledge, never shown the receipt to your sister
17 or any other family member, aside from
18 Mr. Wexler?
19     A. Correct.
20     Q. And have you ever shown the receipt to
21 any of your co-workers?
22     A. No.
23     Q. Or friends?
24     A. No.

ALTMAN

1     Q. Have you ever spoken about the
2 possible statutory violation or your lawsuit to
3 any of your coworkers or family members and
4 relatives, again, including Mr. Wexler?
5     A. Yes.
6     Q. To whom?
7     A. Roger Graham, my boyfriend, my mother,
8 my father, my boss. I had to tell her why I was
9 coming here today. That's it.
10     Q. Was that the first time you had
11 alerted your boss to the lawsuit, was your trip
12 here today?
13     A. Yes.
14     Q. If I asked this before, I apologize.
15 Do you have a new boss as of two weeks ago when
16 your responsibilities changed?
17     A. Are you a Who fan? So, new boss same
18 as the old boss? My boss has been my boss four
19 times, I think.
20     Q. Really?
21     A. Yes.
22     Q. So this would be, I guess, for lack of
23 a better term, also a legacy St. Jude Medical?
24     A. Yes.

ALTMAN

1     Q. And, yes, I am a Who fan. So you will
2 not get fooled again.
3     All right. Well, I'm trying to ask
4 this in a general way without being too general,
5 but could you generalize these conversations
6 you've had outside the presence of your counsel
7 where you have discussed the lawsuit? Has it
8 been kind of general, well, I need to go give a
9 deposition? Or I have filed this lawsuit and
10 here is what I'm claiming, and that sort of
11 thing? Is it possible for you to do that sort of
12 generalization?
13     A. Your generalization is accurate.
14     Q. Okay. And one reason I'm asking that
15 is, and we may pull out later the interrogatory
16 responses again that we showed earlier, but we
17 asked is there anyone else that you believe has
18 knowledge of the facts of the lawsuit.
19     A. Right.
20     Q. Other than you and, obviously, your
21 counsel. And I think the response we were
22 provided mentioned, you know, several from the
23 White House Black Market because we had
24 identified a few people in our own discovery. So

ALTMAN

1 that's the reason I'm asking these questions.
2
3 Do you believe there is anyone else,
4 outside your counsel, which includes Mr. Wexler,
5 even though he has withdrawn, that would have
6 knowledge of the facts of your lawsuit against
7 White House Black Market?
8 A. Not the detailed facts.
9 Q. Okay. Since May of 2015, you have
10 made additional purchases at a White House Black
11 Market location, correct?
12 A. Correct.
13 Q. So let's go to those interrogatory
14 responses I referred to a moment ago. It's
15 Exhibit 5. So let's look at Interrogatory
16 Number 2 at the top of page four, please.
17 And we ask, List all purchases you
18 have made from any White House Black Market store
19 since July 8, 2013, and asked for any information
20 from there. Obviously, we are talking about the
21 current receipt that brings us here today, but
22 you also state, She has made a small number of
23 purchases at WHBM since July 8, 2013, but that
24 she does not recall the precise number of
25 purchases, the date on which those purchases were

ALTMAN

1 made, or the amount of each purchase and whether
2 she used her American Express or MasterCard for
3 those purchases, correct?
4 A. Correct.
5 Q. And then you state that you are
6 investigating her American Express and MasterCard
7 statements for the relevant period, not all of
8 which are readily accessible to her at the
9 present time, and that she will supplement this
10 response once she has completed her
11 investigation. Correct?
12 A. Correct.
13 Q. So have you completed that
14 investigation now?
15 A. Yes.
16 Q. So what has that investigation
17 disclosed?
18 A. A pair of white Capri pants, a white
19 tank top. And then I didn't make the purchase,
20 but Roger made the purchase as a gift to me. It
21 was kind of a gray and blue sweater. One was
22 like an over the head sweater and then one was an
23 open sweater.
24 Q. Do you recall when those purchases

ALTMAN

1 were made, based on what investigation?
2 A. So he gave me those presents in
3 January, yes. So I don't know exactly when he
4 bought them. And then the Capri pants and the
5 tank top, I don't recall exactly when I bought
6 those.
7 Q. Okay. Let's see if we can go there.
8 We will have this as the next Exhibit, Exhibit 8.
9 (Exhibit 8, Purchase receipts, marked
10 for identification.)
11 Q. (By Mr. Goheen) So this receipt, it
12 would appear to reflect purchases, or a purchase
13 you made at a White House Black Market location
14 in Austin on January 23, 2016?
15 A. Yes. I forgot about the leggings,
16 sorry.
17 Q. No, worries. Actually, I thought you
18 may have mentioned that, but that's fine.
19 So the location of the store is
20 identified as Barton Creek Square, correct?
21 A. Yes.
22 Q. Is that like the nearest location?
23 A. It's the main mall in Austin, yes.
24 Q. Phipps Plaza of Austin?

ALTMAN

1 A. I wouldn't quite call it the Phipps
2 Plaza of Austin.
3 Q. It aspires to be the Phipps Plaza of
4 Austin?
5 A. It's the Lenox Square of Austin.
6 Q. Say no more.
7 How often have you shopped at the
8 Barton Creek Square location? Window shopped or
9 otherwise.
10 A. So I have lived in Austin for 19
11 years.
12 Q. Many times then?
13 A. Many times.
14 Q. So in this transaction, looking at the
15 far left-hand side, you are using the same
16 American Express card; is that fair to say?
17 A. Correct.
18 Q. Because here we have the card number,
19 the last four digits are 1001?
20 A. Yes.
21 Q. So you are comfortable it's the same
22 AmEx that you used a few months earlier in
23 Atlanta?
24 A. Yes.

ALTMAN

1
2      Q.   And here all four, I'm sorry the
3  entire set of numbers is masked other than the
4  last four, correct?
5      A.   Correct.
6      Q.   And I guess going back to what you
7  said about May, did you also look at this
8  particular receipt at the point of sale or soon
9  thereafter?
10      A.   Yes.
11      Q.   And notice what you would consider it
12  to be not violative, I guess, of the FACTA
13  statute?
14      A.   Yes.
15      Q.   Of course, this is after the lawsuit
16  was filed, right?
17      A.   Yes.
18      Q.   January 2016.
19          When you saw what you considered to be
20  the compliant receipt, did it make any impression
21  on you one way or the other?
22      A.   I was happy it was compliant.
23      Q.   Did the receipt of the -- that's not a
24  good word.  Did your having been given the May
25  2015 receipt dissuade you from going back to shop

ALTMAN

1
2  at White House Black Market?
3      A.   Clearly, not.
4      Q.   Well, this is eight months later,
5  right?  I mean, we are talking about May to
6  January, I guess.  And you said you had been
7  there, I guess you go there on, perhaps, regular
8  occasions, whether or not you buy anything.
9          So you are comfortable you had
10  probably been there between May and January, but
11  just had not purchased anything?
12      A.   I don't recall.
13      Q.   Okay.  So I go back to my -- well, I
14  guess you answered the question.  You weren't
15  dissuaded from going back to a White House Black
16  Market, fair?
17      A.   Fair.
18      Q.   Now, this reflects you are still a
19  member, or at least as of January 2016 a member
20  of the rewards program, correct?
21      A.   Yes.
22      Q.   So you got that five percent discount,
23  right?
24      A.   Yes.
25      Q.   Now, what about the two receipts to

ALTMAN

1
2  the right of that one?  It looks like -- well, do
3  you remember paying in cash for any part of this
4  and then running that back or having someone run
5  that back through and voiding that out?
6      A.   No.  I'm confused, actually.
7      Q.   Okay.
8      Q.   As to why there are three receipts.
9  For, basically, one pair of leggins and why there
10  are three different prices.  So it looks like
11  maybe the store clerk messed up, right?
12      Q.   Well, you believe it to be the same
13  price, $34.56 total?
14      A.   Oh, okay.
15      Q.   If you look at the total?
16      A.   Sorry.  I was looking at the bottom
17  where it talks about the silver member and the --
18      Q.   Right.
19      A.   So those are different totals.
20      Q.   Yes.
21      A.   Yes.
22      Q.   But you don't have a recollection of
23  paying in cash and then having a post void, which
24  is what that right hand --
25      A.   No.

ALTMAN

1
2      Q.   Okay.  In the 15 months since this
3  transaction, have you made other purchases at
4  this particular location, White House Black
5  Market?
6      A.   I don't know if it was this location.
7  There's another location by me, The Hill Country
8  Galleria, that I think the white leggins maybe
9  came from, or the white capri pants, sorry.
10      Q.   Do you recall now that we have this
11  one of January 2016, do you recall if that may
12  have been subsequent to January 2016, or before?
13      A.   If I had to guess, I would say it
14  would be after, because leggins, you know, black
15  leggins are winter and then white capri pants are
16  spring, but that --
17      Q.   Let me ask this, which you probably
18  can answer with a little more certainly.  It was
19  subsequent to May of 2015?
20      A.   Yes.
21      Q.   Let me mark this as the next Exhibit.
22          (Exhibit 9, American Express
23      Statement, marked for identification.)
24      Q.   (By Mr. Goheen) This will be
25  Exhibit 9.

ALTMAN

1　　　　　ALTMAN
2　　All right. So this, again, you
3　produced to us in this litigation. It's Bates
4　numbered Altman-3003 through 3010.
5　　So again, look at the next to last
6　page of the document. So that would reflect, are
7　you confident that reflects the purchase we were
8　just talking about on the receipt of January 23,
9　2016?
10　　A. Yes.
11　　(Exhibit 10, Store receipt, marked for
12　identification.)
13　　Q. (By Mr. Goheen) Let me have this, this
14　is Exhibit 10, which I think you just referred to
15　a moment ago.
16　　So this purchase was made at the shops
17　at Charleston Place in Charleston,
18　South Carolina, correct?
19　　A. Correct.
20　　Q. Or, at least, so says the top of the
21　receipt.
22　　You said earlier your husband made
23　these purchases, or you believe your husband --
24　　A. Domestic partner.
25　　Q. I'm sorry. Mr. Graham made these

ALTMAN

1　　　　　ALTMAN
2　purchases?
3　　A. Yes.
4　　Q. Excuse me. Roger Graham made these
5　purchases.
6　　Were you in Charleston with him?
7　　A. No.
8　　Q. Do you know why he was in Charleston?
9　　A. For a meeting.
10　　Q. So it was business related?
11　　A. Yes.
12　　Q. So he used your rewards discount?
13　　A. Yes.
14　　Q. And so the Visa card here that has the
15　card number ending in 7628, that likely would be
16　his personal Visa card?
17　　A. I believe so.
18　　Q. Well, let me ask it a better way.
19　It's not your card?
20　　A. It is not my card.
21　　Q. I guess it, conceivably, could be a
22　corporate or a business card. I wasn't trying to
23　suggest otherwise, but it's not your card that
24　was used for this transaction?
25　　A. Correct. Correct.

ALTMAN

1　　　　　ALTMAN
2　　Q. Do you know if he's ever bought other
3　items for you at any other White House Black
4　Market location?
5　　A. I don't know.
6　　Q. Do you know if any other person has
7　made purchases as gifts or otherwise for you at
8　any White House Black Market location?
9　　A. I don't recall.
10　　Q. Do you know of anyone else that
11　purchases items at White House Black Market,
12　friends, coworkers, family members?
13　　A. Not specifically.
14　　Q. Are you aware of any other persons
15　that have purchased items at White House Black
16　Market with a credit card that received a
17　noncompliant receipt?
18　　A. Not --
19　　MR. LAMER: Objection. Objection,
20　calls for a legal conclusion. Go ahead.
21　　A. Yes, not -- I mean, 400,000 people in
22　the class. Is that the right answer?
23　　Q. I'm just asking, do you know?
24　　A. Yes, I don't know them personally.
25　　Q. All right. And that's sort of my -- I

ALTMAN

1　　　　　ALTMAN
2　guess, that was my question. Do you know, I
3　mean, personally of anyone else that you believe
4　might be in the large class that you just alluded
5　to?
6　　A. No.
7　　Q. When you received the receipt in May
8　of 2015, did you ask any friend or acquaintance
9　or family member, again, taking Mr. Wexler out of
10　the equation, whether they had ever received a
11　receipt like the one you had received from White
12　House Black Market?
13　　A. I don't recall.
14　　Q. You understand that you are not
15　seeking actual damages from White House Black
16　Market in this case, correct?
17　　A. Correct.
18　　Q. You are seeking something, the term of
19　art is statutory damages. Is that a term you
20　have heard in the proceeding of this case?
21　　A. Yes.
22　　Q. So, for example, you have not
23　sustained any lost wages as a result of the
24　conduct that underlies your complaint against
25　White House Black Market; is that correct?

ALTMAN

1
2      A.  Correct.
3      Q.  Or lost any salary?
4      A.  Correct.
5      Q.  Correct?
6         And you are not making any such claim
7   here, correct?
8      A.  Correct.
9      Q.  You have not sustained any what would
10  be termed as out of pocket damages as a result of
11  White House Black Market's receipt; is that
12  correct?
13     A.  Correct.
14     Q.  Nor are you seeking to recover such
15  items here, correct?
16     A.  Correct.
17     Q.  You have not sustained any economic
18  damages as a result of the alleged FACTA
19  violation, correct?
20        MR. LAMER:  Objection.  Calls for a
21  legal conclusion.
22     A.  Correct.
23     Q.  (By Mr. Goheen) In other words, you
24  have not incurred a denial of credit that you
25  would attribute to your getting this receipt in

ALTMAN

1
2   May of 2015, correct?
3      A.  Right.
4      Q.  Or that you are required to pay a
5   higher interest rate on a loan or a credit card
6   because of the receipt you were provided in May
7   of 2015, correct?
8         MR. LAMER:  Objection.  Compound.
9   Go ahead.
10     A.  Not that I'm aware.
11     Q.  (By Mr. Goheen) I may have asked you
12  this earlier, but you have not incurred any
13  unauthorized charges to your AmEx card that's
14  used at Phipps Plaza that you would attribute to
15  White House Black Market, correct?
16     A.  Not that I'm aware.
17     Q.  Have you incurred any unauthorized
18  charges to any of your other credit cards that
19  you would attribute to White House Black Market?
20     A.  Not that I'm aware.
21     Q.  So in other words, you're not alleging
22  you have lost any money as a result of the
23  alleged violation, correct?
24     A.  Correct.
25     Q.  You have not received any medical

ALTMAN

1
2   treatment as a result of the conduct you allege
3   from White House Black Market, have you?
4      A.  No.
5      Q.  And, thus, you are not seeking to
6   recover from White House Black Market any cost
7   associated with any potential medical treatment,
8   correct?
9      A.  Correct.
10     Q.  You have not sustained any injury to
11  your reputation as a result of White House Black
12  Market's alleged conduct, correct?
13     A.  Correct.
14     Q.  So you are not seeking to recover any
15  such damages for that, correct?
16     A.  Correct.
17     Q.  You have not sustained any damages for
18  emotional distress as a result of White House
19  Black Market's conduct, correct?
20     A.  Correct.
21     Q.  And you, regardless, are not seeking
22  to recover for any such damages in this lawsuit,
23  correct?
24     A.  Correct.
25     Q.  So in the complaint -- we can go ahead

ALTMAN

1
2   and look at the complaint here, Exhibit 2, at the
3   bottom of page 13, the next to last, I guess,
4   close to the next to last page, at least, up
5   here, page 13 to 14, if you look at that.
6      A.  Of Exhibit 2?
7      Q.  Of the complaint, yes.
8      A.  Okay.  Yep.
9      Q.  So you allege there at the bottom in
10  sub A that you are seeking statutory damages of
11  no less than $100, nor more than $1,000 per
12  violation, correct?
13     A.  Yes.
14     Q.  And you understand that statutory
15  damages, as opposed to actual damages, are the
16  only types of damages you can recover in this
17  case because you have alleged only a willfulness
18  claim against White House Black Market?
19        MR. LAMER:  Objection.  Calls for a
20  legal conclusion.
21     A.  Yes.
22     Q.  (By Mr. Goheen) Well, do you
23  understand you can't recover actual damages the
24  way the complaint is pleaded, correct?
25        MR. LAMER:  Objection.  Calls for a

ALTMAN

1
2  legal conclusion.
3      Go ahead.
4      A.  Yes.
5      Q.  (By Mr. Goheen) So you are comfortable
6  with the fact that the most you would receive in
7  this case is $1,000, and possibly as little as
8  $100, even if you are able to prove that White
9  House Black Market willfully violated the law?
10     A.  Yes.
11     Q.  And you had that understanding when
12 you initiated this case?
13     A.  Yes.
14     Q.  And authorized the complaint to be
15 filed on your behalf?
16     A.  Yes.
17     Q.  Now, you contend that each member of
18 the proposed class should be awarded the same
19 amount of statutory damages, correct?
20     A.  Yes.
21     Q.  Do you know what amount of statutory
22 damages you intend to ask the Court to award you?
23         MR. LAMER:  Objection.  Calls for
24 speculation.
25     Q.  I asked, do you know.

ALTMAN

1
2      A.  No.
3      Q.  I'm not asking you to speculate at
4  all.
5          So you don't know?
6      A.  Correct.
7      Q.  Do you believe that you are entitled
8  to ask for more statutory damages because you're
9  the one that brought the lawsuit?
10     A.  No.
11     Q.  Did you consult with any other
12 potential class members as to whether they would
13 agree to your limiting any individual class
14 member's recovery to, at most, a thousand
15 dollars?
16     A.  No.
17     Q.  Now, in the last page of this
18 complaint, which is the page over, you state that
19 you intend to ask the Court for punitive damages,
20 right?
21     A.  Yes.
22     Q.  Do you have an understanding of what
23 punitive damages are?
24         MR. LAMER:  Objection.  Calls for a
25 legal conclusion.

ALTMAN

1
2      A.  Not entirely.
3      Q.  (By Mr. Goheen) Well, what
4  understanding do you have of punitive damages?
5          MR. LAMER:  Same objection.
6      A.  I guess it would be damages to harm
7  White House Black Market for violating the law.
8      Q.  (By Mr. Goheen) What conduct of White
9  House Black Market do you believe should entitle,
10 I'm sorry, should result in, to use your term,
11 harm to White House Black Market for violating
12 the law?
13         MR. LAMER:  Objection.  Calls for a
14 legal conclusion.
15     A.  I'm sorry.  Will you rephrase the
16 question?
17         MR. GOHEEN:  Can you read back the
18 last answer?
19         (WHEREUPON, the record was read back
20 by the reporter as follows:)
21         "Answer:  I guess it would be damages
22 to harm White House Black Market for
23 violating the law."
24     Q.  (By Mr. Goheen) And my question is,
25 what conduct are you aware of that would support

ALTMAN

1
2  a court imposing that sort of harm to White House
3  Black Market, to use your term?
4          MR. LAMER:  Objection.  Calls for a
5  legal conclusion.
6      A.  It would be that they were not
7  compliant, that their point of sale machines were
8  not up to date.
9      Q.  (By Mr. Goheen) Okay.  Is there
10 anything else that you're aware of?
11         MR. LAMER:  Same objection.
12     A.  No.
13     Q.  (By Mr. Goheen) Okay.  As we sit here
14 today, do you have an amount that you intend to
15 ask the Court to award in terms of punitive
16 damages?
17     A.  No.
18     Q.  Is it your position that every member
19 of your proposed class should receive the same
20 amount of punitive damages?
21     A.  Yes.
22     Q.  Do you have any formula by which
23 punitive damages could be calculated in this
24 case?
25         MR. LAMER:  Objection.  Calls for a

```
1              ALTMAN
2   legal conclusion.
3       A.  I do not.
4       Q.  (By Mr. Goheen) Now, in the
5   complaint -- let's look at the bottom of, or
6   let's look at paragraph 22 in the complaint.
7           So in paragraph 22, at the bottom of
8   page five, you allege, "Defendant's wanton
9   violation is tantamount to turning over
10  plaintiff's physical credit card to an identity
11  thief."  Correct?
12      A.  Yes.
13      Q.  Then over on page 11 at paragraph 50,
14  do you see that?  Paragraph 50, right at the
15  bottom of the page?
16      A.  Yes.
17      Q.  You allege, "Notwithstanding all of
18  the publicity and the Defendant's knowledge of
19  the statute's requirements, Defendant willfully
20  failed to comply with FACTA, thereby putting all
21  of its customers' financial identities at risk."
22  Correct?
23      A.  Correct.
24      Q.  So, essentially, would you agree that
25  you are alleging that the receipt exposed you and
```

```
1              ALTMAN
2   other people in the proposed class to a risk of
3   identity theft?
4       A.  Yes.
5       Q.  Have you ever been the victim of
6   identity theft?
7       A.  Not to my knowledge.
8       Q.  To your knowledge, prior to the events
9   underlying this lawsuit, had anyone ever
10  attempted to steal your identity?
11      A.  Not to my knowledge.
12      Q.  So your identity has not been stolen
13  as a result of the alleged statutory violation
14  you assert as to White House Black Market,
15  correct?
16          MR. LAMER:  Objection.  Asked and
17  answered.
18      A.  Not to my knowledge.
19      Q.  (By Mr. Goheen) Are you aware of any
20  third person or third party's efforts to steal
21  your identity as a result of White House Black
22  Market's alleged violation?
23      A.  Putin?  No.
24      Q.  What was that?
25      A.  Vladimir Putin.  A joke.
```

```
1              ALTMAN
2       Q.  Are you aware of any efforts by any
3   third parties or third persons to steal the
4   identity of any of the potential class members --
5       A.  No.
6       Q.  -- resulting from White House Black
7   Market's alleged violation?
8       A.  No.
9       Q.  In the two years since the lawsuit was
10  filed, or the nearly two years since the lawsuit
11  was filed, have you ever received any collection
12  calls on accounts that did not belong to you
13  resulting from the May 2015 receipt?
14      A.  I have received collection calls on
15  accounts that did not belong to me.  I am not
16  sure why, if it was because of the receipt or
17  not.
18      Q.  When did you receive those calls?
19      A.  I received them on a frequent basis,
20  primarily asking about accounts from my
21  ex-husband.
22      Q.  What, credit card accounts, or some
23  other type?
24      A.  I'm not sure.
25      Q.  Are these debt collector calls?
```

```
1              ALTMAN
2       A.  Yes.
3       Q.  Are they robo calls?
4       A.  I don't know.
5       Q.  How long have you been receiving them?
6       A.  Seven years.
7       Q.  So they predate the events of this
8   lawsuit, correct?
9       A.  Some of them, yes.
10      Q.  Well, I mean, okay.  Let me just try
11  that one more time.  I get it.  That wasn't a
12  very good question.
13          You have received collection calls of
14  some character for the last seven years, correct?
15      A.  Yes.
16      Q.  And I'm not asking you to delineate
17  who has called or whatever, but you have received
18  them pre-dating the events of May 16, 2015,
19  correct?
20      A.  Correct.
21      Q.  It may be that you have received
22  others from different collectors since May 16 of
23  2015; is that fair?
24      A.  That's fair.
25      Q.  But as I understood it, you don't know
```

ALTMAN

1 if there's any connection between those calls and
2 the events of May 16, 2015, correct?
3     A.   Correct.
4     Q.   The same question with collection
5 letters.  Have you received any collection
6 letters on accounts that did not belong to you?
7     A.   I don't recall if I have received
8 letters.
9     Q.   Those accounts that you have been
10 called on for the last seven years, how
11 frequently do you receive those calls?
12     A.   Weekly.
13     Q.   Meaning, one call a week, or multiple
14 calls each week?  Or variable?
15     A.   Varying.
16     Q.   When you access your credit report,
17 though, you don't recognize any accounts that
18 just flat out don't belong to you?
19     A.   Correct.
20     Q.   All right.  Let's go back to the
21 interrogatory responses for a few moments,
22 Exhibit 5.
23         All right.  Let's look at Exhibit --
24 I'm sorry.  Interrogatory 6, which is on the

ALTMAN

1 bottom of page 6.
2         So Interrogatory 6 states, "Explain in
3 detail whether you have ever been the victim of
4 identity theft at any time after receiving the
5 receipt from WHBM.  And, if so, explain when and
6 under what circumstances you were the victim of
7 identity theft," correct?
8     A.   Correct.
9     Q.   And then Interrogatory Number 7, which
10 is on the next page, states, "Explain in detail
11 any efforts by any person to steal your identity
12 or commit identity fraud using your identity at
13 any time after receiving the receipt from WHBM.
14 And for all such efforts, explain in detail the
15 circumstances concerning those efforts," correct?
16     A.   Correct.
17     Q.   Would you agree that your responses to
18 both Interrogatory 6 and 7 are identical?
19     A.   Yes.
20     Q.   Okay.  I'll just read the one to
21 Interrogatory Number 6.  Your response reads,
22 "Plaintiff is currently unaware if her identity
23 has been compromised because of Defendant's
24 privacy violations, but states that given the

ALTMAN

1 nature of identity theft, it is entirely possible
2 for such theft to have occurred without her being
3 aware of it, and that in all likelihood not known
4 until it is too late," correct?
5     A.   Correct.
6     Q.   What do you mean by "the nature of
7 identity theft"?
8     A.   That it happens in secrecy.  And
9 unlike somebody stealing your wallet, taking it
10 from you physically, this happens electronically,
11 behind the scenes.  And so from that standpoint,
12 that's the nature of identity theft.
13     Q.   What's the source for your knowledge
14 of that response you just gave?
15     A.   I'd say general knowledge from the
16 news and the media.
17     Q.   Have you ever known anyone who has
18 been the victim of identity theft?
19     A.   Yes.
20     Q.   Who is that?
21     A.   A coworker.  I'm not sure exactly who,
22 but I remember a coworker who went through it.
23 And the trials and tribulations that occurred to
24 fix it.

ALTMAN

1     Q.   This is a coworker at St. Jude
2 Medical?
3     A.   I think so.
4     Q.   Not one of your prior two employers?
5     A.   It was years ago, so I'm not exactly
6 sure.
7     Q.   So certainly then you are comfortable
8 that it predated May of 2015?
9     A.   Yes.
10     Q.   What do you recall, other than the
11 fact that it happened to your coworker, you know,
12 the trials and tribulations to use the term you
13 used, what did you observe in that instance?
14     A.   Closing all of the accounts, hits on
15 credit scores, having to go through remediation
16 with a bunch of different accounts, including
17 places that wouldn't occur to me like the
18 electric company and other companies, I guess,
19 that use your credit to open and close accounts.
20     Q.   Do you have any recollection as to
21 what the circumstances were of the identity
22 theft?  Meaning, was it someone that this
23 coworker knew, or was it just a criminal act by
24 some random person or anything like that?

ALTMAN

1
2      A.  It was -- he thought it was from a gas
3  station credit card machine.  And I remember that
4  because for several years after that I would go
5  into the gas station to either pay by credit card
6  or use cash.
7      Q.  Is it possible that this particular
8  event predated FACTA?
9          MR. LAMER:  Objection.  Calls for a
10  legal conclusion.
11      A.  Yes, so FACTA was --
12          MR. GOHEEN:  That's not a --
13      A.  -- 2006, is that right?
14      Q.  (By Mr. Goheen) Right.  Yes.
15      A.  And I started at St. Jude in 2007, so
16  it's possible.
17      Q.  Okay.  Do you recall whether there
18  were criminal charges that arose from that event?
19      A.  I don't.
20      Q.  Now, in this response you state there
21  on the last portion, "It is entirely possible for
22  such theft to have occurred without her being
23  aware of it, and that in all likelihood not known
24  until it is too late," correct?
25      A.  Correct.

---

ALTMAN

1
2      Q.  Well, have you undertaken an
3  investigation to ascertain whether a theft of
4  your identity has occurred?
5      A.  An active investigation, I -- yes.  I
6  mean, continuously monitoring my credit, checking
7  my bills, and being aware.
8      Q.  And were those things you were doing
9  also prior to May 2015?
10      A.  Yes.
11      Q.  Do you believe now, nearly two years
12  later, that it is still, to use your term,
13  entirely possible that your identity has been
14  compromised?
15      A.  Yes.
16      Q.  What is the basis for that?
17      A.  Because the information could be out
18  there.  It could be stored on a server somewhere
19  that somebody has hacked and they are sitting on,
20  or they haven't hacked it yet, but they are
21  trying to hack it.  So I --
22      Q.  And, of course, you don't know that
23  any of that actually is occurring or has
24  occurred?
25      A.  That is true.

---

ALTMAN

1
2      Q.  So in the months after submitting this
3  response of Interrogatory 6 and 7, would you
4  change anything about the response?
5      A.  No.
6      Q.  Now, you understand, as we talked
7  about a few moments ago, that your allegation in
8  the complaint is that White House Black Market
9  willfully violated FACTA, correct?
10      A.  Yes.
11      Q.  And as we -- well, then you understand
12  you have not made an allegation that White House
13  Black Market negligently violated FACTA, correct?
14          MR. LAMER:  Objection.  Calls for a
15  legal conclusion.
16      Q.  (By Mr. Goheen) It's your complaint.
17      A.  Yes.
18      Q.  So you understand you're not seeking
19  recovery from White House Black Market based on a
20  claim that White House Black Market negligently
21  violated FACTA, correct?
22          MR. LAMER:  Same objection.
23      A.  Correct.
24      Q.  (By Mr. Goheen) Do you have an
25  understanding of what the concept of negligence

---

ALTMAN

1
2  is?
3          MR. LAMER:  Objection.  Calls for a
4  legal conclusion.
5      A.  Not in legal terminology as you're
6  assuming that I do.
7      Q.  (By Mr. Goheen) I'm not assuming
8  anything.
9      A.  Okay.
10      Q.  I'm just asking you if you understand
11  what the concept is.
12      A.  No.
13          MR. LAMER:  Same objection.
14      Q.  (By Mr. Goheen) Would you agree that
15  what is required to show negligence is not as
16  much as what is required to show wilfulness?
17          MR. LAMER:  Same objection.  Calls for
18  a legal conclusion.  She's not a lawyer.
19          MR. GOHEEN:  I think we clarified
20  that.
21      Q.  (By Mr. Goheen) You can answer.
22      A.  Yes, I don't know.  I mean, I haven't
23  studied what the difference is.
24      Q.  But you understand that if the most
25  you can prove to the Court is that White House

1          ALTMAN
2   Black Market negligently violated the FACTA
3   statute, you won't win the case?
4          MR. LAMER: Objection. Calls for a
5   legal conclusion.
6       Q. (By Mr. Goheen) Well, you understand
7   that, right?
8          MR. LAMER: Same objection.
9          MR. GOHEEN: It's not objectionable.
10      A. Yes, it's whatever the Court believes,
11  right?
12         MR. LAMER: Hold on for a second.
13         For the record, I can lodge my
14  objection and she can answer. I don't need
15  your commentary on whether my objection is
16  proper or not. I believe that it is.
17  Maybe I'm dumb and I don't know, but that's
18  the objection I'm going to lodge.
19         You can go ahead.
20         MR. GOHEEN: Are you done?
21         MR. LAMER: I've just told you, so you
22  don't need to talk to me like that.
23         MR. GOHEEN: Great. I move to strike
24  it.
25      Q. (By Mr. Goheen) Now, do you understand

1          ALTMAN
2   that?
3          MR. LAMER: I will reiterate.
4          MR. GOHEEN: Then I'll move to strike
5   it again.
6          MR. LAMER: I reiterate my objection.
7          MR. GOHEEN: We can do this all day.
8   I'm not the one with the plane.
9          MR. LAMER: That's fine.
10         MR. GOHEEN: I'm going to move to
11  strike it.
12      Q. (By Mr. Goheen But can you just
13  answer the question, please? Or do you need it
14  read back after all that going on?
15      A. No, so I don't know what the court
16  will say.
17         MR. LAMER: Actually, I would like to
18  have the question read back.
19         THE WITNESS: Okay.
20         MR. LAMER: So I know exactly what
21  Barry is attempting to ask. So I can lodge
22  my objection and then you can answer his
23  question.
24         THE WITNESS: Okay.
25      Q. (By Mr. Goheen) I will just ask it

1          ALTMAN
2   this way.
3          You understand that if you prove only
4   a negligent violation of the statute by White
5   House Black Market, you will not win the case?
6          MR. LAMER: Objection. Calls for a
7   legal conclusion.
8       A. So I don't know how the Court will
9   rule based on the facts.
10      Q. (By Mr. Goheen) Let me ask it again.
11         You understand that if the most you
12  prove is a negligent violation by White House
13  Black Market, you will lose the case?
14         MR. LAMER: Same objection. Calls for
15  a legal conclusion.
16      A. Yes, same answer.
17      Q. (By Mr. Goheen) Well, you haven't
18  answered the question, unfortunately.
19         MR. LAMER: She has answered.
20         MR. GOHEEN: No, she hasn't.
21      A. So, I don't -- you say, do you
22  understand, and I say, I don't understand.
23      Q. (By Mr. Goheen) You said you don't
24  know how the Court would rule.
25      A. Right.

1          ALTMAN
2       Q. So if you don't understand, that's
3   fine.
4       A. Okay.
5       Q. If you don't understand the concept
6   then that if you only prove a negligent
7   violation, you won't win the case?
8          MR. LAMER: Objection. Calls for a
9   legal conclusion. Mischaracterizes the
10  witness's testimony.
11      Q. (By Mr. Goheen) So that's your
12  testimony?
13         MR. LAMER: Wait a second. You can
14  ask your question and she can answer it.
15  If it's been answered, then I'm going to
16  say -- go ahead. You ask your question.
17      Q. (By Mr. Goheen) I don't know what that
18  was all about, but can you answer it?
19         MR. LAMER: Would you please ask the
20  question so my witness understands what the
21  question is?
22         MR. GOHEEN: I did ask the question.
23  You objected to it. Now she's confused.
24      Q. (By Mr. Goheen) All right. I will ask
25  it one more time.

ALTMAN

1
2      MR. LAMER:  Please.
3      A.  Thank you.
4      Q.  (By Mr. Goheen) You understand there
5   is a cause of action for negligent violation of
6   FACTA, correct?
7          MR. LAMER:  Objection.  Calls for a
8   legal conclusion.
9          MR. GOHEEN:  Well, there's a legal
10  conclusion whether you understand that.
11  That's interesting.  I never heard that one
12  before.
13     Q.  (By Mr. Goheen) So you understand, yes
14  or no, that there is a cause of action for a
15  negligent violation of FACTA?
16         MR. LAMER:  Same objection.
17     A.  Yes.
18     Q.  (By Mr. Goheen) And you understand
19  there's a cause of action for a willful violation
20  of FACTA?
21         MR. LAMER:  Same objection.
22     A.  Yes.
23     Q.  (By Mr. Goheen) You understand you
24  have not asserted a negligent violation of FACTA
25  here, correct?

ALTMAN

1
2          MR. LAMER:  Same objection.
3      A.  Correct.
4      Q.  (By Mr. Goheen) Ignore that.
5          So you understand that if all you
6   prove is a negligent violation, and you don't
7   prove a willful violation, you will lose the
8   case?
9          MR. LAMER:  Objection.  Calls for a
10  legal conclusion.
11     Q.  (By Mr. Goheen) Are you aware of that?
12     A.  So I -- no.
13     Q.  You don't understand that?
14     A.  No.
15     Q.  Okay.  Do you have any facts or
16  knowledge that White House Black Market
17  intentionally set up its point of sale system at
18  the store in Phipps Plaza to print more than four
19  digits of your credit card number?
20     A.  I do not.
21     Q.  All right.  Let's look at
22  Interrogatory Number 10 on page 8.  Do you see
23  that?
24     A.  Uh-huh.
25     Q.  So we asked here, "Explain in detail

ALTMAN

1
2   every fact that supports your allegation in
3   paragraph 42 of your complaint that Defendant,
4   quote, either recklessly failed to review their
5   own FACTA compliance or intentionally opted to
6   save money by not bringing stores into
7   compliance," close quote.  Do you see that?
8      A.  I do.
9      Q.  Now, your response was, "Plaintiff
10  responds that her facts supporting the
11  allegations are set forth in the complaint and
12  will be supplemented following discovery,"
13  correct?
14     A.  Yes.
15     Q.  What facts are you referring to?
16     A.  I guess they will be supplemented
17  following discovery.
18     Q.  No, actually, it says your facts
19  supporting the allegations.  I'm asking what
20  facts you are referring to there.
21         MR. LAMER:  Objection, vague.
22         Do you know what he's asking?
23         MR. GOHEEN:  Well, that's because the
24  interrogatory response is vague then.
25     Q.  (By Mr. Goheen) I'm asking you what

ALTMAN

1
2   you're referring to in that response.
3      A.  I don't know.
4      Q.  You don't know what facts you're
5   referring to in this response?
6          MR. LAMER:  Objection.  Calls for a
7   legal conclusion.  The document speaks for
8   itself.
9          MR. GOHEEN:  Oh, come on.
10         MR. LAMER:  Go ahead.
11         MR. GOHEEN:  You really like to hear
12  yourself talk, I guess.  That's ridiculous.
13     A.  I mean, we outlined the facts of what
14  happened to me --
15         MR. LAMER:  Objection.  For the
16  record, Counsel, if you would stop
17  characterizing who I am and what I do.  I'm
18  a lawyer.  I am prepared to provide
19  objections --
20         MR. GOHEEN:  Don't make bogus
21  objections.  We will all get out of here
22  quicker.
23     Q.  (By Mr. Goheen) All right.  So the
24  question --
25         MR. LAMER:  My objections are sound

ALTMAN

2 and they will be made in the order in which
3 they are received.
4 All right. You go ahead and ask your
5 questions.
6 MR. GOHEEN: I am. You need to quit
7 interrupting.
8 Q. (By Mr. Goheen) All right. What was
9 the last question?
10 A. You asked about the facts. The facts
11 are I went to the store, they printed a receipt
12 that was in violation of the law.
13 Q. Okay. So are there any more facts,
14 other than what you just said?
15 MR. LAMER: Objection.
16 A. Not that I am aware of.
17 Q. (By Mr. Goheen) Okay. Now, what do
18 you mean when you say they will be supplemented
19 following discovery. Now, you don't, do you?
20 A. I don't.
21 Q. Yes, I don't either.
22 A. Yes.
23 Q. Now, back to the response here. What
24 facts do you have sitting here today that White
25 House Black Market intentionally opted to save

ALTMAN

2 money by not bringing stores into compliance?
3 You don't know that, do you?
4 MR. LAMER: Objection, argumentative.
5 Q. (By Mr. Goheen) Do you have any facts
6 that would support that allegation?
7 A. I do not.
8 Q. Do you understand why it was made then
9 in the complaint?
10 MR. LAMER: Objection, calls for a
11 legal conclusion.
12 A. No.
13 Q. (By Mr. Goheen) You said you reviewed
14 the complaint before it was filed, right?
15 A. I did.
16 Q. So that paragraph, it's paragraph 42,
17 was in there, right?
18 A. Yes.
19 Q. So you don't know why that was in
20 there before you authorized the filing of the
21 complaint, correct?
22 A. You're right.
23 Q. Now, you understand that if you do
24 supplement these responses, we're likely going to
25 have the right to speak with you again, correct?

ALTMAN

2 A. I look forward to it.
3 Q. So you understand that then?
4 A. Yes.
5 Q. All right. Now, we talked about this
6 a few minutes ago, but you understand that the
7 FACTA statute was enacted in late 2003,
8 approximately?
9 MR. LAMER: Objection,
10 mischaracterizes her testimony.
11 A. Yes, I --
12 MR. GOHEEN: I never said it was your
13 testimony, but --
14 A. I thought it was 2006, but --
15 Q. (By Mr. Goheen) That's my next
16 question. You understand it became effective --
17 A. Oh, okay.
18 Q. So you understand the difference? So
19 it was enacted, passed as a law --
20 A. Right.
21 Q. -- and you understand that to have
22 been earlier than when it was made effective?
23 A. Yes.
24 MR. LAMER: Objection. Calls for a
25 legal conclusion.

ALTMAN

2 Q. (By Mr. Goheen) So the effective date,
3 as you, I think, did mention earlier, was
4 sometime in 2006?
5 A. Yes.
6 MR. LAMER: Objection. Calls for a
7 legal conclusion.
8 Q. (By Mr. Goheen) Now, do you have any
9 facts sitting here today that would establish
10 that White House Black Market was not in
11 compliance with FACTA when the statute became
12 effective in 2006?
13 A. I do not.
14 Q. Now, we have talked about your
15 interrogatory responses. Have you read any of
16 the interrogatory responses White House Black
17 Market has served in this case?
18 Your counsel is nodding, so I take it
19 the answer is yes?
20 MR. LAMER: I'm not nodding, actually.
21 MR. GOHEEN: It looks like it.
22 MR. LAMER: Barry, I have a
23 neurological condition that makes me do
24 this sometimes. Okay?
25 MR. GOHEEN: I apologize. I didn't

```
 1            ALTMAN
 2   know that.
 3      Q.  (By Mr. Goheen) Go ahead.
 4      A.  Yes, I don't think so.
 5      Q.  Anything to drink?
 6      A.  I'm fine.
 7      Q.  Certainly, you would agree that at
 8   least from January 2016, when you made the
 9   purchase at the Barton Square store, that White
10   House Black Market has been in compliance with
11   FACTA, correct?
12      A.  At that store, yes.
13      Q.  Well, okay.  That's fair.
14          It has been in compliance at least at
15   that Austin location, correct?
16      A.  Yes.
17      Q.  And you have not shopped -- I'm sorry.
18   You have not made any purchase with a credit card
19   at the Phipps Plaza location since May of 2015,
20   fair?
21      A.  Right.
22      Q.  Okay.  You understand that White House
23   Black Market has addressed the problem you have
24   alleged in your complaint regarding the receipts?
25      A.  I don't know.
```

```
 1            ALTMAN
 2      Q.  Okay.  Do you want to take a quick
 3   break or do you want to --
 4          MR. LAMER:  Do you?
 5      A.  No, let's keep going.
 6      Q.  (By Mr. Goheen) Okay.  I don't think
 7   we have a whole lot longer.
 8          Miss Altman, you are aware that you
 9   brought this case not only individually, meaning
10   on behalf of yourself, but on behalf of a
11   proposed class of individuals, correct?
12      A.  Yes.
13      Q.  What is your understanding of how a
14   class action works?
15      A.  That I am representing a group of
16   people that were also effected by the violation
17   of the law.
18      Q.  Okay.  Have you ever been a plaintiff
19   in a proposed or a certified class action before
20   this one?
21      A.  Not that I'm aware of.
22      Q.  Let me ask it a better way.
23          Have you ever been the named plaintiff
24   in a proposed or certified class action?
25      A.  No.
```

```
 1            ALTMAN
 2      Q.  I am sure you have been a member of a
 3   class action.
 4      A.  I imagine.
 5      Q.  As have I.  And probably everybody in
 6   this room has, right?
 7          Now, do you understand that the person
 8   holding herself out as the representative of the
 9   proposed class occupies a fiduciary relationship
10   to the absent members of that class?
11      A.  Yes.
12      Q.  Now, as the named class representative
13   in this case, do you perceive there to be any
14   advantages of attempting to proceed as a class
15   action?
16      A.  Only that it brings justice to more
17   people.
18      Q.  When you use the term "justice," what
19   do you mean?
20      A.  The law was violated.  That the Court
21   believes that the facts that we present prove the
22   case, and it can help protect these other, I
23   presume, women that shop at White House Black
24   Market, or boyfriends or husbands that are
25   shopping on behalf of their female life partners,
```

```
 1            ALTMAN
 2   or daughters, that it will help protect all of
 3   those shoppers.
 4      Q.  Do you personally know anyone that has
 5   filed a class action lawsuit and held himself or
 6   herself out as the named class representative?
 7      A.  I do.
 8      Q.  Who is that?
 9      A.  I don't know her name.  But it was a
10   friend of my sister's in New York.
11      Q.  Do you recall what law was allegedly
12   violated there?
13      A.  I don't.
14      Q.  So I guess this was years ago before
15   your sister relocated to the south?
16      A.  Correct.
17      Q.  Do you know anyone else that has held
18   himself or herself out as a named class
19   representative?
20      A.  No.
21      Q.  Let's talk about the class definition
22   for a moment.  It's Paragraph 52 of the
23   Complaint, page 12 of 14.
24      A.  Thank you.
25      Q.  Sure.
```

1           ALTMAN
2    A.   Okay.
3    Q.   Paragraph 52 defines the proposed
4 class as, "All persons who used either a Visa,
5 MasterCard or Discover debit or credit card
6 and/or American Express credit card at any of
7 Defendant's locations where defendant provided an
8 electronically printed receipt at the point of
9 sale or transaction that displayed the expiration
10 date of that person's credit or debit card, or
11 more than the last five digits of that person's
12 credit or debit card for a time period beginning
13 five years prior to the filing of this lawsuit
14 until the date the class is certified."  Is that
15 right?
16    A.   Yes.
17    Q.   Now, in your interrogatory responses
18 we asked whether that was still the class
19 definition you proposed, and you said that it
20 was.  Do you remember that?
21    A.   Yes.
22    Q.   As we sit here today, does that remain
23 the class definition that you would propose to
24 the Court?
25    A.   Yes.

1           ALTMAN
2    Q.   And, obviously, you understand White
3 House Black Market to be the defendant as that
4 term is used in that definition, right?
5    A.   Yes.
6    Q.   So let's talk about that definition
7 for a minute.
8         You did not use a Visa debit or credit
9 card at any White House Black Market location
10 where the company provided an electronically
11 printed receipt that displayed the
12 expiration date or more than the last five digits
13 of the credit card, right?
14    A.   Correct.
15    Q.   Or a MasterCard or a Discover?
16    A.   Correct.
17    Q.   Same -- if I asked the same question,
18 you would have the same answer; is that fair?
19    A.   Yes.
20    Q.   So your membership in the class is
21 that you used an American Express credit card at
22 a White House Black Market location that you
23 contend gave you an electronically printed
24 receipt that violated FACTA, right?
25    A.   Correct.

1           ALTMAN
2    Q.   If the Court denies your motion for
3 class certification, do you intend to continue
4 with the lawsuit as an individual plaintiff?
5    A.   I don't know.
6    Q.   What factors would inform that
7 decision on your part?
8    A.   I would discuss it with my counsel.
9    Q.   Speaking of which, on the last page of
10 this complaint, or the last page before we get to
11 the cover sheet, there's only a single counsel
12 Mr. Wexler listed, correct?
13    A.   Uh-huh.
14    Q.   Is he the only, as of July 8, 2015,
15 the only lawyer representing you?
16    A.   Yes.
17    Q.   As of the date the complaint was
18 filed?
19    A.   Yes.
20    Q.   And I know you said he's your
21 brother-in-law, and he still is today; is that
22 right?
23    A.   Yes.
24    Q.   And I think you said in your
25 interrogatory response that relationship began in

1           ALTMAN
2 December of 2011?
3    A.   That's when they got married.
4    Q.   Right.  Well, that's right.  When the
5 brother-in-law relationship --
6    A.   Yes.
7    Q.   -- between you and Mr. Wexler began,
8 in December of '11 when he married your sister?
9    A.   Yes.
10    Q.   That's Eve?
11    A.   Yes.
12    Q.   And I think you said this earlier.  He
13 had not -- well, he has not represented you in
14 any other legal disputes other than this
15 particular one; is that correct?
16    A.   Right.
17    Q.   Now, shortly after the complaint was
18 filed, the law firm of Spencer Fane LLP entered
19 an appearance on your behalf, correct?
20    A.   Yes.
21    Q.   And that's Mr. Lamer's fine firm,
22 right?
23    A.   Yes.
24    Q.   And your interrogatory response says
25 that you have no prior relationship with Spencer

```
1              ALTMAN
2   Fane, correct?
3        A.  Correct.
4        Q.  How did you come to engage Spencer
5   Fane as your co-counsel, or maybe as your lead
6   counsel, or whatever we are calling it, in this
7   case?
8        A.  Through Shimshon.
9        Q.  Okay.  You believe Mr. Wexler had a
10  prior, or at least had some knowledge or
11  relationship or acquaintance with someone at the
12  Spencer Fane law firm?
13       A.  I don't know if it was prior or not,
14  but he engaged them.
15       Q.  Okay.  When is the first time you ever
16  met anyone in person that works for the Spencer
17  Fane law firm?
18       A.  In person?  Today.
19       Q.  It's my understanding that Mr. Wexler
20  has withdrawn as counsel in your case?
21       A.  Yes.
22       Q.  Why did he do that?  Well, let me ask
23  it a better way.  What is your knowledge of why
24  he did that?
25       A.  To ensure that there was no perception
```

```
1              ALTMAN
2   of a conflict of interest that would harm the
3   class.
4        Q.  And he will not be receiving any
5   attorney's fees in the event attorney's fees are
6   awarded to other counsel representing you, is
7   that correct?
8        A.  As far as I know, yes.
9        Q.  Let's mark this as Exhibit 11.
10            (Exhibit 11, Class Action
11       Authorization, marked for identification.)
12       Q.  (By Mr. Goheen) This was produced to
13  us in this litigation.  It's Bates numbered
14  Altman_3126 through 3131.  Do you recognize this
15  document?
16       A.  I do.
17       Q.  If you look at the last two pages of
18  the document, actually the signatures are hard to
19  see at the tops of each of those pages, but at
20  least on the next to last page, do you recognize
21  that as your signature?
22       A.  Yes.
23       Q.  And your address and cell phone and
24  e-mail and all that stuff?
25       A.  Yes.
```

```
1              ALTMAN
2        Q.  It's titled, the document is titled,
3   Class Action Authorization, correct?
4        A.  Yes.
5        Q.  Would you agree it also functions as
6   something of an engagement letter between you and
7   your current counsel in this case?
8        A.  I think we have a separate engagement
9   letter.
10            MR. LAMER:  I will represent for the
11       record that this is the engagement letter,
12       Barry.
13            THE WITNESS:  Oh, okay.
14            MR. GOHEEN:  Thank you.  I saw that.  I
15       appreciate that.
16            THE WITNESS:  Thank you.
17       Q   (By Mr. Goheen) Okay.  So you have
18  engaged, pursuant to this document, three
19  different law firms to represent you and
20  potentially the class.  Correct?
21       A.  Uh-huh.
22       Q.  And one of them, of course, is the
23  Spencer Fane law firm we just talked about,
24  right?
25       A.  Uh-huh.
```

```
1              ALTMAN
2        Q.  Yes?
3        A.  Yes.
4        Q.  You have done great.
5            And another of the firms identified
6   there on the first page is the Keogh Law Firm,
7   correct?
8        A.  Yes.
9        Q.  How did you come to hire the Keogh Law
10  Firm about a year and a half into the case?
11       A.  When Shimshon withdrew, we talked to
12  Bryant --
13       Q.  I don't want to know any
14  communications, but I can understand your facts
15  just as you can tell me the facts that you know.
16            MR. LAMER:  That's fine, go ahead.
17       A.  And --
18       Q   (By Mr. Goheen) I'm not trying to
19  be --
20       A.  No, I appreciate that.  I appreciate
21  that.  And he hired them.
22       Q.  Okay.  Understand.
23            Did you speak with anyone at the
24  Keogh Law Firm before authorizing Mr. Lamer or
25  the Spencer Fane law firm to engage Mr. Keough's
```

ALTMAN

1
2 firm as co-counsel?
3     A.  I don't recall.
4     Q.  I take it you have never personally
5 ever met anyone associated with the Keough Law
6 Firm?
7     A.  Correct.
8     Q.  Did you personally do any
9 investigation about the Keough Law Firm prior to
10 retaining them or having them retained on your
11 behalf?
12     A.  No.
13     Q.  Now, you have also hired a law firm
14 called Skaar & Feagle, correct?
15     A.  Correct.
16     Q.  That's Cliff's firm, correct, who is
17 here today?
18     A.  Yep.
19     Q.  And you understand that the Skaar &
20 Feagle firm functions as what is referred to as
21 local counsel, correct?
22     A.  Yes.
23     Q.  And you understand that they are
24 located in the Atlanta area which is where the
25 case is pending, right?

ALTMAN

1
2     A.  Yes.
3     Q.  Before meeting Cliff today, had you
4 met anyone from the Skaar & Feagle law firm?
5     A.  No.
6     Q.  Now, you're seeking attorney's fees
7 from White House Black Market in this case,
8 correct?
9     A.  Yes.
10     Q.  And I assume you understood that
11 successful plaintiffs that receive a verdict,
12 plaintiff's verdict, under FACTA have entitlement
13 to reasonable attorney's fees, correct?
14     A.  Yes.
15     Q.  Now, in the document here where it has
16 the duties of class representative, do you see
17 that begins near the bottom of page 1?
18     A.  Yes.
19     Q.  And the top of the next page reflects
20 your agreement and understanding of a number of
21 items, correct?
22     A.  Correct.
23     Q.  And you complied with each of those
24 requests of your counsel?
25     A.  I believe so.

ALTMAN

1
2     Q.  Okay.  So let's look at the last one
3 of those, number 9.  Do you see that?
4     A.  Yes.
5     Q.  It states:  Client is to advise the
6 attorneys in advance of seeking any further
7 relief under the bankruptcy laws, open paren,
8 which may result in transfer of client's claim to
9 a trustee, close paren, period.
10         Do you see that?
11     A.  Yes.
12     Q.  Have you ever sought relief under any
13 bankruptcy laws?
14     A.  No.
15     Q.  Are you contemplating the need to file
16 for any relief under the bankruptcy laws at any
17 point during the continued pendency of this
18 lawsuit?
19     A.  No.
20     Q.  That may have just been a boilerplate
21 sort of thing that's stuck in there maybe, to the
22 best of your belief?
23     A.  Possibly.
24     Q.  Well, I mean, you never had any
25 interaction with a bankruptcy court; is that

ALTMAN

1
2 correct?
3     A.  No.
4     Q.  That's not correct?
5     A.  My father was a bankruptcy attorney,
6 so I don't know if that counts as a court.
7     Q.  I should --
8     A.  He's a --
9     Q.  It does count, as a matter of fact.
10     A.  Okay.  Well, good.  Then I'm glad I
11 answered that correctly.
12     Q.  But you personally were not involved
13 in any bankruptcy proceeding --
14     A.  No.
15     Q.  -- for your own --
16     A.  No.
17     Q.  -- assets or debts or whatever?
18     A.  No.
19     Q.  It was not part of your divorce a few
20 years ago or anything like that.
21     A.  Thankfully not.
22     Q.  Now, at the bottom of page 2 there's a
23 section talking about fees.  Do you see that?
24     A.  Yes.
25     Q.  So the first sentence there:  Client

ALTMAN

1 and the attorneys agree that any fee for the
2 attorney's services to client or the class will
3 be contingent upon effecting a recovery or
4 successful result from the parties against whom
5 the claims are brought.
6          Do you see that?
7      A.   Yes.
8      Q.   So kind of putting that in plain
9 speak, this is more or less a straight
10 contingency representation by your counsel?
11     A.   Correct.
12     Q.   So you're not paying any of your
13 counsel an hourly rate as the case proceeds,
14 correct?
15     A.   Correct.
16     Q.   Or like on a monthly basis or
17 otherwise periodically.
18     A.   Correct.
19     Q.   And as the second sentence states,
20 your counsel is advancing costs on your behalf;
21 is that right?
22     A.   That's right.
23     Q.   And the last sentence of that
24 paragraph, it states that your counsel will pay

ALTMAN

1 any or all of defendant's costs to the extent
2 applicable law will allow.  Quote:  In the
3 unlikely event that the court orders such if our
4 litigation is unsuccessful.
5          Do you have an understanding as to
6 what that provision means?
7      A.   Not entirely, no.
8      Q.   What is your best belief as to what
9 that means?
10     A.   That I guess it means that I'll be
11 paying for this case.
12     Q.   Did you ask about that sentence there
13 prior to executing this agreement?
14     A.   When we -- no.
15     Q.   Okay.  Now, the next paragraph states
16 that your counsel will receive the greater of, A,
17 one-third, 33 and one-third percent, of the total
18 settlement proceeds or judgment, if any, or, B,
19 the amount of any attorney's fees for fee
20 shifting claims like FACTA.
21          Do you understand what that provision
22 means?
23     A.   The first section makes clear sense.
24 The second part about fee shifting claims is a

ALTMAN

1 little bit more vague.
2      Q.   Did you ask about any -- did you ask
3 for clarity of any of the vagaries you may have
4 perceived in that last Subsection B there before
5 executing the agreement?
6      A.   No.
7      Q.   The next sentence states:  Client
8 understands that this fee is not set by law and
9 was negotiable between attorneys and client.
10 Correct?
11     A.   Correct.
12     Q.   And is that true?  That it was
13 negotiable between attorneys and client?
14     A.   Sure.
15     Q.   So you negotiated -- so then going
16 back to the first sentence, you would agree that
17 you negotiated an agreement where your counsel
18 received no less than 33 and a third percent of
19 any monetary resolution of this case.
20          Correct?
21     A.   Yes.
22     Q.   Did you seek representation from any
23 other lawyer or set of lawyers other than the
24 three firms that are representing you pursuant to

ALTMAN

1 this agreement prior to signing this agreement?
2      A.   Other than Shimshon, no.
3      Q.   In other words, did you seek advice
4 from another lawyer as to whether --
5      A.   No.
6      Q.   -- this is something you should
7 execute?
8      A.   No.
9      Q.   And you understand that this would
10 govern -- if a class is certified, this would
11 govern the class as well, correct?
12     A.   Yes.
13     Q.   In terms of the fees and that sort of
14 thing?
15     A.   Yes.
16     Q.   So did you stop to think whether it
17 would concern any of the class members that you
18 proposed to represent by agreeing to terms that
19 might bind them even though they would not have
20 had the chance to review this agreement
21 themselves?
22     A.   No.
23     Q.   Do you have a sense of how that would
24 make you feel if you were an absent class member

ALTMAN

1 and someone else executed kind of an agreement
2 that would control your payment to counsel if you
3 were not to opt out of the class?
4 MR. LAMER: Objection. Calls for
5 speculation.
6 A. Yes, you have the right to opt out of
7 the class. So I --
8 Q (By Mr. Goheen) So you would believe
9 that would be the remedy for any class member
10 that doesn't agree with this?
11 A. Yes.
12 Q. Did you seek to determine whether you
13 could find counsel to represent you on a better
14 contingency rate than you negotiated in this
15 case?
16 A. No.
17 Q. Why not?
18 A. Because we had already begun working
19 together, Bryant and I, and I trusted him to not
20 only provide stellar legal advice, but to propose
21 a fair fee structure.
22 Q. Did you discuss this agreement with
23 any other potential class member before you
24 executed it?

ALTMAN

1 A. No.
2 Q. Now, one of the -- I mentioned this a
3 few minutes ago. One of the purposes of a
4 deposition is to ask the person if she knows any
5 individuals that might have additional
6 information. And if I understood your response a
7 few moments back, you don't believe anyone
8 knows -- I think you used the term "details of
9 the lawsuit," certainly not to the degree that
10 you understand them.
11 Is that fair?
12 A. Yes.
13 Q. Okay. We have talked, I think, a
14 couple of times today about your divorce. When
15 did that occur?
16 A. It was final on October 1st, 2010.
17 Q. And that is your only marriage --
18 A. Yes.
19 Q. -- to date?
20 During the course of your marriage,
21 did your husband use or misuse any of your credit
22 cards?
23 A. I think that is subjective.
24 Q. Let me ask it this way: During the

ALTMAN

1 course of the marriage, was it your belief that
2 your husband may have used or misused the credit
3 cards?
4 A. Yes.
5 Q. Obviously, well, I take it from your
6 response he would not agree with your belief on
7 that.
8 A. You would have to ask him.
9 Q. I guess that's true.
10 Did you share credit cards during the
11 course of the marriage?
12 A. Yes.
13 MR. GOHEEN: Why don't we take a
14 couple minutes. I'm about done.
15 THE WITNESS: Okay.
16 (WHEREUPON, a recess was taken.)
17 MR. LAMER: For the record, I'm going
18 to have her clarify one question that was
19 answered that I know to be incorrect. At
20 least, my reading of what this contract
21 says with respect to page 31 -- we are on
22 the record, right?
23 3127 bottom of the paragraph entitled
24 Fees where it begins: Client further

ALTMAN

1 understands that attorneys will pay any and
2 all -- or all of defendant's costs, paren,
3 to the extent applicable law and ethics
4 rules allow, close paren, and the unlikely
5 event that the court orders such if our
6 litigation is unsuccessful.
7 Q (By Mr. Goheen) Would you like to
8 modify or --
9 A. Yes.
10 Q. -- correct or, you know, alter your
11 answer just for clarity purposes?
12 A. Yes.
13 Q. Okay. Go ahead.
14 A. It's my understanding that I am not
15 responsible for paying any fees.
16 Q. Okay. All right.
17 MR. LAMER: That's it.
18 MR. GOHEEN: Thank you.
19 Q (By Mr. Goheen) Miss Altman, you
20 understand that White House Black Market offered
21 you $75,000 to resolve the case individually,
22 correct?
23 A. Yes, we -- that was the settlement
24 offer.

ALTMAN

Q. That's right. And you rejected that offer?

A. I did.

Q. Why?

A. Because I'm representing a class.

Q. We understand the class hasn't been certified, correct?

A. Okay. It's my intention that I can represent a class.

Q. And you realize that's $74,000 more than you would receive if you prevail in this case, correct?

MR. LAMER: Objection. Calls for a legal conclusion.

Go ahead.

A. Yes.

Q. (By Mr. Goheen) And you're comfortable with that?

A. I am.

MR. GOHEEN: All right. Those are the questions I have.

MR. LAMER: Barry wasn't kidding.

MR. GOHEEN: Thank you.

(TIME NOTED: 12:12 p.m.)

ALTMAN


_____

JILL ALTMAN


Subscribed and sworn to before me this _____ day of _____ 2017.

_____

C E R T I F I C A T E

STATE OF GEORGIA )
) ss.:
FULTON COUNTY )


I, Robin Ferrill, Certified Court Reporter within the State of Georgia, do hereby certify:

That JILL ALTMAN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 28th day of April, 2017.


_____

ROBIN K. FERRILL, RPR

-------------------I N D E X-------------------

| WITNESS | EXAMINATION BY | PAGE |
| --- | --- | --- |
| Jill Altman | Mr. Goheen | 5 |

-------------------EXHIBITS-------------------

| ALTMAN | PAGE | LINE |
| --- | --- | --- |
| Exhibit 1 | 7 | 5 |
| Amended Notice of Deposition | | |
| Exhibit 2 | 33 | 21 |
| Introduction and FACTA Background | | |
| Exhibit 3 | 55 | 22 |
| Store receipt | | |
| Exhibit 4 | 72 | 11 |
| American Express statement | | |
| Exhibit 5 | 78 | 20 |
| Plaintiff's First Supplemental | | |
| Responses to Defendant White House | | |
| Black Market, Inc.'s First Set of | | |
| Interrogatories | | |

```
 1
 2     ----------------EXHIBITS (cont.)----------------
 3
 4     ALTMAN                    PAGE LINE
 5     Exhibit 6              82   8
 6       American Express "What You Can Do"
 7       sheet
 8     Exhibit 7              90   12
 9       Plaintiff's Responses to White House
10       Black Market, Inc.'s First Set of
11       Requests for Admission
12     Exhibit 8              98   13
13       Purchase receipts
14     Exhibit 9              103  25
15       American Express Statement
16     Exhibit 10                 104  14
17       Store receipt
18     Exhibit 11                 149  13
19       Class Action Authorization
20
21
22
23
24
25
```

```
 1     NAME OF CASE:
 2     DATE OF DEPOSITION:
 3     NAME OF WITNESS:
 4     Reason Codes:
 5        1. To clarify the record.
 6        2. To conform to the facts.
 7        3. To correct transcription errors.
 8     Page _____ Line _____ Reason _____
 9     From _____ to _____
10     Page _____ Line _____ Reason _____
11     From _____ to _____
12     Page _____ Line _____ Reason _____
13     From _____ to _____
14     Page _____ Line _____ Reason _____
15     From _____ to _____
16     Page _____ Line _____ Reason _____
17     From _____ to _____
18     Page _____ Line _____ Reason _____
19     From _____ to _____
20     Page _____ Line _____ Reason _____
21     From _____ to _____
22     Page _____ Line _____ Reason _____
23     From _____ to _____
24
                    _____
25
```

## A

$1,000 109:11
110:7
$100 109:11 110:8
$130 57:19
$136.25 57:7
$34.56 100:13
$733.25 56:12 57:9
$74,000 162:11
$75,000 161:22
$869.50 57:13
a.m 2:6
Aarons 79:13
Abbott 10:11,12,17
11:15 12:13 13:9
22:9 23:11,22
39:11
abbreviated 28:15
abbreviation 28:18
ability 8:3
able 69:16 110:8
absent 140:10
157:25
absolutely 17:12,14
48:13
accepts 60:23
access 72:7 73:25
74:21 75:6 118:17
accessed 80:11
accessible 95:9
accessing 72:24
accompany 50:20
account 15:17 16:7
17:25 18:2,9,10
18:18 35:11,14
38:6,14,15,17
81:6,8,12,17 85:9
88:3,7
accounts 15:8,9,13
15:14 16:2 38:4
38:10,13 78:15
85:7,8 116:12,15
116:20,22 118:7
118:10,18 121:15
121:17,20
accurate 6:16
93:14
accurately 70:24

achieve 56:20
achieved 56:22
acquaintance
105:8 146:11
acquire 35:24
acquired 10:14
37:25
acquisition 10:22
10:25
act 67:19 121:24
action 1:6 5:20
33:11 68:24 130:5
130:14,19 139:14
139:19,24 140:3
140:15 141:5
147:10 148:3
164:15 166:19
active 80:23 123:5
actively 58:6
activity 81:6,18
actual 87:4 105:15
109:15,23
ad 14:14,15,18,22
15:6 16:10 17:4,8
17:11,15
added 13:16,17,20
159:6
additional 94:10
159:6
address 24:6,20
25:6 26:5 147:23
addressed 138:23
administer 4:13
admission 88:11,15
88:20,24 90:12,21
166:11
admit 88:25 89:3
90:13,15,18,22,24
advance 152:6
advancing 154:21
advantages 140:14
advertisers 20:20
advertising 10:6
14:25 40:19,20
advice 157:4
158:21
advise 67:3 75:9
152:5
affect 8:3

agencies 17:5,8,11
21:5 89:2
agency 14:14,15,18
14:22 15:7,22
16:10 17:15 88:6
89:11
ago 9:8,16 11:20
12:19,22 22:8
30:10 33:5 36:15
45:6 85:11 92:16
94:14 102:15
121:6 124:7 136:6
141:14 153:20
159:4
agree 61:17 62:11
111:13 114:24
119:18 125:14
138:7 148:5 154:2
156:17 158:11
160:7
AGREED 4:2,6,10
agreeing 157:19
agreement 151:20
155:14 156:6,18
157:2,2,21 158:2
158:23
ahead 5:13 6:5
22:19 59:15,25
61:24 62:22 64:2
64:2,10 67:22
73:3 74:17 104:20
107:9 108:25
110:3 126:19
129:16 133:10
134:4 138:3
149:16 161:14
162:16
airport 43:2
Alabama 8:7
alert 88:3,6
alerted 92:12
alerts 84:12
alive 27:17
allegation 60:20
63:22 64:3 124:7
124:12 132:2
135:6
allegations 132:11

132:19
allege 44:23 108:2
109:9 114:8,17
alleged 28:14 67:15
67:18 106:18
107:23 108:12
109:17 115:13,22
116:7 138:24
allegedly 141:11
alleging 31:15
107:21 114:25
allow 41:4 155:3
161:5
allowed 40:13,22
allows 41:6
alluded 105:4
Altanta 2:11
alter 161:11
altered 81:24 82:3
Altman 1:4,12 2:9
5:1,10,18,19,24
6:1 7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1,23 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1,17,17 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1

87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1,8
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1,20 162:1
163:1,5 164:10
165:6,11 166:4
Altman-3003 102:4
Altman_0001 54:7
Altman_3126
147:14
Amended 5:2,14
165:13
amendment 28:24
American 33:17
34:10,13,17,23
35:4,8,12,13 36:9
36:25 39:9 44:24
45:7 70:8,20
77:23 78:2,7 80:5
80:11,22 81:9
82:8 84:20 85:22
85:24 95:3,7
97:17 101:22
142:6 143:21
165:19 166:6,15
AmericanExpres...

80:10
**AmEx** 33:20 34:2
34:12,24 35:16
36:7,11 37:13
38:19 39:7 40:23
63:8,11 70:20
77:17 97:23
107:13
**amount** 41:13,15
41:16 56:19 63:5
95:2 110:19,21
113:14,20 155:20
**Amy** 79:13
**and/or** 142:6
**answer** 22:17,18
29:5,8,9 64:22
65:6 73:13 74:18
101:18 104:22
112:18,21 125:21
126:14 127:13,22
128:16 129:14,18
137:19 143:18
161:12
**answered** 73:12
74:24 76:12 99:14
115:17 128:18,19
129:15 153:11
160:20
**answers** 6:15 8:4
77:11
**anybody** 20:3
**anytime** 76:8
**apart** 30:25
**apartment** 19:3,4
20:2
**apologize** 9:25 51:4
92:15 137:25
**Apparently** 55:19
**appear** 54:11 96:13
**appearance** 145:19
**APPEARANCES**
3:2
**applicable** 155:3
161:4
**appreciate** 7:6
148:15 149:20,20
**appreciated** 6:15
**approximately**

65:17 136:8
**April** 1:14 2:5
13:25 50:2,14
164:19
**area** 30:2,7 150:24
**areas** 22:12
**argumentative**
67:21 73:2 74:16
135:4
**arising** 89:2
**arose** 122:18
**art** 105:19
**ascertain** 123:3
**aside** 87:2,4 91:18
**asked** 51:4 55:7
73:11 74:23 76:11
77:6 92:15 93:18
94:19 107:11
110:25 115:16
131:25 134:10
142:18 143:17
**asking** 55:20 64:18
75:13 83:12 87:15
91:7 93:15 94:2
104:23 111:3
116:20 117:16
125:10 132:19,22
132:25
**aspires** 97:4
**assert** 64:25 115:14
**asserted** 130:24
**asserting** 59:3
62:17
**assertion** 63:21
**assets** 153:17
**associate** 46:10
**associated** 108:7
150:5
**association** 38:17
**assume** 151:10
**assuming** 125:6,7
**asterisks** 71:21
**Atlanta** 1:3,13 3:21
7:25 14:15 16:10
17:2,10,11 18:23
19:8,19 20:25
21:4 25:25 26:5
27:6 28:3 30:10

45:2 47:9 48:14
48:19 49:5,10,19
97:24 150:24
**Atlantan** 53:15
**attempted** 89:16
115:10
**attempting** 127:21
140:14
**attend** 47:14
**attorney** 29:19
75:5,6,13 153:5
**attorney's** 147:5,5
151:6,13 154:3
155:20
**attorneys** 3:5,12,19
4:3 23:16 90:6,9
152:6 154:2
156:10,14 161:2
**attribute** 106:25
107:14,19
**aunt** 26:16
**Austin** 8:18,19,22
8:24 14:14,18
21:2 24:4 25:8
26:2 28:7 47:6
96:15,24,25 97:3
97:5,6,11 138:15
**Austria** 79:7
**authorization**
68:24 147:11
148:3 166:19
**authorize** 33:7,10
67:16 69:12 82:11
84:20
**authorized** 4:12
110:14 135:20
**authorizing** 149:24
**automatic** 55:17
**award** 110:22
113:15
**awarded** 110:18
147:6
**aware** 29:16 31:5
33:16 55:21 59:9
84:21,23 104:14
107:10,16,20
112:25 113:10
115:19 116:2

120:4 122:23
123:7 131:11
134:16 139:8,21

---

**B**

**B** 155:19 156:5
**B-o-m-c-h-e-l** 20:7
**back** 13:23 19:11
19:15 20:2 30:12
36:24 42:4,6 50:2
50:19 55:15 60:17
62:10 67:23 84:8
85:23,25 89:24
98:6,25 99:13,15
100:4,5 112:17,19
118:21 127:14,18
134:23 156:17
159:8
**Background** 31:19
165:15
**backwards** 42:7,11
**bag** 43:19
**Bama** 9:2
**bankruptcy** 152:7
152:13,16,25
153:5,13
**bar** 27:9
**Barry** 3:22 5:11
87:18 127:21
137:22 148:12
162:23
**Barton** 96:21 97:9
138:9
**based** 30:20 34:19
42:22 45:5 59:9
59:19 62:18,25
96:2 124:19 128:9
**basically** 100:9
**basis** 34:14 41:12
64:13 84:10
116:19 123:16
154:17
**bat** 27:4,9
**Bates** 54:5 70:17
102:3 147:13
**bedrooms** 52:6
**began** 144:25 145:7
**beginning** 38:20

142:12
**begins** 151:17
160:25
**begun** 158:19
**behalf** 1:4 32:11
68:4 110:15
139:10,10 140:25
145:19 150:11
154:21
**Belgium** 79:7
**belief** 67:8 76:8
152:22 155:9
160:2,7
**believe** 36:23 51:3
54:8,20 57:22
66:9 72:23 84:17
85:20 93:18 94:3
100:12 102:23
103:17 105:3
111:7 112:9
123:11 126:16
146:9 151:25
158:9 159:8
**believed** 75:18 78:3
**believes** 126:10
140:21
**belong** 116:12,15
118:7,19
**benefits** 55:21 71:8
**best** 14:10 16:6
39:16 58:24 59:2
152:22 155:9
**better** 27:24 92:24
103:18 139:22
146:23 158:14
**Beyond** 22:11
**bills** 34:15 123:7
**bind** 157:20
**Birmingham** 8:7
8:11,20 19:9
20:11 27:14,23
**birthday** 47:11,15
**bit** 28:11 156:2
**black** 1:7 5:19
28:13,14 33:13
45:12,19,23 50:16
51:6 52:12,21
53:3,7,25 54:12

59:4,10,20 62:17
64:13 65:9 67:13
71:2 74:2,7 75:17
75:25 76:7,19,24
77:7 84:5 88:10
88:15 89:12 90:24
93:24 94:7,10,18
96:14 99:2,15
101:4,14 104:3,8
104:11,15 105:12
105:15,25 106:11
107:15,19 108:3,6
108:11,19 109:18
110:9 112:7,9,11
112:22 113:3
115:14,21 116:6
124:8,13,19,20
126:2 128:5,13
131:16 134:25
137:10,16 138:10
138:23 140:23
143:3,9,22 151:7
161:21 165:23
166:10
**blood** 164:16
**blue** 95:22
**bogus** 133:20
**boilerplate** 152:20
**Bomchel** 20:6
**book** 13:7 17:3
21:4
**born** 8:6
**boss** 92:9,12,16,18
92:19,19,19
**bottom** 54:7 56:7
60:19 71:18 76:5
100:16 109:3,9
114:5,7,15 119:2
151:17 153:22
160:24
**bought** 25:12,13
40:18 96:5,6
104:2
**bowl** 9:12,13,14
**box** 71:20,23
**boyfriend** 24:15
92:8
**boyfriends** 140:24

**brand** 10:16 13:14
37:18 63:8 84:22
**breach** 23:24
**break** 14:17 139:3
**breakdown** 36:24
**breaking** 73:6 74:7
**Briarcliff** 19:2
**briefly** 13:6
**bringing** 132:6
135:2
**brings** 94:21
140:16
**broke** 46:18
**broken** 33:9 70:2
**Brook** 8:14
**brother-in-law**
29:18 51:18 61:13
66:13 67:5,24
68:5,21 72:20,21
91:14 144:21
145:5
**brought** 8:24 47:9
111:9 139:9 154:6
**brown** 9:22,23 24:7
24:20 25:22
**BRSG** 14:20 15:7
**Bryant** 3:8 149:12
158:20
**budget** 20:20
**budgets** 15:25
**building** 19:4
**bullet** 81:5 82:4
84:25
**bunch** 121:17
**business** 15:12,13
23:4 60:25 103:10
103:22
**buy** 43:20 99:8
**buying** 42:25

**C**

**C** 164:2,2
**C(G)** 60:22
**calculated** 113:23
**calculation** 57:17
**California** 9:11
**call** 17:15 67:4 74:6
75:17 77:22 97:2

118:14
**called** 5:5 14:20
29:12 50:7 54:16
66:13 68:23
117:17 118:11
150:14
**calling** 79:23 146:6
**calls** 29:3 32:16
59:14,23 61:22
62:7,20 63:23
64:7,15 75:10
104:20 106:20
109:19,25 110:23
111:24 112:13
113:4,25 116:12
116:14,18,25
117:3,13 118:2,12
118:15 122:9
124:14 125:3,17
126:4 128:6,14
129:8 130:7 131:9
133:6 135:10
136:24 137:6
158:5 162:14
**campaign** 15:23
**campus** 8:23
**cancel** 77:23 78:10
79:17,21
**cancellation** 79:24
**capital** 56:8
**capri** 95:19 96:5
101:9,15
**caps** 39:23 72:2
**card** 33:17,20 34:2
34:12,12,24 35:5
35:9,14,16,17,20
35:23,24 36:7,8
36:10,11,15,18,21
36:25 37:2,23
38:19 39:7,21
40:11,15,20,23
41:7 42:4,5,9
44:11,24 46:14,24
46:25 53:13 58:13
58:22,22 60:10,12
60:13 61:2,19,20
62:4,12 63:2,9,11
65:10,20 66:3,20

70:19,21 71:5,8
71:11 77:18,23
78:3,11,16 79:15
79:20 81:13,22
84:22 85:23,25
87:11 89:22 97:17
97:19 103:14,15
103:16,19,20,22
103:23 104:16
107:5,13 114:10
116:22 122:3,5
131:19 138:18
142:5,6,10,12
143:9,13,21
**cardholder** 61:3
**cards** 33:24 34:20
37:15,16,18 38:2
39:3,13 40:17
42:18,19 43:18
60:24,24 78:14,14
79:16,20,23
107:18 159:23
160:4,11
**care** 27:3
**career** 19:18
**Carolina** 102:18
**carrier** 75:21
**case** 5:19 7:23
28:12 31:25 33:16
77:13 105:16,20
109:17 110:7,12
113:24 126:3
128:5,13 129:7
131:8 137:17
139:9 140:13,22
146:7,20 148:7
149:10 150:25
151:7 154:14
155:12 156:20
158:16 161:22
162:13 167:1
**cash** 41:8,21 42:5,6
42:14 60:8 100:3
100:23 122:6
**cause** 130:5,14,19
**CCR-B-1936** 1:24
**celebration** 47:15
**cell** 147:23

**certain** 39:20 40:18
43:22 44:8
**certainly** 65:8,11
101:18 121:8
138:7 159:10
**certification** 144:3
**certified** 21:24
139:19,24 142:14
157:11 162:8
164:7
**certify** 164:9,14
**Chamber** 17:3
**chance** 157:21
**change** 12:20 57:19
124:4
**changed** 11:19,22
13:4,19 14:20
15:7 50:8 83:24
92:17
**changes** 84:13
**changing** 84:14
**chapter** 13:7
**character** 117:14
**characterizing**
133:17
**charged** 41:14,15
**charges** 89:21
107:13,18 122:18
**Charleston** 102:17
102:17 103:6,8
**check** 43:8,8 44:3
46:22
**checking** 38:3,10
38:12,14,15,17
81:24 123:6
**chewing** 43:2
**Chicago** 19:17 69:2
**Chico's** 3:25
**child** 26:22 47:12
**Children's** 11:8
**chip** 46:24 47:2
**circumstances**
119:7,16 121:22
**city** 3:7 19:16
**Civil** 1:6 5:20
**claim** 28:12 59:3
62:17,24 64:13
106:6 109:18

124:20 152:8
**claiming** 93:11
**claims** 154:6
155:21,25
**clarified** 125:19
**clarify** 6:22 41:24
160:19 167:5
**clarity** 156:4
161:12
**class** 1:4 33:11
68:24 104:22
105:4 110:18
111:12,13 113:19
115:2 116:4
139:11,14,19,24
140:3,9,10,12,14
141:5,6,18,21
142:4,14,18,23
143:20 144:3
147:3,10 148:3,20
151:16 154:3
157:11,12,18,25
158:4,8,10,24
162:6,7,10 166:19
**clear** 6:6 155:24
**Clearly** 10:20 99:3
**clerk** 100:11
**client** 15:21,22
18:12 152:5
153:25 154:3
156:8,10,14
160:25
**client's** 152:8
**clients** 23:5
**Cliff** 3:15 151:3
**Cliff's** 150:16
**close** 16:20 19:9
69:19 109:4
121:20 132:7
152:9 161:5
**closed** 35:15
**closing** 78:14
121:15
**clothing** 58:9
**co-counsel** 146:5
150:2
**co-owner** 25:2
**co-workers** 91:22

**coaching** 9:19
**code** 39:22
**Codes** 167:4
**codified** 60:22
**Cole** 16:11 18:4,17
18:20 20:14,21
**collection** 116:11
116:14 117:13
118:5,6
**collector** 116:25
**collectors** 117:22
**college** 8:17 10:2,3
10:8 16:23 19:12
19:14 25:24 35:10
78:21
**colleges** 8:21
**come** 16:25 19:7
49:10 84:19 133:9
146:4 149:9
**comfortable** 97:22
99:9 110:5 121:8
162:18
**coming** 92:10
**commentary**
126:15
**Commerce** 17:4
**commercial** 28:21
**Commission** 86:7
**commit** 119:13
**committed** 89:20
**communication**
12:5 23:17 75:11
78:6
**communications**
11:6 12:25 13:13
13:15,20,22,24
14:11 30:15 77:7
149:14
**companies** 21:13
39:10 121:19
**company** 14:19
15:19 17:18 23:7
23:8,9,15,23
67:12 84:11
121:19 143:10
**complain** 75:18
**complaining** 89:16
89:20

**complaint** 31:25
32:11,20 33:2,8
33:11 44:17 48:8
60:5,18 67:16
68:4 69:13,18
70:2 72:8 105:24
108:25 109:2,7,24
110:14 111:18
114:5,6 124:8,16
132:3,11 135:9,14
135:21 138:24
141:23 144:10,17
145:17
**completed** 65:15
95:11,14
**completion** 60:7
**compliance** 59:21
60:3 66:12,14
132:5,7 135:2
137:11 138:10,14
**compliant** 58:24
98:20,22 113:7
**complied** 59:12
65:22 66:9,25
77:16 151:23
**comply** 21:22 67:9
114:20
**compound** 22:16
59:13 64:9 107:8
**compromise** 23:24
**compromised** 78:4
119:24 123:14
**computer-genera...**
60:8
**conceivably** 103:21
**concept** 124:25
125:11 129:5
**concern** 157:18
**concerning** 119:16
**conclusion** 29:3
59:14,24 61:23
62:8,21 64:8,16
104:20 106:21
109:20 110:2
111:25 112:14
113:5 114:2
122:10 124:15
125:4,18 126:5

128:7,15 129:9
130:8,10 131:10
133:7 135:11
136:25 137:7
162:15
**condition** 137:23
**condo** 25:6,12
38:15,17
**conduct** 105:24
108:2,12,19 112:8
112:25
**confident** 102:7
**confirm** 73:15
**confirmed** 67:25
**conflict** 147:2
**conform** 167:6
**confused** 11:8
100:6 129:23
**confusing** 6:23
**congress** 13:19
**congresses** 12:4
**connection** 118:2
**consider** 34:11
56:4,5 98:11
**considered** 11:3
98:19
**constitute** 64:5
**consult** 111:11
**consumer** 29:19
**consumers** 29:21
**cont** 166:2
**contact** 18:19 73:4
85:25 87:24 88:2
88:5
**contacting** 85:23
**contemplating**
152:15
**contend** 76:6
110:17 143:23
**contending** 65:8
**contingency** 154:11
158:15
**contingent** 154:4
**continue** 77:17
144:3
**continued** 152:17
**continuously** 123:6
**contract** 160:21

**contracts** 15:14
**control** 158:3
**convention** 13:18
**conventions** 49:16
49:17
**conversation** 23:19
23:20
**conversations**
30:14 93:6
**coordinator** 17:25
**copy** 31:24 32:23
32:24 42:20 53:24
54:8 60:11
**corner** 54:7
**corporate** 13:20
22:25 23:6 36:9
36:17 38:19 39:3
39:6,12,17 40:11
40:14,16,17
103:22
**correct** 11:10,13
18:15 21:10 23:12
24:5 25:9 26:3,6,8
26:11 28:2,4,16
30:9,11 33:18,19
34:3 36:3,13,16
37:8,21 38:7
43:15 45:3,4,9
47:8,13 48:12
54:8,13,14,17,18
57:7,8,10,11,14
60:14,15 61:5,6
61:21,25 62:6,14
62:15,19,23 63:3
63:12,16,17,19,20
63:22 64:6 65:10
65:17,18 67:5,6
69:6,7,11,22 72:4
72:5 73:9,14,16
73:17,19,23,24
76:14 77:8,11,12
81:2,6,16 82:6,11
82:12 83:10 84:6
84:7 86:8,9,15
87:7 89:4,5,7,8
90:5,10,11,25
91:2,20 94:11,12
95:4,5,12,13

96:21 97:18 98:4
98:5 99:20 102:18
102:19 103:25,25
105:16,17,25
106:2,4,5,7,8,12
106:13,15,16,19
106:22 107:2,7,15
107:23,24 108:8,9
108:12,13,15,16
108:19,20,23,24
109:12,24 110:19
111:6 114:11,22
114:23 115:15
117:8,14,19,20
118:3,4,20 119:8
119:9,16,17 120:5
120:6 122:24,25
124:9,13,21,23
130:6,25 131:3
132:13 135:21,25
138:11,15 139:11
141:16 143:14,16
143:25 144:12
145:15,19 146:2,3
147:7 148:3,20
149:7 150:7,14,15
150:16,21 151:8
151:13,21,22
153:2,4 154:12,15
154:16,19 156:11
156:12,21 157:12
161:11,23 162:8
162:13 167:7
**correcting** 74:13
**correctly** 52:17
153:11
**cost** 108:6
**costs** 154:21 155:2
161:3
**counsel** 7:7,22
51:21 63:25 64:23
91:7 93:7,22 94:4
133:16 137:18
144:8,11 146:6,20
147:6 148:7
150:21 151:24
154:11,14,21,25
155:17 156:18

158:3,14
**count** 153:9
**country** 8:22 17:9
19:12 101:7
**counts** 153:6
**COUNTY** 164:5
**couple** 8:23 20:22
27:7 28:10 36:6
49:5,18 67:17
159:15 160:15
**course** 5:11 76:3
98:15 123:22
148:22 159:21
160:2,12
**court** 1:2 4:15 5:21
110:22 111:19
113:2,15 125:25
126:10 127:15
128:8,24 140:20
142:24 144:2
152:25 153:6
155:4 161:6 164:7
**cousins** 26:17,19,21
47:17
**cover** 144:11
**coworker** 120:22
120:23 121:2,12
121:24
**coworkers** 92:4
104:12
**creative** 13:21,24
15:24
**credit** 33:17,24
34:12,20 35:5,9
35:11 36:17,21
39:3,6,12,21
40:11,23 41:7
42:4,5,9,14,18,19
43:18 44:11,24
46:14,25 53:13
58:13,21,22 60:10
60:12,13,23 61:20
62:4,12 63:2
65:10,20 66:3,19
70:19,21 71:5,11
77:17 78:3,10,16
79:15,16 81:13
82:5,9,13 84:12

84:13,14,18 86:23
87:11 88:5 89:22
104:16 106:24
107:5,18 114:10
116:22 118:17
121:16,20 122:3,5
123:6 131:19
138:18 142:5,6,10
142:12 143:8,13
143:21 159:22
160:3,11
**Creek** 96:21 97:9
**criminal** 121:24
122:18
**critical** 8:25
**curiosity** 52:3
**current** 24:6 25:22
81:15 84:12 94:21
148:7
**currently** 10:10
24:3 119:23
**customer** 12:5
60:11
**customers** 23:5
71:24 114:21
**cut** 20:20 35:23
71:19,19

**D**

**D** 165:2
**dab** 53:4
**daily** 39:23
**damages** 105:15,19
106:10,18 108:15
108:17,22 109:10
109:15,15,16,23
110:19,22 111:8
111:19,23 112:4,6
112:21 113:16,20
113:23
**date** 7:24 58:22
61:2 62:3,11,18
94:25 113:8 137:2
142:10,14 143:12
144:17 159:20
167:2
**dated** 89:7
**daughter** 53:11

**daughters** 141:2
**day** 50:23 51:9
52:13,20 54:12
55:4 127:7 163:8
164:19
**days** 67:14,17 68:3
69:13
**debit** 37:15,16,18
37:23 38:2 58:13
60:24 142:5,10,12
143:8
**debt** 116:25
**debts** 153:17
**deceased** 27:16
**December** 89:7
145:2,8
**decision** 144:7
**defendant** 3:19
76:18,23 114:19
132:3 142:7 143:3
165:22
**defendant's** 44:25
114:8,18 119:24
142:7 155:2 161:3
**Defendants** 1:9
**defines** 142:3
**definition** 141:21
142:19,23 143:4,6
**degree** 10:5 159:10
**degrees** 10:7
**delineate** 117:16
**Delta** 71:4
**denial** 106:24
**denies** 144:2
**department** 12:16
15:21 18:11
**depending** 41:13
**deposed** 5:25
**deposition** 1:12 2:9
4:11 5:3,14,18 7:8
7:18,21 64:20
75:23 93:10 159:5
164:11,12 165:13
167:2
**describe** 13:6
**described** 12:21
**detail** 119:4,11,15
131:25

**detailed** 94:8
**details** 159:9
**determine** 58:19
65:21 158:13
**development** 15:24
**differ** 18:2
**difference** 125:23
136:18
**different** 12:9,12
13:5 15:8 20:22
34:21 38:10,12
83:8,9,14,17
100:10,19 117:22
121:17 148:19
**differently** 59:8
**digital** 12:3 13:17
13:24
**digits** 30:19 58:21
60:9,12,13 61:2
61:10,19 62:25
63:12,14,15 64:4
64:5 65:10 66:14
87:11 97:20
131:19 142:11
143:12
**direct** 55:23
**directly** 80:9
**director** 11:5,23
12:24 14:11 18:10
**dirty** 72:13 73:5
**disagree** 57:16
64:25
**disclosed** 95:18
**discount** 54:15
55:8,17 99:22
103:12
**Discover** 142:5
143:15
**discovered** 67:8,15
72:6 86:16
**discovering** 87:8
**discovery** 93:25
132:12,17 134:19
**discuss** 7:21 144:8
158:23
**discussed** 67:24
93:8
**discussing** 23:17

**disdain** 67:10,18
**disgust** 67:10,18
**display** 61:19 87:11
**displayed** 58:21
  62:4,12 63:15,19
  65:9 142:9 143:11
**displaying** 62:25
**disputes** 68:14
  145:14
**dissuade** 98:25
**dissuaded** 99:15
**distress** 108:18
**District** 1:2,2 5:21
  5:22
**DIVISION** 1:3
**divorce** 35:19,22
  36:2,4,12 82:25
  153:19 159:15
**document** 32:6
  53:24 70:18,24
  77:2,4 85:16
  88:17 89:25 102:6
  133:7 147:15,18
  148:2,18 151:15
**documents** 33:6
**doing** 123:8
**dollar** 56:19
**dollars** 57:13,20,23
  111:15
**domain** 31:10
**Domestic** 102:24
**DORSEN** 3:15
**Dorsen's** 68:25
**downtown** 16:20
**dozen** 16:9 49:2
**drafts** 32:10
**Drake** 16:11 18:5
  18:21 20:14,21
**drink** 138:5
**Druid** 18:25
**duly** 5:5 164:11
**dumb** 126:17
**duties** 21:11 151:16

**E**

**E** 164:2,2 165:2
**e-learning** 12:3
**e-mail** 55:24 56:3,5

147:24
**e-marketing** 13:11
**earlier** 5:11 71:12
  75:17 93:17 97:23
  102:22 107:12
  136:22 137:3
  145:12
**earn** 71:7
**easier** 42:2
**easy** 53:16
**economic** 106:17
**effect** 4:14 75:25
**effected** 139:16
**effecting** 154:4
**effective** 136:16,22
  137:2,12
**effort** 7:5
**efforts** 15:12
  115:20 116:2
  119:12,15,16
**eight** 9:16 13:2
  99:4
**either** 39:4 42:18
  42:18 43:19 73:25
  75:18 122:5 132:4
  134:21 142:4
  143:11
**electric** 121:19
**electronically**
  120:11 142:8
  143:10,23
**elevated** 84:4
**emotional** 108:18
**employ** 42:23
**employed** 10:10
  11:2
**employee** 11:3 12:6
  22:21
**employees** 21:24
  22:9,13 38:24
**employers** 39:4
  121:5
**employment** 38:20
**enacted** 136:7,19
**enforcement** 89:2
  89:11
**engage** 146:4
  149:25

**engaged** 75:4 81:20
  146:14 148:18
**engagement** 68:20
  69:9 148:6,8,11
**England** 79:5
**enhanced** 83:14
  84:3
**enroll** 55:3,7
**enrolled** 54:21
**enrolling** 54:24
**ensure** 23:17
  146:25
**entail** 15:18 49:13
**entered** 145:18
**entire** 24:18 83:6
  98:3
**entirely** 112:2
  120:2 122:21
  123:13 155:8
**entitle** 112:9
**entitled** 80:14,18
  111:7 160:24
**entitlement** 151:12
**entry** 17:23 18:4
  20:12,13 70:24
**equation** 105:10
**errors** 167:7
**Esquire** 3:8,15,22
**essentially** 114:24
**establish** 35:11
  137:9
**estimate** 48:25
  58:11
**estimating** 36:14
**ethics** 39:22 161:4
**Europe** 78:18,25
  79:9
**Eve** 145:10
**event** 122:8,18
  147:5 155:4 161:6
**events** 12:4 14:3
  42:12 81:24 115:8
  117:7,18 118:3
**everybody** 140:5
**ex-husband** 35:14
  35:16 116:21
**ex-stepmother**
  47:16

**exactly** 28:20 30:3
  35:2 37:24 52:25
  78:19 85:12,14
  96:4,6 120:22
  121:6 127:20
**EXAMINATION**
  5:8 165:4
**examined** 5:6
**example** 40:19
  87:25 105:22
**exception** 91:15,16
**excluding** 7:16
  91:9
**exclusively** 15:4
  37:5,7
**excursion** 51:13
**Excuse** 103:4
**execute** 157:8
**executed** 68:20
  158:2,25
**executing** 155:14
  156:6
**exhibit** 5:2,15
  31:17,18,21 53:19
  53:22 70:6,7,8,16
  76:16,17 80:4,5,7
  88:9,14 94:15
  96:9,9,10 101:21
  101:22,25 102:11
  102:14 109:2,6
  118:23,24 147:9
  147:10 165:12,14
  165:16,18,20
  166:5,8,12,14,16
  166:18
**EXHIBITS** 165:9
  166:2
**expand** 12:21
**expanded** 21:2
**expense** 39:18
**expenses** 39:17,19
  40:16
**Experian** 82:22
  83:6 84:9 86:20
  87:25 88:2
**experience** 43:4
  45:21 72:2
**expiration** 58:22

61:2 62:3,11,18
  142:9 143:12
**explain** 91:11
  119:3,6,11,15
  131:25
**exposed** 114:25
**Express** 33:17
  34:10,13,18,23
  35:4,9,12,13 36:9
  36:25 39:9 44:24
  45:7 70:8,20
  77:23 78:3,7 80:5
  80:11,22 81:9
  82:8 84:20 85:22
  85:24 95:3,7
  97:17 101:22
  142:6 143:21
  165:19 166:6,15
**extent** 155:2 161:4

**F**

**F** 164:2
**Facebook** 9:17
  27:4
**fact** 60:10 110:6
  121:12 132:2
  153:9
**FACTA** 28:15,19
  28:23 29:13 30:17
  31:15,18 59:12,22
  60:21 61:8 62:19
  65:22 66:9,19,25
  67:9 72:7 77:17
  98:12 106:18
  114:20 122:8,11
  124:9,13,21 126:2
  130:6,15,20,24
  132:5 136:7
  137:11 138:11
  143:24 151:12
  155:21 165:15
**factors** 144:6
**facts** 64:18 93:19
  94:6,8 128:9
  131:15 132:10,15
  132:18,20 133:4
  133:13 134:10,10
  134:13,24 135:5

137:9 140:21
149:14,15 167:6
**failed** 114:20 132:4
**fair** 28:20 31:13
32:18 34:11,21
59:18 62:16 97:17
99:16,17 117:23
117:24 138:13,20
143:18 158:22
159:12
**fall** 19:22
**familiar** 77:2,4
**family** 27:9,12
47:14 49:4 91:8
91:18 92:4 104:12
105:9
**fan** 92:18 93:2
**Fane** 3:4 145:18
146:2,5,12,17
148:23 149:25
**far** 26:20 59:8
97:16 147:8
**Fas** 3:25
**father** 27:16,21
92:9 153:5
**Faw** 3:25
**FCRA** 28:25
**Feagle** 3:11 150:14
150:20 151:4
**federal** 28:15,25
30:20 86:6
**fee** 154:2 155:20,25
156:9 158:22
**feed** 9:17
**feel** 6:22 41:17
157:25
**fees** 147:5,5 151:6
151:13 153:23
155:20 157:14
160:25 161:16
**felt** 67:19 74:10
**female** 140:25
**Ferrill** 1:24 2:11
164:7,22
**FICO** 84:16
**fiduciary** 140:9
**file** 1:6 68:4 69:23
70:2 152:15

**filed** 31:15,25 32:7
32:11,20,22 69:18
88:25 89:10,15,19
93:10 98:16
110:15 116:10,11
135:14 141:5
144:18 145:18
**filing** 4:4 29:11
33:7,10 67:16
69:12 76:8 135:20
142:13
**final** 11:25 32:23
32:24 36:5 159:17
**financial** 114:21
**find** 158:14
**finding** 20:25
**fine** 64:21 65:2
76:4 87:3 96:19
127:9 129:3 138:6
145:21 149:16
**finished** 63:24
**firm** 17:17 68:25
68:25 69:2 145:18
145:21 146:12,17
148:23 149:6,10
149:24,25 150:2,6
150:9,13,16,20
151:4
**firms** 148:19 149:5
156:25
**first** 22:3 25:13
32:6 35:8 45:18
51:12 60:11 63:18
64:4 66:22,24
68:17 76:17,19,23
76:24 80:14 81:5
88:10 91:13 92:11
146:15 149:6
153:25 155:24
156:17 165:21,23
166:10
**fitting** 72:13 73:5
**five** 16:5 33:23 35:2
36:15 45:14 54:16
55:14,17 58:21
60:9,25 61:18
63:14,15 66:14
70:11,12 79:10

90:18 99:22 114:8
142:11,13 143:12
**fix** 75:5 120:25
**fixing** 74:19
**flash** 55:24
**flat** 118:19
**floor** 53:2
**Florida** 27:18,22
**focus** 49:15
**focused** 14:25
15:10,11
**follow** 23:14 41:3
**following** 71:23
132:12,17 134:19
**follows** 5:7 112:20
**fooled** 93:3
**force** 4:13
**forgot** 96:16
**form** 4:7 22:15
29:2 64:8
**forms** 40:18
**formula** 113:22
**forth** 132:11
164:11
**forward** 136:2
**found** 15:9 42:2
**four** 17:6 30:19
58:17 60:12 66:15
79:10 90:18 92:19
94:16 97:20 98:2
98:4 131:18
**fourth** 70:23
**frame** 14:3 16:8
36:22
**France** 79:4
**fraud** 80:23 87:13
87:22 88:3,6
89:20 119:13
**frequency** 81:23
82:2
**frequent** 116:19
**frequently** 53:15
65:23 118:12
**friend** 79:13 105:8
141:10
**friends** 19:10,14
27:4,12 91:24
104:12

**front** 7:2
**FTC** 86:7,10,12
**full** 5:23 27:25
**FULTON** 164:5
**function** 86:20
**functions** 148:5
150:20
**funds** 38:16,18
**further** 4:6,10
86:17 152:6
160:25 164:14

------

**G**

**GA** 3:14,21
**Galleria** 101:8
**game** 9:9,12
**gas** 66:11 122:2,5
**gatherings** 27:10
**general** 15:6 61:7
93:5,5,9 120:16
**generalization**
93:13,14
**generalize** 93:6
**generated** 84:16
**Georgia** 1:2,13
2:11,13 5:22
26:10,13 45:2
53:8 164:3,8
**Germany** 79:6
**getting** 42:6 49:8
106:25
**gift** 95:21
**gifts** 104:7
**give** 8:4 93:9
**given** 6:5 16:3
43:17 60:7 62:11
86:2 98:24 119:25
164:13
**glad** 153:10
**global** 11:5,22 12:3
12:3,4,5,24 13:14
13:15,17,18 14:11
**go** 5:13 6:5 8:17
10:16 13:7 14:21
22:18 26:20 50:13
50:16 51:12,15
52:8 53:16 59:15
59:25 60:17 61:24

62:22 64:2,2,10
67:22 73:3 74:11
74:17 79:3,11
85:15 93:9 94:13
96:8 99:7,13
104:20 107:9
108:25 110:3
118:21 121:16
122:4 126:19
129:16 133:10
134:4 138:3
149:16 161:14
162:16
**Goheen** 3:22 5:9,11
9:15 22:17,23
29:4,10,11 31:20
32:5,18 52:2
53:21 59:18 62:2
62:9,24 63:24
64:3,12,17,20,22
65:3,5 70:10,15
73:7,13 74:18
75:2,12 76:13,15
76:22 80:7 87:15
87:19 88:13 96:12
101:24 102:13
106:23 107:11
109:22 110:5
112:3,8,17,24
113:9,13 114:4
115:19 122:12,14
124:16,24 125:7
125:14,19,21
126:6,9,20,23,25
127:4,7,10,12,25
128:10,17,20,23
129:11,17,22,24
130:4,9,13,18,23
131:4,11 132:23
132:25 133:9,11
133:20,23 134:6,8
134:17 135:5,13
136:12,15 137:2,8
137:21,25 138:3
139:6 147:12
148:14,17 149:18
158:9 160:14
161:8,19,20

162:18,21,24
165:6
**going** 30:12 44:2
52:14 70:6 72:2
84:25 98:6,25
99:15 126:18
127:10,14 129:15
135:24 139:5
156:16 160:18
**gold** 56:12,20,22
57:9,22
**good** 5:10 8:15
17:17 65:5 90:7
98:24 117:12
153:10
**gotten** 83:14,14
**govern** 157:11,12
**governing** 39:12
**graduate** 9:25
**graduated** 8:10
25:24
**graduation** 78:22
78:22
**Graham** 24:17
92:8 102:25 103:4
**grander** 27:2
**gray** 95:22
**great** 19:19 126:23
149:4
**greater** 155:17
**grew** 8:8 15:12
19:10 20:10
**grinning** 51:22
**groceries** 44:2
**ground** 6:5
**group** 139:15
**groups** 49:15
**guess** 6:4 17:16
34:17 40:12 48:20
52:2 92:23 98:6
98:12 99:6,7,14
101:13 103:21
105:2 109:3 112:6
112:21 121:19
132:16 133:12
141:14 155:11
160:10
**guidelines** 86:8

**guiding** 42:22
**guilty** 7:3
**gum** 43:2

**H**

**H** 54:16
**habit** 65:20
**hack** 123:21
**hacked** 123:19,20
**half** 16:9 27:21
49:2 149:10
**halfway** 85:2
**hand** 31:20 70:6,16
88:13 100:24
164:19
**handful** 58:15
**hang** 32:4
**happened** 55:11
121:12 133:14
**happening** 31:2
**happens** 69:25
120:9,11
**happy** 6:24 98:22
**hard** 80:22 147:18
**harm** 112:6,11,22
113:2 147:2
**HC&B** 14:21
**HCB** 14:21,24
49:14
**HCG** 15:15 16:3,8
18:3,8,13 20:16
**head** 80:3 95:23
**header** 44:20
**heading** 80:17
85:17
**Health** 14:21,24
**healthcare** 14:25
15:10,12
**hear** 133:11
**heard** 29:12 105:20
130:11
**hearing** 34:19
**held** 2:9 141:5,17
**help** 12:14 35:11
75:4 81:2 140:22
141:2
**helpful** 84:13
**Henderson** 16:11

18:5,21 20:14,21
**hereinbefore**
164:11
**hereunto** 164:18
**hide** 52:8
**high** 8:10,13 10:2
19:10
**higher** 107:5
**Hill** 101:7
**Hills** 18:25 47:25
**HIPAA** 21:22
22:11
**hire** 68:5 149:9
**hired** 17:7 21:7
149:21 150:13
**hits** 121:15
**hold** 7:4 29:7
126:12
**holding** 140:8
**home** 44:3 72:15
**Hospital** 11:8
**hosted** 49:18
**hotel** 40:6
**hourly** 154:14
**house** 1:7 5:19 24:8
24:22,24 28:12,14
33:13 45:11,19,23
47:22,23 50:16
51:6,17 52:3,8,12
52:21 53:3,7,25
54:12 55:18 57:2
58:12 59:4,10,20
62:17 64:13 65:9
67:13,23 71:2
74:2,7 75:17,24
76:7,19,24 77:7
84:5 88:10,15
89:12 90:24 93:24
94:7,10,18 96:14
99:2,15 101:4
104:3,8,11,15
105:12,15,25
106:11 107:15,19
108:3,6,11,18
109:18 110:9
112:7,9,11,22
113:2 115:14,21
116:6 124:8,12,19

124:20 125:25
128:5,12 131:16
134:25 137:10,16
138:10,22 140:23
143:3,9,22 151:7
161:21 165:22
166:9
**household** 34:16
**huh** 71:5
**husband** 102:22,23
159:22 160:3
**husbands** 140:24

**I**

**idea** 75:8
**identical** 119:19
**identification** 5:3
31:19 53:20 63:9
70:9 76:21 80:6
88:12 96:11
101:23 102:12
147:11
**identified** 93:25
96:21 149:5
**identities** 114:21
**identity** 85:21
86:18,21 87:5,12
87:12,21,21 89:17
89:20 114:10
115:3,6,10,12,21
116:4 119:5,8,12
119:13,23,23
120:2,8,13,19
121:22 123:4,13
**Ignore** 131:4
**illegal** 61:9
**imagine** 33:12
45:20 79:25 140:4
**immediate** 55:8
**immediately** 65:21
**implemented** 22:5
**important** 80:24,25
**imposing** 113:2
**impression** 98:20
**in-person** 7:18
**inaccurate** 82:10
**inception** 81:13
**Incidentally** 54:4

**include** 12:2
**includes** 94:4
**including** 92:5
121:17
**incorrect** 160:20
**increased** 87:5
**incurred** 106:24
107:12,17
**individual** 111:13
144:4
**individually** 1:4
139:9 161:22
**individuals** 139:11
159:6
**industry** 15:2
**inform** 85:21,24
144:6
**information** 21:15
21:22 22:13,22
23:2,2,4,6,7,15,15
23:25 80:9 82:10
94:19 123:17
159:7
**initiated** 110:12
**injury** 108:10
**inside** 71:23
**instance** 121:14
**instruct** 29:8
**integrating** 12:13
**integration** 12:14
12:17
**intend** 110:22
111:19 113:14
144:3
**intention** 52:14
74:6 162:9
**intentionally** 91:10
131:17 132:5
134:25
**interaction** 152:25
**interest** 107:5
147:2
**interested** 74:19
164:17
**interesting** 130:11
**Internet** 55:25
**interrogatories**
76:20,25 165:24

interrogatory 77:5
93:16 94:13,15
118:22,25 119:3
119:10,19,22
124:3 131:22
132:24 137:15,16
142:17 144:25
145:24
interrupting 134:7
interview 17:5 21:6
interviewed 17:6
interviews 21:6
Intimacy 50:8,10
51:16 52:15,16,25
53:4
Introduction 31:18
165:15
investigating 95:7
investigation 95:12
95:15,17 96:2
123:3,5 150:9
involved 68:14
153:12
involvement 80:24
involves 33:16
isolate 60:16
issue 77:24
issued 38:20 79:23
Italy 79:7
item 41:21 42:24
43:24,25
items 42:13 43:5,7
54:12,15 84:24
104:3,11,15
106:15 151:21
Ivy 5:24

**J**

J 5:4
January 10:24 96:4
96:15 98:18 99:6
99:10,19 101:11
101:12 102:8
138:8
Jersey 30:7
Jill 1:4,12 2:9 5:18
5:24 20:6 79:12
163:5 164:10

165:6
job 1:25 11:4,18
12:13,20 13:10
14:8 16:22 21:11
70:4 75:15
jobs 21:19
joined 14:19 15:6
16:15,16 17:19,23
36:10
joining 14:12
joint 35:11
joke 115:25
Jude 10:15 11:3,8
11:14 12:23 13:4
13:9 14:12 21:12
21:21 22:3,9
23:22 36:10 38:21
39:8,11 40:13
49:16 92:24 121:2
122:15
judgment 155:19
July 32:7 48:7
69:21 77:8 94:19
94:23 144:14
junk 56:2,5
justice 140:16,18

**K**

K 1:24 2:11 164:22
Kansas 3:7
keep 38:16 139:5
Keogh 149:6,9
Keough 149:24
150:5,9
Keough's 149:25
kidding 162:23
kids 51:24
kind 6:4 22:8 38:5
41:19 71:21 93:9
95:22 154:9 158:2
King 2:10 3:18
knew 8:23 17:2
20:8 29:14,15,19
29:20 30:18,20,21
121:24
know 12:15 14:3
17:20 22:18 26:22
28:18 29:9,23,25

30:4 38:8 51:13
55:6 70:3 71:25
73:7,10 75:22
87:15 93:23 96:4
101:6,14 103:8
104:2,5,6,10,23
104:24 105:2
110:21,25 111:5
117:4,25 121:12
123:22 125:22
126:17 127:15,20
128:8,24 129:17
132:22 133:3,4
135:3,19 138:2,25
141:4,9,17 144:5
144:20 146:13
147:8 149:13,15
153:6 160:20
161:11
knowledge 23:23
24:2 30:12,16,24
38:23 44:10 56:24
91:17 93:19 94:6
114:18 115:7,8,11
115:18 120:14,16
131:16 146:10,23
known 28:25 30:17
120:4,18 122:23
knows 29:8 159:5,9

**L**

L 3:25 5:4,4,4
Laboratories 10:12
lack 27:24 92:23
laid 20:22
Lamer 3:8 9:13
22:15,18 29:2,7
32:3,16 41:22
51:24 59:13,23
61:22 62:5,7,20
63:23 64:2,7,15
64:19,21,23 65:4
67:21 70:12 73:2
73:11 74:14,23
75:10 76:11 87:14
87:18 104:19
106:20 107:8
109:19,25 110:23

111:24 112:5,13
113:4,11,25
115:16 122:9
124:14,22 125:3
125:13,17 126:4,8
126:12,21 127:3,6
127:9,17,20 128:6
128:14,19 129:8
129:13,19 130:2,7
130:16,21 131:2,9
132:21 133:6,10
133:15,25 134:15
135:4,10 136:9,24
137:6,20,22 139:4
148:10 149:16,24
158:5 160:18
161:18 162:14,23
Lamer's 68:25
145:21
landed 52:21
landlord 25:14
language 54:6 63:4
71:19,24
lapse 15:13,14
large 17:18 52:3
67:12 105:4
larger 28:24,24
late 48:22 120:5
122:24 136:7
law 17:17 29:20
30:2 33:9 66:15
66:16 67:13,25
70:2 73:6 74:8
76:6 89:2,10
110:9 112:7,12,23
134:12 136:19
139:17 140:20
141:11 145:18
146:12,17 148:19
148:23 149:6,9,24
149:25 150:5,9,13
151:4 155:3 156:9
161:4
laws 29:21 152:7
152:13,16
lawsuit 14:4 29:12
30:17 31:14,15
42:13 69:23 76:9

92:3,12 93:8,10
93:19 94:6 98:15
108:22 111:9
115:9 116:9,10
117:8 141:5
142:13 144:4
152:18 159:10
lawyer 125:18
133:18 144:15
156:24 157:5
lawyers 156:24
layoffs 20:22
lead 13:12,14,15,18
13:20 87:12 146:5
learned 40:25
86:13
lease 26:7
leaving 67:2
led 13:25 14:3
20:16
left 48:19
left-hand 97:16
legacy 92:24
legal 21:8 29:3
59:14,24 61:23
62:8,21 64:8,16
68:14 72:17 74:25
75:3,19 86:13
104:20 106:21
109:20 110:2
111:25 112:14
113:5 114:2
122:10 124:15
125:4,5,18 126:5
128:7,15 129:9
130:8,9 131:10
133:7 135:11
136:25 137:7
145:14 158:21
162:15
leggings 96:16
leggins 100:9 101:8
101:14,15
Lenox 53:10,14
97:6
Lesson 40:25
let's 14:17 28:11
31:17 44:17 60:4

60:17 70:12 71:16
76:15 80:4 85:15
89:24 94:13,15
96:8 114:5,6
118:21,24 131:21
139:5 141:21
143:6 147:9 152:2
**letter** 68:20 69:9
75:24 148:6,9,11
**letters** 17:4 21:5
56:9 118:6,7,9
**level** 18:4 20:12,13
83:15,17,23 84:4
**levels** 56:15 83:9
**liaison** 15:20
**Lichter** 20:6 79:12
**life** 140:25
**lifetime** 43:11
**likelihood** 120:4
122:23
**limited** 18:5
**limiting** 111:13
**line** 46:21 76:5
165:11 166:4
167:8,10,12,14,16
167:18,20,22
**lines** 46:20
**list** 77:6 94:17
**listed** 144:12
**Lists** 17:3 21:4
**litigation** 102:3
147:13 155:5
161:7
**little** 28:11 59:8
101:18 110:7
156:2
**live** 18:23 19:17
25:5,10 26:12,17
27:13,23
**lived** 18:25 24:18
25:25 26:4,9
48:14 53:16 97:11
**lives** 26:16 27:17
27:22 28:3
**living** 47:6,21
**LLP** 145:18
**loan** 107:5
**local** 150:21

**located** 150:24
**location** 44:25 51:6
53:8 55:18 71:2
94:11 96:14,20,23
97:9 101:4,6,7
104:4,8 138:15,19
143:9,22
**locations** 142:7
**lodge** 72:8 126:13
126:18 127:21
**logic** 57:25
**logistics** 12:6
**long** 11:14 24:10,24
29:25 34:24 46:6
52:19 66:5 79:8,8
81:11,20 82:23
117:5
**longer** 139:7
**look** 12:16 31:21
44:17 58:19 60:4
63:4 65:20,23,25
66:3 71:16 77:3
87:4 88:19 90:13
94:15 98:7 100:15
102:5 109:2,5
114:5,6 118:24
131:21 136:2
147:17 152:2
**looked** 21:2 30:18
46:2
**looking** 8:21 20:24
84:24 97:15
100:16
**looks** 44:19 71:4
100:2,10 137:21
**lose** 128:13 131:7
**lost** 78:14,18 90:22
105:23 106:3
107:22
**lot** 12:7 20:20 42:5
139:7
**loved** 8:22,23
**lovely** 45:20
**loyalty** 54:19 58:8
**Lucie** 27:18

———————
**M**
**M** 5:4

**ma'am** 75:23
**Mac** 9:22
**machine** 46:18
122:3
**machines** 113:7
**Mack** 9:23
**mail** 55:23
**main** 3:13 96:24
**maintain** 43:22
**making** 89:21
106:6
**mall** 50:20 52:14
53:4,12 96:24
**manage** 13:17 16:2
21:21 22:20,25
38:18
**management** 13:14
13:21 15:17
**management-type**
38:25
**manager** 18:3,7,9
75:21
**managers** 16:8
**managing** 15:24,25
22:21 23:14
**manner** 39:18
**Marietta** 16:19
**mark** 5:13,15 11:24
31:17 53:21 70:7
76:15 80:4 101:21
147:9
**marked** 5:3 31:19
53:19 70:9 76:20
80:6 88:11 96:10
101:23 102:11
147:11
**market** 1:7 5:20
25:17 28:13,14
33:13 45:12,19,23
50:17 51:6 52:12
52:22 53:3,7,25
54:12 55:18 57:3
58:12 59:4 62:18
64:14 65:9 67:13
71:2 74:2,7 75:17
75:25 76:7,19
77:8 84:6 88:10
89:13 90:24 93:24

94:7,11,18 96:14
99:2,16 101:5
104:4,8,11,16
105:12,16,25
107:15,19 108:3,6
109:18 110:9
112:7,9,11,22
113:3 115:14
124:8,13,19,20
126:2 128:5,13
131:16 134:25
137:10,17 138:10
138:23 140:24
143:3,9,22 151:7
161:21 165:23
166:10
**Market's** 59:10,20
76:24 88:15
106:11 108:12,19
115:22 116:7
**marketing** 11:5,23
12:4,24 13:13,15
13:22,23 14:11
15:21
**marking** 70:16
**marriage** 159:18
159:21 160:2,12
164:16
**married** 31:3 145:3
145:8
**masked** 98:3
**MasterCard** 34:5
34:15 36:20 95:3
95:7 142:5 143:15
**math** 57:12
**matter** 153:9
164:17
**mean** 13:3 17:9
31:9 34:16 46:17
68:8 69:25 72:20
72:21 75:3 83:20
83:21 99:5 104:21
105:3 117:10
120:7 123:6
125:22 133:13
134:18 140:19
152:24
**meaning** 11:2 55:6

75:2,4 81:15
118:14 121:23
139:9
**means** 155:7,10,11
155:23
**media** 40:19
120:17
**medical** 10:15 11:3
11:15 12:23 13:4
13:9 14:12 21:21
22:4,9 23:22
36:10 38:21 39:8
39:11 40:13 49:17
92:24 107:25
108:7 121:3
**Medical/Abbott**
21:13
**medication** 8:2
**medicine** 8:3
**meet** 7:7
**meeting** 7:17 103:9
151:3
**meetings** 7:19
49:18
**member** 55:22
56:11 58:3,8 91:8
91:18 99:19,19
100:17 105:9
110:17 113:18
140:2 157:25
158:10,24
**member's** 111:14
**members** 40:17
47:14 49:4 92:4
104:12 111:12
116:4 140:10
157:18
**membership** 56:16
143:20
**memory** 66:16
**Memphis** 11:9
**mention** 137:3
**mentioned** 27:9
79:12 93:23 96:19
159:3
**merchandise** 41:17
43:20
**merchant** 34:22

merchants 43:17
messed 100:11
met 5:11 19:14
  79:14 146:16
  150:5 151:4
middle 53:4 57:6
  63:4 65:15
mind 87:18
minute 60:17 143:7
minutes 70:3 136:6
  159:4 160:15
mischaracterizes
  41:23 74:15 129:9
  136:10
missing 44:12,15
  78:19 79:17
mistake 23:10
misuse 159:22
misused 160:3
mitzvahs 27:4,9,9
mixed 48:8
MO 3:7
modify 161:9
moment 22:8 94:14
  102:15 141:22
moments 45:6 67:2
  118:22 124:7
  159:8
monetary 156:20
money 39:23
  107:22 132:6
  135:2
monitor 81:6,17
monitoring 86:23
  123:6
month 81:19 82:17
monthly 84:10
  154:17
months 10:23
  12:16 13:3 69:19
  69:24 70:4 90:18
  97:23 99:4 101:2
  124:2
morning 5:10 7:11
  7:17
mother 27:15
  35:10 47:16 92:8
mothers 51:17

motion 144:2
Mountain 8:14
move 17:2 69:14
  70:3 126:23 127:4
  127:10
moved 19:22 21:4
  24:25 25:22 30:10
moving 19:11,15
multiple 48:16,18
  79:16 118:14

## N

N 5:4 165:2
name 5:10,23 10:13
  14:20 20:6 29:14
  50:9 56:8 73:19
  141:9 167:1,3
named 139:23
  140:12 141:6,18
nature 120:2,7,13
NE 2:11
near 56:7 151:17
nearest 96:23
nearly 116:10
  123:11
necessarily 39:21
  42:16 52:7
necessary 56:19
need 6:14 41:19
  67:3 93:9 126:14
  126:22 127:13
  134:6 152:15
negatively 80:3
negligence 124:25
  125:15
negligent 128:4,12
  129:6 130:5,15,24
  131:6
negligently 124:13
  124:20 126:2
negotiable 156:10
  156:14
negotiated 156:16
  156:18 158:15
nephew's 47:11
net 57:5
Netherlands 79:5
neurological

137:23
never 18:16 26:9
  41:2 52:16 73:15
  91:17 130:11
  136:12 150:4
  152:24
new 15:11 19:17
  30:7,7 38:24
  77:24 79:23 83:23
  92:16,18 141:10
news 31:8 120:17
night 33:3
nine 12:16
nodding 137:18,20
non-healthcare
  15:14
noncompliance
  66:19
noncompliant 86:3
  104:17
nonverbal 6:15
Nope 24:13 25:18
  40:5,10
North 18:25
Northeast 3:20
Northern 1:2 5:22
Notary 2:12 5:6
note 51:21 54:5
NOTED 162:25
notice 5:2,14 66:24
  98:11 165:13
noticed 66:8 69:14
notify 72:8 74:2
  76:7 78:2
Notwithstanding
  114:17
number 5:20 60:10
  61:2,19 63:2,9,11
  64:4 65:10 66:4
  77:6 81:4 85:23
  85:25 88:20,24
  89:25 90:12 94:16
  94:22,24 97:19
  103:15 119:10,22
  131:19,22 151:20
  152:3
numbered 70:17
  102:4 147:13

numbers 63:18
  77:22 98:3
Nutty 24:7,19
  25:22

## O

Oak 19:6 26:5
oath 4:13 6:8
objected 129:23
objection 22:15
  29:2,3 32:16
  41:22 59:13,14,23
  61:22 62:5,7,20
  63:23 64:7,8,15
  64:19 67:21 73:2
  73:11 74:14,23
  75:10 76:11 87:14
  104:19,19 106:20
  107:8 109:19,25
  110:23 111:24
  112:5,13 113:4,11
  113:25 115:16
  122:9 124:14,22
  125:3,13,17 126:4
  126:8,14,15,18
  127:6,22 128:6,14
  129:8 130:7,16,21
  131:2,9 132:21
  133:6,15 134:15
  135:4,10 136:9,24
  137:6 158:5
  162:14
objectionable
  126:9
objections 4:7
  64:25 65:2 133:19
  133:21,25
observe 121:14
obtain 61:11 83:17
  83:23 86:17
obtained 10:7
  66:20
obtaining 35:5
obviously 93:21
  94:20 143:2 160:6
occasion 27:11
Occasionally 43:6
  45:13

occasions 27:8 99:8
occupies 140:9
occur 39:19 78:20
  121:18 159:16
occurred 10:22
  120:3,24 122:22
  123:4,24
occurrence 65:19
occurring 123:23
October 159:17
offer 161:25 162:3
offered 161:21
office 2:10 16:18
officer 4:12
official 10:13
oh 9:12 12:8 32:4
  75:6 88:21 91:15
  100:14 133:9
  136:17 148:13
okay 6:17,24 7:13
  10:20 14:2 18:20
  23:10,13 24:3
  26:25 29:10 31:22
  36:21 53:6 56:4
  58:18 61:11 66:5
  71:16 77:15 88:22
  93:15 94:9 96:8
  99:13 100:7,14
  101:2 109:8 113:9
  113:13 117:10
  119:21 122:17
  125:9 127:19,24
  129:4 131:15
  134:13,17 136:17
  137:24 138:13,22
  139:2,6,18 142:2
  146:9,15 148:13
  148:17 149:22
  152:2 153:10
  155:16 159:14
  160:16 161:14,17
  162:9
old 30:4 92:19
on-line 37:9 45:22
  46:2 55:25 81:6,8
  81:11,18
once 30:13 32:14
  49:24 95:11

**one-third** 155:18
155:18
**ones** 17:7
**oOo** 4:20
**open** 95:24 121:20
152:7
**opened** 35:11 38:3
**opening** 38:6
**operative** 60:21
**opportunities**
20:24
**opportunity** 16:25
19:13,18 20:16
**opposed** 42:14
109:15
**opt** 158:4,7
**opted** 132:5 134:25
**order** 134:2
**orders** 155:4 161:6
**ordinary** 46:15,16
**Oster** 5:24
**outcome** 164:17
**outline** 13:8
**outlined** 133:13
**outlying** 42:5
**outside** 93:7 94:4
**overseeing** 15:24
**oversight** 18:6
**owned** 24:24
**owns** 24:22

**P**

**p.m** 65:17 162:25
**pack** 42:25
**page** 32:6 44:19
60:5,18,19 63:5
70:23 77:5 80:14
85:3,15 88:19,21
90:2 94:16 102:6
109:3,4,5 111:17
111:18 114:8,13
114:15 119:2,11
131:22 141:23
144:9,10 147:20
149:6 151:17,19
153:22 160:22
165:4,11 166:4
167:8,10,12,14,16

**167**:18,20,22
**pages** 147:17,19
**paginated** 44:18
**paid** 42:13 43:12
68:10
**pair** 95:19 100:9
**pants** 95:19 96:5
101:9,15
**paper** 31:9 46:19
**paperless** 85:2,5
**paragraph** 44:18
44:21 60:4,6,18
60:20 114:6,7,13
114:14 132:3
135:16,16 141:22
142:3 154:25
155:16 160:24
**Paraphrasing** 77:6
**paren** 152:7,9
161:3,5
**parents** 26:22
27:13
**part** 8:15 12:13
22:24 35:19,22
47:24 51:15,16
55:16 100:3 144:7
153:19 155:25
**particular** 30:2
45:7 46:5 51:6
52:11,12 55:4
85:9 98:8 101:4
122:7 145:15
**parties** 4:4 116:3
154:5 164:15
**partner** 102:24
**partners** 15:7
140:25
**party's** 115:20
**passed** 136:19
**patient** 21:22
**patients** 22:13
**pattern** 81:23 82:2
**pay** 42:3 43:7 68:9
107:4 122:5
154:25 161:2
**paying** 100:3,23
154:13 155:12
161:16

**payment** 41:6 57:6
57:13 158:3
**Peachtree** 2:10
3:20
**pendency** 152:17
**pending** 5:20
150:25
**people** 8:23 17:14
17:22 20:13 27:2
43:12 93:25
104:21 115:2
139:16 140:17
**perceive** 72:14
140:13
**perceived** 156:5
**percent** 54:16
55:14,17 99:22
155:18 156:19
**percentage** 41:11
**perception** 73:9,14
73:16 146:25
**period** 35:13 36:8
36:19 43:23 95:8
142:12 152:9
**periodically** 154:18
**person** 40:14 60:23
104:6 115:20
119:12 121:25
140:7 146:16,18
159:5
**person's** 21:14
142:10,11
**personal** 21:14
22:12 23:2,24
33:20,24 34:12
35:5 36:11,18
38:14 40:23 42:19
43:8 49:3 103:16
**personally** 66:20
87:9 104:24 105:3
141:4 150:4,8
153:12
**persons** 40:22
104:14 116:3
142:4
**Phipps** 45:2 48:4
48:11,23 49:7,20
50:11,23 53:8

**70**:25 74:8 77:18
96:25 97:2,4
107:14 131:18
138:19
**phone** 147:23
**physical** 114:10
**physically** 120:11
**pigeon** 75:21
**place** 7:13 25:22
44:8 51:12 52:7
102:17
**places** 121:18
**plain** 154:9
**plaintiff** 1:5 3:5,12
44:24 60:7 77:11
119:23 132:9
139:18,23 144:4
**plaintiff's** 60:10,12
76:17,22 88:9
114:10 151:12
165:21 166:9
**plaintiffs** 151:11
**plane** 127:8
**planning** 15:23
**played** 9:5,9
**plays** 80:24
**Plaza** 45:2 48:4,11
48:23 49:20 50:11
53:8 71:2 74:8
77:18 96:25 97:3
97:4 107:14
131:18 138:19
**pleaded** 109:24
**please** 6:12,21
71:25 74:8 91:11
94:16 127:13
129:19 130:2
**plus** 57:13
**pocket** 106:10
**point** 15:5,11 17:17
21:3 41:7 43:7,12
48:12 61:4 65:21
65:23,24 82:4
84:25 98:8 113:7
131:17 142:8
152:17
**points** 81:5
**police** 44:15 89:10

**89**:15,19
**policy** 41:3
**Port** 27:18
**portion** 80:11
122:21
**portions** 62:18
**position** 17:24 18:4
113:18
**positions** 20:13
38:25
**possessed** 35:4
**possession** 90:4,10
90:14
**possibility** 44:6
87:10,20
**possible** 45:25 49:6
85:22 86:13,16
87:8,12 91:16
92:3 93:12 120:2
122:7,16,21
123:13
**possibly** 38:10 46:2
46:4 57:4 110:7
152:23
**post** 19:4,5,6 26:4
100:23
**post-January**
11:18
**postcards** 55:23
**potential** 72:6,9
74:3 108:7 111:12
116:4 158:24
**potentially** 23:4
148:20
**PR** 13:25
**practice** 66:6 81:21
**practiced** 29:19,25
**pre-Abbott** 12:10
**pre-dating** 117:18
**preceding** 59:12
**precise** 94:24
**precisely** 46:8
**predate** 117:7
**predated** 121:9
122:8
**preparation** 7:19
**prepare** 7:8
**prepared** 133:18

presence 93:7
present 3:24 23:19
95:10 140:21
presents 96:3
Presumably 26:7
presume 52:15,17
58:4,5 140:23
prevail 162:12
prevent 87:10,20
prevented 72:24
price 66:2 100:13
prices 100:10
primarily 37:6,7,13
116:20
primary 15:20
18:18 34:12
print 60:25 61:9
131:18
printed 66:14
134:11 142:8
143:11,23
prior 7:17 12:19
13:3 14:12,16
20:8 29:11 30:17
31:14 35:5 36:8
39:4 40:25 45:5
45:10 48:2,23
51:7 57:2 58:13
58:18 59:9,10,11
59:11,19,21 60:2
65:19 66:6,10
76:8 115:8 121:5
123:9 142:13
145:25 146:10,13
150:9 155:14
157:2
privacy 21:18
119:25
privileged 23:20
75:11
probably 6:12 7:3
13:5 16:4 17:21
99:10 101:17
140:5
problem 88:23
138:23
procedure 38:24
procedures 23:13

proceed 140:14
proceeding 35:20
35:23 105:20
153:13
proceeds 154:14
155:19
process 12:14,18
39:17 46:14
produced 46:14
70:18 102:3
147:12
product 83:5 86:18
86:20,24 88:2
products 83:9
Professional 2:12
program 54:19,22
54:25 55:3,7,16
99:20
programs 58:8
prohibition 61:8
62:3
prohibitions 61:18
proper 126:16
property 25:3
propose 142:23
158:21
proposed 33:11
110:18 113:19
115:2 139:11,19
139:24 140:9
142:3,19 157:19
protect 21:14 80:23
140:22 141:2
protected 29:21
protecting 22:12
23:14 80:18
protection 29:20
83:9,15,18 84:4
86:18,21 87:5
prove 110:8 125:25
128:3,12 129:6
131:6,7 140:21
provide 5:16
133:18 158:21
provided 61:3
68:23 84:9 89:12
93:23 107:6 142:7
143:10

provides 60:22
82:19
providing 90:8
provision 60:21
61:16 155:7,22
proximity 52:23
public 2:13 5:6
11:6 22:24 31:10
publicity 114:18
published 60:9,11
pull 93:16
pulled 80:9
punitive 111:19,23
112:4 113:15,20
113:23
purchase 40:14,20
44:25 46:2,3,11
48:9 60:7 70:25
95:2,20,21 96:10
96:13 102:7,16
138:9,18 166:13
purchased 43:5
54:11,15 66:2,3
99:11 104:15
purchases 37:2
40:23 42:17 43:18
45:22 50:25 55:17
56:19 57:2,23
58:11,19,20 59:9
59:11,19 94:10,17
94:23,25,25 95:4
95:25 96:13 101:3
102:23 103:2,5
104:7,11
purpose 50:4,6
purposes 5:14
34:21 159:4
161:12
purse 43:21
pursuant 84:10
148:18 156:25
put 42:4 43:20 44:2
88:3,6
Putin 115:23,25
putting 87:2,3
114:20 154:9

Q

qualification 90:7
quantify 58:15
quarter 39:19
quarters 56:9
question 4:8 6:20
6:23 8:25 11:24
21:17 49:9 59:17
63:25 65:6 69:23
83:12,13 87:17
99:14 105:2
112:16,24 117:12
118:5 127:13,18
127:23 128:18
129:14,16,20,21
129:22 133:24
134:9 136:16
143:17 160:19
questions 8:4 64:24
94:2 134:5 162:22
quick 139:2
quicker 133:22
quickly 69:15
quit 134:6
quite 11:25 12:15
53:14 97:2
quote 60:23 132:4
132:7 155:3

R

R 164:2
ran 46:19
random 121:25
rang 46:10
Rarely 43:9
rate 107:5 154:14
158:15
reaction 67:7
read 31:9 32:21,22
32:25 61:17
112:17,19 119:21
127:14,18 137:15
readily 95:9
reading 160:21
reads 119:22
ready 49:8
real 11:11
realize 162:11
realized 77:15 86:2

realizing 77:21
really 15:12 29:4
37:20 92:21
133:11
reason 33:14 41:2
44:7 51:14 52:10
52:11 57:16 78:11
93:15 94:2 167:4
167:8,10,12,14,16
167:18,20,22
reasonable 70:5
151:13
reasons 72:12
78:13
recall 17:6 20:15
20:18 28:21 31:8
32:14,23 35:2
37:22,25 39:5,9
45:15,18 46:6,9
46:13,18,21,23
47:5,24 49:25
50:4,15 51:8,9,14
52:25 54:21,24
69:4,10 79:19,20
79:22 80:2 83:21
85:11,14 91:12
94:24 95:25 96:6
99:12 101:10,11
104:9 105:13
118:8 121:11
122:17 141:11
150:3
receipt 42:20,25
43:3 44:3 46:14
53:19,24 54:9
56:7 57:7 58:20
60:8 61:3,20 62:9
62:10,13 63:2,16
65:15,16,25 66:8
66:12,20,23,23,24
71:17 72:16,17
73:19 76:6 77:16
77:21 78:8 84:5
86:3 89:3,12 90:5
90:6,14,22 91:8
91:17,21 94:21
96:12 98:8,20,23
98:25 102:8,11,21

104:17 105:7,11
106:11,25 107:6
114:25 116:13,16
119:6,14 134:11
142:8 143:11,24
165:17 166:17
**receipts** 30:18 31:2
43:16,22 44:11,15
59:10,20 60:2
65:20 96:10 99:25
100:8 138:24
166:13
**receive** 110:6
113:19 116:18
118:12 151:11
155:17 162:12
**received** 32:24
53:25 58:20 59:20
60:2 65:16 76:5
84:5 90:23 104:16
105:7,10,11
107:25 116:11,14
116:19 117:13,17
117:21 118:6,8
134:3 156:19
**receiving** 117:5
119:5,14 147:4
**recess** 70:14 160:17
**recession** 20:19
**recklessly** 132:4
**recognize** 31:24
53:23 70:19 88:17
118:18 147:14,20
**recollection** 14:10
16:7 39:16 58:25
59:2 100:22
121:21
**recommendation**
84:25 86:6
**recommends** 82:8
**reconnect** 19:13
**record** 5:14,17 54:5
64:23 70:13
112:19 126:13
133:16 148:11
160:18,23 164:13
167:5
**recover** 106:14

108:6,14,22
109:16,23
**recovery** 111:14
124:19 154:4
**rectangle** 71:21
**recurring** 34:15
**reduce** 81:2 87:10
87:20
**referred** 94:14
102:14 150:20
**referring** 54:6
132:15,20 133:2,5
**reflect** 54:15 70:25
96:13 102:6
**reflected** 57:6
**reflects** 32:7 99:18
102:7 151:19
**refreshed** 66:16
**regarding** 138:24
**regardless** 108:21
**register** 60:8
**Registered** 2:12
**regular** 41:12 99:7
**regularly** 82:6,9,13
**regulation** 29:15
29:17 30:20 60:3
**regulations** 21:23
21:25
**reiterate** 127:3,6
**rejected** 162:2
**related** 27:3 39:21
39:22 103:10
164:15
**relations** 11:6
22:24
**relationship** 11:11
18:12 140:9
144:25 145:5,25
146:11
**relatives** 26:12
51:25 92:5
**relevant** 95:8
**relief** 152:7,12,16
**relocated** 141:15
**remain** 77:13 89:9
91:3 142:22
**remediation**
121:16

**remedy** 158:10
**remember** 9:21
22:5 52:24 53:3
79:2 100:3 120:23
122:3 142:20
**rent** 25:19
**rental** 47:23
**rented** 25:12,13
**renting** 52:4
**rephrase** 6:21 84:2
90:7 112:15
**report** 82:5,9,14
84:19 88:25 89:10
89:15,19 118:17
**reported** 1:24
44:14
**reporter** 2:12
112:20 164:8
**reporting** 88:6
**reports** 39:18
**represent** 68:6,9,10
80:8 148:10,19
157:19 158:14
162:10
**representation**
154:11 156:23
**representative**
140:8,12 141:6,19
151:16
**represented** 68:13
145:13
**representing**
139:15 144:15
147:6 156:25
162:6
**reputation** 108:11
**request** 88:19,24
89:24 90:12
**requests** 88:11,15
151:24 166:11
**required** 21:13
49:9 107:4 125:15
125:16
**requirements**
114:19
**reread** 32:23
**reserved** 4:8
**reside** 24:3,12

**resided** 24:10
**resides** 24:14
**resolution** 156:20
**resolve** 161:22
**respect** 160:22
**respective** 4:3
**responds** 132:10
**response** 77:10
89:3,6 90:19
93:22 95:11
119:22 120:15
122:20 124:3,4
132:9,24 133:2,5
134:23 144:25
145:24 159:7
160:7
**responses** 76:18,23
88:9,14 93:17
94:14 118:22
119:18 135:24
137:15,16 142:17
165:22 166:9
**responsibilities**
11:19,21 12:2,7
12:11,15,20,22
13:2,10,16,18
14:9 18:6 21:19
92:17
**responsibility**
18:11,16 23:18
**responsible** 15:23
22:14,21 161:16
**rest** 15:22
**restate** 6:21 59:16
**restaurants** 37:9
**restructuring**
11:21
**result** 89:11 105:23
106:10,18 107:22
108:2,11,18
112:10 115:13,21
152:8 154:5
**resulting** 116:6,13
**resume** 21:5
**retailers** 37:3 43:17
58:9
**retained** 90:4,9
150:10

**retaining** 150:10
**return** 41:21 42:8
42:24 43:5,25
44:6 62:10 71:17
**returning** 41:18
42:3
**revenue** 17:20
**review** 32:10 82:5,9
82:13 132:4
157:21
**reviewed** 84:18
135:13
**reviewing** 33:6
**rewards** 54:17,22
54:25 55:22 56:15
56:23 58:3 99:20
103:12
**ridiculous** 133:12
**right** 6:8 9:15,24
11:9 14:4 18:14
21:9 24:4 28:11
30:8 31:13 42:7
42:11 47:7 57:12
57:20 59:6 61:16
63:2,9 68:21 69:2
70:2 71:16 73:8
73:19,20,22 76:10
80:17,21 83:16
89:6 90:3,21 93:4
93:20 98:16 99:5
99:23 100:2,11,18
100:24 102:2
104:22,25 107:3
111:20 114:14
118:21,24 122:13
122:14 126:7,11
128:25 129:24
131:21 133:23
134:4,8 135:14,17
135:22,25 136:5
136:20 138:21
140:6 142:15
143:4,13,24
144:22 145:4,4,16
145:22 148:24
150:25 154:22,23
158:7 160:23
161:17 162:2,21

right-hand 54:7
rise 42:12
risk 81:2 114:21
    115:2
Road 24:7
Robin 1:24 2:11
    164:7,22
robo 117:3
Roger 24:17,23
    92:8 95:21 103:4
role 13:3,12,13,15
    13:19 18:3 80:24
roles 13:5,10
room 20:3 140:6
rooming 20:9
rooms 72:14 73:5
rooted 9:5
Rose 9:13,14
Rosen 79:13
roughly 36:14 45:8
    57:19
rounds 20:22
route 74:11,25 75:3
routine 34:14
RPR 1:24 164:22
rule 42:22 128:9,24
rules 6:5 39:12,20
    161:5
run 100:4
running 18:10
    100:4

—————————
        S
—————————
s 76:19 88:10
    165:23 166:10
Saban 9:19
salary 106:3
sale 41:7 43:8 61:4
    65:21,24,25 98:8
    113:7 131:17
    142:9
sales 46:10 49:18
    55:24
salesperson 47:4
Saturday 51:11
save 43:25 44:5
    132:6 134:25
saw 31:8 98:19

148:14
saying 19:24
says 53:13 81:5
    85:17 102:20
    132:18 145:24
    160:22
scenes 120:12
school 8:10,13 10:2
    19:10
scope 18:5
score 84:12,13,14
    84:15
scores 121:16
sealing 4:4
search 21:2
second 29:7 47:11
    62:2 85:15 126:12
    129:13 154:20
    155:25
seconds 70:4
secrecy 120:9
section 60:22 85:20
    153:23 155:24
see 23:11 44:21
    49:4 56:8 63:6
    66:2 71:20 80:15
    80:18 81:4 83:25
    85:2,17 89:6 96:8
    114:14 131:22
    132:7 147:19
    151:16 152:3,10
    153:23 154:7
seeing 40:8
seek 84:3 156:23
    157:4 158:13
seeking 105:15,18
    106:14 108:5,14
    108:21 109:10
    124:18 151:6
    152:6
send 75:21
Senior 11:5 12:24
    14:11
sense 26:21,24 27:2
    46:2 155:24
    157:24
sensitive 23:4,6,19
sent 17:4 21:5

sentence 80:21
    153:25 154:20,24
    155:13 156:8,17
separate 38:16,18
    61:17 148:8
September 20:19
served 137:17
server 123:18
service 82:18,21,23
    83:6,24 84:10
    86:18 87:5
services 11:23
    13:21 154:3
set 76:19,24 88:10
    98:3 131:17
    132:11 156:9,24
    164:11,19 165:23
    166:10
settlement 155:19
    161:24
seven 14:15 82:24
    83:6,15 88:19,21
    117:6,14 118:11
share 71:25 160:11
sheet 80:6 144:11
    166:7
shifting 155:21,25
Shimshon 29:18
    146:8 149:11
    157:3
shook 80:3
shop 50:22 98:25
    140:23
shopped 45:11,19
    45:25 52:16 97:8
    97:9 138:17
shoppers 141:3
shopping 34:14
    37:10 51:13,15
    52:20 53:12
    140:25
shops 33:13 102:16
shortly 145:17
show 125:15,16
showed 9:17 91:13
    93:17
showing 91:6
shown 77:22 91:8

91:17,21
sibling 27:25
siblings 26:23
    27:20
side 97:16
sign 52:18 65:24
    69:5
signature 88:21
    147:21
signatures 147:18
signed 4:12,14
    68:24
signing 69:10 157:2
silver 56:11 100:17
simple 80:25
simply 86:23
single 144:11
sister 26:16 27:19
    27:21,25 31:3
    40:3,8 47:18 49:4
    51:18 79:13 91:12
    91:17 141:15
    145:8
sister's 47:12 67:23
    141:10
sit 58:2 91:4 113:13
    142:22
sitting 123:19
    134:24 137:9
six 17:7 60:11
    63:18 64:4
Skaar 3:11 150:14
    150:19 151:4
SkyMiles 71:5,7
slightly 11:24
    71:19
smack 53:4
small 94:22
social 40:19
sold 25:15
sole 18:18
somebody 40:21
    120:10 123:19
soon 36:4 85:22
    98:8
sorry 9:17 10:19
    23:10 48:7,8
    54:17 59:16 63:14

69:4 83:22 88:22
    91:15 96:17 98:2
    100:16 101:9
    102:25 112:10,15
    118:25 138:17
sort 23:13 31:10
    38:23 71:20 84:3
    93:11,12 104:25
    113:2 152:21
    157:14
sought 152:12
sound 133:25
sounds 12:7 48:22
    79:8
source 30:16,24
    61:14 120:14
south 102:18
    141:15
Spalding 2:10 3:18
speak 75:20 135:25
    149:23 154:10
Speaking 144:9
speaks 133:7
specific 46:12
    66:23
specifically 51:16
    55:2 80:2 83:19
    83:20,21,22
    104:13
specifics 84:14
speculate 111:3
speculation 32:17
    110:24 158:6
Spencer 3:4 145:18
    145:25 146:4,21
    146:16 148:23
    149:25
spend 27:11 39:23
spoke 72:15,18,25
spoken 92:2
spring 101:16
Square 96:21 97:6
    97:9 138:9
ss 164:4
St 10:15 11:3,8,14
    12:23 13:4,9
    14:12 21:12,21
    22:3,9 23:21

27:18 36:10 38:21
39:8,11 40:13
49:16 92:24 121:2
122:15
**stamp** 65:14
**stamped** 54:5,6
**standard** 22:8
38:24
**standing** 91:13
**standpoint** 11:25
17:21 19:18 21:23
34:17 120:12
**stands** 28:19
**start** 69:16
**started** 13:11 15:8
31:2 79:4 81:22
122:15
**starting** 12:17
**state** 2:13 5:17 6:6
26:10 53:7 94:22
95:6 111:18
122:20 164:3,8
**stated** 59:8
**statement** 70:9,20
101:23 165:19
166:15
**statements** 85:6
95:8
**states** 1:2 5:21
13:12 45:12 56:11
60:6,21 80:22
82:5 85:20 88:25
90:13,22 119:3,11
119:25 152:5
154:20,25 155:16
156:8
**station** 66:11 122:3
122:5
**status** 56:12,15,20
56:22 57:10,23
**statute** 28:15,25
29:12 30:16 59:22
66:19 98:13 126:3
128:4 136:7
137:11
**statute's** 114:19
**statutory** 86:17
87:9 92:3 105:19

109:10,14 110:19
110:21 111:8
115:13
**stay** 40:6 47:18
**staying** 40:3 52:4
**steal** 89:17 115:10
115:20 116:3
119:12
**stealing** 120:10
**stellar** 158:21
**step-by-step** 86:7
**stepbrother** 72:16
72:19
**stepbrothers** 27:22
**steps** 80:25 87:10
87:19
**STIPULATED** 4:2
4:6,10
**stole** 78:18
**stolen** 44:11,14
78:14,17 79:18
89:16 115:12
**stop** 74:8 133:16
157:17
**store** 41:6 44:7
45:12,19 46:7
50:7,10,13 52:12
53:19 58:13 67:2
74:8 94:18 96:20
100:11 102:11
131:18 134:11
138:9,12 165:17
166:17
**stored** 123:18
**stores** 50:23 51:2
52:24 53:7 57:3
132:6 135:2
**straight** 16:22
154:10
**strategy** 15:23
23:18
**Street** 2:10 3:6,13
3:20 25:7
**strike** 126:23 127:4
127:11
**structure** 158:22
**stuck** 152:21
**studied** 125:23

**stuff** 147:24
**sub** 109:10
**subject** 78:7
**subjective** 159:24
**submitting** 124:2
**Subscribed** 163:7
**Subsection** 156:5
**subsequent** 35:25
101:12,19
**substantively** 12:12
**subsuming** 28:24
**successful** 151:11
154:5
**suggest** 103:23
**supervisor** 18:9
**supplement** 95:10
135:24
**supplemental**
76:18,23 165:21
**supplemented**
132:12,16 134:18
**supply** 87:25
**support** 112:25
135:6
**supporting** 132:10
132:19
**supports** 132:2
**sure** 13:11 21:16
29:14 32:19 37:19
38:3 41:11 53:2
55:11 59:18 68:22
78:19 83:7,13,19
86:25 87:16
116:16,24 120:22
121:7 140:2
141:25 156:15
**Susan** 3:25
**suspect** 55:9
**suspected** 66:18
**sustained** 105:23
106:9,17 108:10
108:17
**sweater** 95:22,23
95:24
**swipe** 46:24 47:2,3
47:4
**switched** 85:5
**Switzerland** 79:6

**sworn** 4:11,14 5:5
163:7 164:12
**system** 131:17

**T**

**T** 5:4 164:2,2
**take** 7:13 14:24
20:8 28:13 32:3
34:22 35:19 48:3
48:16 53:14 57:15
70:10 77:3 80:25
87:9,19 137:18
139:2 150:4 160:6
160:14
**taken** 5:18 70:14
160:17
**talk** 6:25 28:11
126:22 133:12
141:21 143:6
**talked** 29:24 124:6
136:5 137:14
148:23 149:11
159:14
**talking** 18:13 23:3
55:9 66:22 69:8
94:20 99:5 102:8
153:23
**talks** 100:17
**tank** 95:20 96:6
**tantamount** 114:9
**team** 12:3,3 13:17
13:19 22:20,24
40:17,21
**teams** 15:25
**technically** 68:7,8
**telephone** 7:14
**tell** 7:2 31:7 35:21
52:19 92:9 149:15
**telling** 75:15
**Ten** 9:8
**tend** 34:14
**tendered** 63:5
**term** 26:21 27:24
92:24 105:18,19
112:10 113:3
121:13 123:12
140:18 143:4
159:9

**termed** 106:10
**terminology** 125:5
**terms** 22:12 113:15
157:14,19
**testified** 5:7
**testimony** 6:7
41:23 74:15
129:10,12 136:10
136:13 164:13
**Texas** 8:18 9:6 24:4
**Thank** 6:19 29:10
31:12 51:20 130:3
141:24 148:14,16
161:19 162:24
**Thankfully** 153:21
**theft** 85:21 86:18
86:21 87:5,12,21
115:3,6 119:5,8
120:2,3,8,13,19
121:23 122:22
123:3
**thief** 114:11
**thing** 6:13 17:16
21:3 31:11 93:12
152:21 157:15
**things** 34:16 39:24
43:13 72:13 75:22
123:8
**think** 16:13,16 19:6
26:17 39:19 43:24
44:18 45:17,24
48:7 49:14 50:8
50:18 51:11 52:6
53:9 55:5,13
58:10 62:24 69:13
70:15 71:12 75:12
75:14,16 86:22
92:20 93:22 101:8
102:14 121:4
125:19 137:3
138:4 139:6
144:24 145:12
148:8 157:17
159:9,14,24
**third** 21:14 38:10
38:17 53:2 115:20
115:20 116:3,3
156:19

**thought** 66:12,15
96:18 122:2
136:14
**thousand** 57:20,23
111:14
**three** 16:4 45:8
52:6 56:9 90:2
100:8,10 148:18
156:25
**throw** 44:4
**thumb** 42:23
**time** 4:8 10:25 14:3
15:5 16:3,8 18:8
18:24 19:19 20:14
20:21 23:21 27:11
32:3,25 35:13
36:22 37:22 40:12
41:16 43:23 45:18
47:21 50:7 65:14
66:11,17 67:4
68:17 77:3 90:23
92:11 95:10
117:11 119:5,14
129:25 142:12
146:15 162:25
**timely** 39:18
**times** 7:10 22:25
27:7 32:13 45:14
48:17,18,25 49:5
49:23 58:15 81:19
92:20 97:13,14
159:15
**tips** 84:13
**title** 11:4,19,22,25
12:20,24 14:8
**titled** 148:2,2
**Toco** 47:25
**today** 5:12 6:2 8:4
58:3 71:25 77:13
89:9 90:17 91:4
92:10,13 94:21
113:14 134:24
137:9 142:22
144:21 146:18
150:17 151:3
159:15
**told** 6:13 10:16
68:3 126:21

**top** 17:4,8 32:6
44:20 80:14 88:22
94:16 95:20 96:6
102:20 151:19
**tops** 147:19
**total** 57:5,5 60:13
64:4 77:10 100:13
100:15 155:18
**totals** 100:19
**town** 8:15 19:23
47:24 50:2
**trade** 28:20 86:7
**trained** 10:21
21:24 22:3
**training** 10:16 12:6
21:8 22:6,11
**transaction** 33:21
45:5,10 46:5
58:14 60:24 61:4
65:16 69:24 77:19
97:15 101:3
103:24 142:9
**transactions** 59:5
82:10 84:19
**transcript** 6:16
**transcription** 167:7
**transfer** 152:8
**treatment** 108:2,7
**trial** 4:9
**trials** 120:24
121:13
**tribulations** 120:24
121:13
**trip** 39:25 40:4,9
47:19 50:20 78:23
79:3,8 92:12
**true** 12:17 27:25
53:18 54:8 89:9
91:3 123:25
156:13 160:10
164:12
**trusted** 158:20
**trustee** 152:9
**truthful** 8:4 9:18
**try** 6:25 7:4,4 30:13
117:10
**trying** 31:4 93:4
103:22 123:21

149:18
**Tucker** 3:14
**Tuesday** 1:14
**turn** 77:5 89:24
**turned** 44:11
**turning** 114:9
**twice** 32:14,15
**two** 11:12,20 12:19
12:22 14:16 17:14
18:21 24:11,18
25:25 27:22 33:25
34:6 36:22 38:9,9
38:12 39:4,10
48:14 51:17 52:23
54:11 58:16 61:17
69:13,19,24 70:4
72:12,15 73:18
90:2,3,3 92:16
99:25 116:9,10
121:5 123:11
147:17
**two-year** 36:8,18
**two-year-old** 51:17
**type** 34:16 73:4
116:23
**types** 27:10 29:21
39:24 72:13
109:16
**typically** 37:16
42:19 43:2 56:2

**U**
**Uh-huh** 6:9 14:5
16:21 19:21 44:22
131:24 144:13
148:21,25
**ultimately** 15:3
18:9
**unauthorized**
89:21 107:13,17
**unaware** 119:23
**unclear** 6:23
**underlies** 105:24
**underlying** 115:9
**understand** 6:7,20
19:24 21:16 28:13
28:23 31:4,5 32:5
55:8 68:22 69:8

72:18 73:10 83:8
83:25 87:16
105:14 109:14,23
124:6,11,18
125:10,24 126:6
126:25 128:3,11
128:22,22 129:2,5
130:4,10,13,18,23
131:5,13 135:8,23
136:3,6,16,18,21
138:22 140:7
143:2 149:14,22
150:19,23 155:22
157:10 159:11
161:21 162:7
**understanding**
30:6 56:14,18
61:7,12 110:11
111:22 112:4
124:25 139:13
146:19 151:20
155:6 161:15
**understands**
129:20 156:9
161:2
**understood** 22:7
23:3 117:25
151:10 159:7
**undertaken** 123:2
**unenrolled** 58:6
**unfortunately**
35:18 128:18
**uninterested** 74:12
**United** 1:2 5:21
13:12 45:12
**University** 8:18
**unpack** 60:16
**unredacted** 70:24
**unsubscribe** 56:2
**unsuccessful** 155:5
161:7
**upgraded** 83:23
**USC** 60:22
**use** 33:17 34:6,13
34:15 35:5 36:17
36:18,25 37:2,12
37:15,17,20 38:11
39:12,17,25 41:7

41:20 42:9 44:3
46:24 63:11 71:8
71:11 87:24
112:10 113:3
121:13,20 122:6
123:12 140:18
143:8 159:22
**UT** 9:2

**V**
**vagaries** 156:4
**vague** 87:14 132:21
132:24 156:2
**value** 71:24
**variable** 118:15
**various** 13:10
56:15
**Varying** 118:16
**verdict** 151:11,12
**verse** 13:7
**versus** 5:19 42:5
**victim** 85:18,21
87:21 115:5 119:4
119:7 120:19
**violate** 67:13
**violated** 28:15
110:9 124:9,13,21
126:2 140:20
141:12 143:24
**violates** 76:6
**violating** 112:7,11
112:23
**violation** 64:5
67:15 69:14 72:7
72:9 74:3,13,20
75:19 86:13,17
87:9 92:3 106:19
107:23 109:12
114:9 115:13,22
116:7 128:4,12
129:7 130:5,15,19
130:24 131:6,7
134:12 139:16
**violations** 29:22
31:15 119:25
**violative** 98:12
**Visa** 103:14,16
142:4 143:8

**visit** 8:22 27:6 28:7
  48:2,5,6,23 50:5,7
  50:22 52:11,15
  55:12 86:6,12
**visited** 51:5 53:6
  86:10
**visits** 49:3,12 50:6
**Vladimir** 115:25
**void** 100:23
**voiding** 100:5
**volume** 34:17
**vs** 1:6

**W**

**wages** 105:23
**wait** 46:21 52:18,20
  129:13
**waived** 4:5
**wallet** 41:16 43:20
  78:19 79:17
  120:10
**Walnut** 3:6
**want** 5:13 9:18
  19:16 26:20 41:24
  76:3 139:2,3
  149:13
**wanted** 17:2 19:7
**wanton** 114:8
**warm** 19:16
**warranty** 41:19
**wasn't** 9:12 19:20
  48:5 103:22
  117:11 162:23
**water** 31:24
**way** 11:7 56:9 93:5
  98:21 103:18
  109:24 128:2
  139:22 146:23
  159:25 164:16
**we're** 12:13,17
  135:24
**website** 72:7,24
  80:10,12 86:7,10
  86:12
**websites** 73:18 74:2
  74:22 75:7
**weddings** 27:4
**week** 51:9 118:14

118:15
**Weekly** 118:13
**weeks** 11:20 12:19
  12:22 33:5 67:14
  79:10 92:16
**went** 8:22 11:20
  18:8 20:18,21
  21:2,5 51:14
  52:20 53:11,14
  67:23 72:15 74:25
  78:19 79:4,5,5,6,6
  79:7,7,17 120:23
  134:11
**weren't** 99:14
**Wexler** 7:22 29:18
  30:15,22,25 47:19
  69:6 72:25 91:9
  91:19 92:5 94:4
  105:9 144:12
  145:7 146:9,19
**Wexlers** 52:3
**WHBM** 54:17,22
  54:24 55:22 56:15
  56:23 58:3 72:8
  94:23 119:6,14
**WHEREOF**
  164:18
**white** 1:7 5:19
  28:12,14 33:13
  45:11,19,23 50:16
  51:6 52:12,21
  53:3,7,25 54:12
  55:18 57:2 58:12
  59:4,10,19 62:17
  64:13 65:9 67:13
  71:2 74:2,7 75:17
  75:24 76:7,18,23
  77:7 84:5 88:10
  88:14 89:12 90:23
  93:24 94:7,10,18
  95:19,19 96:14
  99:2,15 101:4,8,9
  101:15 104:3,8,11
  104:15 105:11,15
  105:25 106:11
  107:15,19 108:3,6
  108:11,18 109:18
  110:8 112:7,8,11

112:22 113:2
  115:14,21 116:6
  124:8,12,19,20
  125:25 128:4,12
  131:16 134:24
  137:10,16 138:9
  138:22 140:23
  143:2,9,22 151:7
  161:21 165:22
  166:9
**wilfulness** 125:16
**willful** 130:19
  131:7
**willfully** 110:9
  114:19 124:9
**willfulness** 109:17
**Wilson** 25:7
**win** 15:8 126:3
  128:5 129:7
**window** 52:20 97:9
**winning** 15:9
**winter** 101:15
**withdrawn** 94:5
  146:20
**withdrew** 7:22
  149:11
**witness** 5:5 80:3
  127:19,24 129:20
  148:13,16 160:16
  164:10,13,18
  165:4 167:3
**witness's** 129:10
**woman** 33:13
**women** 140:23
**word** 57:15 98:24
**words** 106:23
  107:21 157:4
**work** 14:13 23:16
  49:6,7,12 80:22
**worked** 11:14
  14:14,15
**working** 10:14
  69:16 158:19
**works** 139:14
  146:16
**worries** 96:18
**wouldn't** 97:2
  121:18

**Wow** 9:4 17:13
**write** 75:24
**www.WHBM.co...**
  73:23
**WWW.WHBML...**
  72:3,3
**www.WhiteHous...**
  73:20

**X**

**X** 165:2
**X's** 30:19

**Y**

**year** 9:24 10:24
  27:7 36:22 57:24
  149:10
**years** 9:8,16 10:15
  11:16,17 13:4,8
  14:15,16 16:17
  18:21 24:11,19
  25:25 28:10 30:10
  33:23 35:3 36:6
  36:15 45:8 48:14
  66:7,10 82:24
  83:6,15 85:11
  90:2,3,4 97:12
  116:9,10 117:6,14
  118:11 121:6
  122:4 123:11
  141:14 142:13
  153:20
**Yep** 56:10 69:20
  109:8 150:18
**yesterday** 53:12
**York** 19:17 30:7
  141:10
**York/New** 30:7
**younger** 28:5

**Z**

**0**

**01** 48:19,22

**1**

**1** 1:8 5:2,15 151:17
  165:12 167:5
**1-800** 74:6

**1:15-cv-024510-S...**
  1:6
**1:40** 65:17
**10** 1:8 10:15 11:16
  11:17 13:4,5,8
  45:16 60:13 61:9
  88:20,24 102:11
  102:14 131:22
  166:16
**1000** 3:6
**1001** 33:18 34:25
  35:6,25 36:8
  63:12 71:14 81:15
  97:20
**103** 166:14
**104** 166:16
**11** 114:13 145:8
  147:9,10 165:18
  166:18
**1180** 2:10 3:20
**11th** 20:20
**12** 141:23 166:8
**12:12** 162:25
**121777** 1:25
**13** 109:3,5 166:12
  166:18
**13-CV-02451** 5:20
**13665** 24:7
**14** 109:5 141:23
  166:16
**149** 166:18
**15** 60:22 65:9 101:2
**16** 44:23 50:19 51:7
  53:25 58:14 59:5
  66:6,10 70:25
  83:18 87:6 117:18
  117:22 118:3
**1681** 60:22
**16th** 48:6,9 49:21
  59:11 65:17 77:16
**18** 1:14 2:5
**19** 97:11
**1999** 10:4 17:13
**1st** 159:17

**2**

**2** 31:17,18,21 60:18
  94:16 109:2,6

153:22 165:14 167:6
**20** 44:18,21 165:20
**2001** 20:18
**2003** 136:7
**2006** 122:13 136:14 137:4,12
**2007** 36:10 122:15
**2010** 36:12 159:17
**2011** 145:2
**2012** 36:15
**2013** 77:8 94:19,23
**2015** 14:2 25:21 32:8 42:13,15 44:23 45:10 46:6 47:7,10 49:23 50:19 51:7 52:4 54:2 57:2 58:14 59:5,12,21 66:6 66:10,24 70:25 78:8 81:25 83:18 84:6 87:6 89:13 90:10 91:8 94:9 98:25 101:19 105:8 107:2,7 116:13 117:18,23 118:3 121:9 123:9 138:19 144:14
**2016** 89:7 96:15 98:18 99:19 101:11,12 102:9 138:8
**2017** 1:14 2:5 11:18 163:8 164:19
**21** 60:4 165:14
**22** 114:6,7 165:16
**23** 96:15 102:8
**2374** 3:13
**2412-B** 25:6
**25** 17:4,8,11,21 166:14
**28th** 164:19
**2942** 70:17
**2946** 70:17

---

**3**

**3** 53:19,22 165:16 167:7

**30** 16:17 17:22
**30084** 3:14
**3010** 102:4
**30309** 3:21
**31** 160:22
**3127** 160:24
**3131** 147:14
**33** 155:18 156:19 165:14
**36** 30:5

---

**4**

**4** 70:6,7,8,16 77:6 165:18
**400,000** 104:21
**42** 132:3 135:16
**4th** 10:24 11:18

---

**5**

**5** 44:19 60:5 76:16 76:17 89:7 94:15 118:23 165:6,12 165:20
**50** 114:13,14
**52** 141:22 142:3
**55** 165:16

---

**6**

**6** 77:5 80:5,7 118:25 119:2,3,19 119:22 124:3 166:5
**64106** 3:7

---

**7**

**7** 60:18,20 88:9,14 119:10,19 124:3 165:12 166:8
**72** 165:18
**7628** 103:15
**78** 165:20

---

**8**

**8** 32:7 48:7 69:21 77:8 94:19,23 96:9,10 131:22 144:14 166:5,12
**82** 166:5
**8th** 48:2,5

---

**9**

**9** 101:22,25 152:3 166:14
**9:00** 2:6
**90** 166:8
**96** 19:22
**98** 166:12