# EXHIBIT A

Page 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION
CASE NO.: 1:15-CV-02451-SCJ-CMS

JILL ALTMAN, Individually and on
behalf of a class,

        Plaintiffs,

vs.

WHITE HOUSE BLACK MARKET, INC.,
and DOES 1-10,

        Defendants.

_____/

VIDEOTAPE DEPOSITION OF

DAVID M. OLIVER

Thursday, July 20, 2017
9:31 a.m. - 12:42 p.m.

Becker & Poliakoff, P.A.
12140 Carissa Commerce Court, Suite 200
Fort Myers, Florida 33966

Stenographically Reported By:
Amory Ranck, FPR
Florida Professional Reporter

---

```
 1              I N D E X
 2
 3   Examination                    Page
 4   Direct     By Mr. Dwyer          4
 5   Certificate of Oath            126
     Certificate of Reporter              127
 6   Errata Sheet (forwarded upon execution)   128
 7
 8
 9
10
11              E X H I B I T S
12   No.                        Page
13
14   1   Declaration                    13
15   2   10-K Form                      42
16   3   10-Q First Quarter Filing        44
17   4   Yahoo Finance Stock printout      62
         (one-year)
18
     5   Yahoo Finance Stock Printout      64
19       (five-year)
20   6   Email from Love to Dwyer 7/12/17    99
21
22
23
24
25
```

Examination — Page
Direct By Mr. Dwyer — 4
Certificate of Oath — 126
Certificate of Reporter — 127
Errata Sheet (forwarded upon execution) — 128

EXHIBITS
1 Declaration — 13
2 10-K Form — 42
3 10-Q First Quarter Filing — 44
4 Yahoo Finance Stock printout (one-year) — 62
5 Yahoo Finance Stock Printout (five-year) — 64
6 Email from Love to Dwyer 7/12/17 — 99

---

Page 2

```
 1   APPEARANCES:
 2
     On behalf of Plaintiffs:
 3
        Spencer Fane LLP
 4      1000 Walnut Street
        Suite 1400
 5      Kansas City, MO 64106
        (816) 292-8296
 6      BY: ANGUS W. DWYER, ESQUIRE
        (Via Videoconference)
 7      angusdwyer@spencerfane.com
 8
     On behalf of Plaintiffs:
 9
        Keogh Law, Ltd.
10      55 West Monroe St., Suite 3390
        Chicago, IL 60603
11      (312) 726-1092
        BY: Michael S. Hilicki, ESQUIRE
12      (Via Videoconference)
        mhilicki@keoghlaw.com
13
14   On behalf of Defendants:
15      King & Spalding
        1180 Peachtree Street, N.E.
16      Atlanta, GA 30309-3521
        404-572-4600
17      BY: BARRY GOHEEN, ESQUIRE
        bgoheen@kslaw.com
18
19
20
21   ALSO PRESENT: Christine Montplaisir, Videographer
                   Gregory Baker
22
23
24
25
```

On behalf of Plaintiffs:
   Spencer Fane LLP
   1000 Walnut Street
   Suite 1400
   Kansas City, MO 64106
   (816) 292-8296
   BY: ANGUS W. DWYER, ESQUIRE
   (Via Videoconference)
   angusdwyer@spencerfane.com

On behalf of Plaintiffs:
   Keogh Law, Ltd.
   55 West Monroe St., Suite 3390
   Chicago, IL 60603
   (312) 726-1092
   BY: Michael S. Hilicki, ESQUIRE
   (Via Videoconference)
   mhilicki@keoghlaw.com

On behalf of Defendants:
   King & Spalding
   1180 Peachtree Street, N.E.
   Atlanta, GA 30309-3521
   404-572-4600
   BY: BARRY GOHEEN, ESQUIRE
   bgoheen@kslaw.com

---

Page 4

```
 1       Videotape Deposition Taken Before Amory Ranck,
 2   Florida Professional Reporter and Notary Public in
 3       and for the State of Florida at Large
 4            in the above cause.
 5                 * * * * *
 6       THE VIDEOGRAPHER: All right. Here begins
 7   the videotaped deposition of David Oliver at
 8   9:31 a.m. on July 20th, 2017.
 9       THE COURT REPORTER: Please raise your
10   right hand.
11       Do you solemnly swear or affirm under the
12   penalties of perjury that the testimony you are
13   about to give will be the truth, the whole
14   truth, and nothing but the truth?
15       THE WITNESS: I do.
16   Thereupon:
17            DAVID M. OLIVER,
18   having been first duly sworn, was examined and
19        testified as follows:
20            DIRECT EXAMINATION
21   BY MR. DWYER:
22   Q.  Good morning, Mr. Oliver.
23   A.  Good morning.
24   Q.  My name is Angus Dwyer. I'm an attorney
25   at Spencer Fane. I'm counsel for Plaintiff in this
```

Page 5

1   action. Thank you for joining us.
2       Can you state your full name for the
3   record, please?
4       **A. Yes. David Michael Oliver.**
5       Q. Thank you. Mr. Oliver, have you ever been
6   deposed before?
7       **A. Yes.**
8       Q. Okay. So you're familiar with the basic
9   background. Obviously let me -- let me finish my
10  question first, then you can answer. Answer orally.
11  Obviously you've just been sworn in, so please give
12  truthful answers. If you need to take a break, just
13  let me know.
14      I know we're on something of a tight
15  clock, I think, because of maybe your counsel's
16  travel schedule, but, you know, we'll try to, you
17  know, we'll take breaks as appropriate.
18      First, let's begin. Can you describe for
19  me your educational background?
20      **A. Yes. I have a bachelor's of accountancy**
21  **from the University of Oklahoma or it's a BBA with a**
22  **major in accounting, actually, but University of**
23  **Oklahoma.**
24      Q. When did you graduate from the University
25  of Oklahoma?

Page 6

1       **A. 1979.**
2       Q. Do you have any post-graduate degrees?
3       **A. No.**
4       Q. Okay. So now let's walk through your
5   professional experience. What was your first job
6   after you graduated from Oklahoma?
7       **A. I worked in public accounting with Arthur**
8   **Anderson & Company for nine years.**
9       Q. Okay. So that was from 1979 to 1988; is
10  that correct?
11      **A. Yes.**
12      Q. What were your responsibilities in that
13  position?
14      **A. I worked in the audit practice auditing**
15  **both private and public companies.**
16      Q. Okay. What was your next job?
17      **A. I was the controller -- excuse me. I**
18  **hired on as the assistant controller with the Vons**
19  **grocery companies in Southern California and I was**
20  **there, I believe, nine years.**
21      Q. And what were your responsibilities at
22  that job?
23      **A. When I left I was the vice president**
24  **controller basically overseeing the core accounting**
25  **responsibilities of the organization.**

Page 7

1       Q. Okay. That was from 1988 through 1997; is
2   that correct?
3       **A. Yes.**
4       Q. Okay. And how many different positions
5   did you hold at that company?
6       **A. Two.**
7       Q. Two, okay. All right. What was your next
8   job?
9       **A. I was the chief financial officer for**
10  **Hughes Markets.**
11      Q. Okay. And what -- during what time period
12  were you in that position?
13      **A. I was in that position from the same year,**
14  **I guess -- trying to make sure I get these dates**
15  **correct. I believe that was '97 through '98.**
16      Q. '97 through '98?
17      **A. Right. We sold the company.**
18      Q. Okay. Then what were your
19  responsibilities in that job?
20      **A. It was overseeing the core accounting, the**
21  **finances of the organization.**
22      Q. Okay. Then what was your next job?
23      **A. I was the chief financial officer for the**
24  **Arden Group in Southern California. At the time**
25  **they were a public company, for five years.**

Page 8

1       Q. And during what timeframe were you in that
2   job?
3       **A. That was '99 through 2004 or might have**
4   **been '03.**
5       Q. Okay. And what were your responsibilities
6   in that job?
7       **A. Those responsibilities were the typical**
8   **responsibilities of a chief financial officer**
9   **overseeing the treasury public reporting and**
10  **accounting of the organization.**
11      Q. What was your next job after that?
12      **A. I was the vice president controller at the**
13  **Super Value, Super Value, Inc., Minneapolis,**
14  **actually Eden Prairie, Minnesota, but I was there**
15  **for eight years.**
16      Q. Eight years, okay. So that would have
17  been 2003 through -- math, 2011?
18      **A. 2012, so -- bear with me just a moment. I**
19  **guess I left there in -- I think I started there in**
20  **2004. I have to go back and look at my records. I**
21  **was at the Arden Group, I started in '99 and was**
22  **there five years essentially.**
23      Q. Okay.
24      **A. But I left there in 2012.**
25      Q. And what were your responsibilities in

2 (Pages 5 to 8)

1    that position?
2        A.  Various.  We had multiple acquisitions
3    during the time I was there.  I worked with respect
4    to the acquisitions.  I oversaw that.  For a point
5    in time my first few years there I worked as the VP
6    controller, then I became the chief financial
7    officer of the supply chain operations.
8        I also managed a transition service
9    agreement for six years of that timeframe that was
10   Cerberus.
11       THE COURT REPORTER:  I'm sorry?
12       A.  Cerberus, but I managed that for a period
13   roughly of six years.  They had acquired -- the
14   acquisition I referenced we made was around
15   $11 billion, but we did not buy all of the assets of
16   the company.  We acquired -- the other assets were
17   acquired by Cerberus and we provided a transition --
18   services to them for a period of that six-year
19   timeframe.
20       Q.  Okay.  Then you left that job in 2012?
21       A.  2012.  During that time I was also for a
22   point in time for two years, in addition to
23   overseeing the TSA, the vice president of investor
24   relations.
25       Q.  And after you left that job, what was your

1    next job?
2        A.  My next job I became the vice president
3    controller at Chico's FAS in 2012.  I continue in a
4    version of that role today.  I'm the controller
5    chief accounting officer.  My position now is group
6    vice president of finance, controller and chief
7    accounting officer.
8        Q.  Okay.  So in the first position you were
9    hired for at Chico's, what were your
10   responsibilities?
11       A.  The responsibilities included the core
12   accounting as controller and in addition to that I
13   had loss prevention and payroll.
14       Q.  And then at what point did you get
15   promoted to your current position?
16       A.  That would have been, I believe, August of
17   2015.
18       Q.  Then, okay.  What are your
19   responsibilities in your current position?
20       A.  I have non-merch procurement, which
21   oversees anything that we acquire as a company,
22   goods or services, that do not go through the point
23   of sale.  I have the core accounting, traditional
24   accounting for the financials of the company itself,
25   loss prevention.

1        Q.  Okay.  What specifically are your loss
2    prevention responsibilities?
3        A.  I have a director of loss prevention, so
4    we're focused on shrink at the store level.  We're
5    also focused on fraud of all types, be it within the
6    store, employee fraud, third-party or any type of
7    fraud in the organization, including online fraud,
8    e-commerce.
9        Q.  And that -- what we walked through was
10   your complete employment history from when you
11   graduated from the University of Oklahoma through
12   today; is that correct?
13       A.  Yes.
14       Q.  Okay.  So am I correct in understanding
15   that you've never been directly employed by White
16   House Black Market itself?
17       A.  That is correct.
18       Q.  What percentage of your time in your
19   current position do you spend dealing with issues
20   relating specifically to White House Black Market as
21   opposed to other aspects of Chico's business?
22       A.  Specifically to White House Black Market
23   is limited to compiling the financial records of the
24   company and reporting out on that entity.
25       Q.  Okay.  Can you give me an estimate as to

1    what percentage of your time you spend on that?
2        A.  My time personally is a -- probably
3    less -- I'm more focused on the parent company, the
4    financials of the parent company.  Specifically as
5    it relates to White House, I'd say 5 percent of my
6    time or less.
7        Q.  5 percent of less; is that correct?
8        A.  Yes.
9        MR. DWYER:  Okay.  Thank you.  All right.
10   Start with the exhibits.  Can -- am I correct
11   in understanding the court reporter has the
12   exhibits that I gave you?  Can you hand out
13   copies of Mr. Oliver's declaration, please.
14   Mark that Exhibit 1 and --
15       MR. GOHEEN:  Well, I think we don't mark
16   it as Exhibit 1.  I think we either need a
17   prefix or we need to continue on in our
18   numeration.
19       MR. DWYER:  Right.  I apologize.  We have
20   a numeration from Ms. Umstead's deposition.
21   Thank you for reminding me.  Not sure where we
22   are.
23       MR. GOHEEN:  And for Mr. Coors.
24       MR. DWYER:  True, true.
25       MR. GOHEEN:  I think what we did last -- I

3 (Pages 9 to 12)

Page 13

1    think we did last week, maybe Mike can correct
2    me, I think we did -- I think we just did Coor
3    1 and so forth is my recollection.
4         MR. HILICKI:  That's correct.  That's what
5    we did.  So why don't we just do Oliver 1, 2,
6    3.
7         MR. DWYER:  Sounds good, Oliver 1.  Sorry
8    about that.
9         MR. GOHEEN:  No worries.
10        (Thereupon, the document was marked as
11   Exhibit 1.)
12        THE COURT REPORTER:  Okay.  All set.
13   BY MR. DWYER:
14   Q.  Excellent.  Mr. Oliver, this is your
15   declaration.  I'm sure you're familiar with it.  If
16   you want to take a chance to read it over, you're
17   welcome to, or we can go into questions.
18   A.  Questions are fine.
19   Q.  Okay.  So turning to the first paragraph
20   of your declaration, what does it mean to be
21   responsible for oversight and management of the
22   financial functions at White House Black Market?
23   A.  The financial records of White House Black
24   Market are one of multiple entities that we have
25   under the umbrella of Chico's FAS, Inc.  Those

Page 14

1    records are all -- the accounting for those records
2    are all captured in our ERP or SAP, our general
3    ledger system, so we have accounting systems.
4         That information is fed from many
5    different sources.  We have subsidiary systems,
6    payable systems, our cash and sales team that
7    captures information regarding sales itself,
8    inventory, management, different platform,
9    Manhattan, and I have a group of roughly 60 to 65
10   people that work beneath me that basically are
11   compiling and recording the records of the entity of
12   White House specifically itself.
13        So the accounting entries as relates to
14   White House Black Market, they're making those
15   entries.  I will review and approve those entries,
16   thinking here in terms of your earlier question when
17   you asked how much time I spent specifically at
18   White House, I'm thinking context of what I actually
19   in the building of White House itself, they're in a
20   separate building versus us, but if you look at the
21   core of what I'm doing on a day-to-day basis, I'm
22   sure that it probably goes beyond 5 percent in
23   retrospect.
24        Because I do approve all of the journal
25   entries that are recorded to capture the financial

Page 15

1    results of that entity.  We also -- our team, my
2    team reports out on the financials of White House
3    Black Market as other entities within our
4    organization specifically related to White House
5    Black Market and, you know, my task at hand is to
6    ensure that those financials collectively are in
7    accordance with generally accepted accounting
8    principles.
9    Q.  So you said you think when you factor in
10   time spent in the Chico's building dealing with
11   White House Black Market, it's more than 5 percent.
12        Do you -- can you give an estimate to what
13   the number is?
14   A.  I would be speculating on that.  I look at
15   many different things on a consolidated basis.  We
16   have a process in place that ensure that -- our
17   controls ensure that records as they relate to White
18   House are captured within our system.
19        So I do rely upon the process that is
20   tested.  My key controls are tested in accordance
21   with Sarbanes-Oxley.  We have both external and
22   internal audit review, to the extent we do report
23   out separately publicly on White House Black Market,
24   that has been audited.  So -- but in terms of the
25   time to sit here and speculate, I'm not going to

Page 16

1    speculate.  I'd have to go back and capture that, a
2    record of that over a period of time.
3    Q.  Okay.  But the -- in excess of 5 percent
4    estimate, the -- your statement it's in excess of
5    5 percent includes time spent on consolidated data
6    that includes White House Black Market; am I
7    understanding correct?
8    A.  No.  I was saying specifically White House
9    Black Market.
10   Q.  Okay.  Do you supervise any White House
11   Black Market employees directly?
12   A.  No.
13   Q.  Do you supervise people at Chico's that
14   supervise people at White House Black Market
15   directly?
16   A.  No.
17   Q.  In general how much involvement does
18   Chico's have in White House Black Market operations?
19   A.  Your question again.
20   Q.  In general how much involvement does
21   Chico's have in White House Black Market operations?
22        MR. GOHEEN:  Object to the form.  Vague.
23   If you know you can answer.
24   A.  The -- first I'm going to talk about my
25   area of -- group.  We operate a shared service

4 (Pages 13 to 16)

1  model.  The brands themselves are not performing the
2  accounting for their individual -- individual brand.
3  That's done by the shared service team, my team.
4          So there's not people in the brand that
5  are making accounting entries to capture the
6  results.  They're users of the product we generate.
7  And so the accounting process has largely been
8  systematized and we're able to, you know, capture
9  that.  But when you indicated Chico's, I am going to
10 assume you meant Chico's FAS, the parent company,
11 not Chico's the brand.  Chico's the brand has very
12 little involvement with White House.
13         Chico's FAS, Inc., the parent company, who
14 our executive officers are part of, would be --
15 provide the strategic leadership for that brand
16 itself, albeit the brand has its own brand president
17 who leads the brand.
18 BY MR. DWYER:
19     Q.  Okay.  Yeah, just -- we should just for
20 the sake of simplicity stipulate for when I say
21 Chico's, I mean Chico's FAS and not Chico's the
22 brand.  If for some reason I want to ask you about
23 Chico's the brand, I'll specify that's what I'm
24 talking about.  Is that okay?
25     A.  That works.

1      Q.  Okay.  Do you know whether Chico's was
2  involved in decision to use the Fujitsu payment
3  processing system that is the subject of this
4  litigation?
5      A.  Yes.
6      Q.  You know whether they were?
7      A.  Yes.
8      Q.  Were they?
9      A.  Yes.
10     Q.  Were you involved in that decision?
11     A.  I did participate in various meetings with
12 Fujitsu and other vendors as they made their initial
13 presentation.
14     Q.  Did you -- were you involved in the
15 decision to go with Fujitsu?
16     A.  I did not have a vote in that
17 decision-making process but I did participate and
18 listen to the presentations and provided some input.
19     Q.  Was Chico's involved in negotiations with
20 Fujitsu?
21     A.  Was Chico's involved, yes.
22     Q.  -- the decision that led to the ultimate
23 agreement with Fujitsu.
24     A.  I was not involved at that time.  My
25 involvement with non-merch procurement began last

1  summer when we formed that department.  Previously
2  that was conducted by our IT group that really led
3  that effort.  I can tell you that we did bring in
4  multiple vendors, including the incumbent, and it
5  was more of a competitive process, so we did get
6  bids from everyone.  We looked at the products
7  themselves and ultimately selected a vendor.
8      Q.  Let's -- can we move onto the second
9  paragraph of your declaration.  In this paragraph
10 you say you reviewed documents and records kept by
11 White House Black Market in the ordinary course of
12 its business.
13         Have I got that correctly?
14     A.  Yes.
15     Q.  What documents did you review in
16 connection with preparing this declaration?
17     A.  I looked at one, I look at our public
18 filings we do with the SEC.  I also -- I've looked
19 at more specifically I think that would be the
20 primary document that I used in preparing this
21 declaration.  When you go back to the
22 exhibit itself, the sales numbers, you can tie it
23 back to the -- our SEC filings, which was a product
24 of our accounting close process that we do in the
25 ordinary course.

1      Q.  Sorry.  You said the what filings, the SEC
2  filings?
3      A.  Right, the Securities and Exchange
4  Commission.
5      Q.  Okay.
6      A.  As a public company, we file --
7      Q.  Sounded like you said RRSAV filings,
8  something I'm not familiar with.  That's on me.  I
9  apologize.
10         So the only documents you looked at were
11 the public filings by Chico's FAS?
12     A.  For this -- when you look at this
13 declaration, there's two parts to this declaration,
14 one, you have information in here that specifically
15 relates to the valuation of Chico's -- excuse me, to
16 White House Black Market and focusing just on that
17 item itself, what I looked at were the sales of
18 Chico's in total and the sales of White House, as
19 well as the market cap at a specific date for
20 Chico's FAS.  From that I extrapolated or derived a
21 valuation for White House Black Market.
22         Now, there's other commentary in here,
23 when I refer to things such as other -- the state of
24 retail today, the headwinds the industry is facing
25 in the ordinary course I'm monitoring, almost daily

Page 21

1  I'm getting communications, you know, talking about
2  how other retailers are doing, what's happening in
3  the space that we operate, and it's an understanding
4  I have and there's nothing I stated here that you
5  would not be able to go back with respect to the
6  state of the retail industry and find in the public
7  domain.
8      Q.  So am I correct in understanding that what
9  you're saying there is you looked at the public
10  filings and then the portion of something to do with
11  the industry, the whole, relate which materials you
12  saw in the public domain, these are websites on the
13  internet?
14      A.  More than the public domain, the Wall
15  Street Journal, the Women's Wear Daily, which is a
16  publication, and other email updates I get from our
17  investor relations team.
18      Q.  Okay.  And did you keep track of what
19  materials you looked at in support of those
20  perusing?
21      A.  With respect to what I have here, first
22  off I went back and I referenced those to make these
23  comments.
24      Q.  Okay.  When you were going back and
25  looking at them as you were preparing the

Page 22

1  declaration, did you keep track in any way what
2  documents you were looking at?
3      A.  I did not, but I could replicate what I
4  have here.  You could replicate what I have here in
5  the public domain.
6      Q.  Okay.  And so the -- am I correct in
7  understanding then that the only documents you
8  looked at to prepare this declaration are the public
9  filings of Chico's FAS and the publicly available
10  documents you just described?
11      MR. GOHEEN:  Object to the form.  That's
12  not what he said.
13      A.  My -- in preparing this is -- also
14  includes the knowledge I've obtained over the last
15  five years working at Chico's FAS and specifically
16  working with the financial records of White House
17  Black Market as well.
18      It also includes the referencing the
19  market close capitalization Chico's FAS as of the
20  June date cited in the declaration, the closing
21  stock price and the shares that were outstanding as
22  of that date at that point.  I think that responds
23  to your question.
24      BY MR. DWYER:
25      Q.  Okay.  Other than the subject we have

Page 23

1  mentioned so far, were there any other documents
2  that you looked at in preparing this deposition?
3      A.  Let's pause for a moment and let me go
4  back and review the declaration in its entirety and
5  I'll get back with you momentarily.
6      Q.  Okay.  That sounds good.
7      A.  Okay.  If we can start on page 2 of the
8  declaration, actually Item 2, the second sentence:
9  I have personal knowledge of the facts stated herein
10  based on my work experience and review of documents
11  and records kept by White House Black Market in the
12  ordinary course.
13      The documents I reviewed in the ordinary
14  course, setting aside journal entries that I approve
15  on a period basis, each month, to close the
16  accounting records, we generate period financial
17  statements that roll up into the quarterly financial
18  statements which ultimately go into our SEC filings
19  for the 10-Q or 10-K, but those documents, the end
20  product that summarizes the actual results for the
21  quarters presented here were the documents
22  referenced specifically for this declaration itself.
23      With respect to Item 6 --
24      MR. GOHEEN:  Let him ask questions.  All
25  right.  This isn't a speech.

Page 24

1      A.  Okay.
2      BY MR. DWYER:
3      Q.  Thank you.  So am I understanding that
4  what you're saying is that, in addition to looking
5  at the public filings, you also looked at the
6  underlying accounting documents that lead to
7  creation of the public filings?
8      A.  No.  I looked at the summary product that
9  we had signed off on and had audited by the external
10  auditors that I prepared in the ordinary course of
11  my job responsibilities.  I did not go back and
12  re-review, you know, each journal entry we made in
13  the ordinary course.  I looked at the end game
14  product, which was the SEC filings, which I believe
15  to have integrity as do our external auditors.
16      Q.  Okay.  Okay.  You can move onto the next
17  thing you were going to say.
18      A.  Item 6 --
19      MR. GOHEEN:  Well, is there a pending
20  question?
21      MR. DWYER:  No, I don't think so.
22      MR. GOHEEN:  Then we're not going to
23  answer anything.
24      BY MR. DWYER:
25      Q.  Other than the -- other than materials you

6 (Pages 21 to 24)

Page 25

1   stated, are there any other documents you relied on
2   in preparation of the declaration?
3       A.  Other than the items of the review in the
4   public domain I mentioned earlier and the closing
5   stock price in the public domain of Chico's FAS as
6   well as the shares outstanding, I believe that to be
7   complete.  However, I still have still the other
8   items I was going to call out, starting with Item 6.
9       Q.  Okay.  We'll get to Item 6 in a bit, but
10  why don't we -- okay.  Just so I'm clear, other than
11  the documents you've highlighted so far, there were
12  no additional documents that you reviewed in
13  preparing this declaration; is that correct?
14      A.  My original intent was to walk through the
15  declaration and discuss each one.  What the
16  documents were, I want to make sure there's clarity,
17  what I looked at in order to make the statements.
18  At this point in time we've talked about Item 2.
19  The next item I have colored that I'd like to talk
20  about is Item 6.
21      Q.  Can you describe to me the documents you
22  relied upon in preparing Item 6?
23      A.  I looked specifically at information in
24  our previous SEC filings.
25      Q.  Okay.  Which previous SEC filings?

Page 26

1       A.  This particular one was likely a
2   combination of the Q-1 SEC filing as well as our
3   10-K filing.
4       Q.  Okay.  The Q-1 for the first quarter of
5   this year?
6       A.  2017, yes, that would have been filed in
7   May '17.
8       Q.  All right.  And the 10-K for last year?
9       A.  Right.  Some of the same information would
10  have been in the -- I might have also pulled that
11  from our press release.  We indicate -- there's an
12  exhibit that indicates the number of boutiques and
13  outlets.  If you look at our press release for Q-1
14  for '17 filed May '17, you'd find the 434, 72.  The
15  6800 employees likely goes back to the 10-K filing.
16      Q.  Okay.  What is the next paragraph in this
17  declaration as to which you relied on documents that
18  you have not previously disclosed?
19      A.  When you go to Item 10, just -- Item 10, I
20  just wanted to call out that in the public domain,
21  the closing stock price, I would have referenced
22  that.  You could find that on many different sites,
23  MSN, Yahoo, et cetera, but I did get -- I do track
24  our closing stock price on a daily basis.  That is
25  there.

Page 27

1       Our 52-week high would have also been
2   available as of June 13th, $16.85, I would have
3   looked at information the public domain here.
4       Q.  Okay.  What is the next paragraph of this
5   declaration on which you relied on the documents you
6   haven't previously mentioned?
7       A.  The -- specifically as relates to 12, my
8   comments made on 12 were in the first sentence --
9   were based upon working with our counsel, the
10  Chico's FAS counsel, and that was the understanding
11  that I gained during -- in preparation for this
12  declaration to have this framed.
13      Q.  So is there specific documents from which
14  you obtained that understanding?
15      A.  That was obtained through conversations
16  with our counsel.
17      Q.  Those conversations were oral or written?
18      A.  Oral.
19      Q.  Okay.  All right.  Are there any other
20  paragraphs in this declaration based on documents
21  you have not yet disclosed?
22      A.  The Item 13 was also based on a working
23  conversation or working meeting with our counsel, as
24  was 14 and 15, albeit some of this knowledge I had
25  line of sight of just talking internally with our IT

Page 28

1   folks in the ordinary course.
2       Q.  Let's go back to the conversations with
3   counsel with regard to 13 through 15.
4       Were those conversations oral or in
5   writing?
6       A.  Oral.
7       Q.  Did they -- in those oral conversations,
8   did counsel identify documents for you to review to
9   further your knowledge there?
10      MR. GOHEEN:  Don't answer that.  That's
11  privileged.  Don't answer that.  I instruct you
12  not to answer.
13  BY MR. DWYER:
14      Q.  All right.  You mentioned previously that
15  you had discussed that internally with IT people; is
16  that correct?
17      A.  In the ordinary course I cannot tell
18  you -- I obtained -- I can't tell you specifically
19  when I learned that.  In the ordinary course,
20  there's certain information I might learn in my
21  day-to-day job responsibilities but this -- these
22  comments are consistent with my knowledge based on
23  working at Chico's FAS.
24      Q.  That's knowledge you had prior to the time
25  you began to prepare this declaration?

7 (Pages 25 to 28)

Page 29

1    A.  Yes.  And it was also subsequently
2  affirmed with conversations.
3    Q.  Conversations with who?
4    A.  People in IT.
5    Q.  Do you remember who in IT?
6    A.  The only other -- the only person I can
7  recall having conversations with specifically was
8  Nancy Holland.
9    Q.  Can you spell that name?
10    A.  Nancy?
11    MR. GOHEEN:  Holland.
12  BY MR. DWYER:
13    Q.  Pulman?
14    MR. GOHEEN:  Holland.
15    A.  Holland, the country.
16  BY MR. DWYER:
17    Q.  Holland.  Okay.  Thank you.  All right.
18    So you had conversations with Nancy
19  Holland on this subject after the time you began to
20  prepare this declaration?
21    A.  Yes.
22    Q.  Do you remember specifically when those
23  conversations were?
24    A.  The last time I had any conversation with
25  her was yesterday and --

Page 30

1    Q.  And do you remember the time of any prior
2  conversations with her after the time you began to
3  prepare this declaration?
4    A.  Nancy was in all the prep meetings --
5  excuse me, and the selection meetings for Fujitsu as
6  well as the other vendors we had and I might see her
7  in the ordinary course of business.  So I cannot
8  give you a specific date, but I've known Nancy
9  Holland for essentially the entire time I've been at
10  Chico's FAS.
11    Q.  And what did Nancy say to you with regard
12  to the subjects of paragraphs 13 through 15?
13    MR. GOHEEN:  Only to the extent not in the
14  presence of counsel.
15    A.  I have no comment.
16  BY MR. DWYER:
17    Q.  Sorry?
18    A.  It was in the -- my conversation was in
19  the presence of counsel and I've been directed not
20  to comment.
21    Q.  All your conversations with Nancy Holland
22  that were relating to paragraphs 13 through 15 were
23  in the presence of counsel?
24    A.  No.  That's not what -- I stated I've had
25  multiple conversations with Nancy Holland over the

Page 31

1  last five years.  I've been in various meetings with
2  her over the last five years, including the rollout
3  of Fujitsu.
4    Specifically the last conversation that I
5  had with Nancy Holland was in the presence of
6  counsel.  The state -- the very last conversation.
7  The comments that were made here in 13, 14 and 15
8  are consistent with my knowledge that I've obtained
9  in the ordinary course of my responsibilities in
10  participating in the rollout of Fujitsu and my
11  knowledge of the point of sale.  My meetings in the
12  presence of counsel only affirmed these statements
13  were factual.
14    Q.  Am I correct in understanding that all the
15  conversations you have had with Nancy Holland
16  subsequent to the time you began to prepare this
17  declaration were in presence of counsel?
18    MR. GOHEEN:  Asked and answered.  Let's
19    move on.
20    A.  Yes.  I've had one conversation with Nancy
21  and it was in the presence of counsel.
22  BY MR. DWYER:
23    Q.  That's -- all right.  All right.  Let's go
24  back to paragraph 2, still on paragraph 2, how did
25  this declaration come about?

Page 32

1    A.  I was contacted --
2    MR. GOHEEN:  Only to the extent it does
3    not reveal attorney-client communications,
4    otherwise you can answer, as long as it doesn't
5    reveal attorney-client communications.
6    A.  Okay.  I received a phone call from
7  counsel and I met with counsel.
8  BY MR. DWYER:
9    Q.  You received a phone call from counsel?
10    A.  Yes.
11    Q.  And what about receiving a phone call from
12  counsel prompted you to draft this declaration?
13    A.  I was asked to draft this declaration.
14    Q.  How did you determine what subjects to
15  discuss in the declaration?
16    MR. GOHEEN:  Same instruction, only to the
17    extent it does not reveal attorney-client
18    communications.
19    A.  Counsel did not --
20    MR. GOHEEN:  Only to the extent it does
21    not reveal attorney-client communications.
22    A.  They did not direct me specifically on
23  anything other -- there was only one comment that I
24  was asked to make, which I think is okay.
25    MR. GOHEEN:  No.  Only -- if it's a

8 (Pages 29 to 32)

Page 33

1    product of attorney-client communications do
2    not reveal it.
3        A.  Okay.  The -- I'd say the majority of the
4    items in here were items that I added on my own
5    without any direction from counsel.
6    BY MR. DWYER:
7        Q.  Counsel contacted you and asked you to
8    prepare a declaration and you decided what to put in
9    the declaration?
10       A.  A lot -- most of this is free form.  That
11   is my own thinking without input from counsel.  I'd
12   say better than 90 percent of it.
13       Q.  Who typed this declaration?
14       A.  I prepared the initial draft.  I wrote it
15   and I shared it with counsel.
16       Q.  Counsel provided comment.
17       MR. GOHEEN:  No.  Objection.  Don't answer
18   that.  Next question.  Next question.
19       MR. DWYER:  Basis for the objection is
20   attorney-client privilege?
21       MR. GOHEEN:  Yes.
22   BY MR. DWYER:
23       Q.  Okay.  Did -- other than yourself and
24   counsel, did anyone have any input in the subject
25   that was discussed in this declaration?

Page 34

1        A.  No.
2        Q.  Move onto paragraph 3, was this something
3    you put in the declaration of your own volition?
4        A.  I believe I already answered that.
5        MR. GOHEEN:  Yeah.  That's asked and
6    answered.
7        MR. DWYER:  No, he said -- we don't need
8    to get in too much argument.  He said the vast
9    majority.  I would like to, with regard to the
10   specific statements in the declaration, probe
11   the witness whether they're made by him
12   initially or by unidentified third party.
13       MR. GOHEEN:  And the relevance of that is
14   what exactly to this case?
15       MR. DWYER:  Relevance goes to relevance of
16   it goes to -- again, I don't want to
17   particularly want to get into objection
18   argument here.  If you want to object you can
19   object, but I think it goes to the, you know,
20   basis for his knowledge of these statements in
21   this declaration.
22       MR. GOHEEN:  So you actually want to ask
23   him whether he knows whether White House Black
24   Market is a women's apparel retailer, that's
25   actually the question?

Page 35

1        MR. DWYER:  No, I want to ask whether this
2    was something he decided to put in the
3    declaration or maybe it was suggested by
4    someone else.
5        MR. GOHEEN:  Why don't you ask him about
6    the facts of the declaration as opposed to who
7    did what then we'll be a lot better off.
8        MR. DWYER:  If you would like to take this
9    deposition, you're welcome to.
10       MR. GOHEEN:  Well, I'm the one that's here
11   and you're not.  So that's how it's going to
12   go.  He may or may not -- he may or may not
13   remember exactly what he put into the
14   declaration.  It's been a few months.  So just
15   ask him about the facts of the declaration
16   versus the preparation and this will move a lot
17   more quickly.
18       MR. DWYER:  Are you directing him not to
19   answer my question or no?
20       MR. GOHEEN:  I'm not.  It's not a good
21   question.  That's why I objected to it.  I
22   think it's irrelevant and I'm not going to go
23   very much further with it.
24       MR. DWYER:  If you want to move to scoot
25   this to some subsequent motion on the basis

Page 36

1    you're free to, but are you directing him not
2    to answer my question?
3        MR. GOHEEN:  You seem to be asking
4    questions multiple times.  No, I've already
5    answered your question.  Let's move on.
6    BY MR. DWYER:
7        Q.  Mr. Oliver, can you please answer my
8    question?
9        MR. GOHEEN:  If you know.
10       A.  I'd have to go back to my original draft I
11   provided counsel and look at the final product on
12   this specific question.
13   BY MR. DWYER:
14       Q.  What does it mean to be a women's apparel
15   retailer?
16       A.  Women's apparel retailer is a -- in our
17   case is a specialty retailer that specializes in
18   women's clothing that we sell to the public.
19       Q.  Does White House Black Market sell
20   anything other than women's clothes?
21       A.  Yes.  We do have other accessories we sell
22   in the ordinary course.  We have sold shoes as well,
23   but I think all that collectively can be referred to
24   as apparel or accessories.
25       Q.  Fair enough.  What kind of apparel does

9 (Pages 33 to 36)

Page 37

```
1    White House Black Market sell?
2        A.  We do not sell undergarments.  The product
3    you visually see any woman wearing, the external
4    garments she might be wearing or the accessories,
5    the bling or the necklace, you might see that as
6    well, or perhaps the sandals or shoes, flats.
7            We do focus on women that are in the
8    workplace.  We're targeting women largely around 35
9    and older, so there's kind of a demographic we're
10   going after but, you know, I'd say they're likely in
11   your law firm women wearing White House Black Market
12   apparel on occasion.
13       Q.  Am I correct in understanding White House
14   Black Market doesn't sell uniforms?
15       A.  We do not sell uniforms.
16       Q.  Okay.  So everything that White House
17   Black Market sells can be perfectly worn outside the
18   workplace as well?
19       A.  Yes.
20       Q.  Thank you.  Move onto paragraph 4 of your
21   declaration.  Is Chico's sole owner of White House
22   Black Market?
23       A.  I'd go back to the legal structure, but it
24   is under the Chico's FAS, Inc. umbrella, but to your
25   point, yes, there are no other external owners.
```

Page 38

```
1    Everything ultimately is 100 percent a subsidiary of
2    Chico's FAS, either directly or indirectly.
3        Q.  Okay.  Thank you.  Do Chico's and White
4    House Black Market share any officers?
5            MR. GOHEEN:  Object to the form.  You can
6        answer if you know.
7        A.  The only officer I believe that would be
8    shared, I'd have to go back to counsel, but I
9    believe that the president of White House Black
10   Market isn't an officer of Chico's FAS.  She is the
11   president of White House Black Market.
12          She's a named executive officer of Chico's
13   FAS if you look at our public filings and she's also
14   an officer of White House Black Market.  If you look
15   at the legal entity, went back to see who the
16   officers were.  I have to go look to see
17   specifically who are the officers of White House
18   Black Market.
19   BY MR. DWYER:
20       Q.  You don't recall any others but there may
21   be?
22       A.  Well, it's a legal entity.  There's going
23   to be more than one.
24       Q.  What I mean is you don't recall any other
25   individuals who are officers of both entities but
```

Page 39

```
1    there may be such individuals?
2        A.  There could be but I'm not aware of any.
3    I've seen that list, but I don't believe that is the
4    case, but I would have to go back and affirm that by
5    looking at the actual officer list and see if there
6    is an intersection.
7        Q.  Are there any directors -- are there any
8    individual who are directors of the Chico's FAS and
9    White House Black Market?
10       A.  When you say directors, I assume you're
11   meaning on the board of directors or just at the --
12       Q.  That is correct, yes.
13       A.  Okay.  No.
14       Q.  Move onto paragraph 5 of your declaration.
15   When specifically did White House Black Market open
16   its first Toronto store?
17       A.  My recollection is the spring of 2013.
18   I'd have to go back and affirm that.
19       Q.  Do you know what system or software White
20   House Black Market used for printing point-of-sale
21   receipts in its Canadian stores between 2013 and
22   2015?
23       A.  I do not.
24       Q.  Do you know whether that software or
25   system printed receipts compliant with U.S.
```

Page 40

```
1    requirements?
2        A.  I was not looking at that.  It's my
3    understanding that what we printed in Canada was
4    appropriate for Canada, but would not have been
5    appropriate for the United States.
6        Q.  Do you know what system or software White
7    House Black Market used for printing point-of-sale
8    receipts in U.S. stores between 2013 and 2015?
9        A.  Well, for point of sale we use Fujitsu.
10   The printers, I'm sure I heard the name.  I'd have
11   to go back and research that.
12       Q.  Between 2013 and 2015 you used Fujitsu in
13   the United States?
14       A.  Between 2013 and 2015, excuse me, we were
15   using Epicor at that point, but with respect to the
16   actual device that was printing the receipts, if
17   it's coming out of Epicor system or separate
18   printer, I'd have to go back and look at that.
19       Q.  What is the basis for your knowledge of
20   this subject?
21       A.  Well, working at FAS there's a certain
22   amount of knowledge I have just being part of the
23   company, having participated in the vendors that
24   came in and presented would have given me knowledge
25   as well.  Having frequented and walked many stores,
```

Page 41

```
 1    White House stores, just looking at to understand
 2    what we're doing inside the four walls would have
 3    provided knowledge but I was not specifically
 4    looking on the credit card receipts.
 5        Q.  Move onto paragraph 6 of your declaration.
 6    How many of the 434 boutiques are located in the
 7    United States?
 8        A.  I would go back to our first quarter
 9    filing and specifically it would identify how much
10    of those were U.S., how many of those were in
11    Canada, but to answer your question, approximately
12    424 of those are in the United States.  I believe
13    ten might be in Canada.  I would have to go back and
14    look, very small number.
15        Q.  And how many of the 72 outlets are located
16    in the United States?
17        A.  I believe all but possibly one.
18        Q.  When you say United States for both the
19    preceding two questions, does that include Puerto
20    Rico and the U.S. Virgin Islands?
21        A.  Yes, I would have, U.S. territories I
22    would have included when I said United States.  I'm
23    thinking when I state international I was stating
24    Canada.
25        Q.  And how many boutiques are located in
```

Page 42

```
 1    Canada?
 2        A.  Ten or less.
 3        Q.  Can we introduce the next exhibit, the
 4    form, the 10-K?
 5            (Thereupon, the document was marked as
 6    Exhibit 2.)
 7        MR. GOHEEN:  This is Oliver 2.
 8        MR. DWYER:  This is Oliver 2, yes.
 9        MR. GOHEEN:  All right.  Need a break or
10    anything?
11        A.  I'm good.
12    BY MR. DWYER:
13        Q.  Okay.  Are you familiar with this
14    document?
15        A.  Yes.
16        Q.  Can you tell me what this is?
17        A.  It's a 10-K filing with the SEC.
18        Q.  Okay.  Can you turn to page 8 of this
19    document?
20        A.  Are you referencing -- my document has two
21    page numbers.  Which page are you referencing?
22        Q.  Sorry.  Page -- that's a good question.  I
23    was intending to reference page 8 or 89 on the
24    bottom right corner.
25        A.  Yes.
```

Page 43

```
 1        Q.  Is there a chart of stores on this page?
 2        A.  Stores by brand, yes.
 3        Q.  Does this refresh your recollection as to
 4    how many of the 434 boutiques are located in the
 5    United States?
 6        MR. GOHEEN:  Object to the form.  That's
 7    improper.  He didn't say anything that
 8    conflicted with that.
 9        MR. DWYER:  Not saying he did.  He said he
10    didn't know.  Trying to jog his memory.
11        MR. GOHEEN:  His declaration was as of
12    today, not as of the end of 2016.  That's my
13    point.  So there may be differences but it's
14    not -- it's apples and oranges.
15        A.  I believe what I stated of the 434
16    boutiques, ten or less were outside the United
17    States.  This document would state that there were
18    423 front line boutiques as of the end of the year.
19    434 would have been a -- most likely as of Q-1.  I
20    think earlier in the deposition I stated on Item 6
21    that part of this came from the first quarter filing
22    and part of it came from the 10-K.
23    BY MR. DWYER:
24        Q.  Okay.  Well, then why don't we introduce
25    as Oliver 3 the first quarter filing?
```

Page 44

```
 1        A.  I've got to pause for a moment.
 2        MR. GOHEEN:  Not a question pending.
 3        A.  Earlier I stated either came from the K --
 4    excuse me, the Q or the press release.  The press
 5    release has an exhibit in the back that would tell
 6    you the store counts for the first quarter.
 7            (Thereupon, the document was marked as
 8    Exhibit 3.)
 9        MR. DWYER:  Okay.  So are we -- is it
10    marked?
11        THE COURT REPORTER:  Yes.
12    BY MR. DWYER:
13        Q.  Okay.  Mr. Oliver, you have before you
14    Oliver Exhibit 3.  Can you tell me what this
15    document is?
16        A.  It's a 10-Q filing with the SEC.
17        Q.  Okay.  Is this for the first quarter of
18    this year?
19        A.  Yes.
20        Q.  Okay.  And does this document contain --
21    am I correct in understanding you jumped in --
22    before I marked this exhibit, is that the number,
23    the 434 boutiques number doesn't come from this
24    document.  It comes from a press release issued
25    around the same time?
```

11 (Pages 41 to 44)

Page 45

```
 1        A.  Yes.  The exhibit would have been on the
 2   last, one of the last two pages of that filing.
 3        Q.  Okay.  All right.  For the moment you can
 4   put that aside.  Let's go back to Oliver 2.
 5        A.  Okay.
 6        Q.  So am I -- so if you go to page 8 of 89 of
 7   Oliver 2, the 10-K -- am I correct the 10-K says at
 8   the end of the year, fiscal year 2016 there were
 9   432 -- excuse me, 423 boutiques, White House Black
10   Market boutiques; is that correct?
11        A.  Yes.
12        Q.  According to your declaration as of the
13   first quarter of this year there are 434 White House
14   Black Market boutiques; is that correct?
15        MR. GOHEEN:  Object to form.  You can
16   answer.
17        A.  In the context of how this is presented,
18   Item 6, the 434 included United States, Canada,
19   Puerto Rico, so when you look at page 8, it would
20   have been the 423 plus six, so total 429.  So
21   there's a difference of five between the 434 and
22   what we have here at that point in time.
23   BY MR. DWYER:
24        Q.  Okay.  So the number increased by five
25   between the 10-K and your declaration; is that
```

Page 46

```
 1   correct?
 2        A.  Yes.
 3        Q.  Okay.  Thank you.  All right.  Let's move
 4   onto paragraph 7 of your declaration.
 5        MR. GOHEEN:  Let's take five.  It's been
 6   about an hour.
 7        MR. DWYER:  Want to take a break?
 8        THE VIDEOGRAPHER:  All right.  We are now
 9   going off the record at 10:29 a.m.
10        (Off the record.)
11        THE VIDEOGRAPHER:  We are now back on the
12   record in the deposition of David Oliver at
13   10:38 p.m.
14        MR. GOHEEN:  A.m.
15        THE VIDEOGRAPHER:  10:38 a.m.
16   BY MR. DWYER:
17        Q.  Mr. Oliver, thank you.  I believe we are
18   on paragraph 7 of your declaration.  What is your
19   basis for the statements in this paragraph?
20        A.  As stated earlier, I do read publications
21   governing the industry.  I do monitor traffic.  I do
22   monitor our store sales.  And collectively if you
23   read what is happening today in specialty retail or
24   retail in general, my comments were consistent with
25   the fact we are experiencing declining mall traffic,
```

Page 47

```
 1   store traffic, and that digital customer service
 2   customers, you know, the likes of Amazon and other
 3   upstart digital retailers is also having impact on
 4   the brick and mortar retail itself.
 5        Q.  All right.  Did you review any internal
 6   White House Black Market documents in preparing this
 7   paragraph?
 8        A.  Other than knowing the -- no.  I would
 9   have looked at the comp sales for -- and traffic for
10   White House Black Market.  That would have been the
11   extent of it.
12        Q.  And that is memorialized in the document
13   somewhere?
14        A.  That is -- we talk about our comp sales in
15   our press release.  You'll see that there
16   specifically for White House, yes.
17        Q.  Comp sales, is that -- you said comp
18   sales?
19        A.  Yes.
20        Q.  Is that correct?
21        A.  Right.
22        Q.  And you said that you looked -- did you
23   also look at documents reflecting traffic?
24        A.  I looked at internal documents regarding
25   traffic.  We make statements with respect to traffic
```

Page 48

```
 1   typically as to what is occurring.
 2        Q.  How does White House Black Market measure
 3   store traffic?
 4        A.  We measure it by the -- we have counters
 5   at our stores that when people walk in, we know what
 6   the traffic is.  When they -- there's software that
 7   tracks that.
 8        Q.  And has White House Black Market
 9   experienced decline in store traffic?
10        A.  Your question again.
11        Q.  Has White House Black Market experienced
12   decline in store traffic?
13        A.  Yes.
14        Q.  Over what timeframe?
15        A.  This is a generalized statement, but over
16   the last few years, we've been declining retail, all
17   our brands, as well as other specialty retail have
18   been experiencing declining traffic.
19        Q.  Have you personally measured traffic for
20   White House Black Market?
21        A.  No.
22        Q.  Have you -- have you reviewed -- am I
23   correct in understanding you have reviewed documents
24   reflecting measurements of store traffic?
25        A.  Yes.
```

12 (Pages 45 to 48)

Page 49

1    Q.  How often is store traffic measured?
2    A.  Continuous.
3    Q.  How often are reports of store traffic
4  generated?
5    A.  We get daily reporting internally but the
6  reports I focus on are a period basis.
7    Q.  Period basis.  What is the period for that
8  period basis?
9    A.  For us we follow a retail calendar, which
10 is 52 weeks.  We are 5/4/4 -- excuse me, 4/5/4, four
11 weeks, five weeks, four weeks make the quarter.
12   Q.  So at the end of a four or five-week
13 cycle; is that correct?
14   A.  Well, in the public domain would be at the
15 end of a 13-week cycle.
16   Q.  Right, but internally it's the end of four
17 or five or four-week cycle?
18   A.  That would be the lowest level I'm focused
19 on myself.
20   Q.  Okay.  What was the -- which measure of
21 store traffic did you review in preparing this
22 declaration?
23   A.  The -- I'm sure it would have been the
24 quarter from our -- I'm sure would have been the
25 quarter.

Page 50

1    Q.  Quarter, so the first quarter numbers for
2  this year?
3    A.  They probably would have gone beyond that.
4  You know, part of the statement I've made here is in
5  having prepared the documents for the last five
6  years on a quarterly basis we have been talking
7  about declining store traffic continually.  That is
8  the state of the union --
9    Q.  Okay.  So just to be clear, am I correct
10 in understanding you did review quarterly store
11 traffic documents as you prepared this declaration?
12   A.  On store traffic I cannot speak to that
13 specifically.  On -- in preparing this declaration
14 as relates to comp sales, that I can attest to that
15 I did look at that.
16   Q.  You can attest to the -- my question with
17 respect to store traffic is you don't recall?
18   A.  I don't -- did I -- no, my statement is I
19 did not go back and refresh my memory with respect
20 to store traffic and look at store traffic for each
21 of the prior quarters.  I have knowledge from my job
22 responsibilities and our public filings we have
23 declining store traffic.
24       I've looked at those in the ordinary
25 course each quarter in drafting our Qs and our Ks,

Page 51

1  but I've seen all of those in the ordinary course at
2  the time we prepared our SEC filings.
3    Q.  Just to be very clear, you did not
4  specifically go back and review the documents for
5  the declaration?
6       MR. GOHEEN:  Object to the form.  Asked
7    and answered.  Come on.  That's about the
8    fourth time you've asked it.  Let's go.
9       MR. DWYER:  I keep getting different
10   answers.
11      MR. GOHEEN:  No, you haven't.  You haven't
12   got the answer you wanted.  That's different.
13 BY MR. DWYER:
14   Q.  Can you answer my question, please?
15      MR. GOHEEN:  Same objection.  Last time
16   we're going to do it, too.  No or yes.
17   A.  Restate your question you'd like answered
18 again.
19 BY MR. DWYER:
20   Q.  I'll go back because I'm very -- this will
21 be the fifth time Barry's going to object.  Am I
22 correct in my understanding that you did not go back
23 and review quarterly traffic numbers in preparing
24 your declaration?
25      MR. GOHEEN:  Same objection.

Page 52

1    A.  I answered that.  Yes.
2  BY MR. DWYER:
3    Q.  What is White House Black Market doing to
4  combat declining store traffic?
5       MR. GOHEEN:  If you know.
6    A.  I am not the party that is driving that.
7  You would need to engage others to answer that
8  question.
9  BY MR. DWYER:
10   Q.  Are you involved in those discussions at
11 all?
12   A.  No.
13   Q.  What do you mean by competition from
14 digital commerce retailers?
15   A.  You have multiple new retail retailers
16 that are selling product.  The ease of entry in the
17 digital commerce world into retail is easier than
18 it's ever been.  The costs have come down and you're
19 looking at a proliferation of new upstarts that are
20 basically taking market share from the historical
21 legacy brick and mortar type retailers in general.
22 The growth --
23   Q.  Who are those new upstarts?
24   A.  There are, you know, sitting here
25 thinking -- some of the companies that you may --

13 (Pages 49 to 52)

Page 53

1   specifically as it relates to White House or women's
2   retailer I can think of Poetry would be one, Venus,
3   there are many retailers -- many players that work,
4   specifically attack just this space.  We did have --
5   there are others out there.  I would have to go back
6   and compile a list.
7        Q.  Did you compile a list as you were
8   preparing this declaration?
9        A.  No.
10       Q.  How long has Venus been operating?
11       A.  I can't speak to that.
12       Q.  Did it -- is it within the last five
13  years?
14            MR. GOHEEN:  Object to form.
15       A.  I can't -- I cannot speak to that.  I
16  don't --
17  BY MR. DWYER:
18       Q.  The other one you said was Poetry; is that
19  correct?
20       A.  Poetry.  P-O-E --
21       Q.  Poetry, I'm sorry.  How long has that been
22  operating?
23       A.  I cannot speak to that.
24       Q.  What is -- how does White House Black
25  Market track the phenomenon of competition from

Page 54

1   digital commerce retailers?
2        A.  I'd defer that to our marketing team.  I'm
3   accounting.
4        Q.  What is your basis for your understanding
5   that White House Black Market has experienced
6   competition from digital commerce retailers?
7        A.  My basis for understanding is in general
8   meetings, we have all associates and from time to
9   time our CEO may make comments.  There's -- if you
10  read publications Women's Wear Daily and the likes
11  thereof you're going to find articles that address
12  that.
13           I mean, it's knowledge I've obtained
14  working in women's specialty retail.  We recognize
15  there's competition out there.  I'm not the person
16  who's trying to combat that or understand it or
17  build a strategy.  My responsibility is generating
18  the financial records of the company to prepare a Q
19  or K.
20       Q.  Okay.  If we can go back for a second, am
21  I correct in understanding that Venus is spelled
22  V-E-N-U-S?
23       A.  Yes.
24       Q.  Great.  And for the sake of the court
25  reporter, can you spell the name of the other

Page 55

1   company you referenced?
2        A.  P-O-E-R-T-Y (sic).
3        Q.  What is the time period you were referring
4   to in your discussion of competition from digital
5   commerce retailers?
6        A.  The onslaught has really occurred over the
7   last six years as you've seen growth in digital
8   commerce.
9        Q.  So in -- so the statement that White House
10  Black Market is facing competition from digital
11  commerce retailers refers specifically to the last
12  six years?
13       A.  More pronounced today but yes.
14       Q.  Am I correct in understanding that digital
15  retailers have been around several decades?
16           MR. GOHEEN:  Object to the form.  Object
17  to the form.
18  BY MR. DWYER:
19       Q.  How long has Amazon been around?
20           MR. GOHEEN:  Object to the form.  If you
21  know.
22       A.  Amazon was in the '90s, early '90s.
23  BY MR. DWYER:
24       Q.  How long has Amazon been selling women's
25  apparel?

Page 56

1            MR. GOHEEN:  Object to the form.  If you
2   know.
3        A.  I can not speak specifically to that.  I
4   can tell you it has grown.
5   BY MR. DWYER:
6        Q.  Am I correct in understanding from your
7   prior answer you're not involved in efforts to
8   combat competition from digital commerce retailers?
9            MR. GOHEEN:  Asked and answered.
10       A.  Yes.  You're correct.
11  BY MR. DWYER:
12       Q.  Let's move onto paragraph 8 of your
13  declaration.  What is your basis for the statement
14  of this paragraph?
15       A.  Information on the public domain.
16       Q.  Did you -- how did you select these
17  companies?
18       A.  I actually went back and looked at various
19  articles.  I knew there have been numerous
20  bankruptcies and I believe I likely googled
21  bankruptcies in retail.  This is not an
22  all-inclusive list.  This is just a list.
23       Q.  So you -- how did you select from the
24  results that your Google search generated as you
25  decided what was to be included on the list?

14 (Pages 53 to 56)

Page 57

1      **A.  It was arbitrary.  I was looking for a**
2   **representative sample.  List would be more**
3   **comprehensive than what I stated.**
4      Q.   What is the time period covered by these
5   recent bankruptcies?
6      **A.   When you look at these bankruptcies these**
7   **are all -- I believe these are all within the last**
8   **two years.**
9      Q.   Two years?
10      **A.   Last two years, I believe.**
11      Q.   Am I correct in understanding from your
12   prior answer you did this search yourself?
13      **A.   Yes.**
14      Q.   Am I correct in understanding half these
15   companies are not apparel retailers?
16      MR. GOHEEN:  Object to form.
17      **A.   You're correct.  The point when you look**
18   **at this, this is all a function of declining**
19   **traffic.**
20   BY MR. DWYER:
21      Q.   What is your basis for your statement this
22   is a function of declining traffic?
23      **A.   Traffic ultimately drives sales.**
24      Q.   How do you know -- do you have personal
25   knowledge that each of the eight bankruptcies

Page 58

1   described in this paragraph was caused by declining
2   traffic?
3      **A.   I do not.**
4      Q.   Am I correct in my understanding that
5   Gorman stores is actually Gordman stores?
6   G-O-R-D-M-A-N?
7      **A.   It may be a typo.**
8      Q.   Okay.  Just wanted to make sure my review
9   was correct.  Is it correct Chico's and White House
10   Black Market are not affiliated with the companies
11   listed in this paragraph?
12      **A.   That is correct.**
13      Q.   They have no common corporate ownership;
14   is that correct?
15      **A.   Correct.**
16      Q.   Is it correct that there are numerous
17   retailers that are not in bankruptcy?
18      **A.   Yes.  There are.**
19      Q.   In fact, many retailers are expanding
20   operations; is that correct?
21      MR. GOHEEN:  If you know.
22      **A.   Many, I think some would be a more**
23   **appropriate word.**
24   BY MR. DWYER:
25      Q.   As you were preparing your declaration,

Page 59

1   did you look for -- did you run a comparable Google
2   search for retailers that were expanding their
3   operations?
4      **A.   I did not.**
5      Q.   Did you make any effort to uncover
6   information about retailers expanding their
7   operations?
8      **A.   No.**
9      Q.   Move onto paragraph 9, what is your basis
10   for your statement in this paragraph?
11      **A.   Specifically when I was researching this,**
12   **I seem to recall an article talking about**
13   **bankruptcies that have occurred and the store**
14   **closures that related to them.  I do recall the**
15   **number was far in excess of a thousand store**
16   **closures, but it would have been as a result of the**
17   **Google search that I ran.**
18      Q.   Do you know how many stores Gymboree is
19   closing?
20      **A.   Without going back and referencing public**
21   **domain again, I cannot respond to that.**
22      Q.   Do you know how many stores Gymboree will
23   continue to operate?
24      **A.   No.**
25      Q.   Do you know how many stores any of the

Page 60

1   particular entries on -- in paragraph 8 are closing?
2      **A.   Well, I think Radio Shack was closing**
3   **essentially all their stores, which is around 1400,**
4   **if I recall correctly.**
5      Q.   You understand Radio Shack is closing all
6   their stores?
7      **A.   Right.  Limited is also listed here.**
8   **Limited closed all their stores.  Limited is very**
9   **much of a White House Black Market-type retailer, or**
10   **excuse me, they were a White House Black Market-type**
11   **retailer.  We were targeting the same type customer.**
12   **They've basically shut their business down.**
13      Q.   So as we sit here today, you believe you
14   have an understanding as to how many stores The
15   Limited and Radio Shack are closing but not any of
16   the other stores on paragraph 8 of your declaration?
17      **A.   At the time I prepared this declaration**
18   **when I looked at the article, that information was**
19   **there.  I read it.  I don't recall the specifics.  I**
20   **can tell you in the aggregate it was more than a**
21   **thousand stores collectively for these stores.**
22      Q.   Let's move onto paragraph 10 of your
23   complaint -- excuse me, of your declaration.  How'd
24   you select June 13, 2017 as the date to use in your
25   calculation?

15 (Pages 57 to 60)

Page 61

1    **A.  It was the date I was doing my**
2    **declaration.  I was drafting it.**
3        Q.  Your declaration is actually signed seven
4    days later; is that correct?
5        **A.  That was the turnaround time before it**
6    **went final, but when I did this declaration, it was**
7    **June 13th, or excuse me, would have been the 14th.**
8        Q.  Did you consider revising these
9    calculations as you prepared the final of the
10   declaration?
11       **A.  Actually I did --**
12       Q.  Why'd you decide not to do that?
13       **A.  The evaluation would have gone lower for**
14   **White House Black Market if I updated it and the**
15   **decline I thought to be 20 to 30 million really**
16   **wasn't relevant.**
17       Q.  Am I correct in understanding that within
18   the last year the stock price is as high as $16.85
19   per share?
20       **A.  Yes.**
21       Q.  That was around December last year,
22   correct?
23       **A.  I'd need to go back and look at the date,**
24   **but at the time I drafted this declaration, I**
25   **determined $16.85 was the high.**

Page 62

1        Q.  Okay.  Why don't we introduce as Oliver
2    3 --
3            MR. GOHEEN:  4, Oliver 4.
4        BY MR. DWYER:
5        Q.  Excuse me, yes, Oliver 4, I'm sorry, yes,
6    the Yahoo printout for the one-year period.
7            MR. GOHEEN:  Which one is it?  There seems
8    to be two.
9            MR. DWYER:  What?  There are two.  One is
10   for a one-year period and one is for a
11   five-year period.  I wanted to look at the one
12   for the one-year period.
13       **A.  Before we look at this --**
14           MR. GOHEEN:  Just let him ask a question.
15       **A.  One moment.  Before I look at this here,**
16   **on the $16.85, now I'm questioning the timeframe**
17   **with the $16.85 was, was it within the last one year**
18   **or was it for a longer period of time that I was**
19   **looking at?**
20           MR. GOHEEN:  I think that's going to help
21   us.  Let's just move on.
22       **A.  I have Exhibit 4 in front of me.**
23           **(Thereupon, the document was marked as**
24   **Exhibit 4.)**
25

Page 63

1        BY MR. DWYER:
2        Q.  Okay.  Based on Exhibit 4, is it correct
3    that -- can you identify Exhibit 4 for me?
4        **A.  It appears to be a printout from Yahoo**
5    **Finance with a stock price as of 2:11 p.m. Eastern**
6    **Time of --**
7        Q.  Okay.  And if you look at the historical
8    data there, is it -- am I correct in my
9    understanding that in the spring the stock price was
10   around $14 -- over $14 a share?
11       **A.  We're not looking at the same document.**
12   **In the spring -- excuse me, looking at the chart.**
13       Q.  Yeah, the chart.  I'm sorry.
14       **A.  The chart in the spring if you come**
15   **straight across momentarily --**
16           MR. GOHEEN:  Don't mark on it.
17       **A.  Just looking.**
18           MR. GOHEEN:  Don't mark on the exhibit.
19       **A.  I'm not marking anything.  That appears to**
20   **be the case.**
21       BY MR. DWYER:
22       Q.  Okay.
23       **A.  It's hard to interpret a graph looking**
24   **across without lines or anything of the nature.  It**
25   **appears --**

Page 64

1        Q.  I apologize for the crudity of this.  Is
2    it also fair to say on the basis of this graph
3    around May the stock price spent the entire year at
4    above $11 a share?
5        **A.  Again, that appears to be the case looking**
6    **at this graph.  Without a ruler and some lines here**
7    **it appears to be the case.**
8        Q.  Thank you.  If we could mark the other
9    document Oliver 5, the other Yahoo printout.
10           (Thereupon, the document was marked as
11   Exhibit 5.)
12       BY MR. DWYER:
13       Q.  Can you identify this document for me?
14       **A.  It's the same -- approximately, close to**
15   **being the same as the prior document one minute**
16   **later.**
17       Q.  The primary difference is the chart in the
18   document goes back five years rather than one year;
19   is that correct?
20       **A.  Yes.**
21       Q.  Okay.  Am I correct looking at this chart
22   that the Chico's stock price spent almost the
23   entirety of the last five years above $11.32 a
24   share?
25           MR. GOHEEN:  Object to the form.

16 (Pages 61 to 64)

Page 65

1    **A. That's what the graph would seem to**
2    **indicate.**
3    BY MR. DWYER:
4    Q. And is it also the case that based on the
5    graph Chico's stock price spent more than half of
6    the last five years above about $15 a share?
7    MR. GOHEEN: Object to the form.
8    **A. Looking at the graph that would appear to**
9    **be the case.**
10   BY MR. DWYER:
11   Q. Thank you. Put those aside. Let's turn
12   to paragraph 11 of your declaration. Do you recall
13   whether this paragraph was included in the original
14   draft of your declaration you prepared?
15   **A. The content would have been included in my**
16   **original draft, yes. Was it verbatim, I can't speak**
17   **to that. I may have made edits afterwards.**
18   Q. Okay. Was this put in the declaration --
19   was putting this into the declaration your idea or
20   was this an idea suggested by someone else?
21   MR. GOHEEN: Object to the form. You can
22   answer if it does not disclose any
23   communications with counsel.
24   **A. I have no comment.**
25

Page 66

1    BY MR. DWYER:
2    Q. You have no --
3    **A. I have no comment in that it -- I think my**
4    **conversations were in the context of communications**
5    **with counsel.**
6    Q. I'm struggling a little to understand that
7    answer. Was it your idea to include this paragraph
8    in this declaration?
9    MR. GOHEEN: Same objection. Same
10   instruction.
11   **A. I have no comment.**
12   BY MR. DWYER:
13   Q. If we could briefly go back to the prior
14   two exhibits, Exhibit -- Oliver 4 and 5, do you have
15   any reason to believe the data included in either of
16   these documents is inaccurate?
17   **A. No.**
18   MR. GOHEEN: Object to the form.
19   BY MR. DWYER:
20   Q. You can answer my question.
21   MR. GOHEEN: He did.
22   **A. No.**
23   BY MR. DWYER:
24   Q. Okay. Sorry. I just wasn't sure -- I
25   know there was some cross talk. I wanted to make

Page 67

1    sure the court reporter got it.
2    Okay. Going back to paragraph 11, can you
3    walk me through the steps how you calculated the
4    market value of White House Black Market?
5    **A. Yes.**
6    Q. Would you please do so?
7    **A. Yes. If you refer to -- in the**
8    **declaration if you refer to Exhibit A, Exhibit A is**
9    **the calculation that was made for this. I**
10   **specifically looked at the trailing four quarters**
11   **for the sales for Chico's FAS, each of those is**
12   **listed here, and computed or derived the total sales**
13   **for Chico's FAS for the totaling 12 quarters.**
14   **I replicated that looking specifically at**
15   **White House Black Market, their sales for the**
16   **previous four quarters, noting that the sales for**
17   **White House Black Market represented what component**
18   **they were of Chico's FAS. We'll get into actual**
19   **calculations.**
20   **Once I had these two items, the total**
21   **sales for Chico's FAS, the total sales for White**
22   **House Black Market as of the end of the first**
23   **quarter, all information in the public domain, I**
24   **then looked back to the market cap, the market of**
25   **Chico's FAS as of the closing stock price on**

Page 68

1    **June 13th, which was $9.43 times shares that were**
2    **outstanding of 128 million, that implies a market**
3    **cap for the total Chico's FAS entity of**
4    **$1.2 billion.**
5    **And if you were to look at the market cap**
6    **expressed as a percent of total sales for Chico's**
7    **FAS was .5, meaning that 1.2 billion divided into**
8    **2.4 billion was .5, from a valuation perspective, a**
9    **multiple of sales is a common measure for coming up**
10   **with a valuation of an entity, one methodology.**
11   **This, I chose this approach simply because**
12   **it was all information used from the public domain,**
13   **but having completed that calculation, if the**
14   **multiple for FAS was .5, I applied the same multiple**
15   **times the White House sales to drive the**
16   **413 million. This is simply a math exercise.**
17   Q. The sales in this chart, are those gross
18   sales?
19   **A. Those are the sales, yes.**
20   MR. GOHEEN: Object to form. Gross sales.
21   **A. They are gross sales. They would exclude**
22   **sales tax. It would be the sales. It would be net**
23   **of any coupons that were -- it's a sales as we**
24   **reported in our public filings for those respective**
25   **quarters.**

17 (Pages 65 to 68)

Page 69

```
 1        BY MR. DWYER:
 2        Q.  Why did you select gross sales as the
 3    measure?
 4        A.  It's the only measure we track.
 5        Q.  Do you not track net revenue by part of
 6    the company?
 7        A.  Our revenue is sales.
 8        Q.  What's the difference between gross sales
 9    and net revenue?
10        A.  By net revenue, what do you mean by net
11    revenue?
12        Q.  Well, I mean, do you track, you know,
13    revenue, net of expenses?
14            This is not getting any response.  Would
15    it be fair to say that your method is highly
16    dependent on the stock price of Chico's?
17        MR. GOHEEN:  Object to the form.
18        A.  The calculation is based on the stock
19    price of Chico's as of close of market, June 13th.
20        BY MR. DWYER:
21        Q.  If you had used the 52-week high stock
22    price of $16.85, would that have produced a
23    different valuation number?
24        A.  Yes.
25        Q.  Would it produce a valuation number of
```

Page 70

```
 1    nearly 1.8 times four?
 2        MR. GOHEEN:  Object to form.
 3        A.  It would be a math exercise, but I could
 4    easily do the math as you have already, I assume.
 5        BY MR. DWYER:
 6        Q.  Do you have any reason to believe that
 7    number I provided is not correct?
 8        MR. GOHEEN:  Object to form.
 9        A.  I would need to make the calculation.
10        BY MR. DWYER:
11        Q.  But it would be more?
12        A.  It would be more.
13        Q.  And the amount that it would be more would
14    be the amount that the stock prices differ?
15        A.  Yes.
16        Q.  The same would be true if you use the
17    higher stock price from April, yes?
18        THE COURT REPORTER:  I'm sorry?
19        BY MR. DWYER:
20        Q.  The same would be true if you used any
21    higher stock price such as the stock price from
22    April?
23        MR. GOHEEN:  Object to the form.  Just
24        like it would be lower if it was done today.
25        What's your point?  You can answer if you want.
```

Page 71

```
 1        MR. DWYER:  Are you instructing him not to
 2    answer?
 3        A.  The -- if you used a stock price in April
 4    that was higher, the stock pricing higher was prior
 5    to us disclosing our first quarter results when we
 6    came out with our negative comps in the first
 7    quarter, and the market has valued us accordingly
 8    and it's reflected in the stock price.
 9            The measure of the value of the entity is
10    based upon how the market perceives us at a given
11    point in time.  The market is not giving us credit
12    for a higher stock price that we had historically.
13    Stock prices fluctuate over time and today with the
14    headwinds and declining traffic and the negative
15    comp sales we are seeing a lower stock price.
16        Q.  Are you familiar with Morning Star?
17        A.  Yes.
18        Q.  Are you aware Morning Star believes that
19    Chico's stock price is undervalued?
20        A.  Many people have different opinions.
21        Q.  How did you select this metric for value
22    of White House Black Market?
23        MR. GOHEEN:  Object to the form.  Asked
24        and answered.  He's already walked you through
25        it.
```

Page 72

```
 1        A.  There are multiple methods for evaluation
 2    common measure back of the envelope computation.
 3    Common measure back of the envelop computation could
 4    be a measure of sales.  Looking at the market, what
 5    the market capitalization was at FAS we
 6    extrapolated -- I extrapolated, there was no we.
 7            Just I extrapolated and came up with this
 8    calculation on my own.  There are alternative
 9    measures for valuations that could have been
10    employed that would have been much more engaged, but
11    I seriously believe you would have come up with
12    something around the same metric, the same estimate.
13        BY MR. DWYER:
14        Q.  What are some of those other methods?
15        A.  One would be a multiple of your cash flow.
16    You might see a retailer go out six to seven times
17    cash flow.  We do not disclose publicly the cash
18    flow of any of our entities.
19        Q.  Is what you just described ultimately the
20    discounted cash flow method?
21        A.  Well, ultimately that's -- that would be
22    another methodology you could look at.  You could --
23        Q.  Okay.  Right.  So the discounted cash flow
24    method is another method you could have used?
25        A.  You could have come to the valuation using
```

18 (Pages 69 to 72)

Page 73

1     a discounted cash flow of the entity on a future
2     basis. That would have included projected future
3     sales, the likes thereof and profitability of the
4     company in the future.
5          Q. Could you also use the net asset value
6     method?
7          A. I would not have used that for a retail
8     company that's largely not really an asset-based
9     business.
10         Q. So did you consider using the net asset
11    value method and reject it?
12         A. I did not consider using it.
13         Q. Did you consider using a discounted cash
14    flow method and reject it?
15         A. Yes, I did reject it.
16         Q. Why did you reject it?
17         A. The -- ultimately to have made that
18    calculation I probably would have hired a valuation
19    firm to come in and do a valuation of the entity and
20    as a back-of-the-envelope calculation that would be
21    a good proxy for valuation. This is the approach I
22    chose.
23         Q. Why did you -- what is the basis of your
24    belief the back-of-the-envelope method would be a
25    good proxy for value?

Page 74

1          A. Because many valuations are typically
2     looked at as a multiple of sales.
3          Q. What is the basis for your belief -- am I
4     correct you believe if a discounted cash flow method
5     had been done it would have given you a similar
6     result?
7          A. It would have been in the ballpark. I
8     mean, you could have done multiple valuations. As I
9     stated, had we engaged a valuation firm to value
10    White House Black Market -- by the way, we never
11    have -- you might have come up with a different
12    answer.
13         Q. Sitting here today you don't know whether
14    you would have or would not have?
15         A. Short of having done the complete exercise
16    of a full blown valuation using a discounted future
17    cash flow, I would not know the valuation that would
18    yield.
19         Q. Okay. As CAO of Chico's you would have
20    had access to the data that you would have needed to
21    do this type of analysis, correct?
22         A. Yes. I could have -- we could have done
23    that. We would have had to make some estimations as
24    to the future projected sales of the company itself
25    and so I would have had to go back and work with

Page 75

1     our -- others to kind of come up with those
2     projections, future sales of Chico's FAS and the
3     ultimate projected profitability in each of those
4     years, then look at that on a discounted basis.
5          Q. You could have done that, though, correct?
6          A. We could have done that. It would have
7     been more than a month-long exercise.
8          Q. And once you had done those steps you then
9     could have run your own discounted cash flow
10    analysis; is that correct?
11             MR. GOHEEN: Object to form. Move on.
12         Okay.
13    BY MR. DWYER:
14         Q. I'd actually like to continue questioning
15    him on the subject. It's one of the core subjects
16    we brought you all to Florida in the first place.
17             Could you have brought -- I'm being told
18    we have five minutes left. Why don't we take a --
19    five minutes left, so let's do five minutes more
20    questioning, then we'll go.
21             So Mr. Oliver, if you had had the data, if
22    you had done the estimates, could you yourself have
23    done discounted cash flow analysis?
24         A. I could have done -- I would have worked
25    with a consultant in making that calculation. We

Page 76

1     would have provided all the input. We would have
2     worked very closely with them in preparing a
3     valuation.
4          Q. Why would you have had to work with a
5     consultant?
6          A. Because they're specialists that deal in
7     valuations, period. Now, I will tell you in the
8     same time one of the methods they will have in their
9     final valuation report will be a multiple of sales.
10         Q. Why were you qualified to use this method
11    to valuate the company but would not have been
12    qualified to do a discounted cash flow analysis?
13         A. The -- because a multiple of sales is a
14    calculation you could run. If you looked at --
15         Q. What is it about a discounted cash flow
16    analysis you would not have been able to do?
17         A. I would have done one. I could have run
18    the entire calculation myself, put it together, but
19    I still would have had it reviewed by a professional
20    valuation firm.
21         Q. Why is that?
22         A. Because that's what they do. You know, I
23    wouldn't try to do my own heart surgery. I would
24    consult with the expert to ensure I had that number
25    nailed.

19 (Pages 73 to 76)

Page 77

1    Q.  Did you consult with an expert about the
2  valuation -- valuation calculation you did?
3    **A.  There's nothing complex about what I did.**
4    Q.  What is complex about discounted cash flow
5  analysis that would have required you to consult
6  with an expert?
7    **A.  The complexity is in terms of doing an**
8  **valuation, you know, I felt confident I could have**
9  **run the calculation in its entirety.  I would have**
10  **gone to an expert and had him come back and review**
11  **it.**
12    **They would have gone out to the market to**
13  **look at valuations in recent deals that have**
14  **happened.  There hasn't been a lot of deals**
15  **happening, but I would look to them.  That's**
16  **something they do every day, something I might run**
17  **periodically.**
18    Q.  So --
19    **A.  And yeah, anyway.  I think I answered your**
20  **question.**
21    Q.  Is going out in the market and looking at
22  recent deals something you could have done?
23    **A.  I would have gone to a valuation firm to**
24  **have them provide information to me because they're**
25  **out there tracking that.**

Page 78

1    Q.  Is that information you could have tracked
2  yourself?
3    **A.  I would have had -- I would have -- it**
4  **would have been much easier to go to a valuation**
5  **firm to track it as part of their core competency.**
6  **I probably could have found deals in the market, and**
7  **come up with multiples and spent hours attempting to**
8  **do that on my own versus rely on experts that**
9  **basically built the databases and done that in the**
10  **ordinary course as part of their core competency, I**
11  **guess.**
12    Q.  How close to the five minutes are we?
13  We're almost done, right?
14    **A.  Two minutes.**
15    Q.  Two minutes.  I think why don't we just
16  take a break now.  We can change the tape.  Let's go
17  off the record.
18    THE VIDEOGRAPHER:  All right.  We are now
19  going off the record at 11:25 a.m.
20    (Off the record.)
21    THE VIDEOGRAPHER:  We are now back on the
22  record with Media Unit 2 of the deposition of
23  David Oliver at 11:37 a.m.
24  BY MR. DWYER:
25    Q.  Thank you.  Mr. Oliver, did Chico's pay a

Page 79

1  dividend earlier this year?
2    **A.  Yes.**
3    Q.  Was that dividend 16 and a half cents a
4  share?
5    **A.  Sixteen and a half cents would have been**
6  **two dividends.  Our annual rate is currently 33**
7  **cents.  So on a quarterly basis we do one-fourth of**
8  **that.**
9    Q.  Okay.  So Chico's paid two dividends that
10  total 16 and a half cents a share this year; is that
11  correct?
12    **A.  I believe that's correct, yes.**
13    Q.  Okay.  Then given the number of
14  outstanding shares, that adds up to around
15  $21 million?
16    **A.  Correct.**
17    Q.  At the end of last year -- excuse me, at
18  the end of the last fiscal year did Chico's have
19  over 142 million in cash and cash equivalents?
20    **A.  Yes.**
21    Q.  And for that fiscal year did Chico's have
22  over 230 million in net cash while operating
23  activities?
24    **A.  I would go back and look at the number but**
25  **that sounds about right.**

Page 80

1    Q.  And based on your prior answer, am I
2  correct understanding Chico's paid $42 million in
3  dividends last year?
4    **A.  That is approximately the number.  I'd**
5  **need to look at the number but $42 million sounds**
6  **about right on.**
7    Q.  If we hop onto Oliver 2, I think 37 out of
8  89 at this time.  No, it's not.  45 out of 89.
9    **A.  42,000,254, so right on.**
10    Q.  And is it correct that Chico's did stock
11  buybacks of almost $102 million this year?
12    **A.  Yes.**
13    Q.  Thank you.  You can put that aside.
14    All right.  Turning to paragraph 12 of
15  this complaint -- excuse me, did it again, this
16  declaration, was this paragraph in your original
17  draft of the declaration?
18    **A.  I don't recall.**
19    Q.  Was it your idea to put this -- the
20  discussion of this topic into the declaration?
21    **A.  I don't recall.  I had a working session**
22  **with our counsel.  My understanding of what the**
23  **information contained here came from that.  I don't**
24  **recall specifically was it before or after.  I**
25  **largely, as I indicated earlier, drafted this after**

20  (Pages 77 to 80)

Page 81

1  my initial consultation with counsel, the specifics
2  which came first, I don't recall.
3      Q.  On the basis of your prior -- am I
4  recalling your prior testimony correctly that the
5  basis for the statement that Plaintiff seeks
6  recovery for herself and the class up to
7  $360 million in this paragraph is the conversation
8  you had with counsel?
9      A.  Yes.
10     Q.  Is there any other basis for that
11  statement?
12     A.  No.  That's the information that was
13  conveyed to me.
14     Q.  Did you review the complaint in this
15  action?
16     A.  Did I look at -- did I -- no, I did not
17  review the Plaintiff's -- I did not review any
18  documents or anything of that nature.
19     Q.  Okay.
20     A.  For the Plaintiff.
21     Q.  Is it fair to say that the opinion you
22  expressed in this paragraph assumes a $360 million
23  judgment against White House Black Market?
24     A.  No.  Says up to.
25     Q.  Okay.  The second sentence of this

Page 82

1  paragraph says:  A judgment of this size equals
2  nearly 90 percent of White House Black Market's
3  estimated market value.
4      Is that accurate?  Have I read that
5  statement accurately?
6      A.  Yes.
7      Q.  Does this sentence assume a judgment of
8  360 million against White House Black Market?
9      A.  If it were up to 360 million that would be
10  the case.
11     Q.  Right.  Is it correct that a judgment of
12  less than 360 million would not be nearly 90 percent
13  of White House Black Market's estimated market
14  value?
15     A.  That's correct.
16     Q.  Okay.  And is it correct that a judgment
17  of less than 360 million might in fact be a result
18  of this action if it proceeds forward?
19     A.  I'm not speculating what the judgment of
20  this action might be.
21     Q.  Not asking you to speculate what the
22  judgment might be.  I'm asking you to state -- that
23  is state the fact is it possible the 360 million
24  might not be recovered?
25     MR. GOHEEN:  Object to the form.  Calls

Page 83

1  for speculation.
2  BY MR. DWYER:
3      Q.  Are you -- you can still answer my
4  question.
5      MR. GOHEEN:  If you can answer.
6      A.  I would be speculating if I were to
7  indicate what the judgment might ultimately be in
8  this type of case.  It's my understanding it can be
9  up to 360 million and my statement, the context of
10  my statement was a judgment of 360 million would be
11  90 percent of the market of the company.  To your
12  point, to your point, I mean, until it's over, it's
13  not over.
14  BY MR. DWYER:
15     Q.  What percentage of the market cap of White
16  House Black Market would a judgment of zero dollars
17  be?
18     A.  Well, zero dollars would be zero.
19     Q.  What percentage of the market cap of White
20  House Black Market would a $36 million judgment be?
21     A.  It's a math exercise.  You could calculate
22  it.
23     Q.  Would it be less than 90 percent of the
24  market capitalization of White House Black Market as
25  you calculated it?

Page 84

1      A.  Yes.
2      Q.  Would a zero-dollar judgment significantly
3  impact White House Black Market's ability to survive
4  -- concerned?
5      A.  Would a zero judgment --
6      Q.  Yeah.  Would a zero-dollar value judgment
7  significantly impact White House Black Market's
8  ability to survive with the going concern?
9      A.  It would have no impact.
10     Q.  Would a $36 million judgment significantly
11  impact White House Black Market's ability to survive
12  with the going concern?
13     MR. GOHEEN:  Object to the form.
14     A.  Respond to that?
15     MR. GOHEEN:  Yes.
16     A.  $36 million would be a headwind but it
17  would not --
18  BY MR. DWYER:
19     Q.  Headwind.
20     A.  It would not limit the company from
21  continuing as a going concern.
22     Q.  Okay.  What is the basis for that
23  statement?
24     A.  Looking at the cash flow of the business
25  that it generates.  $36 million, I mean, it would be

21 (Pages 81 to 84)

Page 85

1    a headwind you would not want to sustain.  It
2    might -- it would be limiting, but it would not
3    be -- it would not result in a going concern issue.
4        Q.  Am I correct in understanding that your
5    calculation that a $360 million judgment would equal
6    90 percent of White House Black Market's estimated
7    market value is based on your estimate of White
8    House Black Market's current market value?
9        A.  The calculation, Exhibit A, it's based
10   upon the calculation Exhibit A, yes.
11       Q.  And that, in turn, is based on Chico's
12   current stock price, right, or Chico's stock price
13   at the time of the declaration?
14       A.  Yes.
15       Q.  Is that correct?
16       A.  Yes.
17       Q.  By the time any judgment is entered in
18   this action, Chico's stock price could be different
19   than it was at the time of this declaration; is that
20   correct?
21       A.  Yes.
22       Q.  So your opinion about the value of White
23   House Black Market could then be different as well,
24   correct?
25       A.  Yes.

Page 86

1        Q.  And so the percentage of White House Black
2    Market's net estimate market value could be
3    different then as well?
4        A.  Yes.
5        Q.  You can move onto paragraph 13 of your
6    declaration.
7            Do you recall whether this paragraph was
8    included in your original draft of the declaration?
9        A.  I do not recall it was in the original
10   draft or a subsequent draft based upon counsel.  The
11   information stated here is based on my communication
12   with counsel.
13       Q.  You don't recall whether it was in your
14   initial draft or subsequent draft?
15       A.  The time it would have made it into the
16   draft I do not recall, but the information contained
17   here was based on my -- the communication that
18   information had been provided.
19       Q.  Okay.  If we could very briefly go back to
20   paragraph 12, then I promise we'll move forward.
21           Would it be correct to say that your
22   90 percent estimate is based off of the speculation
23   of the judgment of 360 million?
24       MR. GOHEEN:  Object to form.
25       A.  It's a statement of fact that if it were

Page 87

1    360 million it would be roughly 90 percent of the
2    valuation.
3      BY MR. DWYER:
4        Q.  Right.  Would you agree with my
5    characterization that the statement if it were
6    360 million is a speculative statement?
7        MR. GOHEEN:  Object -- same objection.
8    Asked and answered.  Come on.  Let's go.  Are
9    you saying you're not seeking 360 million?  If
10   you're not then let's just move on.
11       MR. DWYER:  I'm asking if the sentence he
12   just said, which was phrased in subjunctive
13   mood is, in fact, a speculative or
14   hypothetical?
15       MR. GOHEEN:  He answered your question.
16   Let's go.
17       MR. DWYER:  He didn't answer my question.
18       MR. GOHEEN:  Yes, he did.  It's asked and
19   answered.
20       MR. DWYER:  Are you directing him not to
21   answer?
22       MR. GOHEEN:  If you want the court
23   reporter to read his answer back that will be
24   his next answer.
25       A.  My statement here simply is it's my

Page 88

1    understanding based on conversation with counsel it
2    could be up to 360 million.  How counsel arrived at
3    that number I'm oblivious to.
4      BY MR. DWYER:
5        Q.  Okay.  All right.  Move back to 13, in
6    paragraph 13 of your declaration you reference a
7    list of consumers who made a purchase, return or
8    similar transaction during the relevant time period.
9            Did you help generate that list?
10       A.  No.
11       Q.  Have you reviewed that list?
12       A.  No.
13       Q.  What is your basis for your understanding
14   of what the list contains?
15       A.  Communication from counsel.
16       Q.  You have no basis for stating this
17   paragraph other than the information conveyed to you
18   by counsel?
19       A.  I've done nothing to substantiate the
20   information.
21       Q.  You have no reason to believe the
22   statements in this paragraph are true other than the
23   fact you trust counsel?
24       MR. GOHEEN:  Object to the form.
25       A.  My basis for the statement is

22 (Pages 85 to 88)

Page 89

1  communication with counsel.
2  BY MR. DWYER:
3      Q.  Okay.  You have no personal knowledge
4  beyond what was conveyed to you by your counsel as
5  to the subject of this paragraph of your
6  declaration?
7      A.  I have not seen anything that was produced
8  and provided.
9      Q.  Going to do something slightly unusual, go
10  out of order.  Go to paragraph 15 of your
11  declaration next.
12      A.  Okay.
13      Q.  Was this paragraph in your original draft
14  of the declaration?
15      A.  Again, I don't recall the specific -- as
16  stated, when I did my initial draft I believe was on
17  the 14th.  We finalized just a few days thereafter.
18  What occurred on what day are based upon subsequent
19  input from counsel, the timing thereof.  My
20  knowledge of the fact they have the option, this is
21  something I know we do not track, whether it's email
22  or a receipt.
23         There's not a business reason per se for
24  us to track this but -- but the consumer can opt in
25  one or the other or both.

Page 90

1      Q.  Okay.  What do you mean you do not track
2  this information?
3      A.  I am not tracking anything here under my
4  job responsibilities, but in the ordinary course as
5  part of this, I understand that we are not -- we
6  don't have an audit trail that would tell us in
7  which bucket -- which receipt the consumer received.
8      Q.  What do you mean by audit trail?
9      A.  Something you can independently come
10  through and verify, I guess.  Maybe I should use the
11  word --
12      Q.  Are you saying you don't track this
13  information in your department or that White House
14  Black Market doesn't track this information?
15      A.  I can say White House is not tracking
16  that.  If it were -- I'm not tracking that.
17      Q.  Was it your -- were you the one who
18  decided to discuss the substantive subject of this
19  paragraph in your declaration?
20         MR. GOHEEN:  If you can answer that
21      without disclosing attorney-client
22      communications, you can.  Otherwise I instruct
23      you not to answer.
24      A.  Well, as stated previously, in preparing
25  for this conversation or this declaration I had

Page 91

1  multiple -- I did consult with our internal counsel
2  and where I included or didn't, I don't recall.  I
3  know --
4      BY MR. DWYER:
5      Q.  You don't recall whether this was your
6  decision or whether this was recommended to you by
7  counsel?
8      A.  I do not recall specifically.  I know it
9  was in the final draft, you know, I went through and
10  I had an initial meeting with counsel.  I was
11  told --
12         MR. GOHEEN:  No.  Don't disclose any
13      communication.
14      A.  Okay.  Okay.  I had an initial meeting --
15  following that meeting I prepared a draft and
16  returned it to counsel.
17      BY MR. DWYER:
18      Q.  All right.
19      A.  Largely --
20      Q.  Sorry.
21      A.  No, I was going to say I returned it to
22  counsel, but I reviewed it a final time and that was
23  about it.
24      Q.  Okay.  Where does White House Black Market
25  store email receipts?

Page 92

1      A.  Where does White House Black Market store
2  what?
3      Q.  Store email receipts?
4      A.  I don't know that they do.  The email
5  receipts themselves, I mean.
6      Q.  Do you know that they don't?
7      A.  The email, the emails that went to the
8  consumer, I don't know that they -- I don't know
9  that they do and I don't know that they don't.
10      Q.  You have no knowledge one way or the other
11  whether those emails are stored somewhere?
12      A.  That's outside my area of responsibility.
13  I would -- you would have to talk to someone else.
14      Q.  Okay.  Do you know -- where does White
15  House Black Market store data showing the email
16  receipt was sent for a particular transaction?
17      A.  Again, you would need to consult with
18  someone who has oversight of that.  That's not in
19  the core part of accounting and finance.
20      Q.  You don't know one way or the other
21  whether that data is stored or not stored?
22      A.  I do not have direct knowledge.
23      Q.  If that data were stored somewhere, you
24  wouldn't know where it was stored?
25      A.  That is correct.

23 (Pages 89 to 92)

Page 93

1     Q.  All right.  Is determining the -- would
2  determining whether email receipts are stored
3  somewhere have been important to you had you
4  investigated the statement in paragraph 15 of this
5  declaration?
6         MR. GOHEEN:  Object to the form.
7     A.  No.  That would not have been important to
8  me.
9  BY MR. DWYER:
10     Q.  All right.  Your statement in the
11  paragraph says that:  White House Black Market has
12  no way to determine which customers on the list it
13  produced in this case were issued a hard copy
14  receipt versus an email receipt.
15         Have I read that correctly?
16     A.  You have.
17     Q.  Would knowing whether the emails that were
18  sent to people who received an email receipt were
19  stored in some place be important to you in
20  determining whether or not the statement:  White
21  House Black Market has no way to determine which
22  customers on the list it produced in this case were
23  issued a hard copy receipt versus an email receipt
24  is in fact a true statement?
25         MR. GOHEEN:  I think you're going to have

Page 94

1  to break that up in about eight parts.  Object
2  to the form.
3  BY MR. DWYER:
4     Q.  All right.  Let me rephrase.  Is it
5  correct to characterize the upshot of this paragraph
6  that White House Black Market doesn't have the
7  ability to determine who on the list that was
8  produced received an email receipt?
9     A.  Restate your question once again.
10     Q.  Okay.  Is it accurate to understand this
11  paragraph as saying that White House Black Market
12  does not have the ability to determine which of the
13  customers on the list that was produced received an
14  email receipt?
15     A.  Is that a requirement for me to make the
16  statement, no.
17     Q.  I'm sorry?
18     A.  I said is that a requirement for me to
19  make this statement, no, I don't believe that it is.
20     Q.  No, no.  We jumped ahead a couple
21  questions.  I was simply asking was that an accurate
22  paraphrase of your statement in this paragraph?
23     A.  Well, let me respond in this manner:  The
24  statement I made, White House Black Market has no
25  way to determine which customers on the list

Page 95

1  produced in the case are hard copy or email.  Okay.
2  That's my understanding that I gained in preparation
3  for this deposition.
4     Q.  And as you put this statement reflecting
5  that understanding into a declaration, which you
6  signed under penalty of perjury, did you conduct any
7  investigation to determine the truth or falsity of
8  that statement?
9     A.  I did not.
10     Q.  If it were true that White House Black
11  Market had in some place a cache of these -- had
12  these email stored in some place, would that impact
13  the truth of the statement that White House Black
14  Market has no way to determine who received an email
15  receipt?
16     A.  And if I was provided wrong information
17  and that did exist, you're correct.
18     Q.  So if there was an email cache somewhere
19  containing these emails, this statement would be
20  false?
21         MR. GOHEEN:  Object to the form.  That's
22     not what he said.
23     A.  My statement is based upon in preparation
24  for this deposition what I learned talking with
25  people that I understand were knowledgeable,

Page 96

1  feedback that I have, is we did not have that
2  capability.
3  BY MR. DWYER:
4     Q.  But you don't, in fact, know whether White
5  House --
6     A.  I have not independently confirmed that.
7     Q.  Similarly, if there were a trove of data
8  somewhere showing whether emails had been sent but
9  not the emails themselves, would that affect the
10  truth of this statement?
11         MR. GOHEEN:  Object to the form.
12     A.  The statement made was based on
13  information I had at the time I prepared this
14  declaration.  If it were subsequently determined
15  there was a trove of emails, then the statement
16  would be wrong.  It does not change the fact that
17  that was my understanding at the time I made this
18  declaration.
19  BY MR. DWYER:
20     Q.  When you were drafting this declaration
21  did you consider putting a qualifier in this
22  paragraph to say it is my understanding that White
23  House Black Market has no way to determine which
24  customers on the list, et cetera, et cetera?
25     A.  If I had -- that would have been

Page 97

1   appropriate to put the qualifier in there, yes.
2       Q.  If you had, but did you feel it was
3   appropriate to put in the qualifier?
4       A.  It was not put in there.
5       Q.  I know it wasn't put in there.
6       A.  It was not -- it was not contemplated at
7   the time.
8       Q.  Okay.  Why didn't you feel it was
9   appropriate to put the qualifier in?
10      A.  As stated, when I drafted this I drafted
11  it in free form, shot it over to counsel and we
12  pretty much went with it.  We turned it very quick.
13  It was not included.
14          You're asking was there a pensive moment,
15  no, there was not a pensive moment should I include
16  this or not include this.  It wasn't the case.  I
17  made a statement of fact as I understood them at the
18  time.
19      Q.  Are you in the habit of making factual
20  statements in declarations that are sworn under
21  penalty of perjury that you cannot actually verify
22  the truth or falsity of?
23          MR. GOHEEN:  Object to the form.
24      A.  I do not independently verify everything
25  in our financial records.  I do rely on the

Page 98

1   expertise of others who have direct knowledge, but
2   that is my understanding.
3           BY MR. DWYER:
4       Q.  Am I correct in understanding that you do
5   not personally have the technological capability to
6   locate email receipts or related data in the
7   databases of White House Black Market or Chico's?
8           MR. GOHEEN:  Object to the form.
9       A.  I personally do not.
10          BY MR. DWYER:
11      Q.  If I told you that White House Black
12  Market counsel recently told us that White House
13  Black Market claimed it would take three people
14  working part-time for six to eight weeks to track
15  down email receipts or data showing which
16  transactions and receipts were sent, would that
17  surprise you?
18          MR. GOHEEN:  Object to the form.  Calls
19      for speculation.
20          BY MR. DWYER:
21      Q.  You can answer.
22          MR. GOHEEN:  If you know.
23      A.  I mean, I have no idea.  Would it surprise
24  me, I mean, you know, I don't believe that to be the
25  case.  So if that were the case, yes, it would

Page 99

1   surprise me.
2           BY MR. DWYER:
3       Q.  Can we introduce what I believe is the
4   last exhibit, unless Barry has something, which is
5   the email from Tony Love to me dated July 12th,
6   2017.
7           (Thereupon, the document was marked as
8       Exhibit 6.)
9           BY MR. DWYER:
10      Q.  Let me know when you've had a chance to
11  review it to your satisfaction.
12      A.  Okay.  I've reviewed the first Tony Love
13  email, not the second.
14      Q.  Okay.  Can you identify the document in
15  front of you for the record?
16      A.  It's --
17          MR. GOHEEN:  No, he cannot identify it.
18      You can identify it.  He's not a party to the
19      document.  You can identify --
20          BY MR. DWYER:
21      Q.  Can you describe -- can you tell me what
22  you appear to be looking at?
23      A.  I'm looking at a document provided to me
24  that appears to be from Tony Love to you and
25  basically recapping what you've stated, that even to

Page 100

1   begin to extract this data, I've not talked with
2   anyone within Chico's FAS or White House or any
3   other entity of our company that previously would
4   have given me knowledge that might even be an
5   option.
6           It would appear that Tony has some type of
7   conversation there might be a window to try to
8   attack this, but would that surprise me based on
9   information I have, yes.
10      Q.  Do you have any reason to believe this
11  email is not authentic?
12          MR. GOHEEN:  Object to the form.  He's
13      never seen it before today.  He has no basis to
14      answer that question, no basis whatsoever.  If
15      you can provide a factual foundation for it,
16      maybe but other than that he has no way to
17      authenticate a document he's not party to.  Can
18      you?
19          BY MR. DWYER:
20      Q.  You can still answer my question.
21      A.  I mean, I'm speculating, but --
22          MR. GOHEEN:  Don't speculate.
23      A.  Well, I mean, well, my comment it appears
24  to be a legitimate email but I have no direct
25  knowledge it is.  I'm sure there's parties in here

25 (Pages 97 to 100)

1 that could confirm that it is.
2 BY MR. DWYER:
3 Q. Do you have any reason to believe the
4 factual statements made in the first, the top email
5 in this thread concerning the review are inaccurate?
6 MR. GOHEEN: Same question. If you know,
7 you can. I direct you not to speculate.
8 A. I have no basis to say if it's accurate or
9 inaccurate.
10 THE VIDEOGRAPHER: You're in the shot a
11 lot.
12 MR. GOHEEN: Move it over then.
13 BY MR. DWYER:
14 Q. Who -- if you wanted to attempt to verify
15 the truth of these statements, to whom would you
16 speak?
17 A. I would personally go back to Nancy
18 Holland and visit with her.
19 Q. Did you make any effort to verify the
20 representations that were made to you by counsel
21 that led to the statement in paragraph 15 with Nancy
22 Holland?
23 A. I didn't know these statements until
24 moments ago.
25 Q. No, I'm sorry. Going back to paragraph 15

1 in your declaration, did you make any effort to
2 verify those statements with Nancy Holland?
3 A. No. I did not.
4 Q. Did you make any efforts to verify those
5 statements with anyone?
6 A. Outside --
7 Q. Outside of counsel.
8 A. Outside of counsel I did not.
9 Q. Okay. Is there anyone other than Nancy
10 Holland whom you would have spoken to to verify the
11 statements in paragraph 15 of your declaration?
12 A. I would have to do some questioning, but
13 if there is I'd have to go determine who they are.
14 That's the person I would have -- you asked who I
15 would have gone to, I would have gone to Nancy.
16 Q. Is there anyone else at White House Black
17 Market who would have personal knowledge of the
18 subject of paragraph 15 in the declaration?
19 MR. GOHEEN: Object to the form. Calls
20 for speculation.
21 A. When you state White House Black Market,
22 White House Black Market, there's no one at White
23 House Black Market that would know that,
24 specifically.
25

1 BY MR. DWYER:
2 Q. Who at Chico's would have knowledge of the
3 subject of paragraph 15 of your declaration?
4 MR. GOHEEN: Same objection. Calls for
5 speculation.
6 A. It would be speculation but it would be
7 somebody at the corporate level if there is other
8 people.
9 BY MR. DWYER:
10 Q. But Nancy Holland, Nancy Holland would
11 have knowledge of the contents of paragraph 15; is
12 that accurate?
13 MR. GOHEEN: Object to the form.
14 A. I'd be speculating, but that's who I would
15 go to personally.
16 BY MR. DWYER:
17 Q. Do you have any personal knowledge of how
18 the search described in Mr. Love's email would take
19 place?
20 A. I have no personal knowledge.
21 Q. Who would you speak to to obtain that
22 knowledge?
23 A. I would talk with counsel.
24 Q. Anyone besides counsel to whom you would
25 speak to try to obtain that knowledge?

1 A. I'd start with counsel, always start with
2 counsel.
3 Q. Okay. Do you have any personal knowledge
4 as to whether there's a faster way to conduct a
5 review than the one described in Mr. Love's email?
6 A. I have no knowledge.
7 Q. To whom would you speak to obtain that
8 knowledge?
9 A. I would not speak to anyone. I would not
10 take that on as my responsibility. I would allow
11 counsel to basically address that. They could take
12 it up with others within the organization.
13 Q. All right. So you have -- withdrawn.
14 Have you ever personally operated a
15 point-of-sale system that White House Black Market
16 used in U.S. stores?
17 A. No.
18 Q. Did you help program the point-of-sale
19 system White House Black Market uses in its U.S.
20 stores?
21 A. No.
22 Q. Did you have any involvement how this
23 system is programmed?
24 A. No.
25 Q. Did you have any involvement -- do you

26 (Pages 101 to 104)

1  have any -- do you have any involvement how that
2  system operates?
3      A.  No.
4      Q.  Have you ever had involvement with how
5  that system operates?
6      A.  No.
7      Q.  Are you in charge of maintaining the data
8  generated by the operation of White House Black
9  Market point-of-sales system?
10     **A.  Maintaining the data, not within the four**
11  **walls.  I get the data, the output that goes into**
12  **the general ledger.  No is the response to the**
13  **question.**
14     Q.  Okay.  Do you know whether the system
15  prior to Fujitsu maintained email receipts?
16     **A.  Sitting here today I would be speculating**
17  **to respond to that.  I don't have any direct**
18  **knowledge right now.**
19     Q.  You do not.  Okay.  Do you know whether
20  the system prior to Fujitsu maintained data showing
21  that email receipts had been sent?
22     **A.  I have no direct knowledge.**
23     Q.  Do you know whether using the system prior
24  to the one, the current Fujitsu system, White House
25  Black Market had a way to determine which customers

1  on the list -- which customers it sold product to
2  received a hard copy receipt versus email receipt?
3      **A.  No.**
4      Q.  Setting aside the lack of knowledge of a
5  specific person, is there a department within
6  Chico's to which you would go to find -- to verify
7  the veracity of the statements in paragraph 15 of
8  your declaration?
9      **A.  You're asking if I were going to verify?**
10     Q.  Yeah, if you -- let me withdraw and
11  rephrase.
12         If you were going to go about verifying
13  the truthfulness of the statement in paragraph 15 of
14  your declaration, is there a department at Chico's
15  that you would go to to seek an answer for that?
16     **A.  As stated earlier, I would not undertake**
17  **that as part of my responsibility to go back and to**
18  **drill down into the IT point-of-sale area to**
19  **understand what is or what isn't available.  I'd**
20  **consult with counsel and they would direct that**
21  **action.  You're crossing an area outside my**
22  **responsibility.**
23     Q.  Similarly, if you look to verify the truth
24  or falsity of the statement of Mr. Love's email,
25  would you go -- is there a department at Chico's

1  that you would go to to verify that?
2      **A.  I would not go directly to anyone other**
3  **than general counsel, and counsel would, you know,**
4  **they -- I would assume, I'm assuming here that Tony**
5  **Love got from counsel who in turn has been**
6  **communicating with someone else in the organization.**
7         **Given the date, this is July 12th, that is**
8  **basically a month after my initial draft of this**
9  **declaration.  I would kick it back to counsel and I**
10  **would not be engaged.**
11     Q.  Do you recall how many drafts your
12  declaration went through?
13     **A.  I doubt if it went through more than two**
14  **at the most.**
15     Q.  So the initial draft you proposed and the
16  final draft.
17     **A.  The initial draft proposed, it was pretty**
18  **much that quick.  It was bam, bam, we knocked it out**
19  **and we were done.**
20     Q.  So just to be clear, you propose the
21  initial draft, second draft of the document is the
22  version that was submitted in this case; is that
23  accurate?
24     **A.  I doubt -- there likely -- I can't speak**
25  **to that complete recollection, but it was not more**

1  **than two drafts past my original draft.**
2      Q.  Okay.
3      **A.  Now, now, I did not sit down and, you**
4  **know, log drafts, but just the short timeframe that**
5  **was there I wrote something that was reformatted to**
6  **put bullet numbers by it as shown here and this kind**
7  **of became the draft.**
8         MR. DWYER:  Barry, I don't think we
9  actually -- I don't think any of the drafts of
10  the declaration have been produced.  I think
11  we'd like to request those as responsive to
12  whatever -- document's not in front of me.  I'm
13  fairly certain those were responsive to at
14  least one of them.
15        MR. GOHEEN:  If you can identify the
16  document request, we'll be happy to take it
17  under advisement.
18        MR. DWYER:  All right.  I'll get that to
19  you as soon as we are done here.
20  BY MR. DWYER:
21     Q.  Okay.  Let us now move back to
22  paragraph 14.  Do you recall whether this paragraph
23  was in the initial draft of the declaration?
24     **A.  It may not have been or it may have been.**
25  **I can tell you this comment.  My knowledge is the**

27 (Pages 105 to 108)

1  case comes from having accompanied my wife to White
2  House Black Market, Chico's.  I understand how our
3  system works in that regard.  I recognize that as an
4  option.
5        So I could have made this statement on my
6  own or could have incorporated the statement as a
7  result of input from counsel.  Specifically, my
8  involvement here was I received a request, I turned
9  something almost immediately because I didn't want
10  it to have a life of its own.  Turn it, close it
11  out, got it issued.
12        Counsel basically put in appropriate
13  format, made some edits and largely that became the
14  final draft.  My knowledge from this statement comes
15  from my own shopping experience with my wife at
16  White House Black Market, Chico's and Soma as well.
17  I'm certain it's something counsel also highlighted
18  to me as well, but it was something I previously
19  already new.  So I think I responded to your
20  question.
21        Q.  Did you conduct any factual investigation
22  to determine whether your understanding based on
23  your experience as someone who has shopped at
24  Chico's and White House Black Market was, in fact,
25  accurate?

1        A.  Well, based on my own personal experience
2  knowing what the system does, I believe what I see
3  in real life is accurate.
4        Q.  When is the last time you shopped at White
5  House Black Market?
6        A.  It would have been pre-June.
7        Q.  But sometime this year?
8        A.  I don't recall the specifics.
9        Q.  Was your -- did you -- what is the
10  timeframe being referred to in this paragraph?
11        A.  It's current.
12        Q.  Current.  Okay.  Does the paragraph -- so
13  the paragraph describes the current state of affairs
14  at White House Black Market; is that an accurate
15  statement?
16        A.  Yes.
17        Q.  So the paragraph is not intended to be
18  discussing the state of affairs in early 2015 of
19  White House Black Market?
20        A.  Well, the -- it's the current state of
21  affairs as it is today, as I understand them.  Early
22  2015 could have been pre-Fujitsu.  That could have
23  been the Epicor system.  I would need to go back and
24  look at what was occurring or somebody would need to
25  go back and look what was occurring under the Epicor

1  environment versus the Fujitsu environment.  That's
2  not my expertise.
3        Q.  Does your personal knowledge as a shopper
4  at White House Black Market extend to the period
5  during which the purchases that are the subject of
6  this litigation were made?
7        A.  I can tell you during that timeframe I'm
8  certain -- well, actually, I'm not certain.  I don't
9  know when I actually shopped during that timeframe.
10  I don't know if I have direct knowledge if my
11  statement is based on something that occurred during
12  that window, that brief window, that three months.
13  I can't speak to that.  I tell you that is the way
14  our system is as of today.
15        Q.  But you don't have personal knowledge
16  whether this was the state of affairs during the
17  period in which the members, the people of the class
18  made their purchase?
19        A.  I do not have direct knowledge that would
20  tell me that.  I believe that to be the case.  I
21  don't believe there's been a change there since day
22  one.  The same system was universally for Chico's
23  FAS.
24        Q.  Did you undertake any factual
25  investigation to verify that the statements in this

1  paragraph were equally true of the period in which
2  the members of the class made their purchases?
3        A.  No.
4        Q.  To whom would you have spoken to conduct
5  that investigation?
6        A.  Assuming I was going to make that
7  investigation, again, I would have gone back to --
8  in the context of this litigation I would have
9  started with counsel.  I personally would not have
10  done any additional research.  I can tell you my
11  direct knowledge how the system works is consistent
12  with this.  Comments made to me by counsel is
13  consistent with this.
14        But you would ultimately need to go back.
15  I assume counsel would go back and talk with someone
16  within our point-of-sale group team to confirm this
17  was factual, but at the same point in time if you
18  tomorrow went into a White House store, I think
19  you'd find this to be factual.
20        Q.  So I think -- what time is it now?  It's
21  12:20 your time.  I would like to take -- I think
22  I'm pretty close to done.  I'd like to go back
23  through my notes and just make sure I got everything
24  else.  Could we take a ten-minute break then
25  reconvene?

Page 113

1       MR. GOHEEN:  Of course.
2       THE VIDEOGRAPHER:  Now going off the
3   record at 12:21 p.m.
4       (Off the record.)
5       THE VIDEOGRAPHER:  We are now back on the
6   record in the deposition of David Oliver at
7   12:29 p.m.
8   BY MR. DWYER:
9       Q.  Thank you.  Okay.  Thank you for a few
10  more questions, and then we should be done,
11  hopefully.  Going back to your -- when we were
12  discussing paragraph 1 of your declaration, you
13  mentioned in your testimony with respect to the
14  initial decision to start using the Fujitsu system
15  that you were in those meetings.
16      Can you tell me what you provided in those
17  meetings?
18      **A.  I was a participant in terms of more of a**
19  **passive listener to the presentations made by the**
20  **vendors.**
21      Q.  So to your present recollection you had no
22  input in those --
23      **A.  I was not providing -- in terms of the**
24  **final decision, I was more informed versus**
25  **consulted.**

Page 114

1       Q.  And in terms of the meetings with Fujitsu
2   personnel, did you have any input in those meetings?
3       **A.  No.  There were probably, I don't know, 20**
4   **to 30 people in those meetings and I was just a**
5   **participant sitting there listening to the**
6   **presentation.**
7       Q.  Do you remember --
8       **A.  Listening to the presentation.**
9       Q.  To your present recollection you didn't
10  say anything in those meetings?
11      **A.  I was not someone asking questions or**
12  **making comment.**
13      Q.  Outside the context of those meetings, did
14  you provide any suggestions or advice to any people
15  who were the decision makers?
16      **A.  I don't recall making any comments in**
17  **terms of the decision-making process.  I was more**
18  **focused on check the box, will the system feed into**
19  **my ledger that I can record the information to my**
20  **accounting system.  That was my entire focus.**
21      Q.  Okay.  And around that time in the
22  deposition you made a reference to the IT group?
23      **A.  Yes.**
24      Q.  Can you -- who is -- what is the IT group?
25      **A.  Information technology, basically Nancy**

Page 115

1   **Holland falls under information technology**
2   **department.  You know, we have a -- our company has**
3   **a CIO, Chief Information Officer, and under her**
4   **pyramid is the point-of-sale and Nancy is down**
5   **probably, I don't know, at least two to three layers**
6   **in the organization.**
7       Q.  And the IT group is a part of Chico's; is
8   that correct?
9       **A.  Yes.  Part of the shared services.  So the**
10  **IT -- as part of shared service IT department we**
11  **have, the IT services the entire organization, all**
12  **brands.**
13      Q.  Their paychecks are cut by Chico's; is
14  that correct?
15      **A.  Yes.**
16      Q.  To your knowledge?
17      **A.  Yes.**
18      Q.  So I'm correct in understanding White
19  House Black Market does not have its own independent
20  IT people?
21      **A.  Correct.**
22      Q.  Okay.  So I know that I asked in the
23  beginning about -- at the beginning I asked you what
24  documents you reviewed in preparing your declaration
25  and I think that over the course of the deposition a

Page 116

1   few additional documents that weren't initially
2   discussed may have been mentioned.  So I just wanted
3   to ask again other than the things that have been
4   discussed so far, are there any additional documents
5   that you reviewed in preparing your deposition that
6   have not been mentioned so far in this deposition?
7       **A.  I'm not recalling any at this time.**
8       Q.  What documents did you review in preparing
9   for this deposition?
10      **A.  I looked at -- I would have referenced**
11  **back -- well, we went through that earlier in the**
12  **deposition.  Various documents that I, as a result**
13  **of my Google searches on companies --**
14      MR. GOHEEN:  He said deposition.
15      **A.  In preparing for this deposition.**
16      MR. GOHEEN:  Right.
17  BY MR. DWYER:
18      Q.  Yes.
19      **A.  Preparing for this deposition I went back**
20  **and read my declaration.  That was it.**
21      Q.  That was it?
22      **A.  That was it.**
23      Q.  You didn't look at any other documents to
24  prepare for your deposition?
25      **A.  No.**

29 (Pages 113 to 116)

Page 117

1    Q.  Other than reviewing the declaration?
2    **A.  This declaration was submitted.  I came in**
3    **here cold and I'm talking to you.  I did not review**
4    **any other documents.**
5        MR. DWYER:  Okay.  So that -- I think that
6    is it for questions for you, Mr. Oliver.
7    Barry, I just want to get on the record that
8    the documents, we think the draft -- the
9    document request, we think the drafts of
10   Mr. Oliver's declaration are responsive to our
11   Number 16, 18, 19, 25 and 31.
12       MR. GOHEEN:  So any of those actually
13   specifically request documents related to
14   Mr. Oliver or drafts of his declaration, that's
15   what you're saying?
16       MR. DWYER:  I don't think they
17   specifically name Mr. Oliver, but they are
18   Mr. Oliver's -- they are worded with sufficient
19   breadth that the draft of Mr. Oliver's
20   declaration would fall within the scope.  We
21   think they should be produced.
22       MR. FRIEDMAN:  What are they?  What are
23   those?
24       MR. DWYER:  All right.  Sixteen, all
25   documents pertaining to the software and

Page 118

1    equipment used to gather and store White House
2    Black Market customer information.
3        MR. GOHEEN:  Not close.
4        MR. DWYER:  Any time since May 16, 2010.
5    Including but not limited to a copy of each
6    contract governing the purchase, lease or use
7    of the software equipment and the user manuals
8    and other documents that identify the software
9    and equipment and discuss their capability,
10   operation, programming and maintenance.
11       MR. GOHEEN:  Nowhere close.  Try again.
12       MR. DWYER:  Well, I respectfully disagree
13   with you, Barry, but we don't have to have this
14   fight here.  All documents in 18:  All
15   documents that discuss or reveal White House
16   Black Market policy, practices or procedures
17   with respect to print accuracy for customers at
18   White House Black Market locations in the U.S.
19       Number 19:  All documents and files
20   maintained by you as far as fact compliance.
21   Point of sales hardware flash software,
22   procedures for handling and/or your procedures
23   for retaining customer data related to credit
24   and debit card transactions.
25       Number 25:  All documents Defendants plan

Page 119

1    to use for evidence, demonstrative, impeachment
2    or rebuttal purposes at any trial or other
3    proceeding in this lawsuit including but not
4    limited to any hearing concerning class
5    certification.
6        MR. GOHEEN:  Hold on.  You're saying we
7    would need to produce a draft of something that
8    actually was not final in response to 25,
9    something we might use in a hearing?  Come on.
10   Next?
11       MR. DWYER:  I will note I didn't get
12   responsive to 18 and 19 --
13       THE COURT REPORTER:  I can only get one
14   speaking at a time.
15       MR. GOHEEN:  You did get a response.  I
16   said no to each of those.  None of those are
17   remotely responsive even if they were
18   responsive.  I can't manage they would be
19   privileged, so they're not going to be produced
20   but if you want to --
21       MR. DWYER:  Disagreement on this we can
22   take to court.
23       MR. GOHEEN:  If you really want to go to
24   the court on a draft declaration, you just go
25   right ahead.

Page 120

1        MR. DWYER:  Well, do you want me to read
2    31 into the record?
3        MR. GOHEEN:  Please do.  Yes.
4        MR. DWYER:  Thirty-one:  All other
5    documents not requested above that contain
6    information responsive to Plaintiffs'
7    interrogatories and other information relevant
8    to this matter.
9        MR. GOHEEN:  Yeah, that's not happening.
10       MR. DWYER:  That's that.  The other
11   outstanding issue is that I was trying to get
12   through this expeditiously to get you home,
13   Barry, we obviously take issue with a large
14   number of the privilege objections you made in
15   this deposition.
16       We are giving consideration to raise that
17   issue to the court.  We think a number of the
18   objections you raised aren't actually
19   appropriate privilege objections.  We think
20   Mr. Oliver should be compelled to offer
21   testimony in those subjects.
22       MR. GOHEEN:  What are those?
23       MR. DWYER:  Sorry?
24       MR. GOHEEN:  What are those?
25       MR. DWYER:  What?  For example, every time

30 (Pages 117 to 120)

Page 121

1   you directed him not to answer about the
2   information you provided to him or the basis
3   for how certain statements got in the
4   declaration.  I think those are all not
5   appropriate implications of either
6   attorney-client privilege or the work product
7   doctrine.
8       MR. GOHEEN:  I didn't direct him not to
9   answer.
10      MR. DWYER:  You had --
11      MR. GOHEEN:  There were only two times.
12      THE COURT REPORTER:  I can only get one at
13  a time.
14      MR. GOHEEN:  I'm the one here.  I'm the
15  one that is going to talk.  There were only two
16  times I directed him not to answer.  I gave an
17  instruction and said don't reveal
18  attorney-client communication.  He followed the
19  instruction.  I think there were maybe only two
20  times I said don't answer the question.  So I
21  don't know what you're talking about.
22      MR. DWYER:  All right.  Well, we can hash
23  that out again in front of the court.
24      MR. GOHEEN:  No, we won't.
25      MR. DWYER:  -- lengthy prelude it is my

Page 122

1   intention to suspend not close this deposition.
2   We're obviously well under seven hours.  If in
3   fact we prevail on some privilege issues, I'd
4   like to get Mr. Oliver back to question him on
5   those subjects.  I just want to advise you of
6   that fact.
7       MR. GOHEEN:  Thank you for the advice.
8   Let me make my own statement for the record:
9   Are you saying you have completed your
10  examination of Mr. Oliver with the exception of
11  those very, very few, which I think to be not
12  more than two or three questions where he was
13  instructed not to answer; is that correct?
14      MR. DWYER:  I'm not saying that.  I'm
15  saying that I think there are bona fide dispute
16  about the scope of the attorney-client
17  privilege and about what subject he should or
18  should not answer.
19      I don't think the fact -- whether or not
20  you use the magic words I direct you not to
21  answer is not controlling as to which subject I
22  intend to reserve the right to redepose him on.
23  You obviously if you want to object again in
24  any subsequent deposition we can do that, go
25  back to the court again if we have to, et

Page 123

1   cetera.
2       In federal rules, I get seven hours.  I
3   deposed this gentleman for less than three.  So
4   we have plenty of time left and I'm simply
5   saying I reserve the right after we hash it out
6   in front of the court about the scope of the
7   privilege, what you can and cannot instruct him
8   not to say on that basis, I reserve the right
9   if you think it's appropriate to schedule him
10  up for the second half of this deposition.
11      I want to do that in a way that's
12  convenient for everyone, including Mr. Oliver
13  in particular.  But I don't want there to be
14  any confusion later about what we do or do not
15  intend to do and where things currently stand.
16  Again, if you don't think that's appropriate,
17  we can fight about that in front of the court.
18      MR. GOHEEN:  I can tell you're very -- you
19  have a great affinity for going to court.  I
20  get it.  My question was a simple one, other
21  than privilege issues you've raised are you
22  done with your examination of Mr. Oliver, yes
23  or no.  It's that simple, yes or no.
24      MR. DWYER:  Based on my current
25  understanding of the facts and the obvious

Page 124

1   caveat there is a -- there are a lot of
2   documents your client didn't get produced
3   including the draft of Mr. Oliver's
4   declaration.
5       MR. GOHEEN:  Which you're not going to
6   get.
7       MR. DWYER:  I'm not presently aware of any
8   additional subjects on which I'd like to depose
9   Mr. Oliver, other than the materials in which
10  he did not answer or gave answers because of
11  your privilege instruction.
12      MR. GOHEEN:  Thank you.
13      MR. DWYER:  But obviously when you produce
14  documents to us and we get Mr. Oliver's
15  declaration --
16      MR. GOHEEN:  You're not going to get them.
17  Okay.  You're not going to get the draft
18  declaration.  So just stop it.  Okay.  It's a
19  draft.  It's not relevant to any issue in the
20  case.  Those are not produced routinely.  You
21  know that.  I don't want to hear draft
22  declaration again.
23      Now, let me say a couple things on the
24  record.  First, we asked this be moved up from
25  10:00 to 9:00.  You refused to do that.  It was

31 (Pages 121 to 124)

Page 125

1   at 9:30.  I told you we could go to 1:15.  You
2   stopped at 12:30, so all this gibberish about
3   you got seven hours is completely a red
4   herring.
5        You could have started earlier.  You could
6   have kept going and you chose not to.  That's
7   why I asked the question I just asked.  There's
8   no way in the world you could have seven hours
9   of questions off four -- off three-page
10  declaration in one exhibit.
11       I didn't even take seven hours with your
12  quote, unquote, expert, using air quotes, when
13  he had 60 pages of material.  You're not going
14  to be rewarded for your own inefficiency there.
15  So are we done?
16       MR. DWYER:  We can be done.
17       MR. GOHEEN:  The deposition is concluded.
18       MR. DWYER:  The deposition is suspended.
19       THE VIDEOGRAPHER:  The deposition is
20  concluded at 12:42 p.m.
21       (Thereupon, the proceedings concluded at
22  12:42 p.m.)
23
24
25

Page 126

1
2
3            CERTIFICATE OF OATH
4
5
6   STATE OF FLORIDA
7   COUNTY OF LEE
8
9
10       I, the undersigned authority, certify
11  that DAVID M. OLIVER personally appeared before
12  me and was duly sworn on the 20th day of July,
13  2017.
14       Signed this 25th day of July, 2017.
15
16
17       _____
18       AMORY RANCK, FPR
         Notary Public, State of Florida
         My Commission No. FF175118
19       Expires: 11/09/18
20
21
22
23
24
25

Page 127

1            CERTIFICATE OF REPORTER
2
3   STATE OF FLORIDA
4   COUNTY OF LEE
5
6        I, AMORY RANCK, Florida Professional
7   Reporter, do hereby certify that I was authorized
8   to and did stenographically report the foregoing
9   videotape deposition of DAVID M. OLIVER; that a
10  review of the transcript was requested; and that
11  the transcript is a true record of my
12  stenographic notes.
13       I FURTHER CERTIFY that I am not a
14  relative, employee, attorney, or counsel of any
15  of the parties, nor am I a relative or employee
16  of any of the parties' attorneys or counsel
17  connected with the action, nor am I financially
18  interested in the action.
19       Dated this 20th day of July, 2017.
20
21       _____
         AMORY RANCK, FPR
22
23
24
25

Page 128

1            ERRATA SHEET
2   DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
3   In Re:  ALTMAN V. WHITE HOUSE BLACK MARKET, ET AL.
         Case No.:  1:15-CV-02451-SCJ-CMS
4            DAVID M. OLIVER
             July 20, 2017
5
6   PAGE  LINE      CHANGE            REASON
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  Under penalties of perjury, I declare that I have
    read the foregoing document and that the facts
22  stated in it are true.
23  _____      _____
24  Date            DAVID M. OLIVER
25

32 (Pages 125 to 128)

## Dwyer, Angus

| | |
|---|---|
| **From:** | Love, Tony <TLove@KSLAW.com> |
| **Sent:** | Wednesday, July 12, 2017 4:37 PM |
| **To:** | Dwyer, Angus; Goheen, Barry |
| **Cc:** | Lamer, Bryant; mhilicki@keoghlaw.com; keith@keoghlaw.com; Vile, Leah |
| **Subject:** | RE: Altman v WHBM - Deposition Notice for David M. Oliver |

Angus:  we have consulted with the client on this issue further.  WHBM states that it would need to take three of its very busy employees off of their regular job assignments on a half-time basis for 6 to 8 weeks even begin to extract this data.  Even then, there is no guarantee that the data would be completely accurate.  Given this fact, it is WHBM's position that the request is unduly burdensome and disproportionate to the needs of the case.


Tony Love
King & Spalding LLP
1180 Peachtree Street
Atlanta, Georgia  30309
(404) 215-5913 (phone)
(404) 572-5100 (fax)

**From:** Dwyer, Angus [mailto:adwyer@spencerfane.com]
**Sent:** Wednesday, July 12, 2017 4:59 PM
**To:** Love, Tony; Goheen, Barry
**Cc:** Lamer, Bryant; mhilicki@keoghlaw.com; keith@keoghlaw.com; Vile, Leah
**Subject:** RE: Altman v WHBM - Deposition Notice for David M. Oliver

Tony and Barry:

It has now been two weeks.  Can you please respond to my query regarding production of e-mailed receipts?

Similarly, both your opposition brief and Mr. Oliver's declaration contain references to e-mailed receipts.  If any receipts were in fact e-mailed, then those e-mails presumably exist on a server somewhere, assuming they have not been spoliated.  At a minimum, there must be some kind of data confirming that such e-mails were actually sent and to what e-mail address.  Such materials would be responsive to, *inter alia*, Plaintiff's Document Requests Nos. 2, 3, 6, 23 and 31.  Please produce them as soon as possible and, in any event, by not later than July 7.


Best,
Angus


**Angus Dwyer**  Attorney at Law
Spencer Fane LLP

1000 Walnut, Suite 1400 | Kansas City, MO
64106
**O** 816.292.8338
adwyer@spencerfane.com |
spencerfane.com


**From:** Dwyer, Angus
**Sent:** Thursday, July 6, 2017 3:33 PM
**To:** 'Love, Tony'; 'Goheen, Barry'

1



**Cc:** Lamer, Bryant; 'mhilicki@keoghlaw.com'; 'keith@keoghlaw.com'; Vile, Leah
**Subject:** RE: Altman v WHBM - Deposition Notice for David M. Oliver

Any word on the e-mailed receipts?

Also: do we have a location for Mr. Oliver's deposition?  I'd like to get a court reporter lined up and start coordinating with the technical staff at the site.

Best,
Angus

**Angus Dwyer**  Attorney at Law
Spencer Fane LLP

1000 Walnut, Suite 1240 | Kansas City, MO 64106
**O** 816.292.8338
adwyer@spencerfane.com |
spencerfane.com

**From:** Dwyer, Angus
**Sent:** Wednesday, July 5, 2017 3:14 PM
**To:** 'Love, Tony'; Goheen, Barry
**Cc:** Lamer, Bryant; mhilicki@keoghlaw.com; keith@keoghlaw.com; Vile, Leah
**Subject:** RE: Altman v WHBM - Deposition Notice for David M. Oliver

Tony:

Now that we've resolved the issue of Mr. Oliver's deposition, I'd like to return to the second subject of my initial e-mail, relating to the production of e-mails documenting e-mailed receipts.  When can we expect to receive those?

Best,
Angus

**Angus Dwyer**  Attorney at Law
Spencer Fane LLP

1000 Walnut, Suite 1240 | Kansas City, MO 64106
**O** 816.292.8338
adwyer@spencerfane.com |
spencerfane.com

**From:** Love, Tony [mailto:TLove@KSLAW.com]
**Sent:** Friday, June 30, 2017 12:37 PM
**To:** Dwyer, Angus; Goheen, Barry
**Cc:** Lamer, Bryant; mhilicki@keoghlaw.com; keith@keoghlaw.com; Vile, Leah
**Subject:** RE: Altman v WHBM - Deposition Notice for David M. Oliver

Yes

Tony Love
King & Spalding LLP
1180 Peachtree Street
Atlanta, Georgia  30309

(404) 215-5913 (phone)
(404) 572-5100 (fax)

**From:** Dwyer, Angus [mailto:adwyer@spencerfane.com]
**Sent:** Friday, June 30, 2017 1:36 PM
**To:** Love, Tony; Goheen, Barry
**Cc:** Lamer, Bryant; mhilicki@keoghlaw.com; keith@keoghlaw.com; Vile, Leah
**Subject:** RE: Altman v WHBM - Deposition Notice for David M. Oliver

Can I represent to the court that you would be willing to consent to an additional two-days on our end – i.e., an 8/3 deadline for our reply?

**Angus Dwyer**  Attorney at Law
Spencer Fane LLP

1000 Walnut, Suite 1400 | Kansas City, MO 64106
**O** 816.292.8338
adwyer@spencerfane.com |
spencerfane.com

> **From:** Love, Tony [mailto:TLove@KSLAW.com]
> **Sent:** Friday, June 30, 2017 12:34 PM
> **To:** Dwyer, Angus; Goheen, Barry
> **Cc:** Lamer, Bryant; mhilicki@keoghlaw.com; keith@keoghlaw.com; Vile, Leah
> **Subject:** RE: Altman v WHBM - Deposition Notice for David M. Oliver
>
> Angus:  we will actually need to move the depo to July 20.  Apologies for the change, but wanted to let you know in case you need to include with your conversation with the court about moving the reply deadline.
>
> Thanks,
>
> Tony Love
> King & Spalding LLP
> 1180 Peachtree Street
> Atlanta, Georgia  30309
> (404) 215-5913 (phone)
> (404) 572-5100 (fax)

> **From:** Dwyer, Angus [mailto:adwyer@spencerfane.com]
> **Sent:** Thursday, June 29, 2017 12:30 PM
> **To:** Love, Tony; Goheen, Barry
> **Cc:** Lamer, Bryant; mhilicki@keoghlaw.com; keith@keoghlaw.com; Vile, Leah
> **Subject:** RE: Altman v WHBM - Deposition Notice for David M. Oliver
>
> Tony:
>
> A deposition on July 18 is too close to our July 21 briefing deadline, but we will accommodate you if WHBM agrees to move our class cert reply deadline to August 1 and the Court allows it.  Let me know if you will agree to the move and I will check with the Court to see if the proposed new reply deadline is acceptable.
>
> Best,
> Angus
>
> **Angus Dwyer**  Attorney at Law
> Spencer Fane LLP

3

1000 Walnut, Suite 1400 | Kansas City, MO
64106
**O** 816.292.8338
adwyer@spencerfane.com |
spencerfane.com

**From:** Love, Tony [mailto:TLove@KSLAW.com]
**Sent:** Thursday, June 29, 2017 9:54 AM
**To:** Dwyer, Angus; Goheen, Barry
**Cc:** Lamer, Bryant; mhilicki@keoghlaw.com; keith@keoghlaw.com; Vile, Leah
**Subject:** RE: Altman v WHBM - Deposition Notice for David M. Oliver

Angus:  the earliest Mr. Oliver is available is 7/18.  We will make him available in Ft.
Myers, FL, beginning at 9:30 a.m. EST.  We are working on the location and will follow
up with that.

Thanks,

Tony Love
King & Spalding LLP
1180 Peachtree Street
Atlanta, Georgia  30309
(404) 215-5913 (phone)
(404) 572-5100 (fax)

**From:** Dwyer, Angus [mailto:adwyer@spencerfane.com]
**Sent:** Wednesday, June 28, 2017 12:00 AM
**To:** Goheen, Barry; Love, Tony
**Cc:** Lamer, Bryant; mhilicki@keoghlaw.com; keith@keoghlaw.com; Vile, Leah
**Subject:** Altman v WHBM - Deposition Notice for David M. Oliver

Gentlemen:

Attached please find a deposition notice for David M. Oliver.  Since he was not
previously identified as a person having relevant knowledge on either your Rule 26
disclosures or your interrogatory responses, we did not realize we needed to take his
deposition until you submitted your opposition to the class certification motion.  I have
the deposition set for the offices of our local counsel but, if you prefer, we can do it at
your offices instead or at some other location of your preference.  I will be participating
by telephone.  The deposition should only take a few hours.  If you have a reasonable
alternative date besides July 7 that you want to propose I am happy to entertain it but
we feel strongly that this deposition should happen in the relatively near future.

Similarly, both your opposition brief and Mr. Oliver's declaration contain references to
e-mailed receipts.  If any receipts were in fact e-mailed, then those e-mails presumably
exist on a server somewhere, assuming they have not been spoliated.  At a minimum,
there must be some kind of data confirming that such e-mails were actually sent and to
what e-mail address.  Such materials would be responsive to, *inter alia*, Plaintiff's
Document Requests Nos. 2, 3, 6, 23 and 31.  Please produce them as soon as possible
and, in any event, by no later than July 7.

Best,
Angus

**Angus Dwyer** Attorney at Law
Spencer Fane LLP

1000 Walnut, Suite 1400 |
Kansas City, MO 64106
**O** 816.292.8338
adwyer@spencerfane.com
| spencerfane.com

King & Spalding Confidentiality Notice:

This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message.