IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JILL ALTMAN, *individually and on behalf of a class*,

      Plaintiff,

v.

WHITE HOUSE BLACK MARKET, INC., and DOES 1-10,

      Defendants.

CIVIL ACTION FILE NO.

1:15-cv-2451-SCJ-JKL

## ORDER AND NON-FINAL REPORT AND RECOMMENDATION

This is a putative class action arising under the Fair and Accurate Credit Transactions Act ("FACTA"), 15 U.S.C. § 1681c(g), an amendment to the Fair Credit Reporting Act ("FCRA"). Plaintiff Jill Altman contends that Defendant White House Black Market, Inc. ("WHBM"), a national clothing retailer, violated FACTA by printing more than the last five digits of her credit card number on a store receipt. The case is before the Court on Altman's Motion for Class Certification [Doc. 63], in which she seeks to certify a class of persons who also received receipts that failed to truncate debit and credit card numbers, [Docs. 63-1,

64]. WHBM has filed a brief in opposition to the motion [Doc. 73, 74], and Altman has filed a reply [Doc. 79, 80]. Also pending before the Court is WHBM's Motion for Leave to File Surreply in Opposition to Plaintiff's Motion for Class Certification. [Doc. 86.] Altman opposes that motion [Doc. 92], and WHBM has filed a reply in support of its motion [Doc. 93].

The foregoing motions are now ripe for adjudication. For the reasons that follow, it is **RECOMMENDED** that Altman's motion for class certification be **GRANTED**. It is also **ORDERED** that WHBM's motion for leave to file a surreply brief be **GRANTED** and that Altman's motion for leave to file a post-hearing brief [Doc. 104] be **DENIED**.[1]

## I.   BACKGROUND

FACTA prohibits merchants from printing more than the last five digits of credit and debit card numbers on any receipt provided to the cardholder at the point of sale or transaction. 15 U.S.C. § 1681c(g)(1). FACTA imposes civil liability for willful noncompliance under a provision of the FCRA, 15 U.S.C. § 1681n, which governs liability for FACTA violations. That provision states:

---

[1] In the Court's view, the issue that Altman wishes to address in her proposed post-hearing brief does not require any further briefing.

2

> Any person who willfully fails to comply with any
> requirement imposed under this subchapter with respect
> to any consumer is liable to that consumer in an amount
> equal to the sum of . . . any actual damages sustained by
> the consumer as a result of the failure or damages of not
> less than $100 and not more than $1,000.

15 U.S.C. § 1681n(a)(1)(A). Prevailing parties are also entitled to recover attorney

fees and costs and may also be awarded punitive damages. *Id.* § 1681n(a)(2)-(3).

WHBM is a women's apparel retailer. (Decl. of David M. Oliver [Doc. 74-2] ¶ 3.) In 2013, it expanded internationally with the opening of a store in Toronto, Ontario. (*Id.* ¶ 4.) It presently operates 434 boutiques and 72 outlets and employs over 6,800 associates throughout the United States, Canada, Puerto Rico, and the U.S. Virgin Islands. (*Id.* ¶ 6.)

In 2014, WHBM implemented a new point-of-sale ("POS") system in its Canadian stores. [Doc. 64-1 at 7.[2]] The system was configured to print the first six and last four digits of a customer's full credit card number on receipts in compliance with Canadian law. In 2015, WHBM began to roll out the POS system,

---

[2] In this Order and Report and Recommendation, I refer to information that the parties believe to be confidential and have filed under seal. I do not find, however, that the information I cite within this Order and Report and Recommendation must be sealed, notwithstanding the parties' confidentiality designations.

3

now called "CHARM," in the United States.  According to WHBM, early in the planning process it asked its third-party vendor to modify the receipt-printing format to display only the last four digits of a customer's credit or debit card number.  The vendor conducted numerous tests to confirm compliance with the truncation requirements.  [*Id.*]  Following the tests, the vendor delivered the software code to WHBM; however, when CHARM went live, receipts displayed the first six and last four digits of account numbers.  [*Id.* at 8.]  WHBM admits that during a part of 2015, the software or equipment used to generate POS transaction receipts for customers at its stores in the United States was inadvertently set or programmed to print more than five digits of a customer's credit or debit card number.  [Doc. 63-6 at 19-20; Doc. 64-1 at 7-8.]

On May 16, 2015, Altman used a credit card to make a purchase at a WHBM boutique in Atlanta, Georgia.  (Dep. of Jill Altman [Doc. 63-10] at 44-45.)  The receipt she received contained the first six and last four digits of her credit card number.  (*Id.* at 63.)  On July 8, 2015, Altman filed this lawsuit against WHBM. [Doc. 1.]  On July 13, 2015, WHBM received a courtesy copy of the complaint in this case.  [Doc. 64-1 at 8.]  It immediately contacted its vendor, which modified the POS system to display appropriate truncation for WHBM's U.S. stores within

four business days.  [*Id.*]  According to records that WHBM has produced in discovery, approximately 360,000 receipts were printed at WHBM stores from March 23, 2015, through July 17, 2015 that displayed the first six digits of card numbers in addition to the final four.  [Doc. 64-1 at 5; 64-2 at 6.]

Altman alleges in her complaint that WHBM willfully violated FACTA because it persisted in providing improperly truncated printed receipts to customers at its stores despite knowing and repeatedly being informed about FACTA's truncated receipt requirement.  [Doc. 1 at 5-11.]  She does not allege that she suffered any actual damages as a result of the violation.  (Altman Dep. at 109.) Altman also seeks punitive damages, attorney fees and costs.  [Doc. 1 at 13-14.]

On September 9, 2015, WHBM moved to dismiss the complaint, arguing that Altman failed to establish Article III standing.  [Docs. 13, 13-1.]  The motion was denied in an Order dated July 13, 2016.  [Doc. 28.]

On May 10, 2017, Altman moved for certification of the following class:

> (i) All individuals in the U.S. whose debit or credit card, according to WHBM's records, (ii) was used in a transaction at a WHBM U.S. store operating the CHARM system (iii) that was programmed to print the first six and last four digits of the debit or credit card account number on the customer transaction receipt printed at the point of sale for the transaction, ([iv]) between March 23, 2015 and July 17, 2015.

5

[Doc. 63-1 at 10; Doc. 64 at 10.]   As noted above, WHBM opposes class certification.  On October 20, 2017, I held oral argument on the motion for class certification.  [Doc. 103.]  Altman has filed a motion for leave to file a post-hearing brief.  [Doc. 104.]

## II.   CLASS CERTIFICATION STANDARD

Class actions are an exception to the "constitutional tradition of individual litigation." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016).   The party seeking class certification bears the burden to show by a preponderance of the evidence that the requirements of Federal Rule of Civil Procedure 23 are met.  *Id.*  "A district court that has doubts about whether the requirements of Rule 23 have been met should refuse certification until they have been met."  *Id*. at 1233-34.

"Before a district court may grant a motion for class certification, a plaintiff seeking to represent a proposed class must establish that the proposed class is adequately defined and clearly ascertainable."  *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (quotation omitted).  Once that threshold showing has been made, the plaintiff must then prove under Rule 23(a) that (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions

of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 678 (N.D. Ga. 2016). In addition, she must prove that she meets one of the three requirements listed in Rule 23(b).  *Id.*  Altman seeks class certification under Rule 23(b)(3), [Doc. 63-1 at 11-12, 19-24; Doc. 64 at 11-12, 19-24]; thus, she must prove (1) that questions of law or fact common to class members predominate over any questions affecting only individual members; and (2) that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  *See id.* at 678-79.

## III.   LEGAL ANALYSIS

### A.   Ascertainability

"In order to establish ascertainability, the plaintiff must propose an administratively feasible method by which class members can be identified." *Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 947 (11th Cir. 2015).  A method is "administratively feasible" where "it is a manageable process that does not require much, if any, individual inquiry."  *Id.* at 946 (quoting *Bussey v. Macon Cty. Greyhound Park, Inc.*, 562 F. App'x 782 (11th Cir. 2014)).  A plaintiff cannot carry her burden of establishing ascertainability simply by asserting that class members

7

can be identified using the defendant's records; rather, "the plaintiff must also establish that the records are in fact useful for identification purposes, and that identification will be administratively feasible." *Id.* at 948.  In addition, a plaintiff generally cannot meet the ascertainability requirement by proposing that putative class members identify themselves, unless the plaintiff can show that it would be "administratively feasible and not otherwise problematic." *Id.*

Altman summarily argues that the proposed class is ascertainable because membership is based on electronically recorded store transaction data that purport to show the affected transactions and the customer names and addresses.  [Doc. 64 at 11.]  Thus, she contends, no significant individual inquiry is required.  [*Id.*]

WHBM does not dispute that the transaction data can be used to identify customer names, addresses, and card numbers.  It instead asserts that the transaction records are not sufficient because it "defies logic to assume" that every transaction was effected using a personal credit card and not a business card.[3]  [Doc. 73 at 11;

---

[3] WHBM also argued that the truncation requirement does not apply to emailed receipts, and WHBM's transaction data does not keep track of whether a customer received an email receipt, a hard copy receipt, or both.  Accordingly, individual proof will be necessary to determine class membership.  [Doc. 73 at 11-13; Doc. 74 at 11-13.]  WHBM later withdrew that argument.  [*See* Doc. 91]  Accordingly, I will not address that argument.

Doc. 74 at 11.]  WHBM contends FACTA applies only to consumer transactions, and not business transactions; therefore, each proposed member of the class will have to demonstrate that he or she is a consumer.  [*Id.*]  Such an individualized inquiry, WHBM maintains, precludes a finding of ascertainability.

Altman replies that WHBM's concern about business transactions is a non-issue because FACTA in fact applies to both business and consumer cards, and the class is not limited to consumer transactions, and, thus, there is no need to differentiate between consumer and business transactions.  [Doc. 79 at 4-5; Doc. 80 at 4-5.]  She alternatively argues that if FACTA exempts business transactions, any transaction using business cards can be culled out.  [Doc. 79 at 5-6; Doc. 80 at 5-6.]  She specifically relies on a portion of her putative expert Don Coker's report where he identifies possible methods of differentiating between consumer and business cards.  [Doc. 79 at 5-6; Doc. 80 at 5-6.]  Finally, she contends that WHBM's argument is based on speculation, especially since WHBM sells personal clothing and has not identified any business transactions.  [Doc. 79 at 6; Doc. 80 at 6.]

As a threshold matter, I agree that transactions by business entities are not actionable under the FCRA.  The right to sue for a violation of FACTA's truncation

requirement is set out in 15 U.S.C. § 1681n(a), which pertinently provides, "[a]ny person who willfully fails to comply with any requirement imposed under this subchapter with respect to any **consumer** is liable to that **consumer** . . . ." (emphasis added).  FACTA defines the term "consumer" to mean "an individual."  15 U.S.C. § 1681a(c).  Thus, only individual consumers, and not business entity customers, may obtain relief for violations of FACTA.  *See Keller v. Macon Cty. Greyhound Park, Inc.*, No. 3:07-CV-1098-WKW, 2011 WL 1085976, at *7 (M.D. Ala. Mar. 24, 2011) ("Although the FACTA does not limit the violation to consumers or individuals, the FCRA, through which FACTA violations are prosecuted, plainly does."); *see also Ticknor v. Rouse's Enters., LLC*, Nos. 12-1151, 12-2964, 2014 WL 1764738, at *1 (E.D. La. May 2, 2014), *aff'd*, 592 F. App'x 276 (5th Cir. 2014); *Rowden v. Pac. Parking Sys., Inc.*, 282 F.R.D. 581, 585 (C.D. Cal. 2012); *Friedman-Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 156 (S.D.N.Y. 2010).

Having concluded that transactions using business cards are not actionable, the next issue is whether the possibility that business entities made some of the transactions at issue rather than consumers means that the class is not ascertainable. Altman's position that individuals made most transactions at WHBM during the

10

class period has common-sense appeal, as WHBM is a retailer of consumer clothing. But keeping in mind the Eleventh Circuit's admonition that that there is no presumption in favor of class certification and that the party seeking to certify the class has the burden of establishing the requirements for class certification, I cannot assume that every transaction—or even the vast majority of them—were made by individuals. *See Brown,* 817 F.3d at 1233-34; *accord Ticknor*, 2014 WL 1764738, at *10 (declining to assume that transactions involving business cards were "rare" and stating that the court would not "substitute a mere inference" for plaintiffs' burden of proof). Thus, I assume for purposes of class certification that a material number of transactions were made using non-personal credit and debit cards, and that to show ascertainability of the class, Altman must show that there is a workable method to differentiate those transactions from individuals' cards.

Altman argues that that she can make this showing and cites the report of her putative expert, Don Coker, who describes in detail how he can do so. [*See* Doc. 79-4 at 4, 20-22.] Coker explains in his report that business and commercial cards have different Bank Identification Numbers ("BIN")[4] from consumer or personal

---

[4] The BIN is the first six digits of a credit or debit card number and represents (1) the issuing bank; (2) the brand of the card, (3) whether the card is a consumer or commercial card, and (4) whether it is a credit or debit card. [Doc. 79-4 at 21.]

cards, and those numbers can be cross-referenced with publicly available information to determine whether a particular card is a consumer or business card. [*Id.* at 21-22.]

WHBM objects to the Court considering Coker's report in connection with the motion for class certification because Coker testified at his deposition that he had not been asked to render an opinion "that would bear on the question . . . as to whether a class should be certified in this case." [Doc. 86-1 at 2-3.] WHBM also asserts that Coker is giving a "new opinion[]" and that if the Court is willing to consider his "opinion," then the Court should give WHBM an opportunity to re-depose Coker and defer ruling on class certification. [*Id.* at 3.]

WHBM's objections to the Court's consideration of Coker's report are without merit. First, WHBM has provided only a limited portion of the Coker deposition transcript that appears to exclude important context. It appears that Coker was asked whether he would give an opinion about, or whether he thought, that the class should be certified in this case. [*See* Doc. 86-1, Ex. 1.] He answered, "I don't know that I've been asked that. I don't think I mentioned that in my -- in my four things at the beginning that I said I was giving opinions on, but certainly – I mean, I certainly could." WHBM's counsel said, "Fair enough. As we sit here

12

today, you've not been asked to render any opinions that would bear on the question, at least as you understand it, as to whether a class should be [c]ertified in this case; is that correct?"  Coker answered, "Right, I've not been asked to do anything on certifying the class, but I certainly could."  [*Id.*]

Although I cannot read Coker's answers in their full context, the best reading of his testimony is that he stated that he was not offering an opinion about the legal question of class certification.  And nor could he, as that is a determination for the Court to make.  It is clear that he is instead offering an explanation about how business cards can be separated from personal cards, which bears on issues relevant to class certification.  [*See* Doc. 79-4 at 21-22, ¶¶ 45-47.]  Neither Coker nor Altman represented that Coker's opinions or statements would not be used to support a motion for class certification; thus, there is nothing improper about Altman citing Coker's report at this stage of the proceedings.  Likewise, WHBM is wrong to assert that Coker is giving a "new opinion" and that it should be given leave to re-depose Coker before this Court rules on class certification.  Indeed, I am not convinced that Coker's description about how one can differentiate personal from business cards qualifies as an "opinion."  Rather, he simply explains in detail

13

the ways in which one can determine which cards are personal in nature, and which are not.

Although WHBM's objections do not carry the day, it remains a close call as to whether Altman has met her burden to show that it is administratively feasible to differentiate between types of cards. Coker has identified a way of determining whether a card is a business/commercial card based just on the BIN, but he has not attempted *in this case* to differentiate between consumer and business cards based on the information that WHBM has produced. As a result, for the Court to conclude that Coker has established that the business card transactions can easily be culled out, the Court must infer from Coker's report that a workable methodology exists to identify class members based on the information produced in this case.

I find that Altman has met her burden, albeit just barely. Altman is in possession of credit card information corresponding to each transaction at issue in this case, and I am persuaded that there are workable methods for distinguishing between personal and business cards using his stated methodologies. WHBM has produced the BIN for each transaction in this case, so Altman possesses the information she needs to determine whether particular cards are business cards or consumer cards. If it turns out that Coker is wrong and transactions involving

14

business cards cannot easily be differentiated from personal cards in this case, then the Court may reevaluate the propriety of class certification. *See Shin v. Cobb Cty. Bd. of Educ.*, 248 F.3d 1061, 1064 (11th Cir. 2001) (citing *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983) ("The district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts.")).  But at this point, I am satisfied that Altman has carried her burden of proof as to ascertainability.

### B.    Rule 23(a) Requirements

Having concluded that Altman has met the ascertainability requirement, I next consider the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a).

#### 1.    Numerosity (Rule 23(a)(1))

Under Rule 23(a), a plaintiff must establish that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  WHBM does not dispute that the numerosity requirement is satisfied here.  [Doc. 73 at 14 n.3; Doc. 74 at 14 n.3.]  I conclude that Altman has met her burden.  Specifically, Altman has come forward with evidence indicating that there are over 360,000 transactions across 318 stores where WHBM allegedly printed a transaction receipt revealing the first six and last four digits of the card used in the transaction.  [Doc.

15

64 at 13.]  Joinder of all those individuals in a single action would obviously be impracticable.  Accordingly, Altman has established the numerosity requirement.

## 2.      Commonality (Rule 23(a)(2))

The commonality requirement of Rule 23(a) requires that there be "questions of law of fact common to the class."  Fed. R. Civ. P. 23(a)(2).  A plaintiff meets this requirement by showing just a single common question capable of common resolution.  *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 984 (11th Cir. 2016) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)).

Altman argues that the proposed class meets the commonality requirement because there are at least two issues that affect each class member: (1) whether the receipts provided to each putative class member violated the truncation requirement, and (2) whether WHBM acted willfully.  [Doc. 64 at 14-15.]  Altman further argues that the non-truncated receipts was systemic because they were printed as a result of a computer program.  [*Id.* at 14-15.]  WHBM does not meaningfully dispute that the commonality requirement is met.  [Doc. 73 at 14 n.3; Doc. 74 at 14 n.3.]

I agree with Altman that there are clearly questions of law and fact common to the class.  *See* Fed. R. Civ. P. 23(a)(2).  Accordingly, Altman has satisfied the commonality requirement.

### 3.      Typicality (Rule 23(a)(3))

To meet the typicality requirement, the plaintiff must prove that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  Typicality "refers to the individual characteristics of the named plaintiff in relation to the class." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1275 (11th Cir. 2009) (citation omitted).  A plaintiff is "typical" where she "possess[es] the same interest and suffer[ed] the same injury as the class members." *Id.* (citation omitted).

Altman argues that her claims are typical of the class's claims because she and the members of the proposed class were subjected to the same conduct and their claims are based on the same legal theory.  [Doc. 64 at 15-16.]  Specifically, she contends that WHBM's payment processing system was programmed to print receipts with the first six and last four digits and that those receipts violated FACTA's truncation requirement.  [*Id.* at 16.]

17

WHBM responds that Altman cannot meet the typicality requirement because she lacks Article III standing.  [Doc. 73 at 14-19; Doc. 74 at 14-19.] WHBM points out that Altman admits that she has not sustained any damages and that she is not seeking any damages in this case.  (*See* Altman Dep. at 105-108.) WHBM also submits that there is no real risk of identity theft as a result of the purported violation because no one except for her sister and brother-in-law (who initially appeared as her counsel in this case) has ever seen the receipt.  (*Id.* at 91.) Absent an actual, concrete injury, Altman lacks Article III standing, and as a result, cannot represent the proposed class.  [Doc. 73 at 17-18; Doc. 74 at 17-18.]

Altman replies that the Court has already considered—and rejected— WHBM's standing argument in its order denying WHBM's motion to dismiss. [Doc. 79 at 6; Doc. 80 at 6; *see also* Doc. 28.]  She also points out that there has been no change in the law or fact that would warrant the Court revisiting the issue now, and that "every district Court in this Circuit reached the *same* conclusion this Court reached in denying motions to dismiss FACTA claims for lack of standing."[5] [Doc. 79 at 7; Doc. 80 at 7.]

--------

[5] This assertion may have been true at the time Altman filed her brief; however, it is no longer the case. *See Gesten v. Burger King Corp.*, No. 17-22541-CIV, 2017 WL 4326101, at *6 (S.D. Fla. Sept. 27, 2017) (holding that plaintiff

I agree with Altman that the issue of standing has been decided in this case and, at this time, I sees no basis for revisiting that decision especially absent a change in controlling law.  I also conclude that Altman's claims are sufficiently typical in that she was subject to the same alleged violation FACTA as the other class members.  Proof of her claim—*i.e.*, that WHBM acted willfully in failing to comply with FACTA's truncation requirement—would necessarily prove the claims of the unnamed class members, and there is no indication that her claim is subject to unique defenses.  Thus, Altman has met the typicality requirement.

### 4.   Adequacy (Rule 23(a)(4))

Rule 23(a)(4) requires that Altman demonstrate that both she, as the class representative, and her counsel "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4); *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003).  The purpose of the requirement is to ensure that the representative party and counsel will adequately "assert and defend the interests of the members of the class" and to "uncover conflicts of interest between the named parties and the class they seek to represent." *London*, 340 F.3d at 1253 (citations

_____

lacked Article III standing as to FACTA violation identical to the one in the case at bar).

19

omitted).  As with the other requirements of Rule 23(a), the party seeking class certification bears the burden of establishing adequacy; there is no presumption of adequacy.  *Id.*  The Court is likewise bound to "undertake a stringent . . . examination of the adequacy of representation by the named class representative." *Id.* at 1254 (citation omitted).

### a.   Background Regarding Altman's Representation

Before turning to the analysis of the adequacy requirement, some background information is necessary for context.  At the time that Altman initially filed this lawsuit in July 2015, she was represented by her brother-in-law, attorney Shimshon Wexler, who is a member of the bar of this Court.  (Altman Dep. at 144.) [*See also* Doc. 1.]  In September 2015, Bryant T. Lamer, an attorney with the law firm of Spencer Fane LLP in Kansas City, Missouri, appeared on behalf of Altman, *pro hac vice*.  (Altman Dep. at 145.)  [*See* Docket Entry dated Sept. 28, 2015.] Altman had no prior relationship with Spencer Fane, and at her deposition, she testified that it was Mr. Wexler who "engaged" the firm.  (Altman Dep. at 145-46.) She also testified that the first time that Altman met anyone in person from the Spencer Fane firm was at her deposition on April 18, 2017.  (*Id.* at 146.)

20

On March 13 and 14, 2017, attorneys Clifton Dorsen, Kris Skarr, and Justin Holcombe with the Atlanta-based law firm Skaar & Feagle, LLP, appeared in this case as local counsel, apparently in order to substitute for Mr. Wexler.  [Docs. 50, 51, 52.]  (Altman Dep. at 150.)  On March 16, Mr. Wexler withdrew from the case. [Doc. 53.]  Altman testified that he withdrew to avoid the perception of a possible conflict-of-interest that could harm the class.  (Altman Dep. at 146-47.)  Prior to her deposition on April 18, 2017, Altman had not met any attorneys from Skaar & Feagle.  (*Id.* at 151.)

In early April 2017, attorneys Keith James Keogh and Michael S. Hilicki with the Keogh Law Firm in Chicago, Illinois, appeared on behalf of Altman, *pro hac vice*.  [Docs. 58, 59.]  Altman testified that she could not recall whether she spoke to anyone at Spencer Fane about hiring the Keogh Firm as co-counsel. (Altman Dep. at 149-50.)  She personally did not do any investigation about the firm before they were retained.  (*Id.* at 150.)  As of the date of her deposition on April 18, 2017, Altman had not met anyone at the Keogh Firm.  (*Id.*)

On April 26, 2017, Mr. Wexler filed a notice of attorney's lien for services he provided in this case for the benefit of Altman and the proposed class.  [Doc. 71.]

21

In support of the motion for class certification, Altman has submitted declarations of Mr. Keogh [Doc. 63-11], Mr. Lamer [Doc. 63-12], and Justin Holcombe [Doc. 63-13].  The declarations describe the education, experience, and professional accomplishments for each of the attorneys of record, including their experience litigating consumer class actions in courts across the country.  Mr. Keogh's declaration also states that his firm regularly engages in major complex litigation involving FACTA and has the "resources necessary to conduct litigation of this nature, and has experience prosecuting class actions of similar size, scope, and complexity to the instant case."  [Doc. 63-11 at 1.]

### b.    The Parties' Arguments

Altman contends that she would be able to fairly and adequately protect the interests of the class because her interests are "squarely aligned" with the class. [Doc. 63-1 at 17; Doc. 64 at 17.]  She also argues that her attorneys are also adequate because they have extensive class action experience, resources, and have participated in FACTA class actions, including four in this Circuit.  [Doc. 63-1 at 17-19; Doc. 64 at 17-19.]

WHBM responds that Altman is an inadequate class representative because Mr. Wexler, her brother-in-law, initially represented her in this case, which created

a conflict rendering her inadequate "from day one." [Doc. 73 at 20-23; Doc. 74 at 20-23.]   WHBM argues that Mr. Wexler's conflict is incurable because the Eleventh Circuit has held that adequate representation must be present "at all stages of the litigation," and there were stages during which Altman and the putative class were not adequately represented. [Doc. 73 at 23 (citing *Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1374 (11th Cir. 1984), and *London*, 340 F.3d at 1250); Doc. 74 at 23 (same).]

WHBM also argues that replacement counsel did not cure the "initial inadequacy" because Altman has little knowledge of her current counsel. [Doc. 73 at 23-24; Doc. 74 at 23-24.] Altman was not involved in hiring her current counsel, that she had no formal engagement letter with any lawyer until March 2017, 20 months after she first filed suit, and had not met her two lawyers personally before her deposition on April 18, 2017. [Doc. 73 at 24; Doc. 74 at 24.]

WHBM additionally argues that Altman is not an adequate class representative because she is not seeking actual damages in this case. [Doc. 73 at 25; Doc. 74 at 25.] WHBM finally argues that it is not sufficient for plaintiffs to opt out because it places the burden of her inadequacy on the absent class members. [Doc. 73 at 27; Doc. 74 at 27.]

Altman replies that there is no conflict of interest.  [Doc. 79 at 9-11; Doc. 80 at 9-11.]  She explains that Mr. Wexler withdrew out of an abundance of caution.  [Doc. 79 at 9; Doc. 80 at 9.]   His involvement was limited to pre-certification proceedings, before class members could be bound.  [Doc. 79 at 10; Doc. 80 at 10.]  The fact that Mr. Wexler asserted a lien shows that he has nothing more to do with the case.  [Doc. 79 at 10; Doc. 80 at 10.]

In response to WHBM's argument about damages, she points out that the law requires her to choose between actual and statutory damages—a plaintiff cannot recover both.  [Doc. 79 at 12-14; Doc. 80 at 12-14.]  If that choice disqualified a plaintiff, then no FACTA case could ever be certified.  [Doc. 79 at 12; Doc. 80 at 12.]  She also states that WHBM offers no evidence that any putative class member has suffered actual damages greater than what can be recovered by statute.  [Doc. 79 at 13; Doc. 80 at 13.]

### c.    Legal Analysis

I first address the adequacy of proposed class counsel.  Based on the declarations of Messrs. Keogh, Lamer, and Holcombe, I readily conclude that those attorneys and the other attorneys identified in their declarations possess the resources and experience to serve as class counsel in a consumer class action such

as the one at bar.  Indeed, WHBM makes no real argument that any of the attorneys are unqualified to prosecute this case.

WHBM's argument that Altman lacks a sufficient relationship with those attorneys is unconvincing.  The fact that Altman had not personally met her attorneys before her deposition does not strongly indicate that she would not be an adequate class representative.  After all, she resides in Austin, Texas, and all of her attorneys are located hundreds of miles away.  (Altman Dep. at 24)  Likewise, her apparent limited involvement in selecting counsel does not weigh heavily against finding that her counsel are adequate representatives.  If anything, the lack of a relationship tends to show that her counsel's attorney-client relationship is not, and would not be, tainted by some other interest with Altman personally.  On the other hand, it appears from Altman's deposition testimony that she is sufficiently engaged in the litigation and with her counsel.

I also find unpersuasive WHBM's argument that Mr. Wexler's early involvement in this case irreversibly tainted Altman's adequacy.  WHBM's contention that a potential conflict at any stage of the litigation cannot cured is not supported in either *London* or *Shroder*.  *London* and *Shroder* are factually distinguishable because in each of those cases the putative class attorney with the

potential conflict had not withdrawn from the case prior to class certification, and, in fact, litigated the motion for class certification.  In *London*, the named class representative was the stockbroker for proposed class counsel, and they had a close personal and business relationship.  *London*, 340 F.3d at 1253.  After filing the lawsuit, the lawyer moved his brokerage account so the plaintiff was no longer his stockbroker.  The court concluded that measure was insufficient to cure a conflict because they still had a close relationship that presented a "*present* conflict of interest—an incentive for [plaintiff] to place the interests of [counsel] above those of the class."  *Id.* at 1255.  The court noted that, even though the plaintiff was no longer his lawyer's stockbroker, nothing would prevent him from returning to that role after the case ended.  *Id.*  If he planned to do so, the court reasoned, he would have an incentive to increase his counsel's fees at the expense of the class.  *Id.*  Similarly, in *Shroder*, the named putative class representative was an employee of counsel for the proposed class, which presented a conflict because the plaintiff might place her loyalties to her employer and attorney over those of the class.  729 F.2d at 1375.

Here, by contrast, Mr. Wexler withdrew from the case before the motion for class certification had been filed, and apparently has not had, and will not have,

26

any further involvement in the case. Assuming that Mr. Wexler's status as Altman's brother-in-law could have created a conflict, I am not aware of any way that the conflict actually manifested itself, much less prejudiced any unnamed class member. Simply put, there is no evidence that his involvement in the case created any antagonism between Altman or her current counsel on the one hand and the rest of the unnamed class members on the other. To the contrary, prior to his withdrawal from this case, Altman and her attorneys vigorously, and successfully, litigated the issue of standing and engaged in discovery.

Nor can it be said that Mr. Wexler's involvement in this case creates a future potential conflict of interest. Mr. Wexler is not now an attorney of record, and it appears will not appear in this case going forward. Nor does it appear that there is any type of ongoing relationship where Altman would be incentivized to place the interests of Mr. Wexler over those of the class members.

WHBM makes much of the fact that Mr. Wexler has filed a notice of attorney's lien in this case, but I fail to see how it renders Altman inadequate. If anything, Mr. Wexler's notice of lien tends to show that Altman does not have the

ability to benefit Mr. Wexler economically, otherwise, he would not have had to assert a lien in this case.[6]

I also find unpersuasive WHBM's argument that Altman is not an adequate representative because she is not seeking actual damages. Recently, the Eleventh Circuit rejected a similar argument in a putative Fair Debt Collections Practices Act class action, which is directly applicable here. *See Dickens v. GC Servs., L.P.*, __ F. App'x ___, 2017 WL 3616345, at *5 (11th Cir. Aug. 23, 2017). In *Dickens*, a district court concluded that the named plaintiff did not adequately represent the absent class members because he was only seeking statutory damages under the FDCPA, while other class members might have suffered actual damages. *Id.* at *4. In reaching that decision, the district court concluded on the one hand that it was unlikely that any putative class members suffered actual damages, and yet considered that "remote possibility" to conclude that the plaintiff was not an

---

[6] In support of her reply brief, Altman attached a second declaration of Mr. Lamer in which he provides some additional detail concerning the apparent fee dispute with Mr. Wexler. In its surreply, WHBM objects to the declaration and urges the court to not consider it. I will not dwell on whether or not to consider the declaration because the declaration is unnecessary as it adds nothing to this analysis.

adequate class representative. *Id.* at *5. The Eleventh Circuit reversed, explaining that

> In essence, the district court concluded that where the proposed class representative fails to seek every remedy that possibly—as opposed to probably—would be sought by absent class members, the representative is inadequate. That proposition contradicts our admonition that minor conflicts alone are insufficient to deem a representative inadequate.

*Id.* at *5. The Circuit went on to say that "any conflict between [the named plaintiff] and class members who have suffered actual damages is especially minimal given that in the rare circumstance in which a class member suffered actual damages, the class member could simply opt out of the class and pursue litigation on his own." *Id.*

Based on the record before the Court, there is no evidence that any potential class member suffered actual damages as a result of issuing receipts that displayed the first six and last four digits of card numbers. Coker's report states that the first six digits of the card number identify the issuer of the card, whether the card is a credit card or a debit card, and whether it is a personal/consumer card or a business/commercial card. [Doc. 79-4 at 10.] The remaining digits are the account number for the card user. [*Id.*] Thus, it appears that displaying the first six and last four digits of a credit card number poses no actual risk (or no more than a remote

29

possibility of a risk) of identity theft to potential class members. *See Dickens*, 2017 WL 3616345, at *4-5.

Courts have reached a similar conclusion, albeit in a different context, in FACTA cases where Article III standing was evaluated by determining whether displaying too many card number digits on a receipt created an imminent risk of harm—that is, an imminent risk of identity theft.[7]  Courts have held that displaying the first six and the last four digits does not cause a material risk of harm.  *See, e.g., Katz v. Donna Karan Co.*, 872 F.3d 114, 120-21 (2d Cir. 2017) (holding that district court did not err in concluding that displaying first six digits of a card number on a receipt did not result in a "material risk of identity theft absent other allegations of harm"); *Gesten*, 2017 WL 4326101, at *2 (same); *Kamal v. J. Crew Grp., Inc.*, No. CV 2:15-0190 (WJM), 2017 WL 2587617, at *4 (D.N.J. June 14, 2017) ("[T]he Court cannot reasonably infer that printing the first six and last four digits of Plaintiff's credit card materially increased the risk of future harm, because doing so gives an identity thief no more personal information about a person's account

---

[7] Here, the Court has resolved the Article III standing question differently, concluding that consumers have a substantive right to receive a truncated credit card receipt.  [Doc. 28 at 12-13.]  The alleged invasion of that substantive right is a sufficiently concrete injury for purposes of Article III standing.  [*Id.*]

than Congress has permitted to be printed on receipts. (citation omitted)), *appeal filed*, No. 17-2345, 2017 WL 2587617 (3d Cir. June 22, 2017).  Given the remote possibility that any class member has suffered actual damages in this case, I cannot conclude that Altman's decision to pursue statutory damages rather than actual damages creates a significant conflict.  And, of course, any class member who has suffered actual damages will have the option to opt out of the class.  *See Dickens*, 2017 WL 3616345, at *5.

The bottom line is that Plaintiff has presented evidence showing that she is knowledgeable about FACTA's requirement about truncating digits, she has actively participated in the litigation, that she understands her role as the potential named class representative.  (*See* Altman Dep. at 30, 32-33, 60-61, 139-41.)  I am also satisfied that the attorneys of record are sufficiently experienced and capable to serve as class counsel.  Accordingly, Altman has satisfied her burden to showing that she and counsel has met the adequacy requirement of Rule 23(a)(4).

**C.     Rule 23(b)(3)**

I next consider whether Altman can demonstrate, pursuant to Rule 23(b)(3) that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to

31

other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### 1.    Predominance of Common Issues

To determine whether predominance is satisfied, the Court must first identify the parties' claims and defenses and their elements. *Brown*, 817 F.3d at 1234. Then, the Court should "classify these issues as common questions or individual questions by predicting how the parties will prove them at trial." *Id.* "Common questions are ones where the same evidence will suffice for each member, and individual questions are ones where the evidence will var[y] from member to member." *Id.* (alteration in original) (quotation omitted).

Altman argues that common issues predominate here because the putative class members' claims all derive from a systemic programming error that caused receipts issued at the point of sale to display too many digits. [Doc. 63-1 at 20; Doc. 64 at 20.] She further argues that the willfulness of WHBM's actions bear directly on each class member's right to relief because the complaint seeks only statutory and punitive damages. [Doc. 63-1 at 21; Doc. 64 at 21.] She also asserts that there are no significant individual issues among class members that would warrant a contrary conclusion. [Doc. 63-1 at 21; Doc. 64 at 21.]

WHBM responds that the amount of statutory damages is an individualized determination, ranging from $100 to $1,000. [Doc. 73 at 28-29; Doc. 74 at 28-29.] It also argues that it is entitled to present evidence of mitigation, which similarly requires an individualized assessment. [Doc. 73 at 30-32; Doc. 74 at 30-32.] WHBM goes on to identify ways in which Altman failed to take steps to mitigate the risk of identity theft after receiving the receipt, including, *inter alia*, not contacting her credit card issuer to request a new card, not seeking to obtain any increased identity theft protection, not requesting a fraud alert be placed on her account, and not seeking information from her card issuer or the Federal Trade Commission. [Doc. 73 at 31-32 (citing Altman Dep. at 77-79, 85-88); Doc. 74 at 31-32 (same).]

In reply, Altman argues that its individual damage calculations generally do not defeat a finding that common issues predominate. [Doc. 79 at 15 (citing *Brown*, 817 F.3d at 1239); Doc. 80 at 15 (same).] She also argues that calculating statutory damages will not require individual determinations here because each claim is based on the same core facts, and each claim has the same statutory recovery range of $100 to $1,000. [Doc. 79 at 15-16; Doc. 80 at 15-16.] As for mitigation, Altman responds that WHBM has not shown that mitigation of damages is relevant to

calculating statutory damages or that mitigation is an issue for any potential class member.  [*Id.* at 16.]

The central issue in this case—whether WHBM willfully violated FACTA's truncation requirement—is shared by all potential class members.  I am not persuaded that the calculation of damages precludes class certification.  Although WHBM correctly points out that statutory damages can range from $100 to $1,000, it appears that that calculation would be based on the same core set of facts that Altman will use to establish willfulness.  In other words, it is not clear what individual issues there are that would be relevant to determining the amount of statutory damages.

Nor am I convinced that a mitigation defense precludes class certification.  WHBM cites no binding authority holding that statutory damages are susceptible to a mitigation-of-damages defense.   Indeed, other courts addressing nearly identical issues have suggested that the opposite is true.  For example, in *Legg v. Spirit Airlines, Inc.*, a FACTA class action, the court contrasted actual damages to statutory damages in assessing the predominance factor of Rule 23(b)(3), and stated as follows:

> [Defendant] . . . argues that the class members' actual damages are central to the case and are not amenable to

34

> class-wide determination.  ***But this is not a concern because Plaintiff seeks only statutory damages.***

315 F.R.D. 383, 391 (S.D. Fla. 2015) (emphasis added).

In sum, I find that Altman has adequately shown that questions of law or fact common to the class members predominate over questions affecting only individual members.

## 2.     Superiority of the Class Action

Having concluded that common issues predominate, I next consider whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  Factors the Court should consider in making this determination include:  (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3)(A)-(D).  Courts routinely find that class resolution of consumer protection actions is superior because the potential recovery for each individual is often too slight to justify an individual prosecuting his or her rights solo.  *See Bush v. Calloway Consol. Grp. River City,*

*Inc.*, No. 3:10-CV-841-J-37MCR, 2012 WL 1016871, at *11 (M.D. Fla. Mar. 26, 2012).

Altman argues that in this case, a class action is superior to individual actions because it promotes efficiency and judicial economy.  [Doc. 63-1 at 22; Doc. 64 at 22.]  She also contends that certifying a class here would also promote justice and fairness because it ensures that proposed class members who are unaware of their claim or lack the ability to prosecute their own lawsuit can "vindicate their rights." [Doc. 63-1 at 22-23; Doc. 64 at 22-23.]  Altman adds that the work to prosecute FACTA cases and establish willfulness is "substantial" and points to other FACTA class actions in which counsel in this case took numerous depositions, conducted expert discovery, briefed dispositive motions, and litigated *Daubert* issues.  [Doc. 63-1 at 24; Doc. 64 at 24.]

WHBM responds that individual actions are superior to a class action because plaintiffs can recover their reasonable attorney fees if they prevail in their suit; thus, individuals and their attorneys have sufficient motivation to litigate these claims.  [Doc. 73 at 33-36; Doc. 74 at 33-36.]  WHBM reiterates that facts particular to each plaintiff, including the measure of actual, statutory, or punitive damages, can be assessed better in an individual suit.  [Doc. 73 at 36; Doc. 74 at 36.]

36

WHBM additionally argues that certifying this case would lead to an award of damages "grossly disproportionate" to any actual harm sustained by members of the putative class. [Doc. 73 at 37-39; Doc. 74 at 37-39.] WHBM points out that if Altman were able to prove that it willfully violated FACTA, the statutory damages could range between $36,000,000 and $360,000,000, not including attorney fees and punitive damages. Such an award, WHBM maintains, would be unconstitutional. WHBM cites the Eleventh Circuit's decision in *London* as well as the District Court decisions in *Leysoto v. Mama Mia I., Inc.*, 255 F.R.D. 693 (S.D. Fla. 2009), *Ehren v. Moon, Inc.*, No. 09-cv-21222, 2010 WL 5014712 (S.D. Fla. Dec. 3, 2010), and *Hillis v. Equifax Consumer Servs., Inc.*, 237 F.R.D. 491 (N.D. Ga. 2006), to support its position.

In her reply, Altman reiterates that a class action is superior because it avoids multiple, repetitive lawsuits. [Doc. 79 at 16-17; Doc. 80 at 16-17.] She also argues that the fee-shifting provision of the FCRA does not sufficiently incentivize individual plaintiffs to prosecute FACTA violations because the costs to litigate a case like the one at bar require substantial investment of time and resources. Altman specifically points out that in this case WHBM identified over 15 witnesses in discovery, it produced nearly 14,000 pages of documents, and she has retained

an expert.  [Doc. 79 at 17-18; Doc. 80 at 17-18.]  In response to WHBM's argument that individual issues are better addressed in individual suits, Altman replies that WHBM has not identified any material individual issue in this case, much less one that would predominate.  [Doc. 79 at 18; Doc. 80 at 18.]

Altman also contends that WHBM's argument about the magnitude of potential damages is premature and should be addressed after class certification and resolution of the case on its merits.  [Doc. 79 at 18-19; Doc. 80 at 18-19.]  Altman further maintains that WHBM could afford to pay a judgment since its market capitalization is over $400 million and it paid nearly $42 million in dividends in 2016 alone.  [Doc. 79 at 19; Doc. 80 at 19.]  Finally, Altman asserts that the size of a potential award is not a factor in determining superiority because Congress has not expressly so provided.  [Doc. 79 at 19-20; Doc. 80 at 19-20.]

I conclude that the four enumerated factors in Rule 23(b)(3) support certifying a class in this case.  There is no indication that any proposed class member has any interest in individually controlling the prosecution of this case, and even if there were, that individual could opt out.  *See Legg*, 315 F.R.D. at 391. I am also not aware of any putative class member who has already filed an action concerning the FACTA violations alleged in this case.  Nor has either party

suggested that there is any reason why litigating class issues in this forum would be "undesirable" or that there would likely be difficulties in managing a class action.

WHBM's contention that the FCRA's fee-shifting provision makes individual determination superior is unpersuasive. Litigating issues of willfulness is a time and resource-intensive endeavor, and common sense tells us that few individuals would be willing to front the costs and spend the time to litigate those issues all for a potential award of up to $1,000. The fee-shifting provision of the FCRA perhaps makes it easier for individual plaintiffs and their lawyers to prosecute these types of cases individually, but the fact that individual suits may be a viable alternative does not necessarily mean they are superior to class actions. Under the facts of this case, the legal and factual issues in this case predominate, and it would be far more efficient for the parties and the Court to litigate the claims in a single proceeding.

WHBM's argument regarding its potential exposure in a class action presents a closer call. After carefully considering the authority cited by WHBM, however, I am not persuaded that the possibility of a judgment of $36,000,000 to $360,000,000 should preclude class certification under the facts of this case.

WHBM correctly points out that the Eleventh Circuit has expressed its doubt that a class action is a superior device to adjudicate claims where an award of statutory damages would be "enormous and completely out of proportion" to any harm actually suffered by a class member. *London*, 340 F.3d at 1255 n.5. Other courts in this Circuit, including those cited by WHBM, have applied the reasoning in *London* to conclude that the potential for a disproportionate—and possibly annihilating—award of damages precludes a finding of superiority under Rule 23(b)(3).

Although the Circuit's observations in *London* are dicta and not precedential, the Eleventh Circuit has repeatedly approved of district courts' consideration of the potential for a grossly disproportionate damages award at class certification. *See Dickens*, 2017 WL 3616345, at *7 n.4 (instructing district court on remand that it may "consider the possibility of disproportionately harsh class damages as part of the superiority inquiry"); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1271 (11th Cir. 2004) ("[W]e assess whether the potential damages available in a class action are grossly disproportionate to the conduct at issue."); *Heaven v. Tr. Co. Bank*, 118 F.3d 735, 738-39 (11th Cir. 1997) (concluding that it is not an abuse of discretion for the district court to consider whether technical violations of statute counsel in

favor or against class certification); *Roper v. Consurve, Inc.*, 578 F.2d 1106, 1114 (5th Cir. 1978) (recognizing that the court may be properly "concerned with a fixed minimum penalty of a substantial amount for a technical violation, that if magnified, would exact a punishment unrelated to the statutory purpose" (citation omitted)).

The issue then becomes, how does the Court determine if a potential award is so disproportionate that it negates all the other factors that weigh strongly in favor of class certification? Neither party offers any concrete suggestions as to what standard the Court should apply, and none of the cases that the parties cite gives a clear test. Nonetheless, a close reading of the cases provides some guidance as to factors that are relevant to this analysis.

One factor is whether the defendant's behavior is "deliberate or intentional." As the Circuit explained in *Klay*:

> Where the defendant's alleged behavior is deliberate or intentional, we have had no problem allowing class actions to proceed. Where defendants are being sued for statutory damages for unintentional acts under a strict liability standard, however, courts take a harder look at whether a defendant deserves to be subject to potentially immense liability.

*Klay*, 382 F.3d at 1271; *see Hillis*, 237 F.R.D. at 506 (denying class certification where defendant was subject to strict liability for alleged statutory violations);

41

*Helms v. ConsumerInfo.com, Inc.*, 236 F.R.D. 561, 569 (N.D. Ala. 2005) (same). This factor weighs in favor of finding that a class action is superior in this case. Although this is a statutory damages case, FACTA and the FCRA do not impose strict liability for failing to truncate card numbers on printed receipts.  Rather, to recover any damages in this case, Altman must show that the violation was willful. Accordingly, this is not a case in which an innocent defendant—or even a negligent one—would face liability.

A second factor is the complexity of the law at issue—*i.e.,* whether damages are being sought for technical violations of a "complex regulatory scheme, subject to different reasonable interpretations."  *See London*, 340 F.3d at 1255 n.5.  This point is illustrated in *Campos v. ChoicePoint, Inc.*, where the court declined to certify a putative class of over a million individuals and instead certified a class of around 6,000 based in part on the fact that statutory damages in a class of a million people could exceed a billion dollars for minor or technical violations of the FCRA for allegedly failing to disclose sufficient information a consumer's file.  237 F.R.D. 478, 480-81, 490 (N.D. Ga. 2006) (Duffey, J.).  Significantly, the court noted that "[t]he statutory provision which Defendant allegedly violates is, at most, ambiguous. . . . [H]ere there exists substantial danger that plaintiffs are attempting

to obtain a windfall based on minor or technical violations, which Plaintiffs claim at most discloses a possible ambiguity in the statute.  *Id.* at 490 (citation and quotations omitted).

This factor also weighs strongly in favor of Altman.  FACTA's truncation requirement is not complex or difficult to understand.  In fact, WHBM contends that it was in compliance with FACTA for many years before it changed its POS system in 2015, and after it learned of this lawsuit, it promptly corrected its POS software to stop displaying the first six card digits.  Nor can it be said that the violation of which Altman complains—printing too many digits on a receipt—is merely "technical."  FACTA exists to limit what information is displayed on printed receipts and explicitly forbids the very conduct that led to this suit.  As a district court in Alabama explained:

> The court hesitates to describe any violation of FACTA as merely technical, because all violations of FACTA would be technical.  Compliance with FACTA does not require great effort or the deciphering of complex statutory schemes, and if [the defendant's] argument prevailed, any FACTA defendant would be able to shield itself from class action liability by quickly and easily bringing itself into compliance.

*Keller*, 2011 WL 1085976, at *11.

43

A third factor is whether the amount of class damages is so large that it would be disproportionate to any actual harm *and* be ruinous to the defendant. The few FACTA cases in which courts have concluded that a disproportionately high class damages award defeats superiority have considered the proportionality of the damages to the harm and whether such an award would be "annihilative" or "ruinous" to the defendant. In *Leysoto v. Mama Mia I., Inc*., the court held that a class action was not the superior method of adjudicating the suit because the defendant's net worth was only around $40,000, and potential statutory damages ranged from $4,600,000 to $46,000,000. 255 F.R.D. at 695. Thus, any finding of liability on a class-wide basis would be ruinous to the defendant. *Id.* at 699. Similarly, in *Ehren v. Moon, Inc.*, the court found that a class action was not a superior way to adjudicate a case because it would cause "annihilative liability" on the defendant. 2010 WL 5014712, at *1-2.[8]

WHBM argues that an award of damages in this case would be grossly disproportionate and that a $360 million judgment, approximately 90% of WHBM's market capitalization, would "significantly impair WHBM's ability to

---

[8] *Ehren* is silent as to what the potential damages would have been or what the net worth of the defendant was.

survive as a 'going concern.'"  (Oliver Decl. ¶ 12.)  But a $360 million judgment

is a worst-case scenario, and it cannot be said that any potential judgment,

especially one at the low-end of the spectrum, would be "ruinous" or "annihilative"

to WHBM.  (*See id.*)  Nor am I entirely convinced that WHBM would necessarily

have to shoulder the entire burden of a judgment.  I observe that WHBM has

asserted a defense that other parties are responsible for damages, which apparently

includes the vendor charged with implementing the CHARM POS system.  [*See*

Doc. 64-1 at 7-8, 22 (interrogatory response referring to actions of vendor and

defense that third parties are responsible for any alleged damages).]  To be sure,

any potential damages award in his case is serious, but I am not persuaded, based

on the authorities cited above, that the possibility of a large statutory damages

award outweighs all the other reasons for finding that class adjudication is superior.

Moreover, other courts in his Circuit have concluded the potential for a large

damages award is more appropriately addressed at a later point in the proceedings.

For example, in *Bush v. Calloway Consolidated*, a FACTA case, a district court in

Florida, after a lengthy and well-reasoned discussion of the law, concluded that it

would be "unduly speculative" to deny a class certification motion based solely on

the ***possibility*** of a large damages award.  2012 WL 1016871, at *14 (emphasis

added).  The court concluded that the issue of whether an award of damages would be "ruinous" "is better left for resolution at a later juncture."  *Id.*  Similarly, in *Legg v. Spirit Airlines, Inc*., another district court in Florida concluded that the potential for a large damages award did not bar a finding of superiority because whether such an award is constitutionally excessive can be addressed later in the proceedings. 315 F.R.D. at 392.  Here, it is not a foregone conclusion that a jury would find WHBM liable, much less award "ruinous" damages.

I pause to note that WHBM's potential liability in this case is certainly troubling.  Nonetheless, I cannot ignore that Congress has determined that an aggrieved individual may recover statutory damages of $100 to $1,000 for willful violations of FACTA, presumably on the basis that those damages would be proportionate to the potential harm of displaying too many digits on a printed receipt and penalize unlawful conduct.  Congress also made no exception for class actions, and unlike other consumer protection statutes, it did not impose a ceiling to potential class liability to defendants that willfully violate the law.  *See, e.g.,* 12 U.S.C. § 2605(f)(2)(B) (Real Estate Procedures Settlement Act); 15 U.S.C. § 1692k(a)(2)(B) (Fair Debt Collection Practices Act).  While in some cases the size

of a potential award can preclude a finding of superiority, for the reasons stated above, this is not one of those cases.

In sum, I conclude that Altman has carried her burden of showing that a class action is a superior method for adjudicating the case at bar.

## IV.    CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Altman's motion for class certification be **GRANTED**.  [Doc. 63.]  It is also **ORDERED** that WHBM's motion for leave to file a surreply brief be **GRANTED** [Doc. 86] and that Altman's motion for leave to file a post-hearing brief be **DENIED** [Doc. 104].

IT IS SO ORDERED AND RECOMMENDED this 25th day of October, 2017.

_____
JOHN K. LARKINS III
United States Magistrate Judge