```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3   JILL ALTMAN, INDIVIDUALLY AND    :
     ON BEHALF OF A CLASS,            :
 4                                    :
              PLAINTIFF,              :
 5                                    :
     vs.                              :  DOCKET NUMBER
 6                                    :  1:15-CV-2451-SCJ-JKL
     WHITE HOUSE BLACK MARKET,        :
 7   INC., AND DOES 1-10,             :
                                      :
 8            DEFENDANTS.             :

 9

10         TRANSCRIPT OF ORAL ARGUMENT PROCEEDINGS

11        BEFORE THE HONORABLE JOHN K. LARKINS, III

12            UNITED STATES MAGISTRATE JUDGE

13                   OCTOBER 20, 2017

14                      9:08 A.M.

15

16

17

18

19

20     MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

21                 TRANSCRIPT PRODUCED BY:

22

     OFFICIAL COURT REPORTER:        SHANNON R. WELCH, RMR, CRR
23                                   2394 UNITED STATES COURTHOUSE
                                     75 TED TURNER DRIVE, SOUTHWEST
24                                   ATLANTA, GEORGIA  30303
                                     (404) 215-1383
25
```

<pre>
 1              A P P E A R A N C E S   O F   C O U N S E L

 2

 3    FOR THE PLAINTIFF:

 4
          KEITH JAMES KEOGH
 5        KEOGH LAW, LTD

 6        JUSTIN THARPE HOLCOMBE
          SKAAR & FEAGLE, LLP
 7

 8    FOR THE DEFENDANTS:

 9

10        BARRY GOHEEN
          JOHN ANTHONY LOVE
11        KING & SPALDING

12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

| | |
|---|---|
| 1 | **I N D E X   T O   P R O C E E D I N G S** |
| 2 | |
| 3 | * * * |
| 4 | ARGUMENT |
| 5 | by Mr. Keogh                                    5 |
| 6 | by Mr. Goheen                                  15<br>by Mr. Keogh                                   48 |
| 7 | CERTIFICATE                                    56 |

ARGUMENT

        by Mr. Keogh                                    5
        by Mr. Goheen                                  15
        by Mr. Keogh                                   48

CERTIFICATE                                    56

1          **P R O C E E D I N G S**

2      **(Atlanta, Fulton County, Georgia; October 20, 2017.)**

3              THE COURT:  All right.  This is Case Number 15-2451,

4      *Jill Altman vs. White House Black Market, Inc*.  The case is

5      before the Court on the plaintiff's motion for class

6      certification.

7              In the courtroom today -- I don't believe I have met

8      any of you personally.  So if you wouldn't mind introducing

9      yourselves, I would appreciate it.  Start with the plaintiff.

10              MR. KEOGH:  Good morning, Your Honor.

11              THE COURT:  Y'all are the plaintiffs?

12              MR. KEOGH:  Yes.

13              THE COURT:  Y'all switched sides on me here.

14              MR. KEOGH:  Do you want us to switch?

15              THE COURT:  No.

16              MR. KEOGH:  Good morning, Your Honor.  Keith Keogh

17      for the plaintiff.

18              THE COURT:  Hi, Mr. Keogh.  Nice to meet you.

19              MR. KEOGH:  Nice to meet you as well.

20              MR. HOLCOMBE:  Justin Holcombe for the plaintiff.

21              THE COURT:  Mr. Holcombe, good to see you.

22              MR. GOHEEN:  Good morning, Your Honor.  Barry Goheen

23      for the defendant.

24              MR. LOVE:  Good morning, Your Honor.  Tony Love for

25      defendant.

1          THE COURT:  All right.  Gentlemen -- well, Mr. Keogh,

2     are you going to do the argument today?

3          MR. KEOGH:  I am, Your Honor.

4          THE COURT:  All right.  Since it is your motion, I'll

5     be glad to hear from you first.

6          MR. KEOGH:  Certainly.

7               **(There was a brief pause in the proceedings.)**

8                              ARGUMENT

9          MR. KEOGH:  Your Honor, my plan is to briefly

10    summarize and not repeat too much what is in the briefs because

11    I think we've had a lot of briefing here.  And it has been

12    somewhat exhaustive.

13          So obviously I think if you have any questions,

14    please interrupt me.  Because I think that might be more

15    helpful than me repeating what is in the brief.

16          With that being said, plaintiffs strongly believe

17    this case is appropriate for class certification.  And one

18    great way to look at why it is appropriate is look at

19    defendants' arguments and actions.  Their actions and arguments

20    are the same for virtually every single class member.

21          Their standing argument applies to every single class

22    member.  Their lack of willfulness argument applies to every

23    single class member.  The way they installed their systems when

24    they rolled it out in 318 stores, the way they tested it for

25    each store is the same for every single class member.

1      And based upon discovery, we know that they rolled

2   out their new credit card processing software system in 318

3   stores.  And for the time period between March 23rd, 2015, and

4   until shortly after plaintiff filed this lawsuit, they stopped

5   printing -- they were printing violative receipts until June

6   17th of the same year.  And the system was programmed to print

7   these receipts because they use the same system they use in

8   Canada where it is purposely programmed to do this.  And even

9   though they tested it, they didn't catch the issue here or they

10  didn't care.  But those issues and willfulness are the same for

11  every class member.

12      Now, defendant has identified in discovery about

13  360,000 transactions between that time period for those 318

14  stores.  And defendant has withdrawn its argument whether

15  something was printed or e-mailed, and we filed a notice of

16  withdrawal, and we included the e-mail to this Court where they

17  withdrew that argument.

18      So unlike the *Guarisma* case they recently cited

19  yesterday where there was an issue where there was no evidence

20  whatsoever of whether someone who stays at a hotel checked out

21  at the front desk or not.  They didn't track it.  Their systems

22  weren't programmed to do it.  We don't have that here.

23      We actually have the list of every transaction at

24  issue.  And I believe defendant said a couple of them might

25  have been returns or exchanges.  But we can go through that

1    list and remove those if that is an issue.  So we have --

2            THE COURT:  How do you identify the ones that are

3    returns or exchanges?

4            MR. KEOGH:  The transaction information has that.

5            THE COURT:  Okay.

6            MR. KEOGH:  It is all -- just like they would

7    identify it.  If I walked in the store and asked about -- you

8    know, gave my credit card, they would have a record of my

9    purchase and exchange.

10            THE COURT:  Is that on that spreadsheet?

11            MR. KEOGH:  That is not on the spreadsheet.  But

12    their discovery responses state that they note they -- a

13    certain percentage include those.  So it is just a matter of

14    them willing to do that.  They say it is a big production

15    expense.

16            But we'll do it for them if they don't want to do it.

17    We can have our data card person go through that sheet.  And

18    I'm a little skeptical.  They know how many returns they have.

19    They know what their profitability is.

20            THE COURT:  So you are saying you can readily

21    ascertain those transactions?

22            MR. KEOGH:  Yes, Your Honor.  I don't think it is any

23    different than saying, you know, give me all the transactions

24    over $5.  It is just a query is all it is.

25            And even though they withdrew the e-mail argument,

1   once again, there's over 23,000 transactions without even an

2   e-mail address.  I know it has been withdrawn.  But since they

3   raised it yesterday in a roundabout way when they brought up

4   *Guarisma*, I want to make sure there is really no issue here

5   between whether something was printed or e-mailed.  They

6   withdrew the argument, and they even admitted there is a small

7   percentage here.

8           So it is apparent because this case really is a -- it

9   is the cliche classic textbook case for certification.  We have

10  a uniform practice.  We have a statutory claim.  We have

11  numerosity.  We have common actions.

12          Then defendants spend most of their time attacking

13  standing and adequacy.  And for adequacy, they are not

14  attacking plaintiff as much as they are attacking plaintiff's

15  former counsel.  Well, that is why we are here.  That is why my

16  firm filed an appearance, Mr. Holcombe's firm filed an

17  appearance, and Mr. Wexler withdrew.  Because we agree that

18  Mr. Wexler could not or I should say should not -- some courts

19  have allowed it -- but should not represent a relative to the

20  class representative.

21          And as the Court is well aware, he filed an attorney

22  lien in the case.  So, you know, it is very clear that he won't

23  be entitled to anything unless the court thinks he is.  So that

24  issue was mooted before the plaintiff moved for class

25  certification.  It really isn't an issue.

1       So with that, Your Honor, I really don't have much of

2  anything else to say except for I would be happy to answer any

3  questions on any other particular arguments.

4       THE COURT:  I would like to ask you about

5  ascertainability.  One of the issues that you alluded to in a

6  footnote in your opening brief was this business about some

7  transactions being made with a business credit card versus a

8  personal credit card.

9       And, you know, they have come back and said that it

10 is essentially foolish to assume that every transaction at

11 White House Black Market during this time period was a consumer

12 transaction, that there could have been some business purposes.

13      And you have come back, and you have pointed to a

14 portion of Mr. Coker's report where he, as I understand it,

15 kind of outlines ways that he can apparently differentiate

16 between business transactions or transactions made using a

17 business card -- I suppose is the proper terminology -- and a

18 consumer card.  But I've got a couple of questions there.

19      First of all, for Mr. Coker's report, has he actually

20 analyzed the data that White House Black Market has produced in

21 this case to determine whether he can make that differentiation

22 in this case?

23      MR. KEOGH:  No, Your Honor.  The argument was raised

24 after he filed his report.  And the credit card numbers are the

25 same -- I mean, the analysis is the same in this case as in

1    every case.  You look at the credit card numbers, and you look

2    at first whether they indicate a consumer or business account.

3          So it is kind of like saying, I haven't drove

4    20 miles per hour in a Ford, but I have driven 20 miles per

5    hour in a Chevy.  I can drive 20 miles per hour.  There is no

6    distinction between the data here and the data in other cases.

7          But even taking a step back, you know, our first

8    argument is:  It doesn't matter; that FACTA applies equally to

9    both business and consumer accounts.

10         THE COURT:  I think I disagree with you on that.  I

11   mean, my read -- push back if you would.  But my read of the

12   law is that, you know, FACTA may not differentiate.  But the

13   liability under the FCRA seems to distinguish between the

14   consumer transactions, for lack of a better term, and the

15   business ones.

16         Am I wrong about that?

17         MR. KEOGH:  There is no qualification for consumers.

18   You won't find that limitation in either the FACTA -- the

19   statutory damages claim portion.  So that is why the couple of

20   cases we cited found there is no distinction.

21         And, you know, so our position is that it really

22   doesn't matter.  And that is a merit issue.  And if we are

23   right, you know, they can't raise, I would argue, a false merit

24   issue that precludes certification.

25         THE COURT:  Yeah.  But it is not -- but it seems

1    rational to make that determination now.  Because, I mean, if I
2    agree which -- my own review of the case law seems to indicate
3    that at least the majority of the cases seem to recognize this
4    differentiation.
5           And I haven't made a final decision on that
6    obviously.  But it seems like it would be appropriate to at
7    least weigh in on that issue now because it does, I think, go
8    into the ascertainability.  And I think what concerns me most
9    is, you know, what we have is -- what I sense is -- I don't
10   know if hostility is the right word.  But we have some pretty
11   stern warnings from the Eleventh Circuit about class
12   certification, things along the lines of that it is not
13   something to be assumed.  This is the exception, not the rule.
14   The plaintiff bears the burden of proof as to each element.
15   Things of that nature.  And the Eleventh Circuit has also
16   instructed trial courts to conduct a rigorous examination.
17          And so what I'm -- what I'm trying to satisfy myself
18   with is that you-all have made the analytical leap from
19   Mr. Coker's statement that, you know, in the vast majority of
20   situations he's been involved in he is able to differentiate
21   between business and consumer transactions and the information
22   that has been produced in this case.  And it hasn't been done.
23          And so what I'm concerned about is:  Have you carried
24   your burden of proof there to satisfy, you know, the Eleventh
25   Circuit ultimately down the road, or is it enough to simply

1   have Mr. Coker say in his report, this is done in lots of other

2   cases.  You know, I drive Chevies, and this is a Ford, and

3   therefore the Ford should act like a Chevy.

4          MR. KEOGH:  Okay.  And let me take those in the order

5   you raised them.  I think most of the case law discusses the

6   consumer versus business.  There is no analysis on the actual

7   statute.  A lot of them discuss FDCPA cases where it has to be

8   consumer debt.  It is very limited and a very precise term

9   where a business debt wouldn't qualify.

10         But even in those FDCPA cases, there is a whole

11  plethora of class certification rulings saying that the issue

12  of whether it is consumer debt versus a business debt doesn't

13  preclude certification.  It is not such an individual issue,

14  and it is something that can be administratively figured out.

15         And that goes into the Court's comments regarding the

16  Eleventh Circuit.  And as we pointed out in our reply, you

17  know, it is plaintiff's burden.  We absolutely agree with that.

18  But as the Supreme Court said in *Shady Grove*, if we meet the

19  requirements, we're entitled to class certification.  So the

20  exception-not-the-norm language simply means that you have to

21  show that Rule 23 applies, you know, that Rule 23 is the

22  exception.  But once it applies, the class should be certified.

23         The Eleventh Circuit just had a great case -- the

24  name escapes me.  It was an FDCPA case.  It was an unpublished

25  decision that I would be happy to file it in five minutes or

1    maybe look it up when counsel is speaking where they talked

2    about the importance of consumer claims.  And the judge made a

3    couple of various other rulings in nonclass certification on

4    ascertainability.  And they reversed.  So I think the trend in

5    the Eleventh Circuit may be going a little bit the other way.

6            But in any event, for this case, you know, our burden

7    is to show it can be administratively identified.  We don't

8    have to show at certification because in most cases we don't

9    get the underlying data.  We don't get the class list.  We

10   might get some sample or something.

11           So you will find very few class certification orders

12   where the plaintiff has all the data and has done all the work

13   and said, you know, we have already done it.  Here it is.  It

14   is usually, here is the process.  We can do it.  And that is

15   the burden we have met.  We have shown that based upon the

16   transaction data it can be done.

17           If the Court wants it done, we can do that.  I mean,

18   it would take a short manner of time.  Obviously class

19   certification is always granted or denied without prejudice.

20   It can always be revisited.

21           So to the extent the Court feels that we haven't met

22   our burden, that you want it done, not just shown it can be

23   done, we can do that.

24           THE COURT:  Or alternatively I can grant

25   certification and then with the caveat that if you-all can't do

1    it for some reason then we can revisit the propriety of

2    certification.

3            MR. KEOGH:  That is a much better suggestion than

4    what I said, Judge.

5            THE COURT:  I thought you might say that.

6            MR. KEOGH:  And, quite frankly, I mean, courts have

7    not hesitated to decertify classes when the plaintiffs haven't

8    been able to do what they said they have done.  So we

9    understand that.

10           But -- you know, so our first position is the law is

11   required.  And in this context here of a women's clothing

12   store, it is unlikely to have business transactions.  It is

13   possible.  But they haven't shown a significant -- I'm

14   surprised defendant hasn't come in with statistics saying that

15   X percent of their sales are business sales.  Most businesses

16   track that.  You would think if they had something that would

17   help them they would have raised it.  They didn't.  They just

18   said you can't assume.

19           Well, I think it is safe to assume for a retail

20   consumer women's clothing store that they sell women's clothing

21   to consumers.  Not businesses.  The whole market is for

22   consumers.

23           But to the extent that we want to even go further,

24   you know, Mr. Coker has identified, you know, that we can sort

25   the information out by removing the business credit cards and

1    you know -- which might be overinclusive.  But that is better

2    than, you know, throwing-out-the-baby-with-the-bath-water-type

3    of issue.

4            So I would urge the Court to certify the class.  We

5    have shown that it can be done.  And if it turns out that it

6    cannot be done, then obviously the Court can always decertify.

7            THE COURT:  All right.  Anything further?

8            MR. KEOGH:  Nothing, Your Honor.  Thank you.

9            THE COURT:  All right.  Thank you, Mr. Keogh.

10           MR. KEOGH:  Actually may I -- that case I was talking

11   about from the Eleventh Circuit, could I just file the case

12   without any argument?  Just the brief or just the order?

13           THE COURT:  Yeah.  Sure.  That is fine.  Mr. Holcombe

14   seems to be waving at you.  Do you have it?

15           MR. HOLCOMBE:  I believe he is referring to *Dickens*

16   *vs. GC Services*, but I may be incorrect.

17           THE COURT:  What is the name of the case?

18           MR. HOLCOMBE:  *Dickens vs. GC Services*.

19           THE COURT:  Dickens, D-I-C-K-E-N-S?

20           MR. HOLCOMBE:  Yes, Your Honor.

21           THE COURT:  We could find it with that.

22           MR. GOHEEN:  That is a FDCPA case; right?

23           MR. KEOGH:  Yes.

24                          ARGUMENT

25           MR. GOHEEN:  Good morning, Your Honor.  Again, Barry

1    Goheen with Tony Love representing the defendant.

2             Let me unpack some of the misstatements we just

3    heard.  First -- one of the last things we just heard was it is

4    safe to assume they are a business or they sell to consumers.

5    Well, that is exactly what can happen on class certification.

6    I think Your Honor was just pointing out the burdens that they

7    have.

8             THE COURT:  Obviously there were consumers.  I mean,

9    the plaintiff is a consumer; right?

10            MR. GOHEEN:  Right.

11            THE COURT:  I mean, really -- I mean, it is White

12   House Black Market.  It is a women's retail clothing -- I mean,

13   I think it is safe for everybody to assume that there were

14   consumers that shopped there and that there may have been

15   business cards that were used there.

16            MR. GOHEEN:  I don't think there is any question

17   about that.

18            THE COURT:  Right.

19            MR. GOHEEN:  That was my point.  I mean, it is

20   certainly safe to assume it is predominantly consumers.  But it

21   is also safe to assume that of 360,000 transactions all of them

22   were consumer.  That is a ridiculous assumption if that is what

23   is being promoted here.

24            And I guess another thing is there was a point of,

25   well, we didn't come out with statistics.  Well, it is not our

1    burden.  We don't have to do anything.  It is their burden on

2    ascertainability.  That never changes.

3          They have had 27 months -- 27.  This case was filed

4    in July of '15.  They have had 27 months to come up with their

5    proof on class certification.  So this, well, let's certify

6    class and decertify it later, that is ridiculous.  They have

7    had all of the discovery they wanted.  We have produced

8    thousands of pages of documents.  If they come up today 27

9    months after they filed the lawsuit and say, well, we don't

10   have the data yet, that is completely inappropriate we would

11   respectfully submit.

12         With regard to Mr. Coker, he made it very clear in

13   his deposition he had not been engaged to talk about class

14   certification issues.

15         THE COURT:  No, that is not what he said at all.  He

16   said that he wasn't engaged to opine as to class certification.

17   That is a very different statement than what you just said.  I

18   mean, he is giving -- his opinions may bear on issues that are

19   relevant to class certification.  But he is not giving an

20   opinion as to whether the class should be certified.  No expert

21   can give that opinion.

22         MR. GOHEEN:  I agree with that.

23         THE COURT:  So I mean -- I don't view Mr. Coker's

24   opinions as really inappropriate for consideration at this

25   stage of the proceedings.

1          MR. GOHEEN:  Well, we need to file a *Daubert* motion

2    then because he is not remotely -- he didn't do any homework at

3    all -- I mean, it is clear from his deposition this was a

4    cookie-cutter thing that goes back 10 to 12 years when he was

5    first hired by plaintiff's counsel when FACTA cases just

6    started being filed.  He did no research.

7          Probably one of the funniest things I have ever seen

8    in a deposition before is when he put in his report, well, it

9    is easy to find Jill Altman.  Look what I did.  I just went on

10   the internet and put in Jill Altman, Atlanta, and I found her.

11   Well, yeah, he found Jill Altman.  He didn't find the Jill

12   Altman in this case who lives in Austin, Texas, and not

13   Atlanta.

14         That just is an idea of just how slipshod his work

15   is.  He cannot be relied upon for any purpose, let alone --

16         THE COURT:  What about this business about

17   identifying business transactions and consumer transactions?

18         MR. GOHEEN:  There is no data that would --

19         THE COURT:  Did you depose him about that?

20         MR. GOHEEN:  I don't know that I did because --

21         THE COURT:  It is in his report.

22         MR. GOHEEN:  After he said he wasn't opining on

23   issues on class certification, there was no need to talk about

24   that, Your Honor.  And it is their burden.  And he can't say in

25   an unsworn report that this is -- this I think can happen.

 1    That is just not an appropriate basis for class certification.

 2           THE COURT:  He is not saying that exactly either.  He

 3    is saying that in other cases he has taken this type of data.

 4    And when he has the first six digits of a credit card number,

 5    which presumably you all have produced to him in discovery, he

 6    can determine from those first six digits a variety of

 7    information, including whether or not the card was a business

 8    card or a consumer card.

 9           So I mean, as I mentioned to Mr. Keogh, that to me

10    was one of the biggest hangups I have with the plaintiff's

11    motion here is making that analytical leap.  Because Mr. Coker

12    hasn't connected that dot.  And to me, the issue that is most

13    pressing in my mind is whether the failure to make that

14    connection justifies denying the motion or if it is enough

15    based on Mr. Coker's summary of what he has done in other

16    situations to -- to find that they have met their burden at

17    this point.

18           MR. GOHEEN:  Well, ascertainability is the least of

19    their problems, Your Honor.

20           THE COURT:  Okay.  Let's talk about the other ones.

21           MR. GOHEEN:  Let's definitely talk about the other

22    ones.  They don't have standing.

23           THE COURT:  Okay.

24           MR. GOHEEN:  There is no way in the world they have

25    standing.  It is one thing to hold that based on unpleaded

1   allegations that they have standing.  But they don't have --

2   the facts now are clear.  There is no standing.

3          There was no harm.  There was no injury.  She's

4   admitted she has no actual damages.  She didn't do anything to

5   mitigate the so-called risk of identity theft, which is just

6   nonexistent and made-up anyway.  And that simply isn't the

7   case.

8          In the year 2017, I am aware of one case -- one --

9   that has denied a motion to dismiss in a FACTA case for lack of

10  standing.

11         THE COURT:  Yes.  But unfortunately we have a

12  situation here where the court has already ruled on standing in

13  this case.  And I'm not aware of any binding authority that

14  would require that the court reexamine the earlier decision on

15  standing in this case.

16         MR. GOHEEN:  Absolutely it should.  Standing needs to

17  be -- needs to be met at all stages of the litigation.

18         THE COURT:  What binding authority is there that

19  would allow me at this stage --

20         MR. GOHEEN:  We cited it in our papers.

21         THE COURT:  Excuse me.

22         MR. GOHEEN:  Go ahead, Your Honor.  I'm sorry.

23         THE COURT:  I mean, I would ask that you not

24  interrupt me.

25         MR. GOHEEN:  I apologize.

1          THE COURT:  I know this is important to you and your

2    client.  But let's remember some civility here.

3          MR. GOHEEN:  Thank you, Your Honor.

4          THE COURT:  My question is:  Is there any binding

5    authority that would allow the Court at this point to revisit

6    the Court's prior order finding that Ms. Altman had standing

7    for Article III purposes?

8          MR. GOHEEN:  Well, we cited the *Hutton* case, Your

9    Honor, where there was --

10         THE COURT:  Okay.

11         MR. GOHEEN:  We cited that -- it is Eleventh Circuit,

12   1990 -- where the court in that case denied the motion for lack

13   of standing; said the parties should take discovery and then

14   revisit its standing at the summary judgment stage.

15         THE COURT:  All right.

16         MR. GOHEEN:  I mean, I guess I view this, Your Honor,

17   as no different than any other motion -- I mean, like

18   willfulness, for example.  The Court denied our motion to

19   dismiss on willfulness.  Does that mean we can't now file a

20   motion that there was no willfulness?

21         THE COURT:  No, we're not saying that at all.

22   Because what you're talking about in the *Hutton* case is that is

23   summary judgment.  This is class cert.  Right.  And willfulness

24   is obviously going to be something you're going to argue at

25   summary judgment.

1          And I am not entirely convinced that I can't revisit

2     those issues or even if it is revisiting -- I think it may

3     actually be visiting them properly at summary judgment at the

4     merits.

5          MR. GOHEEN:  Agreed.

6          THE COURT:  But what I'm -- what I'm unclear about

7     and not entirely convinced about is that I can revisit the

8     Article III standing at this juncture given that we have

9     already litigated the motion to dismiss.

10         MR. GOHEEN:  I guess my view of that, Your Honor,

11    would be -- I'm sorry.  Were you --

12         THE COURT:  Go ahead.

13         MR. GOHEEN:  I apologize.  I guess my view of that,

14    Your Honor, would be class certification -- I think it is

15    clear, and I think Your Honor was talking about this with

16    counsel -- is made on a full record.  It is not made on just

17    the pleadings.

18         So the class certification decision necessarily must

19    be assessed upon a very full record.  And part of that full

20    record here is the plaintiff's deposition where she again

21    admitted or her discovery responses -- same thing -- admitted

22    that she has no actual damages.  And that is -- and that is --

23    they are asking 360,000 people who have no actual harm, if as

24    they say they are similarly situated to one another, which I'll

25    get to momentarily, for tens of millions of dollars or up to

1   $360 million in a case where the named plaintiff has had no

2   harm.

3           I can tell you the number of Eleventh Circuit Court

4   of Appeals opinions that have held that is proper -- zero -- in

5   a FACTA case.  There is none.  I mean, that is -- this is a

6   technical violation.  There is no actual harm.  It is admitted

7   there is no actual harm.  This is not what the procedural

8   device of a class action was designed to do.

9           Since the *Meyers* case came down -- that is the

10  Seventh Circuit case in December 2016 -- the first appellate

11  court, in this case the Seventh, to weigh in on FACTA and

12  standing post-*Spokeo* -- as I said, one case has denied a motion

13  to dismiss.  It was in Arizona.  And I think it was February.

14  And then another judge in the same courthouse later did grant a

15  motion to dismiss.  So you have got interdistrict battles going

16  on there.  So this is just not where the law is.

17          So I suppose the answer then would be we'll file a

18  summary judgment motion on standing then if it is not

19  appropriate to assess at the class certification stage.

20  Because I guess our respectful view is it has to be assessed.

21  I mean, that is -- the Eleventh Circuit has held probably time

22  and time again, as we cited in our papers, any analysis of

23  class certification begins with the issue of standing.

24  *Prado-Steiman* being prominent on that.  But there are a number

25  of other cases.

1        So in a case where a claim was untimely, like *Piazza*

2  or I think *Franze* was another one, the Eleventh Circuit held,

3  well, they don't have standing.  Now, we can quibble whether

4  not having -- being expired of the statute of limitations

5  equates to standing.

6        But putting that aside, the Eleventh Circuit

7  certainly seems to suggest, if not outright hold, that this is

8  something that class cert having -- part of that rigorous

9  analysis that was discussed earlier must be assessed on a full

10 record.

11       And that would include what the plaintiff herself

12 says about standing.  We would respectfully suggest that to

13 ignore the plaintiff's deposition testimony would be error in

14 this circumstance.

15       THE COURT:  Let me ask you this.  What information

16 came out of her deposition that was not already readily

17 apparent from the complaint?  For instance, the fact that she

18 had not been -- she was not seeking any damages for actual

19 harm?

20       I mean, that was apparent in the complaint, and I

21 think that that was something that everybody agreed on at the

22 motion to dismiss.

23       What other facts have come to light?

24       MR. GOHEEN:  Well, that she did absolutely nothing to

25 try to mitigate the so-called risk of identity theft.  Not one

1    iota.

2          THE COURT:  That is a good segue to a question I did

3    have.  What relevance does mitigation have to the statutory

4    damages calculation?

5          MR. GOHEEN:  We are absolutely entitled to put on

6    evidence of this plaintiff's action or inaction or errors or

7    omissions or whatever she did after she found out that she had

8    a supposedly noncompliant receipt.  She rushed it over to her

9    brother-in-law to race to the courthouse to file a lawsuit.

10   Those are the facts.  She did not do anything.  She did not --

11   she did not put -- have a fraud alert placed on her file.  She

12   did not change credit cards.  She did not file a police report.

13         The receipt itself had at least two websites and/or

14   phone numbers to say, well, if you have any questions, call

15   this.  Didn't do that.  Didn't contact her credit card issuer

16   at all.  Didn't contact the FTC, which happened to have a

17   contact on her credit card account or monthly statement to say,

18   if you think you've been a victim of identity theft, please

19   call this number or access this website.  She didn't do any of

20   that.

21         She did not do anything.  This is just made up.  I

22   mean -- and the one reason is -- and this was not in her -- in

23   the complaint, by the way.  This has been very important to the

24   cases that have dismissed these cases as they should have at

25   the standing -- at the motion to dismiss stage, including Judge

1    Scola in the case we cited a few weeks or a couple of weeks

2    ago, *Gesten*.

3          The receipt never left her possession other than

4    handing it to her brother-in-law and presumably her other

5    counsel of record.  That has been paramount to the courts that

6    have held because there would be no reason -- there is no way

7    there could be an identity theft if she has gotten the receipt.

8          THE COURT:  But the thing is the statutory damages

9    don't look to whether or not someone's identity was stolen or

10   not; right?

11         MR. GOHEEN:  That is not -- yes, I agree with that.

12         THE COURT:  Yeah.  That is where I'm having a

13   difficult time trying to understand.  Like what you said

14   regarding mitigation makes absolute sense if you were talking

15   about someone who is actually harmed.  We all know Ms. Altman

16   wasn't.

17         And what she and what she is trying to do on behalf

18   of this class is to seek the statutory damages.  You may call

19   it a penalty.  But what I'm still trying to figure out is:  If

20   a jury gets this case, will they hear about what she did or she

21   didn't do after getting the receipt and will they consider that

22   information in determining where in this spectrum of $100 and

23   $1000 the award of damages should fall?

24         MR. GOHEEN:  Absolutely.  I mean --

25         THE COURT:  What authority -- do you have any

1    authority that clearly says that that is what the jury is to

2    consider of mitigation and relevant to statutory damages in a

3    FACTA case?

4          MR. GOHEEN:  We have cited authority that it is

5    relevant in a FCRA case, as well as the influential Judge

6    Wilkinson opinion that concurred in the *Stillmock* case where he

7    said --

8          THE COURT:  Right.  That was a concurrence; right?

9          MR. GOHEEN:  Yes, Your Honor -- where he said -- and

10   cited much more than the original opinion as well.  And what he

11   said in that case was, businesses deserve the opportunity to

12   argue that plaintiffs or class members or whatever the term is

13   did not -- you know, that they should be -- that they should

14   only be entitled to damages at the low end of the range, $100

15   to $1000 at the low end of that range depending on what they

16   did or what they did in reaction to the receipt.  Did they give

17   it to someone, or was there an actual attempt of identity

18   theft, or did they actually make efforts, unlike this

19   plaintiff, to do something about it if they really genuinely

20   felt a fear?

21         We know based on the facts she had no fear.  She

22   couldn't possibly have had that because she didn't do anything.

23   We absolutely would have a right to put on a defense to a case,

24   whether it is an individual case or in the context of a class

25   action.

1           And obviously -- so the Court is aware that the

2    Eleventh Circuit has held time and again that the Rules

3    Enabling Act precludes there being any procedural adjustment in

4    the context of a class action just because it is a class

5    action.

6           So I can't -- I have tried FCRA cases before.  I'm

7    sure Mr. Keogh has as well.  Of course, you are entitled to put

8    on conduct of the plaintiff.  I mean, they are seeking punitive

9    damages too.  Right?  It has got to bear a reasonable

10   relationship.  I mean, that has to be relevant.  If it is

11   relevant to her, well, obviously it has to be relevant and we

12   have to have that right to the other putative class members.

13          I mean, that has to be -- that has to be the law.  I

14   mean, that is just -- I think that just should be black letter

15   law.  But as we quoted in our papers, it is a little hard to

16   imagine that an absent class member would want to tie his or

17   her facts to this plaintiff based on all of that inaction that

18   I just mentioned.

19          I mean, that is very -- you know, others may well

20   have put on a fraud alert, talked to the police, and done

21   something.  Then they would be entitled to -- in the unlikely

22   event they can prove willfulness, they may be entitled to $1000

23   versus the low end of the range.

24          But that I would respectfully suggest is why Congress

25   set a range of $100 to $1000.  So that there can be assessments

1    based on individual circumstances as to whether it should be

2    100, 500, or 1000, or nothing if the -- you know, obviously if

3    willfulness is not proven.  So that is why there is a range as

4    opposed to $500.

5            THE COURT:  I suppose Mr. Keogh is going to probably

6    stand up and say, well, if you believe what Mr. Goheen is

7    saying, you would never have a class certification in an FCRA

8    case because it would be true in any case that mitigation would

9    be relevant and really an individualized type of determination.

10           How would you respond to that?

11           MR. GOHEEN:  Well, I don't -- I guess I can respond

12   on whether that has been raised in a previous FCRA class action

13   as opposed to how clearly it is an issue here.  I mean, I don't

14   know that mitigation has been or has not been accepted by

15   courts in how various courts have assessed Fair Credit

16   Reporting Act or its FACTA component.

17           Class actions -- I mean, chances are there have been

18   other lawsuits that were much more homogenous than this one.

19   But this is just not one of those cases where you have got

20   someone that has gone through this sort of, you know, complete

21   inaction and hired the brother-in-law, which kind of segues

22   into adequacy.

23           This case was -- there is no adequacy of

24   representation.  Again, the Eleventh Circuit has held adequacy

25   must be present at all stages in a class certification,

1    especially when you're talking about 360,000 people, none of

2    whom apparently have any actual harm.  We're going to -- you

3    know, this is going to be proposed and they believe certified

4    based on a sister-in-law and her brother-in-law filing a

5    lawsuit.  That just can't be.

6            I mean, that -- and then the attorney's lien was

7    mentioned.  All that did was lay open the infighting that is

8    going on here.  Clearly, there is going to be -- there is

9    because their Kansas City counsel submitted an affidavit with

10   their reply brief kind of taking to task the brother-in-law and

11   so forth and so on.  So there's clearly issues there that have

12   not been vetted.

13           And I think there is pretty much an admission there

14   that in the Eleventh Circuit a close relationship precludes

15   class certification.  *London* had that.  *Schroder* had that.  We

16   cited other cases from other circuits.  *Zylstra*, which actually

17   is this circuit, the old Fifth Circuit -- it was in '78.  Other

18   cases from other jurisdictions.

19           So it is just a relationship here that it was

20   never -- it was a conflict, to begin with.  Let's put it that

21   way.  There appears to be not much of a dispute about that.

22           THE COURT:  Did the conflict ever really manifest

23   itself?  I mean, was anybody prejudiced by the supposed

24   conflict that you can tell?

25           MR. GOHEEN:  I guess I would answer it two ways.

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1    One, I don't know.  Two, I would respectfully suggest it
2    doesn't matter.  I'm not aware of an Eleventh Circuit case that
3    has said, well, A, you can cure the conflict.  I'm not aware of
4    a case that has said that, which is what they are trying to do
5    here by bringing in other counsel.  And, B, I'm not aware of
6    Your Honor's question where, well, if there is no prejudice to
7    the defendant, well, let's forget about it.

8         I would respectfully suggest -- and this is, of
9    course, as Your Honor knows very clear, a fiduciary
10   relationship that the plaintiff and her counsel occupy
11   vis-a-vis the class.  That goes back to *Kirkpatrick* at least,
12   which was in '87, Judge Kravitch.  So at least that far back,
13   it is a fiduciary relationship.  So that has nothing to do with
14   the defendant.  It just doesn't.  There is nothing in the law
15   that says, well, it is the defendants' issue.

16        The reason for the adequacy requirement is to protect
17   the absent class members.  So if the sister-in-law may try to
18   incentivize or try to maximize the recovery for her
19   brother-in-law at the expense of other class members, well,
20   that's the problem.  We cited the *O'Shaughnessy* case out of
21   Missouri to do exactly that.

22        THE COURT:  Well, I get that.  That was the -- you
23   know, going back to the *London* case, for instance, I mean, that
24   was the big problem there because you had this relationship
25   between stockbroker and his lawyer and all that stuff.

1              MR. GOHEEN:  Right.

2              THE COURT:  The court there was certainly concerned

3     about present conflict of interest and the future conflict of

4     interest.  So where is the present -- is there a present

5     conflict of interest though, or is there the potential for a

6     future one as you see it?

7              MR. GOHEEN:  Yes, Your Honor.  Just because of the

8     attorney's lien issue.  I mean, he --

9              THE COURT:  How does that -- how does that cause a

10    conflict between, you know, Ms. Altman and the rest of the

11    class or these lawyers and the rest of the class?

12             MR. GOHEEN:  I think the answer -- I'm sorry.  I

13    think the question was the future conflict.  If I may answer

14    that, Your Honor.

15             THE COURT:  Yes.

16             MR. GOHEEN:  I would say that there is going to be

17    infighting over fees.  He has injected himself back into the

18    case or reinjected himself into the case if he indeed had never

19    really pulled out, which I don't think he did.  I think he

20    pulled out because plaintiff's counsel told him to.

21             But there is no -- there is no evidence that he is

22    going to go away quietly.  He is still the brother-in-law, as

23    far as I am aware.  It has been a few months since we deposed

24    the plaintiff and everything.

25             Assuming for these purposes they still have the

 1   familial relationship, I don't believe -- to me, the conflict

 2   is still there.  Certainly the potential for conflict for

 3   fighting over attorney's fees, which could then come at the

 4   expense of the absent class members.  Well, you know, we want a

 5   million dollars in attorney's fees.  Well, actually I need to

 6   get another 25,000.  I am Mr. Wexler.  Okay.  We'll take that

 7   out of the common fund.

 8          I mean, to say that those things are purely

 9   hypothetical would be wrong.  Because I'm sure Your Honor has

10   had many occasions and many times where these sorts of things

11   can happen.  I'm not saying they do happen.  But I think the

12   question was where could it come up now or later, and I

13   respectfully suggest that as long as this sort of infighting is

14   out there among plaintiff's counsel, one of whom has a familial

15   relationship with the plaintiff, the only plaintiff, the one

16   who was the only and original counsel of record to begin with,

17   I would suggest that that conflict is out there and it

18   absolutely does not comply with long-held Eleventh Circuit law.

19   They have some pretty stringent Eleventh Circuit cases out

20   there on this.

21          And I would kind of -- the other side of the coin is

22   that she did nothing to kind of vet her current counsel.  I

23   mean, she's not -- I mean, she did nothing to interview them.

24   She said three times in her deposition because I asked her

25   three times:  Did you talk with the firm from Kansas City?  No.

1    Shimshon did.  Did you hire the firm from Kansas City?  No.

2    Shimshon did.  Have you talked to the firm from Chicago?  No.

3    Shimshon did.

4            Even the firm in Atlanta, Mr. Holcombe's firm, had

5    not met anybody until her deposition, which was 21 months into

6    the lawsuit.  They didn't even have an engagement letter.  This

7    is in a proposed nationwide class action.  They didn't even

8    have an engagement letter until March of 2017, 20 months into

9    the lawsuit.

10            I mean, I have never heard of that before.  I have

11    had a few class actions.  To not have -- to not even have a

12    binding engagement letter for 20 months, I think that would

13    suggest the closeness of the relationship was still in play at

14    that point.

15            As the Court held in *London*, the requirement for a

16    stringent examination of the adequacy of the class

17    representative is especially great when as in this case the

18    attorney's fees will far exceed the class representative's

19    recovery.

20            I don't think anybody is going to stand up here and

21    argue that the most you can get is $1000.  They are going to

22    seek many millions of dollars if they get the judgment they

23    wanted.  And that, we would respectfully suggest, falls

24    squarely into *London*.

25            There must be a stringent examination.  I don't think

1   they can -- I don't believe they could surmount any

2   examination.  But I really don't believe they can pass the

3   *London* stringent examination test when their client can only

4   get $1000 and they are going to request millions of dollars, if

5   given the chance.  That is why the *London* court held what it

6   held.

7         Now, the final issue I want to talk about, Your

8   Honor, is superiority.  FACTA/FCRA contains a fee-shifting

9   provision, of course, that allows the prevailing plaintiff to

10  recover her reasonable attorney's fees, if she is successful.

11  Courts everywhere, especially in this circuit, have denied

12  class certification in FACTA cases and other FCRA cases for

13  exactly this reason.

14        In fact, *Guarisma*, which we heard about earlier, one

15  of the bases for denying in that case was exactly that reason,

16  superiority.  Then there is *Leysoto*.  Then there is *Ehren*.

17  Then there is the *Grimes* case.  All from district courts in

18  this circuit.  All of which held that because FACTA has a

19  built-in incentive for individual actions in the form of

20  attorney's fees, as well as punitive damages if it is a

21  particularly egregious violation, they are capable of

22  individual adjudication and should be individually adjudicated.

23        Judge Acker had this to say in *Grimes*, which the

24  *Guarisma* court quoted just three weeks ago to deny

25  certification.  And, in fact, we quoted it as well a few months

1    ago in our brief.  Individual actions are not only feasible,

2    but they are much more manageable than a class action would be,

3    especially where there might be victims in many states.  And

4    that is Judge -- that is Judge Acker in *Grimes* in 2010.

5          Plus, appellate courts have held the same way.  We

6    cited the *Ticknor* case.  That is a case from the Fifth Circuit

7    in 2014.  It affirmed the denial of class certification in a

8    FACTA case because superiority was lacking.

9          Now, here is the key -- here is the key point.  This

10   is what we always hear.  Well, this is a negative value case.

11   No, it is not a negative value.  It can't possibly be a

12   negative value case.  If you're able to get your attorney's

13   fees, it cannot be -- per se, it cannot be a negative value

14   case.  That is what the Fifth Circuit held.

15         And I quote, it is difficult to categorize prevailing

16   plaintiffs whose costs are covered and who are guaranteed more

17   than nominal damages as negative value plaintiffs.  That is the

18   Fifth Circuit.  That is a FACTA case.  It is right squarely on

19   point.  It couldn't be any more on point.

20         And then, finally, there is the problem that I just

21   alluded to a few moments ago of disproportionate recovery.

22   Again, that is *London*.  I think it is undisputed that they are

23   seeking at a minimum 36 million -- and that is 360,000 times

24   100 -- up to 360 million, I guess.  Math isn't my strong suit,

25   but I think that plays out.

1          So -- but I don't think there can be any question

2     that if such a judgment were entered that would be completely

3     out of proportion to the alleged harm sustained by the class

4     members, which, of course, is nonexistent.  They didn't have

5     any alleged harm by their own admission.

6          In the *Ehren* case -- that is the case out of the

7     Southern District -- the court held certifying a class action

8     that would impose annihilative damage where there has been no

9     actual harm from identity theft could raise serious

10    constitutional concerns.  But that is *Ehren*.

11         The Eleventh Circuit held that -- and this is

12    *London* -- that a proposed class action would likely fail the

13    superiority requirement where the defendants' potential

14    liability would be enormous and completely out of proportion to

15    any harm suffered by the plaintiff.

16         I'm sorry, Judge.

17         THE COURT:  Let me ask you about *London*.  I mean --

18    you said it held that.  And a lot of other cases have called

19    that dicta.  Do you think it is a holding?

20         MR. GOHEEN:  Let me answer it this way.  It was in a

21    footnote.  If it is considered dicta, it was then given the

22    beef the very next year by *Klay vs. Humana*, which is a case

23    they actually cited in their brief.

24         So I'll accept Your Honor's characterization of that.

25    You are correct.

1          THE COURT:  It is not mine.  It is just I want to
2     make sure I understand what you are arguing.  If you're arguing
3     it is the holding, I wanted to hear from you.
4          MR. GOHEEN:  You are right about that, Your Honor.
5     If I said otherwise, I apologize to the Court.  I think a lot
6     of courts have held dicta.  It is a long footnote at the end of
7     *London*.  I think it is Note 5.
8          So I don't -- I'm not arguing that point, and I'll
9     accept Your Honor's, you know, view of that.  And I don't
10    disagree with it.  I'm not trying to pick a fight.  I think
11    Your Honor is correct on that.
12         But my point -- but I will say this -- a couple of
13    things.  One is -- and I'll get to *Klay*.  That's the first
14    point.  The second is a lot of courts, including judges in this
15    court, have cited that, dicta or not.  So they have applied
16    *London*.
17         So I don't want to -- you know, whether we call it
18    dicta, a holding, you know, just musings after they have
19    already decided the certification needed to go back anyway and
20    they just decided to continue on -- I mean, whatever we call
21    it, reasonable minds certainly can argue --
22         THE COURT:  It is certainly persuasive to me that the
23    potential liability is something that may in some cases under
24    some circumstances be a factor.  I mean, I think the *Leysoto*
25    decision is probably the starkest example.  You know, you have

```
1    the pizzeria -- mom-and-pop pizzeria where they have -- the
2    business is worth $40,000, and you've got potential liability
3    between 4.6 and 46 million, and you're talking literally
4    pennies if people were able to succeed there.
5             And so your circumstances are different in that y'all
6    are not a mom-and-pop pizzeria.  Nonetheless, the upper end of
7    the statutory damages here is huge.
8             I mean, listening to the news today, I mean, I heard
9    that a number of the states' attorneys general had settled with
10   GM for the ignition switch issue for well under $360 million.
11   And those are situations where people were harmed, killed.
12   This is a case where nobody was apparently harmed, much less
13   killed.
14           MR. GOHEEN:  I agree.
15           THE COURT:  And so there is something that is kind of
16   shocking about a potential remedy that -- but it has been
17   authorized by Congress at the same time.  I know you know, as
18   well as I know, that there are courts that say, well, look, we
19   can deal with this issue later on.  I mean, this may raise
20   constitutional issues, and that can be handled later on.
21   But --
22           MR. GOHEEN:  I agree.
23           THE COURT:  But, you know, try to persuade me with
24   respect to this case as to why I should consider that now.
25           MR. GOHEEN:  I will.  But, first, you never been to
```

1      the Chico's pizza cafe?

2              THE COURT:  Not Chico's.  I've --

3              MR. GOHEEN:  I'm just kidding.

4              THE COURT:  Is it next to the White House Black

5      Market cafe?

6              MR. GOHEEN:  That is all right.  I shouldn't have

7      said that.

8              But in all seriousness, in *Klay* -- the very next year

9      after *London*, the *Klay* court held -- I think this was Judge

10     Tjoflat, as I recall.  This is a quote.  Whether the potential

11     damages available in a class action are grossly

12     disproportionate, not annihilative -- grossly disproportionate

13     to the conduct at issue, close quote, is the most important

14     factor in analyzing whether it is desirable to concentrate all

15     of the claims in one forum for purposes of the superiority

16     analysis.  That is one of the components, I think, under

17     23(b)(3), superiority, whether it is desirable to put all the

18     claims into one forum -- concentrate the claims into one forum.

19             So *Klay* to the extent -- well, I won't go back to

20     that.  I think *Klay* gave the *London* language a lot more beef in

21     that particular instance by just coming right out and saying,

22     this is the most important factor in that component of

23     superiority.

24             And I guess I'll just take a slight frolicking

25     detour.  But in speaking of concentration of claims, why in the

1    world would this court want to burden itself with adjudicating

2    360,000 claims, whether class action or not -- but 360,000

3    claims where none of the named parties even reside in Atlanta?

4            I mean, the named plaintiff lives in Austin, Texas.

5    Chico's -- I keep saying Chico's.  That is the parent company.

6    White House Black Market is in Fort Myers, Florida.  There is

7    no reason, respectfully, to congregate hundreds of thousands of

8    claims in this court on such a flimsy basis.  There is no

9    reason -- that is another superiority component that is just

10   not met here where you have neither party here in the city or

11   this district, I should say, or even in Georgia, for that

12   matter, in terms of its headquarters or citizenship or

13   residence.

14           But in any event, there has been at least two judges

15   in this court that I'm aware of, Your Honor, that have followed

16   *Klay* and *London*, the language we just talked about.  In the

17   *Campos* case we cited in our papers, Judge Duffey denied

18   certification to one of the classes in that case, which

19   actually was brought under the Fair Credit Reporting Act, not

20   FACTA, but another component of the FCRA where the class -- one

21   of the classes, the one he denied, was seeking a class of

22   1 million persons.

23           So as Judge Duffey mentioned there, if certified,

24   that could have had potential liability of $1 billion.  He

25   cited both *Klay* and *London*.  And Judge Duffey held -- I quote

1   again -- here there exists substantial danger that plaintiffs

2   are attempting to obtain a windfall based on minor technical

3   violations.  I would suggest that is right on point to what is

4   going on here, a windfall based on minor violations.

5        Then Judge Batten in the *Hillis* case, which we also

6   cited in our papers, denied the motion for class certification.

7   And there were technical violations of the Credit Repair

8   Organizations Act in that particular case.

9        And in that case, the damages would have yielded --

10  I'm sorry -- if liability was assessed and the class was

11  certified, the liability would have been over $200 million.

12  Judge Batten held, as follows -- and, again, this is language

13  that is spot-on here.  Quote, given that plaintiff has not

14  suffered any economic loss and complains of technical

15  violations and with an eye to the likelihood that class damages

16  would be disproportionately large when compared to defendants'

17  conduct, allowing this action to proceed in class form simply

18  is not superior.

19       So we have Judge Duffey.  We have Judge Batten

20  applying these -- the language of *London* and of *Klay*.  So I

21  would respectfully suggest -- and, first of all, I agree with

22  Your Honor.  There is a Ninth Circuit case called *Bateman*,

23  Seventh Circuit case called *Murray* -- they are not obviously

24  binding on this Court.

25       What we have are language of *Klay*, language of *London*

 1    that says this is the most important thing in this component of

 2    superiority.  Is it grossly disproportionate?  There is no

 3    mention in either case that, well, let's just push this off and

 4    certify class and then let's work on this afterwards.

 5            I mean, that is just nowhere in that particular -- in

 6    those cases is any of that language suggested.  So, you know,

 7    we're not in the Ninth Circuit or the Seventh or a couple of

 8    the other courts.  So --

 9            THE COURT:  Let me ask you about *Hillis* real quick.

10            MR. GOHEEN:  Sure.

11            THE COURT:  If I recall correctly, the statute or act

12    at issue in that case would have imposed strict liability.

13    Does that -- is that a point of distinction?  And if it is a

14    distinction, does it really matter as opposed to here where the

15    plaintiff is going to obviously have to prove willfulness in

16    order to get a recovery at the end of the day?

17            MR. GOHEEN:  Let me see if I can answer it this way,

18    Your Honor, because I understand and I appreciate the question.

19    But let me see if I can answer it this way.

20            If we're not entitled to put on that evidence of the

21    plaintiff, then it is strict liability at some level I would

22    suggest because then it becomes a trial on the defendants'

23    conduct alone.  And that I just -- I am not aware of any case

24    under the FCRA that has ever allowed such a process, whether it

25    is in an individual case or otherwise.

1          So in the pure FCRA/FACTA case, the answer to Your

2     Honor's question is no, it is not a strict liability statute.

3     And defendants, companies should be entitled to make their case

4     as to why there was not a willful violation by focusing on what

5     the plaintiff did, in addition to the whole calculus of the

6     defendants' system and all the other things that Mr. Keogh

7     mentioned at the outset of his remarks to Your Honor.

8          But if all we're going to do is focus on the

9     defendants' conduct, putting aside but not ignoring the serious

10    constitutional due process concerns, I think that would -- that

11    would give rise to, then it becomes very close to a strict

12    liability case in that instance.  And then, you know, the

13    Batten -- sorry -- Judge Batten *Hillis* ruling becomes much more

14    in the -- in the realm of now we really need to be careful.

15    Because if we're just going to try the defendants' conduct and

16    then the defendant is subject to $300 million, you know, where

17    is the due process there?

18          So that, I hope, answers Your Honor's question.  But

19    that is how I would answer it.  I appreciate Your Honor's

20    distinction in that that was a different statute.  There was

21    not -- as in the Judge Duffey case, it was not under the FCRA.

22    So I get it that it was a CROA case.  But depending on how the

23    trial is structured, it really could come into play.

24          THE COURT:  You know, let me ask you about that --

25    about -- going back to the mitigation issue.  So if I

1    understand correctly, willfulness, is the plaintiff's conduct

2    after she receives a receipt relevant to willfulness?

3              MR. GOHEEN:  I believe it absolutely is, Your Honor.

4              THE COURT:  How is that?  Because it seems -- it

5    seems like it might be relevant to determining where in the

6    spectrum of statutory damages an award of damages should fall.

7              But whether or not there is willfulness at all, you

8    are saying that that determination does -- rests in part on the

9    plaintiff's conduct after receiving a non-truncated receipt?

10             MR. GOHEEN:  Your Honor, I guess I would maybe

11   respond this way.  I don't see how willfulness can be judged in

12   a vacuum.  I guess that is how -- and I think I would make that

13   response for any statutory claim -- I mean, of this ilk for any

14   other FCRA claim.  A background screening claim, which is also

15   under the Fair Credit Reporting Act.  Okay.  There was a

16   violation of the -- you didn't get a stand-alone disclosure.

17   This is another Judge Duffey case earlier this year where he

18   dismissed the case for lack of standing.

19             But if there was not an actual harm, we need to

20   determine that.  And I think that absolutely plays into

21   willfulness.  I don't see -- again, it goes back to a trial of

22   the defendants' conduct.  Do we even need a plaintiff?  If we

23   were to stipulate that she received the receipt in May of 2015,

24   is there any need then?  If we're not entitled to put her

25   through cross-examination, is there any need to even have a

1    plaintiff in the case?

2           That is how, I guess, I would respond to that, Your

3    Honor.  Willfulness -- and, of course, we haven't gotten into

4    this yet.  We haven't briefed summary judgment and all that

5    sort of stuff on the specific issue.  I think Your Honor won't

6    be surprised to learn that we strongly will oppose willfulness

7    in this case at the appropriate time.

8           But, you know, certainly we're going to -- I believe

9    there are cases out there that stand for the proposition that

10   this sort of liability is not measured in a vacuum.  And I

11   think I would say this.  I don't believe this is on point to

12   Your Honor's question.  So forgive me and bear with me.

13          But it goes a little bit to the trial and the damages

14   issue.  Statutory damages are intended to be a proxy for actual

15   damages.  The idea was actual damages are hard to -- sometimes

16   actual damages are hard to ascertain.  And therefore there is a

17   substitute remedy given of $100 to $1000 without putting on

18   other -- you know, the sort of proof that sometimes is required

19   for actual damages under the FCRA.

20          And that is why I believe these other issues, what

21   she did afterwards or what she did beforehand -- you know, if

22   she's colluding -- that is not a fair term.  If she and her --

23   and what seems to be clear from her deposition is she was sort

24   of on the lookout for something like this.

25          I'm not saying that necessarily pejoratively.  I'm

1  just saying that she with a brother-in-law and her family -- I

2  think it is very clear from her deposition that they discussed

3  these sorts of things and she was attuned to -- when she got

4  receipts to see if they were compliant with the statute.

5      And once, you know -- once she got the statute {sic},

6  she immediately handed it to her brother-in-law and so forth

7  and so on.  You know, those sorts of facts certainly would be

8  relevant.  Right?  The pre-receipt -- if we're drawing the line

9  of demarcation there.  So all of that I think would go into,

10  you know, I think, the calculus as well.

11      So I believe -- and I believe the case law would

12  support that willfulness is not something to be assessed

13  strictly in a vacuum, that we would have to understand

14  something and the jury would need to understand something about

15  the named plaintiff.

16      So I'm sorry I've been up here a long time, longer

17  than Your Honor hoped.  I apologize for interrupting Your

18  Honor.

19      THE COURT:  This has been very helpful.  You have

20  done a very good job.  Thank you, Mr. Goheen.

21      MR. GOHEEN:  I appreciate that.  The only thing I

22  would say just to wrap up, as Your Honor pointed out, as the

23  *Electrolux* court in the Eleventh Circuit held last year, there

24  is a presumption against class certification just because it is

25  an exception to the usual rule of individual adjudication.

1          We respectfully suggest that the plaintiffs have not

2     overcome that presumption, and we think the motion should be

3     denied.

4          Again, thank you for your time, Your Honor.

5          THE COURT:  Thank you, Mr. Goheen.

6          Mr. Keogh.

7                          ARGUMENT

8          MR. KEOGH:  Thank you, Your Honor.

9          We heard a lot of what counsel believes the law

10    should be, not what it is.  The Supreme Court in *Safeco*

11    discussed willfulness and held it is a knowing or reckless

12    standard.  In discussing the reckless standard, it held it was

13    an objective test of whether a reasonable -- how a reasonable

14    defendant would act.

15         It never discussed willfulness is whether -- in the

16    plaintiff's actions.  I mean, the fact that for half of the

17    situations, it is an objective test even for defendant, which

18    they use saying, well, it doesn't matter if we knew about the

19    law.  It really matters whether -- you know, whether reasonable

20    across the board.

21         Not a single case has allowed mitigation in response

22    to a statutory claim.  Every case counsel talked about as cited

23    in his brief, as we pointed out, sought actual damages.  There

24    is no mitigation.

25         So in willfulness you should --

```
 1            THE COURT:  So let me ask you then, to interrupt you:
 2   So the jury is given the authority by Congress to award
 3   somewhere between $100 or $1000.  How do they make that
 4   determination?
 5            MR. KEOGH:  The degree of willfulness, Your Honor.
 6            THE COURT:  Okay.  And does mitigation -- what
 7   Mr. Goheen is calling mitigation play any part in that?  Does
 8   the conduct of the individual person play any role in the
 9   jury's award of damages?
10            MR. KEOGH:  No, Your Honor.  Because the Supreme
11   Court even held that on recklessness the conduct of the
12   defendant doesn't even play any role as far as whether or not
13   there's reasonable actions.  It is an objective test.  Because
14   in *Safeco*, they reversed the appellate court which held -- it
15   was an insurance company.  And it knew about the law.  And both
16   the district court and appellate court found that it knew about
17   the law and its actions were unreasonable.
18            Well, the Supreme Court said it doesn't matter
19   whether they knew about the law.  It is an objective test.  So,
20   you know, we do need a plaintiff.  And counsel can
21   cross-examine her whether she -- on the date in question she
22   used a card, whether it is a consumer card, if the Court rules
23   that way.  But they can't question her on the mitigation.  Not
24   a single case allows that, despite what counsel wants.
25            And so willfulness goes to the degree.  And as the
```

1    Court alluded earlier too, that, you know, most of the cases

2    talk about if there is a due process concern that is dealt with

3    at the due process stage.  You don't say that you violated it

4    to such a grand scale that we can't hold you liable for class

5    action.

6            And we cited the Supreme Court -- and I think it was

7    Justice Stevens' concurrence -- saying that a class action

8    simply turns -- it doesn't turn a 500-dollar case into a

9    5 million case.  It is just the procedural vehicle.  The

10   Supreme Court had no problem aggregating statutory damages in

11   those cases we cited.

12           And *Klay vs. Humana* certified the class.  You know,

13   the defendant is cherrypicking parts of *Klay* they like.  But at

14   the end of the day, they didn't have a problem certifying the

15   class when they had to show willfulness.  And that is the key

16   here.  It ties into this, as he said, not annihilating damage

17   but disproportionate damages argument.  There's only damages if

18   we show willfulness.  It is not strict liability.

19           So because we have to show willfulness, the Court

20   shouldn't feel sorry for a defendant who willfully violated the

21   law.  And that is *Klay vs. Humana*.  And they granted class

22   certification, or they held that class certification was

23   appropriate.

24           One thing I think I want to deal with very quickly is

25   this venue argument.  This has been litigated for two years.

1   They have never raised venue of whether this case belongs in

2   Florida.  I don't think the class certification -- they didn't

3   even raise it in their briefs.

4        It is just a throw-away argument up here that has

5   been waived and not appropriate, Your Honor.  This Court has

6   jurisdiction.  It has venue.  And they never said otherwise

7   until 20 minutes ago.

8        And in discussing the standing argument and how it is

9   appropriate here, defendant keeps on talking about she didn't

10  suffer identity theft, she doesn't have actual damages, she has

11  no standing because she has no actual damages.  That has never

12  been the test.  That has never been the test pre-*Spokeo*, and it

13  is not the test now.

14       The Supreme Court in *Spokeo* made it very clear you

15  don't need actual damages.  Injury in fact is a distinct legal

16  issue besides economic damages.  And as the Court already ruled

17  in this case, she has sufficient Article III injury in fact.

18  Nothing has changed.

19       Going to counsel's adequacy arguments, one thing he

20  points out is there was no engagement letter until March 2017.

21  Well, that is when we became involved, Your Honor.  We have

22  never done anything in this case without having a written

23  engagement letter first.  Neither myself nor Mr. Holcombe has

24  lifted a finger in this case until we had a signed engagement

25  letter with the plaintiff.

1          So to the extent that Mr. Wexler didn't have one, we

2     rectified that.  Mr. Wexler is not in this case.  There is --

3     as counsel said, he is unaware of a case where you can, quote,

4     hear that.  There are cases holding that family relations are

5     okay.  They are usually frowned upon, but we cited cases

6     allowing them.

7          If you want, I can send you half a dozen in 20

8     minutes saying that once you bring in new counsel you moot the

9     issue because there is no more issue.  You know, counsel talked

10    about infighting of fees.  If the Court holds that Mr. Wexler

11    is entitled to some kind of quantum meruit, the FCRA awards

12    fees in addition to any damages.  So it is not coming out of

13    any class fund.

14          And, Your Honor, to the extent it comes out of any

15    class fund, the court can make one award.  You know, it is not

16    a matter of double-dipping between our fees and his fees or

17    anything like that.  You can have one award and deal with the

18    lien that way where -- you know, I guess what I'm saying is we

19    would be willing for -- that any fees that the court would ever

20    award if it is a common fund issue come out of the same share.

21          So if we petition the court for X percent, those are

22    all fees, however it is divvied up.  So there is no conflict to

23    the class here.  The class gets the same amount of money

24    whether Mr. Wexler receives zero or whatever.

25          THE COURT:  Would Ms. Altman have any say in what

1   amount of fees Mr. Wexler should receive?

2        MR. KEOGH:  No, Your Honor.  And I don't think she

3   has any say on the amount of fees we receive.  It is the

4   court's obligation to figure out what the fees are in a class

5   action.

6        And, quite frankly, in the last -- I don't know --

7   dozen settlements I have done, for the most part anyway, we

8   didn't even get defendant to agree on fees.  It is fees that

9   we'll petition the court for both an incentive award as well as

10  attorney's fees.  So there is no clear sailing.

11       And I would be agreeable to say that.  I'll tell you

12  right now we'll do the same thing in this case.  If there is a

13  settlement, we won't agree for fees or for incentive award.

14  Because objectors look at that and say it is not proper.  And,

15  quite frankly, it doesn't really matter whether defendant

16  agrees or not.  It is what the court believes.  You know, the

17  defendant can agree to pay whatever.  I have never had a judge

18  really care that much, quite frankly.

19       So we would be willing to stipulate that any fees are

20  contingent -- there will be no agreement by defendant for

21  incentive or for fees.  And there will be no clear sailing.

22       So, Judge, once again, most of the discussion was

23  willfulness and the 100 to 1000.  I think I covered that.  For

24  the most part, it is an objective test of the defendants'

25  conduct, which actually helps them in quite a bit of ways.

```
 1              But whether it is 100 or 1000, you know, really what
 2     they are asking you to do is, well, since there is a chance it
 3     might be more than 100, no one should get anything and no one
 4     should get class certified.
 5              It is really throwing-the-baby-out-with-the-bath-
 6     water-type of argument, Judge.  That on the off-chance that
 7     their actions here were so willful that they might be imposed a
 8     greater -- statutory damages more than $100.  Well, no class
 9     should be certified because we acted too willfully and it is an
10     individual issue.  That doesn't make sense.  And not a single
11     case has held that.
12              So, Your Honor, I think I have covered most of the
13     topics.  And I would just ask if you want the cases where they
14     say you can moot the potential conflict I can send them.
15              THE COURT:  We have had plenty of briefing on this so
16     far.  But I appreciate the offer.
17              MR. KEOGH:  Very good, Your Honor.  So unless the
18     Court has further questions, I have nothing else.
19              THE COURT:  No.  I appreciate the argument very much.
20              All right.  I don't think there is anything further.
21     I am going to take this under advisement.  I suspect I'm going
22     to get a ruling out probably early next week if I can.  But I
23     do want to just say for both of you I appreciate very much your
24     argument.  I think that it has been enormously helpful, and it
25     is always good to have, you know, well-prepared lawyers who
```

1    live and breathe this stuff every day of their working career.

2    So I'm very grateful to both of you for that.

3              So thank you.  We can go off the record.  We'll be in

4    recess.

5                        **(The proceedings were thereby concluded at**

6                        **10:18 A.M.)**

C E R T I F I C A T E


UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA


     I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of the United States District Court, for the Northern District of Georgia, Atlanta Division, do hereby certify that the foregoing 55 pages constitute a true transcript of proceedings had before the said Court, held in the City of Atlanta, Georgia, in the matter therein stated.

     In testimony whereof, I hereunto set my hand on this, the 27th day of October, 2017.




                              _____
                              SHANNON R. WELCH, RMR, CRR
                              OFFICIAL COURT REPORTER
                              UNITED STATES DISTRICT COURT